**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
-------------------------------------------------------x
HOWARD TAYLOR,                        )
                                      )
              Plaintiff,              )          Civil Matter No.:
                                      )
        -against-                     )
                                      )          COMPLAINT AND
                                      )          DEMAND FOR JURY TRIAL
JEFFREY GURAL,                        )
                                      )
              Defendant.              )
-------------------------------------------------------x
```

Plaintiff, Howard Taylor ("**Taylor**"), for his complaint against Defendant, Jeffrey Gural ("**Gural**"), alleges as follows:

## INTRODUCTION

1.      Plaintiff, Howard Taylor, brings this action to hold Defendant Gural accountable for his brazen defamatory statements and related tortious conduct intended to damage a rival racehorse owner.

2.      Plaintiff Taylor is a long-time owner of racehorses with a stellar reputation.  Taylor began harness racing when he was 12 years old and experienced success as a driver and a trainer before making a name for himself as an owner.  In the last few decades, Taylor has owned more than one thousand horses, many of which were nationally-ranked stakes-winners.  In addition to his horse ownership, Taylor built a practice as an equine lawyer.

3.      Gural is one of Taylor's competitors.  He also owns racehorses, and he races them at racetracks that he owns, including the Meadowlands Racetrack ("**the Meadowlands**").

4.      Gural has spearheaded a smear campaign intended to undermine, defame, and destroy Taylor's reputation in both the harness racing and equine law industries.  Gural has falsely claimed that Taylor purchased and forced his trainers to supply his racehorses with EPO, a

performance enhancing drug ("**PED**").  There is no more damaging accusation to the reputation of a racehorse owner.

5.    Gural undertook this wrongful campaign to damage a rival and to exact revenge on Taylor for a lawsuit Taylor filed against him several years ago.

6.    The recent smear campaign began on November 3, 2023, when the Meadowlands suspended Taylor (among others) from racing at the Meadowlands effective December 1, 2023.  According to the Meadowlands press release, this ban was the result of "evidence" revealed in an unrelated criminal trial that purportedly tied Taylor to the purchase of a certain PED for racehorses.

7.    Unsatisfied with merely destroying Taylor's ability to race at the Meadowlands, Gural then targeted Taylor's reputation *personally*.  On the same day that he banned Taylor from racing his horses at Meadowlands Racetrack, Gural singled out Taylor as a particularly egregious rule-violator in a widely-circulated industry publication.  (*See* Bill Finley, *After Document Review, Meadowlands Bans 33 Owners/Trainers*, Thoroughbred Daily News (last accessed Dec. 11, 2023 at 9:43 am), https://www.thoroughbreddailynews.com/after-document-review-meadowlands-bans-33-owners-trainers/ (the "**Article**").)  In the Article, Gural stated that Taylor "had to be giving EPO to his trainers to use and not a single trainer picked up the phone and said I have an owner who wants me to use EPO on his horses."

8.    Gural knew that this statement was false.  No disclosed facts in either the Meadowlands press release or the Article supported the outrageous claim that Taylor ever gave EPO to any of his trainers or that Taylor ever instructed even one trainer to *use* EPO on his horses.

9.    Yet despite the lack of factual support for this fabrication, Gural has repeated it multiple times to multiple people, including racehorse owners and people of influence in the horse racing industry.

10.     Gural's false statements are highly damaging to Taylor's horseracing business and his professional and personal reputations.  These false statements led other racetracks outside of New Jersey to impose similar bans on Taylor.  These defamatory statements have also damaged Taylor's relationships with his partners who co-own some of his racehorses.  The defamatory statements have also damaged Taylor's investments in racehorses.

11.     Gural has not stopped at just these falsehoods.  He also falsely told others in the harness-racing industry—without any basis at all—that Taylor assured his trainers that he (Taylor) would serve as their attorney and protect them if they were caught with the illegal substances.

12.     These attacks on Taylor are defamatory, unsupported by any facts, and are intentionally false or were made with reckless disregard for the truth.

13.     Through this suit, Taylor seeks redress for this ongoing, unabated harm.

## PARTIES

14.     Taylor is an individual residing in Philadelphia County, Pennsylvania, and is a citizen of Pennsylvania.

15.     Gural is, upon information and belief, an individual residing in New York county, New York.  Thus, Gural is a citizen of New York.

16.     Gural is the owner of Meadowlands Racetrack and CEO of New Meadowlands Racetrack LLC, which operates Meadowlands.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action based on diversity jurisdiction pursuant to 28 U.S.C. § 1332.

18.     Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred within this District.  In addition, Gural's tortious conduct was targeted at Taylor with the knowledge that the harm from the tortious conduct would

occur in Pennsylvania, where Taylor resides.  The defamatory statements in the Article were published on the Internet and were read by Taylor, among many others, in this District.

<u>FACTS</u>

**I.     Background**

19.     Taylor has earned many accolades in his decades-long participation in harness racing.  In 2010, Taylor was named the Pennsylvania Owner of the Year by the Keystone Chapter of the U.S. Harness Writers Association.  In 2016, Taylor enjoyed one of the most prolific days as an owner in harness racing history when his horses won three major races at the Meadowlands on August 6th: the U.S. Pacing Championship, the Cane Pace, and the Lady Liberty.  Earlier that year, Taylor's horse Control the Moment won the $732,050 Meadowlands Pace.  Taylor has earned millions of dollars each year from racing his horses at the Meadowlands.

20.     Taylor is also one of the preeminent equine law attorneys in the country and frequently represents horse trainers in court and before racing commissions nationwide.

21.     Gural owns and operates the Meadowlands, a harness and thoroughbred racing track in East Rutherford, New Jersey.  Gural regularly races his own horses at the Meadowlands, as well as at other racetracks.  Gural also owns other racetracks, including: Tioga Downs and Vernon Downs in New York State.

22.     Taylor is no stranger to the Meadowlands.  He has raced his horses at the Meadowlands thousands of times and has won almost every major race at the Meadowlands, including the three major races he won on August 6, 2016, the Meadowlands Pace (twice) and the Hambletonian.

23.     Taylor routinely participates in five to six races at the Meadowlands a week.  Due to the improper Meadowlands ban, Taylor can no longer participate in those races.

4

24.     Prior to 2017, Taylor and Gural enjoyed a cordial relationship and even owned horses together.

25.     In 2017, however, Taylor sued Gural following Gural's cancellation of an important Meadowlands stakes race.  Taylor owned a New Jersey-bred horse and had purchased the horse with a partner based on the expectation that the horse could participate in this race, which was restricted to horses bred in New Jersey.

26.     Gural's animosity toward Taylor has only increased over time.  Upon information and belief, this animosity and desire for vengeance ignited the smear campaign at issue in this suit.

## II.     The Fishman Trial

27.     For the last several years, Gural facilitated criminal prosecutions relating to the use of PEDs in the horse racing industry, pointing federal prosecutors to potential violators for further investigation.

28.     Upon information and belief, Gural and his representatives assisted federal prosecutors in the recent prosecution and conviction of Dr. Seth Fishman in New York City.

29.     Dr. Fishman is a veterinarian who was convicted in 2022 of federal crimes related to PEDs and horses (conspiracy to distribute adulterated and misbranded PEDs) in connection with the operation of his business Equestology.  Fishman's associate, Lisa Giannelli, was convicted of the same crimes.[1]

30.     Upon information and belief, Gural suggested that the government investigate Taylor.  Yet critically, Taylor was not named as a defendant.  Moreover, even after the extensive investigation, no law enforcement agency ever charged him (criminally or civilly).

---

[1] Fishman's trial was one of a series of four cases in March 2020, in which over 30 defendants were charged.  Of these defendants, only Giannelli and Fishman, in separate trials, were convicted by juries, and 22 others have plead guilty.  This Complaint refers to both the Fishman and Giannelli trials as "the Fishman trial."

31.     There is only one extremely limited connection between Taylor and the Fishman trial.  One 83-page exhibit that the government entered into evidence in the case against Giannelli purports to be a receipt of products that Taylor's trainers received from Equestology.

32.     In that document, there are a handful of mentions of a product called "BB3," all of which are listed in July of 2018.  While Taylor currently works with dozens of trainers, the few entries relating to BB3 were connected to one particular trainer.  That trainer has never been charged (criminally or civilly) with any wrongdoing in connection with these transactions, either as part of Fishman's trial or elsewhere.

33.     Taylor never ordered or used BB3, nor did he instruct his trainers to order or use BB3.

34.     In any event, BB3 is not EPO.  It is a mimetic peptide that is structurally distinguishable from EPO.

35.     The trial against Fishman went on for eleven days with dozens of witnesses and hundreds of exhibits.  None of these witnesses or documents, nor those used in the Giannelli trial, implicated Taylor in any way in providing PEDs to his horses.  Based solely on those few references to "BB3" in one document, Gural fabricated his assault on Taylor's character, including his claim that Taylor routinely gave his horses EPO.  Gural continues to publicize these falsehoods knowing that nothing at the Fishman trial provided any substantiation for his malicious and demonstrably false claims against Taylor.

## III.    The Meadowlands Press Release

36.     On Friday, November 3, 2023, the Meadowlands published a press release (the "**Press Release**") listing 33 individuals excluded from racing at Meadowlands effective December 1, 2023—including Taylor.

37.    The Press Release noted that, "among the volumes of evidence introduced by the US Attorney in the prosecution of [the Fishman/Giannelli cases] are trial exhibits, offered in open court and now available to the public, which reveal the identity of numerous persons who have purchased prohibited substances – BB3 (EPO) or TB-7 Thymosyn (sp)."  The Press Release contained a list of ten individuals identified as purchasers of BB3, including Taylor.

38.    The Press Release continued:  "This remains a serious matter. Consequently, the Meadowlands is conducting its own internal investigation given these revelations. And until that investigation is completed, the Meadowlands has determined that all individuals listed below will be placed on the Meadowlands exclusion list."  That exclusion became effective December 1, 2023.

39.    The Press Release stated further:

> We believe this timeframe will also allow owners, should they choose, an opportunity to change trainers and/or horses in partnership with excluded owners. We anticipate the Meadowlands investigation will be time consuming. We also expect that additional disclosures will be released, and if so, where warranted, the Meadowlands will act on that information. We will also require that any change of trainers or dissolution of any partnerships with excluded owners will require proof to the satisfaction of The Meadowlands.

40.    Taylor was the only owner included on the "BB3 list" who owned horses in partnership with others.  As such, the admonition that owners should "change trainers and/or horses in partnership with excluded owners" was directed at Taylor and intended to disrupt Taylor's relationships with his partners.

41.    The Press Release concluded:  "We believe these steps are warranted per the revelations from the above prosecutions and are necessary in the interest of the industry we all love and wish to preserve."

**IV.      The Thoroughbred Daily News Article**

42.      The same day the Meadowlands issued its Press Release, Gural expanded his allegations against Taylor in the Article.

43.      The Article repeated the substance of the Press Release, noting that the excluded individuals included "trainers and owners who had purchased banned substances from individuals who were charged with manufacturing and selling performance-enhancing drugs."

44.      The Article further highlighted that "[w]hile the evidence against Fishman was enough for him to be sentenced to 11 years in prison, the government's case did not shed much light on who was buying what from Fishman and his company."

45.      The Article then quoted Gural as stating that "[i]t's sad because there are people who had no choice but to cheat."

46.      Gural then specifically and intentionally defamed Taylor:

> What's really sad is Howard Taylor.  He's not a trainer, he's an owner.  He had to be giving EPO to his trainers to use and not a single trainer picked up the phone and said I have an owner who wants me to use EPO on his horses.  He has 150 horses and he uses a lot of trainers.  You would have thought at least one trainer would have picked up the phone and told us what's going on.

47.      Gural knew, or was reckless in not knowing, that his statements about Taylor in the Article were false.  Nothing in the Article, or elsewhere, supported Gural's allegation that Taylor either used or forced his trainers to use EPO on his racehorses.  While the Press Release and the Article suggest that such evidence emerged from the Fishman trial, neither the Press Release nor the Article detail any such evidence.

48.      More specifically, the only link between Taylor and the Fishman trial is the lone exhibit that reflects a handful of July 2018 orders of a substance called BB3 by one of Taylor's

trainers.  But this exhibit does not in any way support the statements that *Taylor was giving EPO to his trainers to use on Taylor's horses and that he was instructing them to do so*.

## V.      Defamatory Remarks in Furtherance of the Smear Campaign

49.      On the heels of the Press Release and the Article, Gural continued his smear campaign against Taylor by further amplifying his false claims that Taylor was directing the use of EPO on his racehorses.

50.      Gural knew that he had no factual support for his false and increasingly damaging accusations.  Gural knew that the lone exhibit from the Fishman trial did not come close to showing that Taylor told his trainers to purchase and give his horses EPO.  Nevertheless, despite knowing his statements to be false, Gural pursued his crusade to spread false and defamatory statements about Taylor.

51.      For example, Gural repeated false accusations of Taylor administering EPO to his horses in conversations with individuals of influence and power in the racehorse industry, including leadership of the Standardbred Owners Association of New Jersey ("**<u>SBOA</u>**").

52.      The SBOA is a state-funded organization that represents horse owners in securing contracts with the two racetracks in New Jersey, Freehold and Meadowlands.

53.      On November 3, 2023, Gural participated in a conference call with a few of his associates and three of the SBOA's Board of Directors members (the SBOA's president, vice-president, and treasurer).  The purpose of the call was to discuss negotiations for horse owners with the Meadowlands.

54.      Gural used this call as an opportunity to further defame Taylor before a prominent and influential group of industry leaders.

55.     During this call, Gural repeated his claim that Taylor provided EPO to his trainers and instructed them to use it on his horses.  He added that Taylor also assured his trainers that he (Taylor) would represent them successfully if they were caught.

56.     These statements are false and unsupported, and Gural knew that they were false or recklessly disregarded the truth of the statements when he made them.

57.     Upon information and belief, Gural has also told others in the industry that "nobody can own as many horses as Howard does."  Through this statement, Gural implied that Taylor does not actually own his horses, but rather is improperly "fronting" for other people who could not receive a license.

## VI.     Taylor's Damages

58.     Gural's smear campaign is ongoing and continues to cause Taylor damages, including but not limited to reputational harm, humiliation, embarrassment, mental suffering, shame, and emotional distress.

59.     Gural's campaign is aimed directly at Taylor's professional abilities.  Gural has purposefully embarrassed Taylor by falsely accusing him of engaging in improper and unethical conduct.

60.     The reputational damage to Taylor is far-reaching.  For example, on November 29, 2023, the Commissioner of Ohio's State Racing Commission called Taylor and reported that the Commission had received inquiries from Ohio residents about why Taylor is being allowed to race in Ohio given Gural's allegations against him.

61.     Moreover, approximately 80% of Taylor's horses are owned jointly with partners. Taylor's partnerships and relationships with trainers are at risk of collapse because the Meadowlands ban explicitly applies to partners trying to race horses jointly owned with Taylor.

10

Since the Press Release and the Article, Taylor's partners inquired whether they would need to sell the horses or buy out Taylor's share.

62.     Taylor has also suffered financially.

63.     Taylor substantially invested in his horses in order to race them at the specific types of races from which he is now banned.  When Taylor decides to purchase a horse (or a stake in a horse), part of the calculation is the anticipated proceeds from the races for which that particular horse would qualify.  In reliance on several lucrative Meadowlands races, Taylor purchased horses that now will be unable to race in the precise events for which Taylor purchased and trained them.

64.     Moreover, as a result of Gural's conduct, Taylor has likely lost potential winnings from the Meadowlands races from which he is now banned.  Taylor has historically won millions of dollars through racing his horses at the Meadowlands.

65.     Two other racetracks, Buffalo Raceway and Batavia Downs, have also banned Taylor from racing.  Upon information and belief, these racetracks banned Taylor as a result of Gural's defamatory statements.  Because of Gural's tortious conduct, Taylor will also lose both the investments he made in reliance on these races as well as the potential earnings.

66.     Gural's smear campaign, premised on demonstrably false facts, is ongoing and continues to cause Taylor damage to his reputation both as a horse owner and also as a lawyer and expert in equine law.

## FIRST CAUSE OF ACTION
(Defamation *per se*)

67.     Taylor incorporates by reference paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68.     Gural published statements that falsely attribute unethical and criminal conduct to Taylor, falsely impugn his integrity and honesty, and ascribe to him character and conditions that

would adversely affect the proper conduct of his lawful profession both in horseracing and in the legal profession.

69.     Specifically, in the Article, Gural states that Taylor "had to be giving EPO to his trainers to use."

70.     Gural then repeated these false claims in a November 3, 2023 telephone conversation with the three directors of the SBOA Board of Directors.  During that call, Gural stated that not only was Taylor giving EPO to his trainers, he was instructing them to use it on his horses, and assured the trainers that if they were to get caught, Taylor would successfully defend against any actions.

71.     The statements described above impugn Taylor's reputation in both his profession as a racehorse owner as well as an attorney.

72.     Moreover, these statements accuse Taylor of being unfit in his profession, acting illegally and/or coercing trainers to act illegally, and improperly trading on his credentials as an attorney in order to use banned PEDs on his racehorses for personal gain.

73.     The thrust of the defamatory statements is that Taylor is unfit as a business partner, horse owner, and lawyer.  Recipients and readers of these statements understood their defamatory meanings.

74.     These statements were false when made.  Taylor did not give EPO to his horses or instruct his trainers to do so.  Nor did Taylor tell his trainers that he would successfully defend them as their attorney if they were caught giving EPO to his racehorses.

75.     Gural made these statements  with actual knowledge that such statements were false or, at least, in reckless disregard of their falsity.

76.     As to the EPO claims in the Article, Gural knew (or was reckless in not knowing) these statements were false.  The Article cited a criminal prosecution, but the lone exhibit tied to Taylor in that criminal prosecution did not substantiate a claim that Taylor was giving his trainers EPO to use.  Taylor was not named as a defendant nor did he have any action brought against him by law enforcement.

77.     Indeed, as Gural knew because of his connection to the Fishman trial, the only mention of Taylor in the Fishman trial was with respect to one exhibit that showed that *one* trainer associated with Taylor (out of many of Taylor's trainers) purchased BB3 in July of 2018.  That exhibit did not show that Taylor told his trainer to purchase and give his horses EPO.

78.     Gural also did not have any grounds on which to state that Taylor told his trainers he would defend them if they were caught giving his racehorses EPO.

79.     Gural knew his defamatory statements to be false when he made them, had a high degree of awareness of their probable falsity, or otherwise had a reckless disregard of whether or not they were false, such that they were made with actual malice.

80.     Gural's statements were also made with ill will and/or an evil motive.

81.     Gural had no privilege or authorization to publish the false and defamatory statements about Taylor.

82.     Gural's statements are defamatory *per se* and Taylor need not prove monetary harm resulting from their publication as a component of his claim.

83.     Nevertheless, Taylor has suffered actual compensatory harm to his reputation and standing in the community by reason of Gural's defamatory statements.

84.     Taylor is entitled to recover punitive damages in an amount to be determined at trial.

85.     By reason of the foregoing, Taylor seeks judgment in an amount to be determined at trial, but which exceeds $150,000, exclusive of interests and costs.

## SECOND CAUSE OF ACTION
(Defamation)

86.     Taylor incorporates by reference paragraphs 1 through 85 of this Complaint as if fully set forth herein.

87.     Gural published statements that attribute untruthful, unethical, and criminal conduct to Taylor, falsely impugn his integrity and honesty, and ascribe to him character and conditions that would adversely affect the proper conduct of his lawful profession.

88.     Specifically, in the Article, Gural states that Taylor "had to be giving EPO to his trainers to use."

89.     Gural then continued to repeat these false claims in a November 3, 2023 telephone call with several directors of the SBOA Board of Directors.  During that call, Gural repeated the defamatory claim that Taylor was giving EPO to his trainers and instructing them to use it on his horses.  Gural also falsely stated that Taylor assured the trainers that if they were to get caught, Taylor would represent them as their attorney to successfully defend against any proceedings.

90.     Gural's statements were intentionally disseminated in a publication known to a wide audience of horse racing fans, enthusiasts, and professionals, specifically Taylor's acquaintances, friends, peers, competitors, news reporters, industry regulatory bodies, and other public outlets.

91.     The statements described above impugn Taylor's reputation in both his profession as a racehorse owner as well as an attorney.  Moreover, these statements accuse Taylor of being unfit in his profession, acting illegally and/or coercing trainers into acting illegally, and improperly

trading on his credentials as an attorney in order in use banned PEDs on his racehorses for personal gain.

92.     The thrust of the defamatory statements is that Taylor is unfit as a business partner, horse owner, and lawyer.  Recipients and readers of these statements understood their defamatory meanings.

93.     The statements described above also expose Taylor to public contempt, aversion, and disgrace.

94.     These statements were false when made.  Taylor did not give EPO to his horses or instruct his trainers to do so.  Nor did Taylor tell his trainers that he would successfully defend them as their attorney if they were caught giving EPO to his racehorses.

95.     Gural made these statements maliciously, with actual knowledge that such statements were false or, at least, in reckless disregard of their falsity.

96.     As to the EPO claims in the Article, Gural knew (or was reckless in not knowing) these statements were false.  The Article cited a criminal prosecution, but the lone exhibit tied to Taylor in that criminal prosecution did not substantiate a claim that Taylor was giving his trainers EPO to use.  Taylor was not named as a defendant nor did he have any action brought against him by law enforcement.

97.     Indeed, as Gural knew because of his connection to the Fishman trial, the only mention of Taylor in the Fishman trial was with respect to the exhibit of receipts that showed that *one* trainer associated with Taylor (out of many of Taylor's trainers) purchased BB3 in July 2018. That exhibit did not show that Taylor told his trainer to purchase and give his horses EPO.

98.     Gural also did not have any grounds on which to state that Taylor told his trainers he would defend them if they were caught giving his racehorses EPO.

99.     Gural knew his defamatory statements to be false when he made them, had a high degree of awareness of their probable falsity, or otherwise had a reckless disregard of whether or not they were false, such that they were made with actual malice.

100.    Gural had no privilege or authorization to publish the false and defamatory statements about Taylor.

101.    The damage to Taylor's otherwise decades-long stellar and flawless reputation is far-reaching, including complaints from Ohio residents to the Commissioner of Ohio's State Racing Commission as to why Taylor should be allowed to race given these allegations levied against him.

102.    Taylor has also suffered, and continues to suffer, financial harm as a result of Gural's manufactured scandal.

103.    A vast majority—nearly 80%—of Taylor's horses are owned jointly with partners These partners are now prohibited from racing horses jointly-owned with Taylor at the Meadowlands banned races.

104.    The risk of these partnerships collapsing has already begun materializing.  Taylor has received phone calls from his partners inquiring whether they would need to sell the horses or buy out Taylor's shares in order to race these horses.

105.    Taylor substantially invested in his horses based on the anticipation of racing them at the Meadowlands.  Several of these horses are now unable to race for the exact events for which Taylor purchased and trained them.

106.    Due to Gural's conduct, Taylor also lost the potential winnings from the Meadowlands races from which he is now banned, which historically have yielded millions of dollars in winnings.

107.    Gural's publication of defamatory statements also limited Taylor's opportunities beyond the Meadowlands itself, including a ban from racing at Buffalo Raceway and Batavia Downs.  Taylor will lose the investments he made in reliance on those races and the potential earnings associated with those races.

108.    The defamatory statements set forth herein have directly and proximately caused Taylor to suffer significant damages, as outlined herein, including damage to his reputation, humiliation, embarrassment, mental suffering, shame, emotional distress, monetary losses, and disappointment of a reasonable expectation of gain.

109.    Taylor is entitled to recover punitive damages in an amount to be determined at trial.

110.    By reason of the foregoing, Taylor seeks judgment in an amount to be determined at trial, but which exceeds $150,000, exclusive of interests and costs.

### THIRD CAUSE OF ACTION
(Trade Libel)

111.    Taylor incorporates by reference paragraphs 1 through 110 of this Complaint as if fully set forth herein.

112.    Gural published knowingly false and deceptive statements, as described herein, regarding Taylor and his business operations—both as a horse owner and as a lawyer.

113.    Gural's statements in the Article that Taylor "had to be giving EPO to his trainers to use," which he repeated to the several of the SBOA Board of Directors on a November 3, 2023 conference call, were intended to and in fact did harm Taylor and his business.

114.    Similarly, Gural's assertions in this SBOA conference call, that Taylor told his trainers he would defend them successfully if they were caught with PEDs, were intended to—and did in fact—harm Taylor and his business.

115.    Gural's false and deceptive statements have damaged Taylor's horse owning business's goodwill, impacted his existing relationships with his professional peers, and impacted the business's reputation in the industry.

116.    Taylor has already received calls from his partners as to the implications of the Meadowlands ban on their ability to conduct business and inquiring as to whether they needed to sell the horses or buy Taylor out.  Critically, nearly 80% of Taylor's horses are jointly owned with partners.

117.    Specifically, Gural's statements that Taylor gave EPO to his trainers to use impugn the quality of Taylor's race-horsing business, tainting it with claims of illegal activity.  These statements go directly to the quality of Taylor's race-horsing business activity.

118.    Gural also spread disparaging, false, and incorrect statements of fact regarding the nature, characteristics and qualities of Taylor's legal practice and law firm business by intimating that Taylor trades on his professional license, experience, and status to sanitize illegal conduct. These statements implicate Taylor's ethical standing as a lawyer and impugn his ability to conduct his legal practice and law firm.

119.    Gural publicized these false and deceptive statements regarding Taylor with the intent that his false and deceptive statements cause harm to Taylor's business's interests (including without limitation the business's commercial and pecuniary interests).  In the alternative, Gural should have reasonably known that these defamatory statements would result in pecuniary losses for Taylor's business.

120.    Gural was further aware that by repeating these statements to industry leadership, notably through his conversation with the SBOA, he would harm Taylor's business's reputation.

121.     Gural's disparaging, false, and incorrect statements concerning Taylor's business were made without privilege or justification.

122.     Gural's statements are material in that they are highly likely to influence Taylor's business prospects.  Specifically, Taylor's partners in horse ownership already expressed concern with partnering with him on horse deals.

123.     Moreover, Taylor has routinely participated in five to six races at the Meadowlands a week.  He is currently banned from such races.  Upon information and belief, the statements also influenced Batavia Downs and Buffalo Raceway to ban Taylor.

124.     As a result of Gural's disparaging, false, and incorrect statements, Taylor's business suffered and continues to suffer direct pecuniary loss as detailed above.

125.     At all times relevant, Gural made the disparaging, false, and incorrect statements concerning Taylor's business knowing the falsity and incorrectness of the statements or acting in reckless disregard of the truth, falsity, correctness, or incorrectness of the statements.

126.     By reason of the foregoing, Taylor seeks judgment in an amount to be determined at trial, but which exceeds $150,000, exclusive of interests and costs.

**FOURTH CAUSE OF ACTION**
(False Light)

127.     Taylor incorporates by reference paragraphs 1 through 126 of this Complaint as if fully set forth herein.

128.     Gural placed Taylor in false light through his false statements, as detailed herein. These false statements include:

- Gural's statement in the Article that Taylor "had to be giving EPO to his trainers to use";

- Gural's statement that Taylor assured his trainers that if they were to get caught, Taylor would represent them as their attorney to successfully defend against any actions; and

- Gural's claim that "nobody can own as many horses as Howard does," suggesting that Taylor does not actually own his horses, but rather is fronting for other people who could not receive a license.

129.    In addition to these defamatory statements, Gural continued to cast Taylor in a false light by repeating these false accusations to others in the industry, including the SBOA's Board of Directors.

130.    Gural's smear campaign, premised on demonstrably false facts, is ongoing and continues to cause Taylor damages, including but not limited to reputational harm, humiliation, embarrassment, mental suffering, shame and emotional distress.

131.    Gural designed this campaign to target Taylor's professional abilities, and has successfully impugned Taylor's reputation and caused Taylor great embarrassment.

132.    Taylor owns approximately 80% of his horses in partnership with other owners. The Meadowlands ban explicitly applies to partners trying to race horses jointly owned with Taylor.  Since the Press Release and the Article, Taylor has already received calls to discuss how to address this ban and whether the partners should sell the horses or buy Taylor's share in them. These horses will be unable to race in the banned Meadowlands races so long as Taylor is associated with them.

133.    This reputational damage exceeds the local market.  On November 29, 2023, the Commissioner of Ohio's State Racing Commission reported a series of complaints made to the

Commission by local residents contesting Taylor's ability to race given the allegations brought against him.

134.    Not only does Taylor continue to suffer reputational damage and distress, he has also suffered financially.

135.    In making investment decisions, Taylor chose horses based on his calculation of the anticipated proceeds from the races for which a given horse could qualify.  As the Meadowlands races are highly lucrative, Taylor substantially invested in several horses in reliance on their participation in those races.  Given the ban, several horses he purchased will now be unable to race in the events for which they were chosen and trained.

136.    Taylor also lost the potential earnings from the races from which he is now banned. In the past, Taylor 's horses have won millions of dollars in these events.

137.    Gural's defamatory statements also influenced Taylor's ban from racing at two other tracks, Buffalo Raceway and Batavia Downs.  These bans caused Taylor the additional loss of his investments in reliance on participating in those events and the potential earnings he could have received.

138.    The false light created by Gural's accusations and statements about Taylor would be highly offensive to a reasonable person.

139.    Gural knew that his publication of falsehoods about Taylor would create a false and highly unfavorable impression of Taylor in the eyes of his peers, friends, industry colleagues, regulators, and the public at large as both a potentially criminal actor and an unethical attorney. Gural nevertheless published his accusations in the Article and repeated them to industry leaders, among others, in conscious disregard of the truth.

140.    Gural's statements, as detailed herein, were false statements of fact which placed Taylor in a false light before the public.  Gural also knew these statements to be false or was reckless in not knowing they were false.

141.    As to the EPO claims in the Article, Gural knew (or was reckless in not knowing) these statements were false.  The Article cited a criminal prosecution, but the lone exhibit tied to Taylor in that criminal prosecution did not substantiate a claim that Taylor was giving his trainers EPO to use.  Taylor was not named as a defendant nor did he have any action brought against him by law enforcement.

142.    Indeed, as Gural knew because of his connection to the Fishman trial, the only mention of Taylor in the Fishman trial was with respect to the exhibit of receipts that showed that *one* trainer associated with Taylor (out of many of Taylor's trainers) purchased BB3.  That exhibit did not show that Taylor told his trainer to purchase and give his horses EPO.

143.    Gural also did not have any grounds on which to state that Taylor told his trainers he would defend them if they were caught giving his racehorses EPO.

144.    In the alternative, the false and defamatory statements have placed Taylor in a false light before the public in that they are capable of being interpreted as reflecting upon Taylor's reputation and/or character in a manner that: (1) injures Taylor's reputation and/or exposes Taylor to public hatred, ridicule, shame, or disgrace; and (2) adversely affects Taylor's trade, profession and/or business.

145.    Gural placed Taylor in a false light before the public and proximately caused injury to Taylor's personal reputation, professional reputation, and/or credibility as a horse owner and as a lawyer.

146.     Specifically, the statements have caused Taylor to suffer damages and harm including, but not limited to, loss of his personal and professional reputation; loss of his business opportunities; loss of potential profits in racing at the Meadowlands, particularly given past performance; loss of potential and existing business relationships, given the application of the ban to horses co-owned with Taylor and trainers associated with Taylor; limitations in future business prospects; imputation of dishonesty and immorality to his personal and professional character; and emotional distress, embarrassment, mental anguish, and personal humiliation.

147.     Taylor is entitled to recover punitive damages in an amount to be determined at trial.

148.     By reason of the foregoing, Taylor seeks judgment in an amount to be determined at trial, but which exceeds $150,000, exclusive of interests and costs.

**FIFTH CAUSE OF ACTION**
(Tortious Interference with Contractual Relationships)

149.     Taylor incorporates by reference paragraphs 1 through 148 of this Complaint as if fully set forth herein.

150.     Gural tortiously interfered with Taylor's contractual relationships with trainers as well as business partners.

151.     Taylor co-owns horses with over 70 partners, including:

- Let it Ride Stable

- Order By Stable

- Deo Volante Farm

- Dylan Davis

- Robert Cooper

- Edwin Gold

- Chuck Pompay

- Abraham Basen

- Joel Bauson Stables Inc.

- Burke Racing Stable LLC

- Weaver Bruscem LLC

- Elizabeth Novak

- Odds On Racing

- Adriano Sorella

- David Roving LLC

- VIP Internet Stable LLC

- Judith Taylor

- Gary Wedelman

- Holy Lane Stud East LLC

- Brixton Medical AB

- Curtis Daniels

- Crawford Farms Racing

- James A. Crawford

- Triple D Stables Inc.

- Donald Robinson

- Michael Robinson

- Rising Stein Stables LLC

- William Hartt

- Falcon Racing LLC

- Michael P. Hall

- KDP Stable LLC

- CTC Stable

- Bottom Line Racing LLC

- HO Racing Inc.

- Jeffrey Billings

- Bradley Grant

- Thomas Jackson

- William T. Mullin

- Christopher Zazo

- Jenna Cornelison

- Robert Cleary

- Lawrence Rosen

- Enviro Stables Ltd.

- Andy Miller Stable Inc.

- Jean A. Goehlen

- Panda Monium Stable

- Caviart Farms

- Rick Zeron Stables

- Hutt Racing Stable

- Michael A. Anderson

- Patrick J. Hoopes

- One Legend Stable Inc.

- Michael Reroon

- Raymond W. Scanittker

- Thomas Spatorico

- Theodore Gewertz

- James H. Walker

- Zerow Donato Stable

- Rojan Stable

-  N Taktor Stable

- Jerry Silva

- Shannon DePinto

- Chris Aru

- Country Club Acres Inc.

- Joe Sbrocco

- Acadia Farms

- JAF Racing

- Mac T. Nichol

- Fiddlers Creek Stables

- Pellpac AB 260-93

- Carl T. Howard

- JB Racing

152.   Gural was aware of these contractual relationships.

153.   Because the Meadowlands ban explicitly applies to any trainers and horses that are jointly-owned with Taylor, Taylor's partnerships are now at risk of collapse—all as a result of Gural's wrongful ban and defamatory conduct.  Taylor has already received phone calls from partners inquiring whether they would need to sell the horses or buy out Taylor's share.  Moreover,

these jointly owned horses will not be able to race at the Meadowlands races so long as the improper ban is in effect.

154.    Indeed, Taylor was the only owner on the Press Release's "BB3 list" who owned horses jointly with partners.  The admonition that owners should reconsider their partnerships with those on the Press Release's banned list was therefore intended to directly target Taylor and encourage his partners to divest from co-ownership with Taylor.

155.    Gural intentionally and maliciously interfered with the Taylor's contracts with these partners by falsely publicizing that there was evidence from the Fishman criminal prosecution that Taylor directed his trainers to purchase EPO and give it to his horses.

156.    Based on these improper and defamatory statements, Gural intentionally and maliciously interfered with the contracts between Taylor and these partners, inducing Taylor's partners to terminate their co-ownership with Taylor.

157.    There was no legitimate justification for these false, misleading, and defamatory statements.  Gural intended to harm Taylor by preventing him from continuing his contracts with over 70 partners.  Upon information and belief, Gural sought to preserve his competitive advantage over Taylor as well as to seek revenge for Taylor's prior lawsuit against Gural.

158.    Gural's malicious interference with Taylor's business relationships is causing and will continue to cause Taylor to suffer significant financial harm.  The risk of Taylor's partnerships collapsing has already begun materializing.  Taylor has received phone calls from his partners inquiring whether they would need to sell the horses or buy out Taylor's shares in order to race these horses.

159.    Gural's intentional and unlawful acts have caused Taylor harm by damaging his reputation and inducing his partners to disassociate from horse ownership with Taylor.

160.    Together these defamatory acts are denying and will continue to deny Taylor substantial potential revenue.

161.    By interfering with Taylor's business relations through defamatory means, as detailed herein, Gural did not act with privilege.

162.    Gural's conduct was likewise without justification as his conduct was defamatory, motivated by a years-long grudge borne out of Taylor's litigation with Gural.

163.    By reason of the foregoing, Taylor seeks judgment in an amount to be determined at trial, but which exceeds $150,000, exclusive of interests and costs.

## SIXTH CAUSE OF ACTION
### (Unfair Competition)

164.    Taylor incorporates by reference paragraphs 1 through 163 of this Complaint as if fully set forth herein.

165.    Gural has caused harm to Taylor's commercial relations through his defamatory statements and tortious interference with Taylor's prospective and existing business relationships such that Gural's actions constitute an unfair method of competition.

166.    These actions have caused Taylor's business to suffer while benefitting Gural's business, which is a competitor in the same market.

167.    Gural's defamatory statements and improper ban of Taylor harmed and continue to harm Taylor's commercial interests by prohibiting him from continuing his business relationships and partnerships with others in connection with racing at the Meadowlands.  Taylor's inability to participate in Meadowlands races benefits Gural as a competitor.

168.    Gural's defamatory statements and improper ban of Taylor also harmed Taylor's commercial interests by devaluing Taylor's investment in horses that can no longer participate in certain races.

169.    Finally, Gural's defamatory statements have influenced other racetracks to ban Taylor and eliminate competition for Gural's racehorses.

170.    The statements describe above impugn Taylor's reputation in both his profession as a racehorse owner and as an attorney.

171.    Gural has performed, and continues to perform, these acts with malice.

172.    By reason of the foregoing, Taylor seeks judgment in an amount to be determined at trial, but which exceeds $150,000, exclusive of interests and costs.

## PRAYER FOR RELIEF

WHEREFORE, Taylor prays for the entry of judgment in this Court:

(i)     An award of compensatory, special and punitive damages in amounts to be established at trial;

(ii)    Injunctive relief prohibiting the publication or republication of the defamatory statements detailed herein;

(iii)   An award of Taylor's costs associated with this action, including but not limited to his reasonable attorneys' fees and expenses; and

(iv)    Such other and further relief as this Court deems just and proper to protect Taylor's rights and interests.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Taylor demands a trial by jury of all claims in this Complaint so triable.

Dated:   New York, New York
          December 11, 2023                     Respectfully submitted,


                                   _/s/:  Catherine Yun, Esq._
                                   Michael B. de Leeuw (*pro hac vice forthcoming*)
                                   Tamar S. Wise (PA State Bar ID: 307851)
                                   COZEN O'CONNOR
                                   3WTC
                                   175 Greenwich Street, 55th Floor
                                   New York NY 10007

212-908-1331
MdeLeeuw@cozen.com
TWise@cozen.com


Catherine Yun (PA State Bar ID: 324382)
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
215-864-8021
Cyun@cozen.com

*Attorneys for Plaintiff*