**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HOWARD TAYLOR, | CIVIL ACTION |
| Plaintiff, | |
| | No.: 2:23-cv-04882-JHS |
| v. | |
| JEFFREY GURAL, | |
| Defendant. | |

**MEMORANDUM OF LAW OF DEFENDANT JEFFREY GURAL
IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Angelo J. Genova (ID # 205373)
Lawrence Bluestone, Esq.  (ID # 322261)
**GENOVA BURNS LLC**
1600 Market Street, Suite 1650
Philadelphia, PA 19103
Phone: (973) 533-0777
agenova@genovaburns.com
lbluestone@genovaburns.com

*Attorneys for Defendant,
Jeffrey Gural*

## **TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................... 1

II.    STATEMENT OF RELEVANT FACTS ................................................... 3

   A.  The Parties ............................................................................................ 3

   B.  Events Preceding the Alleged Tortious Conduct .................................. 4

      1.  Plaintiff's 2017 Lawsuit Against Gural .......................................... 4

      2.  The Fishman Trial and Evidence that Plaintiff Purchased Illegal PEDs ....................... 5

   C.  The Alleged Defamatory Statements ................................................... 7

      1.  The Meadowlands Press Release ................................................... 7

      2.  The *Thoroughbred Daily News* Article .......................................... 8

      3.  Additional Alleged Defamatory Statements to Individuals in the Horse Racing Industry ........................... 9

   D.  Plaintiff's Alleged Damages ............................................................. 10

III.   STANDARD OF REVIEW ................................................................... 10

IV.  ARGUMENT ........................................................................................ 12

   A.  PLAINTIFF FAILS TO STATE CLAIMS OF DEFAMATION, DEFAMATION *PER SE* AND TRADE LIBEL BECAUSE THE STATEMENTS COMPLAINED OF ARE NOT FALSE OR DEFAMATORY AS A MATTER OF LAW AND DEFENDANT DID NOT ACT WITH ACTUAL MALICE. ......................................... 12

      1.  The Statements In The Press Release Are Not Defamatory Because They Are True and Not Capable of a Defamatory Meaning. ....................... 15

      2.  The Statements in the Article and Repeated to Industry Professionals Are Not Defamatory Because they Constitute Opinion. ............................ 18

      3.  The Alleged Additional Statements to Industry Professionals Concerning Taylor's Ownership of Numerous Horses and Taylor's Assurance He Would Provide Legal Representation to Trainers if they Got Caught Using PEDs Are Not Defamatory in Nature or by Implication. ........................ 21

      4.  The Statements In Issue Cannot Form the Basis for a Claim of Defamation Because They Were Not Made with Actual Malice. ............................ 23

   B.  PLAINTIFF FAILS TO AND CANNOT STATE A VALID CLAIM OF FALSE LIGHT INVASION OF PRIVACY ............................................. 27

   C.  PLAINTIFF FAILS TO STATE A COGNIZABLE CLAIM OF TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS. ................. 29

      1.  Plaintiff Has Failed to Plausibly Plead the Absence of Privilege or Justification on the Part of Defendant ........................ 30

      2.  Plaintiff Has Failed to Plausibly Plead that he Has Sustained Actual Harm as a Result of Defendant's Conduct ........................ 33

D.  PLAINTIFF FAILS TO AND CANNOT STATE A CLAIM OF UNFAIR COMPETITION. ............................................................................................................ 35

V.    CONCLUSION ............................................................................................................. 37

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Air Prods. and Chems., Inc. v. Inter–Chem., LTD*, et al.,
  No. Civ.A.03–6140, 2003 WL 2291749 (E.D. Pa. Dec. 2, 2003) ............................................ 35

*Alpart v. Gen. Land Partners, Inc.*,
  574 F. Supp. 2d 491 (E.D. Pa. 2008) ...................................................................................... 34

*Alvin v. Suzuki*,
  227 F.3d 107 (3d Cir. 2000) .................................................................................................... 26

*Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pennsylvania*,
  592 Pa. 66, 84, 923 A.2d 389, *cert. denied*, 552 U.S. 1076 (2007) .................................... 14, 23

*Arone v. Sullivan Cnty. Harness Racing Ass'n, Inc.*,
  457 N.Y.S.2d 958 (App. Div. 3d Dep't 1982) ......................................................................... 32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................ 11

*Beckley Newspapers Corp. v. Hanks*,
  389 U.S. 81 (1967) .................................................................................................................. 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................ 11

*Beverly Enters, Inc. v. Trump*,
  182 F.3d 183 (3d Cir. 1999), *cert. denied*, 528 U.S. 1078 (2000) .................................... 18, 22

*Bobb v. Kraybill*,
  511 A.2d 1379 (Pa. Super. Ct. 1986), *app. denied*,
  513 Pa. 633, 520 A.2d 1384 (1987) ......................................................................................... 15

*Byars v. Sch. Dist. of Phila.*,
  942 F. Supp. 2d 552 (E.D. Pa. 2013) ....................................................................................... 14

*Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*,
  415 Pa. 276, 203 A.2d 469 (1964) ........................................................................................... 36

*Casselli v. City of Philadelphia*,
  54 F. Supp. 3d 368 (E.D. Pa. 2014) ......................................................................................... 27

*Castleberry v. STI Grp.*,
  863 F.3d 259 (3d Cir. 2017) .................................................................................................... 11

*Cornerstone Sys. v. Knichel Logistics, L.P.*,
    255 F. App'x 660 (3d Cir. 2007) ........................................................................ 19

*Curran v. Children's Service Center of Wyoming County, Inc*.,
    578 A. 2d 8 (Pa. Super. 1990), *app. denied*, 526 Pa. 648, 585 A.2d 468 (1991) ............... 27, 28

*Earley v. Gatehouse Media Pennsylvania Holdings, Inc*.,
    2015 WL 1163787 (M.D. Pa. Mar. 13, 2015) .................................................... 26

*Egiazaryan v. Zalmayev,*
    No. 11 CIV. 2670 PKC, 2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) .............................. 25-26

*Empire Trucking Co. v. Reading Anthracite Coal Co.*,
    71 A.3d 923 (Pa. Super. Ct. 2013) ................................................................ 29, 30

*Fanelle v. LoJack Corp.*,
    2000 WL 1801270 (E.D. Pa. Dec. 7, 2000) ........................................................ 27

*Fanelle v. LoJack Corp.*,
    79 F. Supp. 2d 558 (E.D. Pa. 2000) ............................................................... 27

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ....................................................................... 11

*Franklin Prescriptions, Inc. v. The New York Times Co*.,
    267 F. Supp. 2d 425 (E.D. Pa. 2003) .............................................................. 24

*Fresh Made, Inc. v. Life Way Foods*,
    No. Civ.A.01–4254, 2002 WL31246922 (E.D. Pa. Aug. 9, 2002) .................................. 35

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) .............................................................................. 24

*Gelman v. State Farm Mut. Auto. Ins. Co.,*
    583 F.3d 187 (3d Cir. 2009) ..................................................................... 11

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ............................................................................ 24

*Gilmour v. N.Y. State Racing & Wagering Bd.*,
    405 F. Supp. 458 (S.D.N.Y. 1975) ............................................................... 32

*Graboff v. Colleran Firm*, 744 F.3d 128 (3d Cir. 2014), *aff'g,*
    No. CIV. A. 10–1710, 2013 WL 1286662 (E.D. Pa. Mar. 28, 2013) ............................... 21, 27

*Granite State Ins. Co. v. Aamco Transmissions, Inc.*,
    57 F.3d 316 (3d Cir. 1995) ...................................................................... 35

*Hadges v. Yonkers Racing Corp.*,
  733 F. Supp. 686 (S.D.N.Y. 1990), *aff'd*, 918 F.2d 1079 (2d Cir. 1990) ............................ 32, 33

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989) ............................................................................................ 24

*Heyl & Patterson Int'l, Inc. v. F.D. Rich Hous. of the V.I., Inc.*,
  663 F.2d 419 (3d Cir. 1981), *cert. denied*, 455 U.S. 1018 (1982) ............................ 26

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ............................................................................ 12

*In re Maze*, No. 98–33715,
  1999 WL 554600 (E.D. Pa. July 16, 1999) ......................................................... 20

*Joseph v. Scranton Times, L.P.*,
  634 Pa. 35, 70, 129 A.3d 404 (2015) ................................................................. 12

*Kendall v. Daily News Pub. Co.*,
  716 F.3d 82 (3d Cir. 2013) ............................................................................... 25

*Kerrigan v. Otsuka Am. Pharm., Inc.*,
  560 F. App'x 162 (3d Cir. 2014) ....................................................................... 19

*Larsen v. Phila. Newspapers, Inc.*,
  543 A.2d 1181 (Pa. Super. Ct.), *app. denied*, 520 Pa. 597,
  552 A.2d 251 (1988), *cert. denied*, 489 U.S. 1096 (1989) .................................... 27

*Livingston v. Murray*,
  612 A.2d 443 (Pa. Super. Ct. 1992), *app. denied*,
  533 Pa. 601 A.2d 1275 (1992) .......................................................................... 22

*M3 USA Corp. v. Hart*,
  516 F. Supp. 3d 476 (E.D. Pa. 2021) ................................................................ 36

*Mallory v. S & S Publishers* ("*Mallory I*"),
  168 F. Supp. 3d 760 (E.D. Pa. 2016) ............................................................ 13, 27

*Mallory v. S & S Publishers*,
  260 F. Supp. 3d 453 (E.D. Pa. 2017) ("*Mallory II*"), *aff'd sub nom.*,
  *Mallory v. Simon & Schuster, Inc.*, 728 F. App'x 132 (3d Cir.),
  *cert. denied*, 139 S. Ct. 154 (2018) ............................................................ *passim*

*Manco v. St. Joseph's Univ.*,
  No. CV 22-285, 2024 WL 299265 (E.D. Pa. Jan. 25, 2024) ............................... 27, 28

v

*Marcone v. Penthouse Int'l Magazine for Men*,
  754 F.2d 1072 (3d Cir. 1985), *cert. denied*, 474 U.S. 864 (1985)............................................ 14

*Martin v. Monmouth Park Jockey Club*,
  145 F. Supp. 439 (D.N.J. 1956), *aff'd*, 242 F.2d 344 (3d Cir. 1957) ........................... 31, 32, 33

*Masson v. New Yorker Mag.*, Inc.,
  501 U.S. 496 (1991) ................................................................................................................... 24

*Mathias v. Carpenter*,
  587 A.2d 1 (Pa. Super. Ct. 1991), *app. denied*, 529 Pa. 650, 602 A. 2d 860 (1992) ............... 13

*Maverick Steel Co. v. Dick Corp.*,
  54 A.3d 352 (Pa. Super. Ct. 2012), *app. denied*, 619 Pa. 723, 65 A.3d 415 (2013) ........... 13, 14

*Mayer v. Belichick*,
  605 F.3d 223 (3d Cir. 2010), *cert. denied*, 562 U.S. 1271 (2011)............................................ 12

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
  674 F.3d 369 (4th Cir. 2012) ..................................................................................................... 25

*McCafferty v. Newsweek Media Grp.*,
  955 F.3d 352 (3d Cir. 2020) ........................................................................... 20, 23, 24, 25, 28

*McLaughlin v. Bayer Corp.*,
  172 F. Supp. 3d 804 (E.D. Pa. 2016)................................................................................... 10-11

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990) ....................................................................................................................... 18

*Monge v. Univ. of Pennsylvania*,
  No. CV 22-2942, 2023 WL 3692935 (E.D. Pa. May 26, 2023)......................................... 21, 28

*Moore v. Cobb-Nettleton*,
  889 A.2d 1262 (Pa. Super. Ct. 2005)......................................................................................... 18

*Morse v. Lower Merion Sch. Dist.*,
  132 F.3d 902 (3d Cir. 1997) ........................................................................................................ 3

*Mzamane v. Winfrey*,
  693 F. Supp. 2d 442 (E.D. Pa. 2010) ......................................................................................... 22

*N.Y. Times v. Sullivan*,
  376 U.S. 254 (1964) ............................................................................................................ 14, 24

*Pace v. Baker-White*,
  432 F. Supp. 3d 495 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021),
  *cert. denied*, 142 S. Ct. 433 (2022) .................................................................. 19, 20, 22, 24, 26

*Pacitti v. Durr*,
  310 F. App'x 526 (3d Cir. 2009) ......................................................................................... 15

*Pena v. New Meadowlands Racetrack LLC*,
  No. CIV.A. 12-2 SRC, 2012 WL 95344 (D.N.J. Jan. 10, 2012) ......................................... 31, 33

*Penn. State Univ. v. Univ. Orthopedics, Ltd.*,
  706 A.2d 863 (Pa. Super. Ct. 1998) ..................................................................................... 36

*People v. Licata*,
  268 N.E.2d 787 (N.Y. 1971) ................................................................................................ 32

*Phillips v. Selig*,
  959 A.2d 420 (Pa. Super. Ct. 2008), *app. denied*, 600 Pa. 764,
  967 A.2d 960 (2009) ............................................................................................................ 30

*Purcell v. Ewing*,
  560 F. Supp. 2d 337 (M.D. Pa. 2008) ............................................................................ 20, 26

*Reardon v. Allegheny College*,
  926 A.2d 477 (Pa. Super. Ct. 2007), *app. denied*, 596 Pa. 755,
  947 A.2d 738 (2008) ............................................................................................................ 21

*Reed v. Pray*,
  53 A.3d 134 (Pa. Commw. Ct. 2012), *app. denied*, 619 Pa. 718,
  64 A.3d 633 (2013) .............................................................................................................. 26

*Remick v. Manfredy*,
  238 F.3d 248 (3d Cir. 2001) ........................................................................... 14, 18, 19, 23

*Sarkees v. Warner-West Corp.*,
  349 Pa. 365, 37 A.2d 544 (1994) .................................................................................. 22, 23

*Scott-Taylor, Inc. v. Stokes*,
  425 Pa. 426, 229 A.2d 733 (1967) ....................................................................................... 13

*Seguro Medico, LLC v. Suffolk Admin. Servs., LLC*,
  No. 5:23-CV-2495, 2023 WL 7324081 (E.D. Pa. Nov. 7, 2023) ........................................ 14

*Smith v. Pennsylvania*,
  No. CV 21-5473-KSM, 2022 WL 3139854 (E.D. Pa. Aug. 4, 2022),
  *aff'd*, No. 22-2632, 2023 WL 3336642 (3d Cir. May 10, 2023) ........................................ 26

*Spring Steels, Inc. v. Molloy*,
   400 Pa. 354, 162 A.2d 370 (1960) .................................................................. 36

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ..................................................................................... 24

*Synygy, Inc. v. Scott-Levin, Inc.*,
   51 F. Supp. 2d 570 (E.D. Pa. 1999), *aff'd*, 229 F.3d 1139 (2000) ........................... 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..................................................................................... 12

*United States v. Hodge*,
   321 F.3d 429 (3d Cir. 2003) ............................................................................ 5

*Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*,
   982 A.2d 94 (Pa. Super. Ct. 2009), *aff'd*, 610 Pa. 371, 20 A.3d 468 (2011) ........... 29, 30, 34

*Ware v. Rodale Press, Inc.*,
   322 F.3d 218 (3d Cir. 2003) ........................................................................... 34

*Zuber v. Boscov's*,
   871 F.3d 255 (3d Cir. 2017) ........................................................................... 10

## Statutes

42 Pa. Cons. Stat. § 8343(a) ........................................................................ 12, 13, 18

## Rules and Regulations

Fed. R. Civ. P. 8(a)(2) ............................................................................... 10, 11

Fed. R. Civ. P. 12(b)(6) ................................................................................ *passim*

Fed. R. Civ. P. 15(a)(2) ................................................................................... 26

N.Y. Comp. Codes R. & Regs. tit. 9, § 4119.8 ......................................................... 32

## Other Authorities

Restatement (Second) of Torts § 573 (1977) ............................................................ 13

Restatement (Second) of Torts § 767 .................................................................... 29

Restatement (Third) Unfair Competition § 1(a) ......................................................... 35

## I.    __INTRODUCTION__

All the actions complained of in this case emanate from one indisputably true fact: evidence admitted in a recent federal criminal trial in New York revealed that Plaintiff Howard Taylor ("Plaintiff" or "Taylor") purchased BB3, a potent and illegal performance enhancing drug ("PED"), from a veterinarian who was convicted of the federal crimes related to the distribution of that drug and other adulterated and misbranded PEDs.  As the indictment in that criminal case asserted, the existence of illegal PEDs and "doping" in professional horse racing is a matter of significant public concern.  In an attempt to deflect attention from the evidence of his PED purchases and avoid the consequences that flow from them, Plaintiff has brought this suit against Defendant Jeffrey Gural ("Defendant" or "Gural"), wrongfully seeking to impose tort liability for Defendant's non-defamatory statements of fact and expressions of opinion about Plaintiff's PED purchases, and also for Defendant's lawful action to exclude horses owned by Plaintiff from racing at the Meadowlands as a result.  However, none of the causes of action Plaintiff has asserted in his Complaint state viable claims for relief under applicable law.

Plaintiff—who touts his renown as an owner of Stakes-winning horses and as a nationally preeminent equine law attorney—is a public figure who must allege facts to plausibly support the basic elements of a defamation claim under Pennsylvania law, as cabined by the First Amendment.  He fails to do so because his defamation claims are based upon true statements of fact and expressions of opinion about him, neither of which are actionable as defamation, as well as statements that simply are not defamatory in nature or by implication.  Moreover, even if the statements in issue could be deemed false and defamatory, Plaintiff has failed to and cannot plead facts that show that the statements were made with actual malice, the constitutionally required level of fault needed for a public figure plaintiff to state a claim of defamation.  Statements about public figures and matters of public concern are accorded the highest constitutional protection

and, as such, attempts by public figures to recover in defamation for statements made about them on matters of public concern have been rejected time and again by other courts. It should be rejected here as well.

Plaintiff's remaining tort claims – alleging false light, tortious interference with contractual relations, and unfair competition – are little more than a re-packaging of his defamation-based claims and are equally infirm.

Plaintiff has failed to and cannot state a claim of false light because, like his defamation claims, he is required to plead facts plausibly alleging that Defendant made false statements of fact and acted with actual malice, a showing Plaintiff cannot make. Plaintiff also cannot show that certain of the statements in issue were widely disseminated as is required to state a valid false light claim.

Plaintiff has failed to and cannot state a claim of tortious interference with contractual relationships because that tort is only cognizable if the Plaintiff can show that the Defendant engaged in improper conduct without justification or a right to do so. But as a racetrack owner and leader in the effort to remove illegal PEDs and doping from the horseracing industry, Defendant was justified in commenting on the Plaintiff's purchase of PED's from an individual who had been convicted of federal criminal offenses related to PEDs and had an absolute right to exclude him and others tied to PEDs from racing at his racetracks as a result. Plaintiff's allegation of future, speculative damage rather than actual harm caused by Defendant's actions is also fatal to his tortious interference claim.

Finally, Plaintiff has failed to and cannot state a claim of unfair competition because the conduct of Defendant as alleged in the Complaint is not the type of conduct that is recognized as unfair competition under Pennsylvania's common law.

Plaintiff has failed to meet his basic pleading burden under the standards this court is bound to apply. Because Plaintiff's claims are legally insufficient, his Complaint should be dismissed in its entirety and with prejudice.

## II.    STATEMENT OF RELEVANT FACTS

Plaintiff's Complaint, filed in this Court on December 11, 2023, (Doc. No. 1), includes six counts: Defamation Per Se (First Count), Defamation (Second Count), Trade Libel (Third Count), False Light (Fourth Count), Tortious Interference with Contractual Relationships (Fifth Count), and Unfair Competition (Sixth Count.)   Defendant disputes many of the facts alleged by Plaintiff, but recites the allegations in the Complaint, which must be presumed to be true for purposes of considering this Rule 12(b)(6) motion to dismiss for failure to state a claim. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

### A.    The Parties

According to the Complaint, Plaintiff is a long-time owner of racehorses who experienced success as a driver and a trainer before making a name for himself as an owner. (Compl. ¶ 2.)  In the last few decades, Plaintiff has owned more than one thousand horses, many of which were nationally ranked stakes-winners.  (*Id..*)  Approximately 80% of Plaintiff's horses are owned jointly, and Plaintiff owns horses with over 70 partners.  (*Id.* ¶¶ 61, 103, 132, 151.)

Plaintiff cites numerous accolades in his decades-long participation in harness racing:  In 2010, Plaintiff was named the Pennsylvania Owner of the Year by the Keystone Chapter of the U.S. Harness Writers Association.  On August 6, 2016, Plaintiff enjoyed one of the most prolific days as an owner in harness racing history when his horses won three major races at the Meadowlands:  the U.S. Pacing Championship, the Cane Pace, and the Lady Liberty.  Earlier that year, Plaintiff's horse, Control the Moment, won the $732,050 Meadowlands Pace.  (*Id.* ¶ 19.)

In addition to his horse ownership, Plaintiff has built a practice as an equine lawyer. Plaintiff is one of the preeminent equine law attorneys in the country and frequently represents horse trainers in court and before racing commissions nationwide. (*Id.* ¶¶ 2, 20.)

Defendant Gural is the owner of the Meadowlands Racetrack (the "Meadowlands"), a harness and thoroughbred racing track in East Rutherford, New Jersey, and is the CEO of New Meadowlands Racetrack LLC, which operates the Meadowlands. (*Id.* ¶¶ 3, 21.) Defendant also owns the racetracks Tioga Downs and Vernon Downs in New York State. (*Id.* ¶ 21.) Defendant also owns racehorses, and he races them at the Meadowlands and other racetracks that he owns. (*Id.* ¶ 3.)

### B.    Events Preceding the Alleged Tortious Conduct

Plaintiff has raced his horses at the Meadowlands thousands of times and has won almost every major race at the Meadowlands, including the three major races he won on August 6, 2016, the Meadowlands Pace (twice) and the Hambletonian. (*Id.* ¶ 22.) Until recently, Plaintiff routinely participated in five to six races at the Meadowlands per week. (*Id.* ¶ 23.)

### 1.    Plaintiff's 2017 Lawsuit Against Gural

Before 2017, Plaintiff and Defendant enjoyed a cordial relationship and even owned horses together. (*Id.* ¶ 24.) In 2017, however, Plaintiff sued Defendant Gural following Defendant's cancellation of a Meadowlands stakes race (the "2017 Lawsuit"). (*Id.* ¶ 25.) Plaintiff alleged in the 2017 Lawsuit that he owned a New Jersey-bred horse and had purchased the horse with a partner based on the expectation that the horse could participate in this race, which was restricted to horses bred in New Jersey. (*Id.*)

Plaintiff alleges that Defendant developed animosity towards Plaintiff as a result of the 2017 Lawsuit, which, Plaintiff contends has only increased over time.  (*Id.* ¶ 26.)  Plaintiff further alleges that this animosity and "desire for vengeance" ignited a "smear campaign" at issue in this suit.  (*Id.*)

### 2.  The Fishman Trial and Evidence that Plaintiff Purchased Illegal PEDs

The use of illegal PEDs has been a longstanding problem in the horse racing industry and Defendant has long been a leader in seeking to clean up the sport.[1]  For the last several years, Defendant facilitated criminal prosecutions relating to the use of PEDs in the horse racing industry, pointing federal prosecutors to potential violators for further investigation. (*Id.* ¶ 27.)  Specifically, Plaintiff alleges that Defendant and his representatives assisted federal prosecutors in the recent prosecution and conviction of Dr. Seth Fishman in New York City.  (*Id.* ¶ 28.)

Dr. Fishman is a veterinarian who, along with his associate, Lisa Gianelli, and others, was charged with federal crimes related to PEDs and horses (conspiracy to distribute adulterated and misbranded PEDs) in connection with the operation of his business called "Equestology." Fishman and Giannelli were convicted of those crimes in 2022.[2]  (*Id.* ¶ 29.)  Among the illegal PEDs Fishman was charged with conspiring to sell are Erythropoietin and analogues.[3] Erythropoietin is commonly referred to by participants in the racing industry by the brand name

---

[1] *See, e.g.*, Gus Garcia-Roberts, *With private eyes and political muscle, horse racing's elite pushed to punish dopers*, Washington Post (Apr. 29, 2021), *available at* https://www.washingtonpost.com/sports/2021/04/29/horse-racing-doping-jockey-cub/ (describing Gural's extensive and expensive efforts to rid the industry of PEDs).

[2] Fishman's trial was one of a series of four cases in March 2020, in which over 30 defendants were charged. Of these defendants, only Giannelli and Fishman were convicted by juries, and 22 others pled guilty. Like the Complaint, this brief refers to both the Fishman and Giannelli trials together as the "Fishman trial." (Compl. ¶ 29, n. 1.)

[3] An "analogue" is a pharmaceutical with a similar chemical structure that has a similar effect. *See, e.g.*, *United States v. Hodge*, 321 F.3d 429, 438 (3d Cir. 2003).

Epogen or the shorthand "epo," and is used to boost a racehorse's red blood cell count in order to stimulate endurance during a race and improve race recovery. (*See* a true and correct copy of the Superseding Indictment, attached hereto as **Exhibit 1**, at p. 9, ¶ 13(a)**.**) [4]  Fishman and Gianelli were also charged with crimes relating to "similar customized 'blood building' substances referred to by the defendants using various code names, including "BB3" [among others]." *Id.*

The Fishman trial occurred over eleven days with dozens of witnesses and hundreds of exhibits.   (Compl. ¶ 35.)  The Complaint alleges that "[n]one of these witnesses or documents, nor those used in the Giannelli trial, implicated Taylor in any way in providing PEDs to his horses," (*id.*),  and there was only "one extremely limited connection between Taylor and the Fishman trial" consisting of "[o]ne 83-page exhibit that the government entered into evidence in the case against Giannelli [which] purports to be a receipt of products that Taylor's trainers received from Equestology."  (*Id.* ¶ 31.)

The Complaint alleges that Plaintiff never ordered or used BB3, nor did he instruct his trainers to order or use BB3.  (*Id.* ¶ 33.)  However, the 83-page exhibit referred to in the Complaint, which the Government introduced into evidence at the Fishman trial as Government Exhibit 16000, shows a history of purchases by Plaintiff from Equestology.  (A true and correct copy of Government Exhibit 16000 is attached hereto as **Exhibit 2**.)  Plaintiff is identified in the exhibit as the account holder on two accounts (A and B) and the invoices indicate that the items in the invoice are for Howard Taylor, listing his name and address. Additionally, in the Client Account Registers, which list the items purchased, Howard Taylor, identified by name and address, is listed as Equestology's "Client."  (*Id.*)

---

[4] On a Rule 12(b)(6) motion, the court may consider matters of public record and documents referred to in or integral to the complaint without converting it into a motion for summary judgment.  (*See* discussion *infra*, at 11-12.)

Although Plaintiff did not testify at the trial, the Government and Fishman stipulated to the admission of Government Exhibit 16000, explaining to the Court and jury that "[i]f called as a witness at trial, Howard Taylor would testify that Government Exhibit 160000 reflects true and accurate copies of records that Taylor maintained with request to Equestology." (*See* a true and correct copy of excerpts of the trial transcript in the Fishman Trial from May 2, 2022, attached hereto as **Exhibit 3**, at p. 613, line 24 through p. 614, line 17.)

The Complaint acknowledges that BB3 was listed multiple times in Exhibit 16000 (Compl. ¶ 32) and Exhibit 16000 indisputably shows that BB3 was ordered by and sent to Taylor on at least 5 separate occasions. (See Exhibit 2, at pp. 37, 39, 68 and 77.) In the Government's publicly filed sentencing memo for Fishman, BB3 is described as "Fishman's custom-made blood builder" that is among the most "potent" of the PEDs sold by Fishman. (See a true and correct copy of the Government's sentencing memo (without exhibits) dated July 5, 2022, attached hereto as **Exhibit 4**, at p. 3.)

### C.    The Alleged Defamatory Statements

#### 1.    The Meadowlands Press Release

On Friday, November 3, 2023, the Meadowlands published a press release (the "Press Release") listing 33 individuals, including Plaintiff, excluded from racing at the Meadowlands effective December 1, 2023. (Compl. ¶ 36; *see also* a true and correct copy of the Press Release dated November 3, 2023 attached hereto as **Exhibit 5**.) According to the Press Release, this ban was the result of evidence revealed in a criminal trial that tied Plaintiff to the purchase of a certain PED for racehorses. (Compl. ¶ 6.)

The Press Release noted that, "among the volumes of evidence introduced by the US Attorney in the prosecution of these cases are trial exhibits, offered in open court and now available to the public, which reveal the identity of numerous persons who have purchased prohibited

substances – BB3 (EPO) or TB-7 Thymosyn (sp).'' (*Id.* ¶ 37.)   The Press Release contained a list of ten individuals identified as purchasers of BB3, including Taylor.  (*Id.*)

The Press Release continued: "This remains a serious matter. Consequently, the Meadowlands is conducting its own internal investigation given these revelations. And until that investigation is completed, the Meadowlands has determined that all individuals listed below will be placed on the Meadowlands exclusion list." That exclusion became effective December 1, 2023.  (Id. ¶ 38.)

The Press Release stated further:

> We believe this timeframe will also allow owners, should they choose, an opportunity to change trainers and/or horses in partnership with excluded owners. We anticipate the Meadowlands investigation will be time consuming. We also expect that additional disclosures will be released, and if so, where warranted, the Meadowlands will act on that information. We will also require that any change of trainers or dissolution of any partnerships with excluded owners will require proof to the satisfaction of The Meadowlands.

(*Id.* ¶ 39.)   The Complaint alleges that Plaintiff was the only owner included on the "BB3 list" who owned horses in partnership with others, and, therefore, this language in the Press Release was directed solely at him.  (*Id.* ¶ 40.)   However, the Press Release does not identify Taylor as an owner.  (*See* Exhibit 5.)

The Press Release concluded: "We believe these steps are warranted per the revelations from the above prosecutions and are necessary in the interest of the industry we all love and wish to preserve."  (*Id.* ¶ 41.)

## 2.  **The *Thoroughbred Daily News* Article**

The same day the Meadowlands issued its Press Release, Defendant was quoted making statements about Plaintiff in an article in the *Thoroughbred Daily News* (the "Article").  (Compl. ¶ 42; *see also* a true and correct copy of the Article published on November 3, 2023 attached

hereto as **Exhibit 6**.) The Article repeated the substance of the Press Release, noting that the excluded individuals included "trainers and owners who had purchased banned substances from individuals who were charged with manufacturing and selling performance-enhancing drugs." (Compl. ¶ 43.)

The Article further highlighted that "[w]hile the evidence against Fishman was enough for him to be sentenced to 11 years in prison, the government's case did not shed much light on who was buying what from Fishman and his company." (*Id.* ¶ 44.)

The Article then quoted Gural as stating that "[i]t's sad because there are people who had no choice but to cheat." (*Id.* ¶ 45.)  With respect to Taylor, Gural stated:

> What's really sad is Howard Taylor. He's not a trainer, he's an owner. He had to be giving EPO to his trainers to use and not a single trainer picked up the phone and said I have an owner who wants me to use EPO on his horses. He has 150 horses and he uses a lot of trainers. You would have thought at least one trainer would have picked up the phone and told us what's going on.

(*Id.* ¶ 46.)

### 3.    Additional Alleged Defamatory Statements to Individuals in the Horse Racing Industry

The Complaint alleges that, in addition to the statements in the Press Release and Article, Defendant made several additional false and defamatory statements about Plaintiff "in conversations with individuals of influence and power in the racehorse industry, including leadership of the Standardbred Owners Association of New Jersey ('SBOA')." (Compl. ¶ 51.) The SBOA is a state-funded organization that represents horse owners in securing contracts with the two racetracks in New Jersey, Freehold and Meadowlands.  (*Id.* ¶ 52.)

Specifically, Plaintiff alleges that, on November 3, 2023, Defendant participated in a conference call with a few of his associates and three of the SBOA's Board of Directors members for the purpose of discussing negotiations for horse owners with the Meadowlands.   (*Id.* ¶ 53.)

Plaintiff alleges that, during this call, "Gural repeated his claim that Taylor provided EPO to his trainers and instructed them to use it on his horses" and "added that Taylor also assured his trainers that he (Taylor) would represent them successfully if they were caught." (*Id.* ¶ 55.)

Finally, Plaintiff alleges that Defendant has also told others in the professional horse racing industry that "nobody can own as many horses as Howard does," implying that Plaintiff does not actually own his horses but rather is improperly "fronting" for other people who could not receive a license. (*Id.* ¶ 57.)

### D.   Plaintiff's Alleged Damages

In his Complaint, Plaintiff alleges that, as a result of the defamatory statements and "smear campaign" by Defendant, Plaintiff has suffered damages in the form of reputational harm (both as a horse owner and as a lawyer and expert in equine law), humiliation, embarrassment, mental suffering, shame, and emotional distress. (Compl. ¶¶ 58-60, 66, 71, 91, 101, 108.) He also alleges financial harm consisting of damage to his partnerships and his relationships with trainers, which are "at risk of collapse" because of the Meadowlands ban, (*id.* ¶¶ 61, 104, 153); damage to his investments in the purchase of his horses, which were made in reliance on them being able to race in lucrative Meadowlands races from which Plaintiff is now banned; and "likely" lost potential winnings from races at the Meadowlands and other racetracks (Buffalo Raceway and Batavia Downs) from which he is now banned. (*Id.* ¶¶ 63-65, 105-107, 135-137.)

## III.   STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule 12(b)(6), the court must accept as true the factual allegations in the complaint and view all reasonable inferences that can be drawn from those allegations in the light most favorable to the plaintiff. *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quotation marks omitted). For a claim to be viable, the plaintiff must plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), sufficient to give the defendant

"'fair notice of what the . . . claim is and the grounds upon which it rests.'" *McLaughlin v. Bayer Corp.,* 172 F. Supp. 3d 804, 812 (E.D. Pa. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court is *not* required to accept as true "unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gelman v. State Farm Mut. Auto. Ins. Co.,* 583 F.3d 187, 190 (3d Cir. 2009) (quoting *Iqbal,* 556 U.S. at 678). "A complaint that pleads facts merely consistent with a defendant's liability stops short of the line between possibility and plausibility of entitlement to relief." *McLaughlin*, 172 F. Supp. 3d at 812.

Moreover, a complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'shown'- 'that the pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* The court should dismiss the complaint under Rule 12(b)(6) if the factual allegations in the complaint fail "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Finally, when analyzing a Rule (12)(b)(6) motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007); *see also Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010), *cert. denied,* 562 U.S. 1271 (2011) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that "a document integral to or explicitly relied upon in the complaint may be considered.") (internal quotations omitted)).

## IV.    ARGUMENT

### A.    PLAINTIFF FAILS TO STATE CLAIMS OF DEFAMATION, DEFAMATION *PER SE* AND TRADE LIBEL BECAUSE THE STATEMENTS COMPLAINED OF ARE NOT FALSE OR DEFAMATORY AS A MATTER OF LAW AND DEFENDANT DID NOT ACT WITH ACTUAL MALICE.

To state a claim for defamation under Pennsylvania law, Plaintiff has the burden of pleading and proving:

> (l) the defamatory character of the communication;
> (2) publication by the defendant;
> (3) its application to the plaintiff;
> (4) understanding by the recipient of its defamatory meaning;
> (5) understanding by the recipient of it as intended to be applied to plaintiff;
> (6) special harm to the plaintiff;
> (7) abuse of a conditionally privileged occasion.

*Joseph v. Scranton Times, L.P.*, 634 Pa. 35, 70, 129 A.3d 404, 424 (2015) (quoting 42 Pa. Cons. Stat. § 8343(a)(1)–(7)).  A communication is defamatory if it tends to harm the reputation of

another so as to lower that person in the estimation of the community or to deter third persons from dealing with that person. *Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 767 (E.D. Pa. 2016) ("*Mallory I*"). However, the statement must do more than embarrass or annoy the plaintiff to be deemed defamatory; "it must provoke 'the kind of harm which has grievously fractured his standing in the community of respectable society.'" *Id.* (quoting *Scott-Taylor, Inc. v. Stokes*, 425 Pa. 426, 229 A.2d 733, 734 (1967)); *see also Mathias v. Carpenter*, 587 A.2d 1, 2 (Pa. Super. Ct. 1991), *app. denied*, 529 Pa. 650, 602 A. 2d 860 (1992) (to be defamatory, statement must tend to "blacken a person's reputation or to expose him to public hatred, contempt, or ridicule….").

Under Pennsylvania law, defamation per se can be either words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct. *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999), *aff'd*, 229 F.3d 1139 (2000) (internal quotations omitted). A statement is defamatory per se as an accusation of business misconduct if it ascribes to another conduct, characteristics or condition that would adversely affect his fitness for proper conduct of his lawful business; statement must be more than mere general disparagement and must be of type that would be particularly harmful to individual engaged in plaintiff's business or profession. *Id.* (citing Restatement (Second) of Torts § 573 (1977)); *see also* 42 Pa. Cons. Stat. § 8343(a)(6). To state a claim for trade libel, or commercial disparagement, under Pennsylvania law a plaintiff must alleges that there has been the publication of a disparaging statement concerning the plaintiff's business where: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the publication is false or acts in reckless disregard of its truth or falsity. *Seguro Medico, LLC v. Suffolk Admin. Servs., LLC*, No. 5:23-CV-2495, 2023 WL 7324081, at *3 (E.D. Pa. Nov. 7, 2023) (citing *Maverick Steel Co. v. Dick Corp.*, 54 A.3d 352, 354 (Pa. Super. Ct.

2012), *app. denied*, 619 Pa. 723, 65 A.3d 415 (2013)) (internal quotation omitted).

The trial court must make the threshold determination of whether a challenged statement is capable of a defamatory meaning. *Mallory v. S & S Publishers*, 260 F. Supp. 3d 453, 458 (E.D. Pa. 2017) ("*Mallory II*"), *aff'd sub nom., Mallory v. Simon & Schuster, Inc.*, 728 F. App'x 132 (3d Cir.), *cert. denied*, 139 S. Ct. 154 (2018) (internal citation omitted); *see also Byars v. Sch. Dist. of Phila.*, 942 F. Supp. 2d 552, 564 (E.D. Pa. 2013) ("Whether a statement is capable of a defamatory meaning is a question of law for the court."). If the statement is not capable of a defamatory meaning, "the claim must be dismissed." *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001).

Because Plaintiff is a public figure[5] and the subject matter of the alleged defamatory communications—the use of illegal and harmful PEDs in the horse racing industry—is a matter of public concern, Plaintiff must also allege and be able to prove that any factual statements were false and made with actual malice. *N.Y. Times v. Sullivan*, 376 U.S. 254, 279–80 (1964); *Mallory II*, 260 F. Supp. 3d at 462 (citing *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1087 (3d Cir. 1985), *cert. denied*, 474 U.S. 864 (1985) (when a public figure, even a limited purpose public figure, sues for defamation, "the First Amendment demands that the plaintiff prove both that the statement was false and that it was made with 'actual malice.'"); *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pennsylvania*, 592 Pa. 66, 84, 923 A.2d 389, 400, *cert. denied*, 552 U.S. 1076 (2007) (internal citations omitted) ("If the plaintiff is a public official or public figure, . . . and the statement relates to a matter of public concern, then to satisfy First Amendment strictures the plaintiff must establish that the defendant made a false and defamatory statement

---

[5] The Complaint acknowledges that Taylor is a public figure with respect to the defamation claims, not only because it alleges facts which clearly establish Taylor as a public figure in relation to the subject matter of the Complaint, but also in the consistent pleading of the elements of the actual malice standard (Defendant's knowledge or reckless disregard of falsity) throughout. (*See* Compl. ¶¶ 8, 12, 47, 50, 56, 75, 76, 79, 95, 96, 99, 125).

with actual malice.").

Plaintiff cannot meet his pleading burden in this case. He has failed to and cannot plausibly plead all of the elements of the claims of defamation, defamation per se, and trade libel because (1) certain of the alleged defamatory statements are true, or substantially true; (2) certain of the statements in issue are expressions of opinion which are not actionable as defamation; (2) certain of the statements are not capable of a defamatory meaning; and (3) regardless of whether some or all of the statements could be deemed false and defamatory, Plaintiff has not plausibly pleaded facts that show that Defendant acted with knowledge of falsity or with serious doubts as to the truth of the statements, as required by the Constitution.

      **1.**     **The Statements In The Press Release Are Not Defamatory Because They Are True and Not Capable of a Defamatory Meaning.**

Under Pennsylvania law, truth is an absolute defense to a defamation claim. *Pacitti v. Durr*, 310 F. App'x 526, 528 (3d Cir. 2009) (citing *Bobb v. Kraybill,* 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986), *app. denied*, 513 Pa. 633, 520 A.2d 1384 (1987) (citation omitted)). As such, under any scienter standard, a showing by the defendant that the statements in issue are true precludes liability for defamation as a matter of law. Moreover, a defendant need only show substantial, rather than complete, truth. *Id*.

Plaintiff cannot sustain a claim of defamation based on the Press Release because none of the statements in the Press Release are false. The first three paragraphs of the Press Release do not apply to Taylor; and, in any event, they are straightforward truthful statements of fact about the trial and conviction of Fishman and Gianelli in the Southern District of New York.

The fourth paragraph, which is at the heart of Plaintiff's claim and refers to the evidence of persons who purchased PEDs, states:

               Among the volumes of evidence introduced by the US Attorney in
               the prosecution of these cases are trial exhibits, offered in open court

> and now available to the public, which reveal the identity of
> numerous persons who have purchased prohibited substances – BB3
> (EPO) or TB-7 Thymosyn (sp). Persons identified in the lists below
> and categorized under those substances, are referenced in those trial
> exhibits released by the US Attorney SDNY office to the
> Meadowlands at its request.

Plaintiff's name is included at the bottom of the Press Release as the last name on a list of excluded

people under the heading "BB3 (EPO)"

The statements contained in this fourth paragraph are unquestionably true.  As set forth

above, the evidence introduced by the U.S. Attorney in open court in the Fishman trial –

specifically, Government Exhibit 16000 – did, in fact, reveal that Plaintiff's name was among the

names of numerous people who had purchased the prohibited substances of BB3 (EPO) or TB-7

Thymosyn, just as the Press Release stated. (*See* Exhibits 2 & 3.) Because the trial evidence

disclosed Plaintiff's purchase of BB3, Plaintiff's name was included on the list in the Press Release

entitled "BB3 (EPO)".  There is nothing false, and thus can be nothing defamatory, about these

statements.[6]

Plaintiff attempts to thread a needle and discredit the veracity of the Press Release by

alleging that "BB3 is not EPO. It is a mimetic peptide that is structurally distinguishable from

EPO." (Compl. ¶ 34.)  Even accepting this allegation as true for the purposes of this motion, it

does not render the statements in the Press Release false.  The reference to EPO in the Press

Release, simply as a parenthetical next to the term BB3, is an accurate reflection of how BB3

was characterized in the charges filed by the Government against Fishman, and for which he was

---

[6] The statement in the fifth paragraph of the Press Release that this is a "serious matter" is an
expression of opinion, and thus not actionable (*see infra*, at 18-21); but even if viewed as a
statement of fact, it can only be characterized as true given that it relates to the Meadowlands'
discovery that owners and trainers of horses that had previously raced at the Meadowlands and
would or might seek to do so in the future had purchased illegal PEDs from an individual who was
convicted of conspiracy to manufacture and distribute those illegal and dangerous drugs.

convicted: that it was a customized "blood building" substance like EPO that was referred to by the "code name" BB3. (*See* Exhibit 2 at p. 9, ¶ 13(a).) The use of EPO in parentheses after BB3 in the Press Release thus accurately reflects the similarity and functional interchangeability of the drugs as presented at the Fishman trial, which was the source of the information in the Press Release related to Plaintiff's PED purchases.

At the very least, the statements linking EPO parenthetically with BB3 are substantially true. "Under Pennsylvania law, proof of substantial truth must go to the 'gist' or 'sting' of the alleged defamatory matter; the test is whether the alleged libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Mallory II*, 260 F. Supp. 3d at 461. The gravamen of the Complaint in this case is that Plaintiff was falsely accused of purchasing and instructing trainers to use PEDs, an accusation Plaintiff characterizes as the most damaging accusation that can be made to the reputation of a racehorse owner. (Compl. ¶ 4.) The evidence at the Fishman trial clearly showed that Plaintiff purchased BB3, described by the Government as among the most "potent" of the PEDs sold by Fishman. (*See* Exhibit 4, at p. 3.) Regardless of whether BB3 and EPO are technically structurally distinguishable or not, the gist of the communication is the same: both are PEDs and, thus, the alleged libel that Plaintiff purchased EPO would <u>not</u> have a different effect on the mind of the reader than the truth— that he purchased BB3—would produce. Even if was not 100% accurate to characterize BB3 as equivalent to EPO through use of a parenthetical reference, the statements are substantially true within the meaning of Pennsylvania's defamation jurisprudence. As such, they cannot be actionable as defamation as a matter of law.

The remainder of the Press Release sets forth truthful information about how the Meadowlands intends to follow up on the information disclosed at the trial (by investigating), the effective date of the exclusion, and how the effective date of the exclusion will give owners in partnership with excluded owners time to change trainers or horses if they so choose. Plaintiff alleges that the language in the release addressing excluded owners is directed towards him and his partners because he is the only owner on the excluded list; but neither the excluded list nor any other part of the Press Release identifies him as an owner. (*See* Exhibit 4.) Even if it did, there is nothing inherent in the nature of the communication itself that can reasonably be regarded as tending to lower Plaintiff's estimation of the community or to deter third persons from dealing with that him. While that might occur as a result of what was stated in the Press Release, any such effect would be the byproduct, not of a false communication by Defendant, but of Plaintiff's own conduct in purchasing the banned PEDs which caused him to be added to the Meadowlands excluded list.

> **2.    The Statements in the Article and Repeated to Industry Professionals Are Not Defamatory Because they Constitute Opinion.**

Under Pennsylvania law, generally "[o]nly statements of fact, not expressions of opinion, can support an action for defamation." *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005); *see also Milkovich v. Lorain J. Co.,* 497 U.S. 1, 20 (1990) ("[S]tatement[s] of opinion relating to matters of public concern which do[] not contain a provably false factual connotation will receive full constitutional protection"); 42 Pa. Cons. Stat. § 8343(a)(1–7).[7] The trial court decides whether the allegedly defamatory statements constitute fact or opinion as a

---

[7] Similarly, rhetorical hyperbole and epithets are not actionable as defamation. *See, e.g., Remick,* 238 F.3d at 262; *Beverly Enters, Inc. v. Trump*, 182 F.3d 183, 187 (3d Cir. 1999), *cert. denied*, 528 U.S. 1078 (2000) ("[S]tatements which are no more than rhetorical hyperbole or a vigorous epithet are not defamatory.") (quotation and citation omitted).

threshold matter of law on a motion to dismiss.  *Kerrigan v. Otsuka Am. Pharm., Inc*., 560 F. App'x 162, 168 (3d Cir. 2014); *Mallory II*, 260 F. Supp. 3d at 459-60 (internal citations omitted).

Under Pennsylvania law, an opinion can only be actionable as defamation if it could reasonably be understood to imply undisclosed defamatory facts may support a cause of action based upon those unenumerated facts. *See Remick*, 238 F.3d at 261.  However, the corollary to this rule is that an opinion that could not reasonably be construed as implying undisclosed defamatory facts will not substantiate a defamation claim.  *See Cornerstone Sys. v. Knichel Logistics, L.P.*, 255 F. App'x 660, 665 (3d Cir. 2007); *Pace v. Baker-White*, 432 F. Supp. 3d 495 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 433 (2022).

The statements in the Article that Plaintiff "had to be giving EPO to his trainers to use and not a single trainer picked up the phone and said I have an owner who wants me to use EPO on his horses"—and the same or similar statements allegedly repeated to horse racing industry leaders— cannot support a claim for defamation under this analysis.  These statements reflect the speaker's opinion about what Plaintiff must have done with the PEDs he purchased rather than an unequivocal assertion of fact.   Indeed, a statement by any speaker that something "has to be" or "had to be" true is, by its very nature and choice of words, an acknowledgment of a lack of certainty about the underlying matter and also an expression of skepticism about a contrary fact or factual denial, thus negating any reasonable inference that the speaker is making the assertion as a provable statement of fact.  Simply stated, it is the speaker's surmise about the subject matter of the statement.  As this court has held, "[i]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable defamation under Pennsylvania law." *Pace*, 432 F. Supp. 3d at 495.  The statements allegedly made by Defendant in the Article and repeated to horse racing industry insiders that Plaintiff "had to be" giving PEDs to his trainers and

instructing them to use them on his horses fall squarely within that description and constitute non-actionable opinion.

Furthermore, nothing in the "had to be" statements in the Article and allegedly repeated to horse racing industry leaders could reasonably be understood to imply undisclosed defamatory facts which might render the statements actionable even as an opinion. In fact, the opposite is true. The opinion that Plaintiff "had to be" giving PEDs to his trainer and telling them to use them on his horses is based on, and a direct logical inference drawn from, the *disclosed*, *non-defamatory* and *true* fact that Plaintiff purchased PEDs from a veterinarian convicted of federal crimes related to the manufacture and sale of those PEDs to individuals in the horseracing industry for use on horses. Additional support for that opinion is in the four corners of the Complaint, wherein Plaintiff himself characterizes Government Exhibit 16000 as reflecting a handful of orders of BB3 *by one of his trainers*, thereby providing confirmation that the purchases were made for use by a trainer. (Compl. ¶¶ 31-32.) It is hardly a stretch or unfounded for Defendant to deduce that Plaintiff purchased the PEDs for the purpose of having them administered to his horses, since that is the very purpose of the PEDs being sold by Fishman. As the Third Circuit Court of Appeals has held, "[e]veryone is free to speculate about someone's motivations based on disclosed facts about that person's behavior . . . Those statements are just . . . opinions based on disclosed facts, so they too are not actionable." *McCafferty v. Newsweek Media Grp.*, 955 F.3d 352, 359 (3d Cir. 2020).

Cases in which alleged defamatory statements feature equivocal language are routinely dismissed because the statements are non-actionable opinion. *Pace*, 432 F. Supp. 3d at 512 (citing *Purcell v. Ewing*, 560 F. Supp. 2d 337, 340 (M.D. Pa. 2008) (finding statements that alumnus looked like "someone accused of child molestation" was non-actionable opinion); *In re Maze*, No. 98–33715, 1999 WL 554600, at *2 (E.D. Pa. July 16, 1999) (finding statement in letter that

plaintiff failed to pay taxes, "which money he seemingly misappropriated from his employees[,]" was non-actionable opinion); *see also Reardon v. Allegheny College*, 926 A.2d 477, 484 (Pa. Super. Ct. 2007), *app. denied*, 596 Pa. 755, 947 A.2d 738 (2008) (finding use of the phrase "might have" rendered statement non-actionable because it was "a strong indication that this statement [was] merely one outlining possibilities"). That same result should obtain here with respect to Plaintiff's claims that are based on Defendant's opinion as to what Plaintiff must have been doing with the PEDs he unquestionably purchased.

> **3.** **The Alleged Additional Statements to Industry Professionals Concerning Taylor's Ownership of Numerous Horses and Taylor's Assurance He Would Provide Legal Representation to Trainers if they Got Caught Using PEDs Are Not Defamatory in Nature or by Implication.**

The remaining statements alleged in the Complaint to be defamatory cannot support claims of defamation because they are not capable of a defamatory meaning as a matter of law.

The first of these statements is that Defendant told racing industry colleagues that "nobody can own as many horses as Howard does." (*See supra*, at 11.) That statement is not defamatory on its face: there is nothing in its nature or words that, standing alone, could be said to "grievously fracture[]" Plaintiff's standing in the community or to deter third persons from dealing with him. *See Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014), *aff'g*, No. CIV. A. 10–1710, 2013 WL 1286662, at *16 (E.D. Pa. Mar. 28, 2013). Recognizing this, Plaintiff asserts that the statement was defamatory when viewed in context because it "suggest[ed] that Taylor does not actually own his horses, but rather is fronting for other people who could not receive a license"—in other words, that the statement is defamatory by implication or innuendo.

"Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the *context in which these statements are issued creates a defamatory implication*, i.e., defamation by innuendo." *Monge v. Univ. of*

21

*Pennsylvania*, No. CV 22-2942, 2023 WL 3692935, at *4(E.D. Pa. May 26, 2023) (quoting *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010) (emphasis in original).  In order to establish a claim of defamation by innuendo, "the innuendo must be warranted, justified and supported by the publication." *Id.* (quoting *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. Super. Ct. 1992), *app. denied*, 533 Pa. 601, 617 A.2d 1275 (1992) (internal quotation marks omitted). The Court must determine whether the language used "could fairly and reasonably be construed to have the meaning imputed in the innuendo." *Sarkees v. Warner-West Corp*., 349 Pa. 365, 37 A.2d 544, 546 (1994). "When the implication alleged by the plaintiff is not 'reasonably susceptible of a defamatory meaning,' the plaintiff has failed to state a claim." *Pace*, 432 F. Supp. 3d at 510 (quoting *Beverly Enters., Inc.*, 182 F.3d at 191).

Furthermore, "[i]f the publication complained of is not in fact libelous, it cannot be made so by an innuendo which puts an unfair and forced construction on the interpretation of the publication." *Sarkees*, 37 A.2d at 546.  A claim of defamation by innuendo "cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." *Id.*  "It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo." *Id.* Even when viewed in context, it is not defamatory to question whether an individual who claims to have owned over one thousand racehorses over his career does actually own as many horses as he claims.  The statement may imply that Plaintiff is exaggerating, but it would be a gigantic and unfounded leap for the court to find that such a statement was actually implying that Plaintiff acts as an illegal "front" for unlicensed owners.   This is a textbook example of the kind of "unfair and forced construction" of a statement that the court should reject when making the legal determination of whether a

particular statement is defamatory in nature.  *Sarkees*, 37 A.2d at 546.  The statement concerning horse ownership is simply not capable of a defamatory meaning and should not be construed as such.

The same is true of Defendant's alleged statement that Plaintiff assured his trainers that he would represent them if they were to get caught using PEDs.  There is nothing inherently defamatory in a statement by an attorney who has characterized himself as a nationally preeminent equine law attorney offering to provide legal representation to trainers if they were to be accused of being involved with the use of PEDs.   Like the statement about horse ownership, the alleged offer of representation statement can only be viewed as potentially defamatory if the court were to view it as implying, as Plaintiff alleges, that Taylor himself (as opposed to trainers) is engaged in illegal activity.   However, such a construction would be forced and unwarranted under the circumstances. Because these additional statements are not defamatory by nature or by implication, they are not actionable as a matter of law and Plaintiff's defamation claim predicated on them "must be dismissed.   *Remick*, 238 F.3d at 261*;see also Sarkees*, 37 A.2d at 546 (affirming dismissal of defamation by innuendo claim for failure to state a claim because, "when taken in their usual and ordinary sense: the alleged defamatory statements "could not be understood by those who read it as disparaging or damaging the plaintiff's reputation" and there is "nothing the [statement] itself or the [Complaint] to justify the meaning ascribed in the innuendo."

      **4.**      **The Statements In Issue Cannot Form the Basis for a Claim of Defamation Because They Were Not Made with Actual Malice.**

The First Amendment mandates that a defendant act with actual malice for its statements about a public figure to constitute defamation.  *See McCafferty*, 955 F.3d at 356 (quoting *Am. Future Sys., Inc.*, 923 A.2d at 400 ("To show defamation, a public figure (even if just a 'limited purpose public figure'...) must show that the publisher acted with 'actual malice.'"); *see also*

*Mallory II*, 260 F. Supp. 3d at 465 (applying and analyzing actual malice standard to a defamation *per se* claim.)  Actual malice means that that the defendant "either knew that the statement was false or published [the statement] with reckless disregard for the truth," *N.Y. Times Co. v. Sullivan*, 376 U.S. at 279-80.  Actual malice is a stringent exacting standard that requires a plaintiff to plead that the speaker made each defamatory statement with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) at 334 n.6.  "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

The plaintiff has the burden of proving that the defendant acted with actual malice by clear and convincing evidence.  *Franklin Prescriptions, Inc. v. The New York Times Co*., 267 F. Supp. 2d 425, 438 (E.D. Pa. 2003).  "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989) (citation omitted).

Actual malice under the *New York Times v. Sullivan* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will.  *Masson v. New Yorker Mag*., Inc., 501 U.S. 496, 510 (1991).  In fact, "[a]ctual malice is a term of art that does not connote ill will or improper motivation.  Rather, it requires that that the publisher either know that its [statement] was false or publish[ed] it with reckless disregard for its truth." *McCafferty*, 955 F.3d at 359 (citation and internal quotation marks omitted); *see also Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82-83 (1967) (per curiam) (distinguishing common law malice from constitutional actual malice).

Moreover, the Third Circuit has held that the plaintiff's already exacting actual malice burden is higher in defamation-by-implication cases, requiring a showing beyond even knowledge

of or recklessness regarding the falsity of the statement's defamatory meaning: it requires a showing of an intent by the speaker to communicate a defamatory meaning. The rationale for the higher standard in these cases is that because the statements in defamation by implication cases can have both a defamatory and non-defamatory meaning, the court cannot presume with certainty that a defendant knows it is making a defamatory statement as it does in more traditional defamation cases. *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 90 (3d Cir. 2013).

When these principles are applied in this case, they compel a finding that the Plaintiff has failed to plead and cannot establish actual malice by Defendant as a matter of law. All of the alleged defamatory statements relating to Plaintiff's purchase of PEDs are based upon the evidence presented at the Fishman trial showing that Plaintiff made multiple purchases of BB3, a potent PED, from a veterinarian who was convicted and sentenced to 11 years in prison for his adulteration, misbranding and sale of those drugs to horse owners and trainers. Even if there were a question as to whether some or all of the statements in issue were true, misleading, or even wholly inaccurate, because they were based on Plaintiff's indisputable purchase of PEDs Plaintiff cannot possibly prove that Defendant had a "high degree of awareness of [the statements'] probable falsity" or "'serious doubts' as to the truth of the publication" – or, with respect to the statements alleged to be defamatory by implication, that he made them with an intent to communicate a defamatory meaning. Moreover, even assuming it is true, for purposes of this motion, that Defendant published and made the statements in issue out of a desire for revenge or spite, as Plaintiff alleges, that motivation is irrelevant to the court's actual malice analysis. *McCafferty*, 955 F.3d at 359. The precedent makes clear that allegations of common law malice are insufficient to allege actual malice. *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (finding allegations that defendant "intended to harm" plaintiff insufficient); *Egiazaryan v. Zalmayev,* No. 11 CIV. 2670 PKC, 2011 WL 6097136, at *8

(S.D.N.Y. Dec. 7, 2011) (rejecting allegations regarding defendant's hostility to plaintiff).

As this court observed in *Pace v. Baker-White*, "[i]n the wake of *Iqbal* and *Twombly*, adequately pleading actual malice is an onerous task[.]" 432 F. Supp. 3d at 513–14 (quoting *Earley v. Gatehouse Media Pennsylvania Holdings, Inc.*, 2015 WL 1163787, at *2 (M.D. Pa. Mar. 13, 2015). A failure to do so "regularly results in early dismissal of an action." *Id.* at 514 (citing cases). As in those cases, Plaintiff has failed to and cannot plausibly allege facts to support that the statements in issue were false and defamatory or published with actual malice.

In addition, because Plaintiff cannot plausibly plead his defamation and trade libel claims as a matter of law, his Complaint should be dismissed with prejudice and without leave to amend. Although the Federal Rules generally provide that a court "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), leave is properly and frequently denied for a number of reasons, including futility of amendment. *Heyl & Patterson Int'l, Inc. v. F.D. Rich Hous. of the V.I., Inc.*, 663 F.2d 419, 425 (3d Cir. 1981), *cert. denied*, 455 U.S. 1018 (1982). An amendment would be futile "if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000); *see also Smith v. Pennsylvania*, No. CV 21-5473-KSM, 2022 WL 3139854, at *12 (E.D. Pa. Aug. 4, 2022), *aff'd*, No. 22-2632, 2023 WL 3336642 (3d Cir. May 10, 2023) (internal citations and quotations omitted). Here, any proposed amended pleading could not cure the legal deficiencies that permeate the Complaint and would be subject to dismissal for the same reasons argued in this motion. As a result, the Complaint should be dismissed with prejudice and without leave to amend. *See Purcell*, 560 F. Supp. 2d at 342-43 (granting Rule 12(b)(6) motion to dismiss libel claim on opinion grounds without leave to amend); *Reed v. Pray*, 53 A.3d 134, 144 (Pa. Commw. Ct. 2012), *app. denied*, 619 Pa. 718, 64 A.3d 633 (2013) (affirming trial court's denial of a motion for leave to amend a defamation complaint on the grounds of futility).

26

### B.    PLAINTIFF FAILS TO AND CANNOT STATE A VALID CLAIM OF FALSE LIGHT INVASION OF PRIVACY

Under Pennsylvania law, public statements that place a person in a false light are actionable at law as an invasion of privacy.  *Graboff*, 2013 WL 1286662, at *16 (citing *Fanelle v. LoJack Corp.*, 79 F. Supp. 2d 558, 563 (E.D. Pa. 2000).  To successfully plead a claim of false light invasion of privacy under Pennsylvania law, the Plaintiff must allege facts showing that the defendant published material that is "not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." *Graboff*, 744 F.3d at 136 (*quoting Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct.), *app. denied*, 520 Pa. 597, 552 A.2d 251 (1988), *cert. denied*, 489 U.S. 1096 (1989).

Although torts of defamation and false light are similar in certain respects – *e.g.,* the requirement that the plaintiff prove the falsity of the alleged offensive statement – they differ in others.  *Mallory I*, 168 F. Supp. 3d at 760, 776–77.  For, example, "false light requires scienter, or at least reckless disregard, whereas defamation claims not involving public figures or matters of public concern require only a showing of negligence."  *Id.* at 577. Additionally, "false light requires "publicity," meaning widespread dissemination, as opposed to mere "publication" under defamation."  *Id.* (citing *Fanelle*, 2000 WL 1801270, at *9 (internal citations omitted).   "The "publicity" requirement for false light in Pennsylvania requires that the "matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Manco v. St. Joseph's Univ.*, No. CV 22-285, 2024 WL 299265, at *16 (E.D. Pa. Jan. 25, 2024) (quoting *Casselli v. City of Philadelphia*, 54 F. Supp. 3d 368, 380 (E.D. Pa. 2014) (quoting *Curran v. Children's Service Center of Wyoming County, Inc.*, 578 A. 2d 8, 12 (Pa. Super. 1990), *app. denied*, 526 Pa. 648, 585 A.2d 468 (1991) (internal quotations omitted).

When judged by these standards, Plaintiff's false light claims fail as a matter of law. *Manco*, 2024 WL 299265, at *17. The statements Defendant allegedly made in person or by phone to select industry professionals cannot serve as the basis for a false light claim because they do not and cannot allege widespread dissemination of those statements as required to plead a false light claim. Accordingly, the false light claims based on those statements should be dismissed on that basis alone. *See, e.g., id.* at *16 (dismissing false light claim on 12(b)(6) motion due to failure to allege sufficient facts to establish widespread dissemination of alleged offensive statements); *Curran*, 578 A. 2d 8 at 13 (upholding on appeal dismissal of plaintiff's complaint for failure to allege or show widespread publicity of statements in issue.) With respect to the alleged offensive statements in the Press Release and Article, both of which were more widely disseminated, Plaintiff's false light claim is legally deficient for the same reasons as his defamation claims. He cannot prove the falsity of the statements in the Press Release because they are true (*see* Point IV(a)(1), *supra*), and it is well-settled that false light claims cannot be sustained as to any true or substantially true statements. *See Monge*, 2023 WL 3692935 at *8. Additionally, "in Pennsylvania, falsity means the same thing for false light as it does for defamation" and "[i]n both contexts, an opinion based on disclosed facts cannot be false." *Id.* at 7 (citing *McCafferty*, 955 F.3d at 360).

As with a public figure defamation claim, under Pennsylvania law the required standard of fault in a false-light claim is actual malice. *Monge*, 2023 WL 3692935 at *7. Plaintiff's inability to plausibly plead actual malice in connection with his defamation claims also fatally undermines his claim alleging that Defendants' published statements placed him in a false light. Accordingly, for the same reasons argued in Point A, the Fourth Count of the Complaint should be dismissed for failure to state a claim upon which relief can be granted.

## C.    PLAINTIFF FAILS TO STATE A COGNIZABLE CLAIM OF TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS.

Pennsylvania common law recognizes an action in tort for an intentional, unprivileged interference with existing contractual relationships, but Plaintiff has failed to and cannot plausibly allege facts necessary to establish key elements of that claims in this case.

To state a claim for tortious interference with contractual relationships, a plaintiff must plausibly allege: (1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct. *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc*., 982 A.2d 94, 98 (Pa. Super. Ct. 2009), *aff'd*, 610 Pa. 371, 20 A.3d 468 (2011).    The fundamental premise underlying this cause of action is the general recognition that "'one has the right to pursue his business relations or employment free from interference on the part of other persons *except where such interference is justified or constitutes an exercise of an absolute right*.' "  *Walnut St. Assocs, Inc.*, 610 Pa. at 383, 20 A.3d at 475. (internal citations and quotations omitted) (emphasis added.).    In other words, a tortious interference claim cannot lie without a showing of improper conduct by the defendant along with defendant's intention to harm the plaintiff. *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 934 (Pa. Super. Ct. 2013).[8]  Courts require a showing of both harm and improper

---

[8] The third element of the claim, requiring proof that the defendant's actions were improper and unjustified, is generally determined through the court's consideration of the factors listed in Restatement (Second) of Torts § 767:  (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties. *Walnut St. Assocs., Inc.*, 982 A.2d at 98.

conduct because they have recognized that some intentionally harmful conduct is done "at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff." *Id.* (quoting *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008), *app. denied*, 600 Pa. 764, 967 A.2d 960 (2009)).

In the Fifth Count of his Complaint, Plaintiff alleges that Defendant's alleged defamatory statements concerning him and his exclusion of horses owned solely or jointly by Plaintiff from racing at the Meadowlands are the acts that constituted intentional interference in his contractual relationships with his business partners. (Compl. ¶¶ 150-162.)  When Plaintiff's claim is examined against the applicable legal standards, however, it is evident that Plaintiff has failed to plausibly plead and cannot prove at least two of the elements of his tortious interference claim.

> **1.    Plaintiff Has Failed to Plausibly Plead the Absence of Privilege or Justification on the Part of Defendant.**

First, Plaintiff cannot state a cognizable claim of tortious interference with contract in this case because he cannot show that Defendant's statements about Plaintiff and his exclusion of Plaintiff from the Meadowlands were improper and without privilege or justification.

Defendant's statements about Plaintiff were not improper because, in Pennsylvania, truthful statements are not improper as a matter of law and thus cannot serve as the basis for a tortious interference claim. *See Walnut St. Assocs.,* 982 A.2d at 100.  As shown more fully in Point I, above, the statements that Plaintiff alleges were defamatory were true, substantially true, or constituted an opinion based on a true statement.  As such, they cannot serve as the basis for a tortious interference with contract claim against Defendant.

Furthermore, as an owner of racetracks and a leader in the fight to prevent and eliminate the use of PEDS in the horse racing industry, Defendant was justified in speaking out about Plaintiff's purchase of PEDs from a convicted criminal, especially since, as Plaintiff alleges, Plaintiff has raced his horses at the Meadowlands thousands of times, has won almost every major race at the Meadowlands, including the three major races he won in 2016, and, prior to his exclusion, routinely participated in five to six races at the Meadowlands each week.  (*See supra*, at 3-4.) Accordingly, Defendant's statements about Plaintiff and his connection to the PEDs cannot serve as the basis for a tortious interference with contract claim in this case.

With respect to the racetrack ban, Defendant had and has an absolute right under the law of both New Jersey and New York (the locations of his racetracks (Compl. ¶ 21)) to exclude anyone from racing at those racetracks under the facts alleged in the Complaint.

New Jersey recognizes the right of racetrack owners to exclude any individual for no reason or any reason other than a discriminatory reason.  *Pena v. New Meadowlands Racetrack LLC*, No. CIV.A. 12-2 SRC, 2012 WL 95344, at *6 (D.N.J. Jan. 10, 2012); *Martin v. Monmouth Park Jockey Club*, 145 F. Supp. 439, 440 (D.N.J. 1956), *aff'd*, 242 F.2d 344 (3d Cir. 1957).  In *Pena*, the Court rejected the plaintiff's assertion that the Meadowland Racetrack's decision to exclude him from the racetrack for no clear reason was conduct fairly attributable to the State (the ground lessor of the property) and, in the absence of that State nexus, recognized the racetrack's "common law right, as a private operator of a horse-racing facility, to exclude Mr. Pena from the racetrack." *Pena*, 2012 WL 95344, at *6 (citing *Martin,* 145 F. Supp. at 439).  In *Martin*, a case involving a jockey who was excluded from a racetrack for betting on a horse that was running against his horse (as well as other offenses), the Court held that the racetrack had the right to exclude the jockey, stating:  "Although it is intensely regulated, the defendant Club is a private organization. Nothing is more elementary than its right as a private corporation to admit or exclude any persons it pleases

from its private property, absent some definite legal compulsion to the contrary" (for example, the jockey's race).  *Martin*, 145 F. Supp. at 440.   The Third Circuit affirmed, adopting the reasoning of the District Court.  *Martin,* 242 F.2d 344 ("The facts and the applicable legal principles are adequately set out in the opinion filed by Chief Judge Forman in the district court, 145 F. Supp. 439, and need not be repeated here. It is sufficient to say that we are in full accord with Chief Judge Forman's conclusions and need add nothing to the reasons given by him in support of them.").

New York similarly recognizes a racetrack owner's right to exclude individuals from racetracks, especially when the reason for doing so is to protect the sport against those who might harm it.   "The owners of the raceways . . . have a great stake in maintaining and protecting the sport's integrity against those who would despoil it."   *Hadges v. Yonkers Racing Corp.* ("*Hadges I*"),  733 F. Supp. 686, 691 (S.D.N.Y. 1990), *aff'd*, 918 F.2d 1079 (2d Cir. 1990) ("*Hadges II*") (quoting *Gilmour v. N.Y. State Racing & Wagering Bd.*, 405 F. Supp. 458, 460 (S.D.N.Y. 1975).  Thus, the private owner of a racetrack has the right to choose whom it wishes to conduct business, and "***may exclude any person without reason, provided that the exclusion is not based on race, creed, color or national origin.***"  *Hadges II,* 918 F.2d at 1083–84 (emphasis added); *see also People v. Licata*, 268 N.E.2d 787, 788 (N.Y. 1971) ("The rule is well established that the operator of a racetrack can 'exclude a person from attending its races . . .  as long as the exclusion is not founded on race, creed, color or national origin."); *Arone v. Sullivan Cnty. Harness Racing Ass'n, Inc.*, 457 N.Y.S.2d 958, 959 (App. Div. 3d Dep't 1982) (noting the "long-recognized prerogative  of racetrack operators  to exclude anyone  from  its  track,  without  cause,  provided the exclusion is not based on race, creed, color or national origin").  Indeed, New York's Racing Commission has codified this common-law rule.  *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 4119.8 (affirming right of race track to "expel[] from the track"  "any person whether a licensee, participant or patron whose conduct is deemed detrimental to the best interest of harness racing or

who is deemed an undesirable person, listing examples of such conduct, and noting that "[n]othing contained in this section shall diminish the right of any track to exclude any person as a patron or otherwise without reason, provided such exclusion is not based upon race, creed, color or national origin.").

Here, Plaintiff does not allege that he was excluded by Defendant from participating in races at the racetracks for a discriminatory reason such as his race, creed, color or national origin. As such, Defendant was and is permitted to exclude Plaintiff from racing at the Meadowlands *without reason*.  *Pena*, 2012 WL 95344, at *4-6; *Hadges II*, 918 F.2d at 1083–84.  If Plaintiff could be lawfully excluded from the racetracks for no reason or any non-discriminatory reason, then, *a fortiori*, Defendant had an absolute right to exclude him for the very laudable reason (expressly recognized in both *Martin* and *Hodges*) of trying to maintain the integrity of harness and thoroughbred racing by eliminating the use of harmful PEDs in the sport.  Defendant's act of excluding Plaintiff from the Meadowlands was justified and an exercise of his absolute legal right and, for this reason alone, Plaintiff's claim for tortious interference fails as a matter of law.

### 2.   Plaintiff Has Failed to Plausibly Plead that he Has Sustained Actual Harm as a Result of Defendant's Conduct.

Plaintiff also cannot show that he has suffered any actual harm as a result of the Defendant's conduct: instead, his claim is based upon the specter of some future harm or damages. Plaintiff's attempt to ground his tortious interference claim on speculative harm that may or may not occur is improper and at odds with Pennsylvania law.

As a preliminary matter, it is noteworthy that, although the Complaint contains a list of various business partners with whom Plaintiff allegedly has contracts (Compl. ¶ 151), the Complaint fails to allege any specific facts concerning any of those contracts, such as the dates, parties, type of agreement, duration, or any other terms.  Most significantly, completely missing

33

from Plaintiff's Complaint is any factual allegation that there was an ***actual breach*** of any contracts forming the basis for the tortious interference claim. Instead, Plaintiff alleges generally and vaguely that he co-owns horses with over 70 partners; that Defendant was aware of these contractual relationships; that Defendant made the alleged defamatory statements and placed Plaintiff on the excluded list to target Plaintiff and encourage his partners to divest from co-ownership with Plaintiff; and Defendant's actions put Plaintiff's partnerships "at risk of collapse". He also alleges that Defendant's actions have damaged his investments in the purchase of his horses, which were made in reliance on them being able to race in lucrative Meadowlands races, and caused "likely" lost potential winnings from races at the Meadowlands and other racetracks from which he is now banned.

Plaintiff's allegations of harm are too speculative to support a tortious interference claim. The Complaint alleges only the potential for harm from Defendant's conduct but does not allege any facts showing ***actual*** harm or damages to Plaintiff, the fourth element required to state a valid tortious interference with contract claim. *Walnut St. Assocs*., 982 A.2d at 98. Plaintiff's alleged damages hinge entirely on the contention that the Plaintiff's horses would have necessarily performed at a level to produce profits for Plaintiff in the future, and not losses. In other words, Plaintiffs' claimed damages are dependent on the wholly uncertain outcomes of future races. However, a party seeking damages such as lost profits in relation to a claim of breach of a contract must be able to prove damages with "reasonable certainty, which at a minimum embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." *Alpart v. Gen. Land Partners, Inc*., 574 F. Supp. 2d 491, 504 (E.D. Pa. 2008) (citing *Ware v. Rodale Press, Inc*., 322 F.3d 218, 226 (3d Cir. 2003). Even accepting Plaintiff's allegations as true, they

are insufficient to establish the requisite element of actual damages to succeed on his tortious interference claims and, for this additional reason, Plaintiff's tortious interference with contract claim should be dismissed.

     **D.**    **PLAINTIFF FAILS TO AND CANNOT STATE A CLAIM OF UNFAIR COMPETITION.**

In the Sixth Count of his Complaint, Plaintiff alleges that Defendant's alleged defamatory statements and his ban on Plaintiff's horses and trainers from racing at the Meadowlands constitutes Unfair Competition because they were done with malice and "have caused Taylor's business to suffer while benefitting Gural's business, which is a competitor in the same market." (Compl. ¶ 166)  These allegations in this Count fall far short of what is required to plausibly plead a common law claim of unfair competition under Pennsylvania law.

Pennsylvania recognizes "a common law claim of unfair competition under the Restatement (Third) of Unfair Competition." *Air Prods. and Chems., Inc. v. Inter–Chem., LTD*, et al., No. Civ.A.03–6140, 2003 WL 22917491, at *12 (E.D. Pa. Dec. 2, 2003) (*quoting Fresh Made, Inc. v. Life Way Foods*, No. Civ.A.01–4254, 2002 WL31246922, at *9 (E.D. Pa. Aug. 9, 2002). The Restatement provides, in relevant part:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless ... the harm results from ... acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person, seeking relief and the public.

Restatement (Third) Unfair Competition § 1(a).

As the Third Circuit has observed, "[i]t is not so easy to conclude that there is one narrow and clear category of the common law tort" of unfair competition. *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995).  However, that does not mean that the type of conduct actionable as unfair competition is limitless. Quite the contrary, relying on the

Restatement, Pennsylvania courts have recognized a cause of action for unfair competition only in limited circumstances: if a defendant "(1) engages in deceptive marketing, infringement of trademark or other protectable intellectual property, misappropriation of trade secrets, or acts or practices that are actionable under federal or state statutes; and (2) his conduct causes harm to the plaintiff's commercial relations." *M3 USA Corp. v. Hart*, 516 F. Supp. 3d 476, 504–05 (E.D. Pa. 2021); *see also Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 415 Pa. 276, 284, 203 A.2d 469 (1964) (holding that "false and misleading representations" in outreach to customers is unfair competition); *Spring Steels, Inc. v. Molloy*, 400 Pa. 354, 364, 162 A.2d 370 (1960) (describing unfair competition where "the defendants' action consist[ed] of ... fraud or deception in its dealings with third parties or consumers"); *Penn. State Univ. v. Univ. Orthopedics, Ltd*., 706 A.2d 863, 867 (Pa. Super. Ct. 1998) (A claim of unfair competition encompasses trademark infringement and unfair practices involving a misappropriation of the skill, expenditures and labor of another") (citation omitted)) , a cause of action for unfair competition has been recognized "where there is evidence of, among other things ... tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." *M3 USA Corp.,*516 F. Supp. 3d at 505.

Plaintiff has not alleged, nor can he, that Defendant engaged in any kind of conduct that could be considered deceptive marketing, infringement of trademark or other protectable intellectual property, misappropriation of trade secrets, usurpation of product rights, siphoning of employees, or any acts or practices that are actionable under federal or state statutes.  As detailed above in connection with Plaintiff's tortious interference claim, Plaintiff also has not alleged facts showing *actual* harm to plaintiff's commercial relationships but has only speculated that he could be harmed in the future.  (*See supra*, at 33-34.)

36

Even if Pennsylvania's common law of unfair competition is broad enough to encompass conduct by a defendant that does not fit precisely within any of the categories of claims described above, Plaintiff's claim still fails as a matter of law because Plaintiff does not and cannot plausibly allege facts to support a finding that the defendant misappropriated the skill, expenditures and labor of the Plaintiff, or engaged in any deceptive unfair, and wrongful towards the Plaintiff that was intended to harm the Plaintiff's business and was not justified by non-competitive reasons (in this case, the desire to rid the racing industry of harmful PEDSs). The conduct of Defendant as alleged in the Complaint is not the type of conduct that is recognized as unfair competition under Pennsylvania's common law and, accordingly, the claim should be dismissed with prejudice for failure to state a claim upon which relief can be granted.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed in its entirety under Fed. R. Civ. P. 12(b)(6), with prejudice, for failure to state a claim upon which relief can be granted.

Respectfully submitted,

Dated: February 26, 2024                **GENOVA BURNS LLC**

 _/s/ Angelo J. Genova_____
By:    Angelo J. Genova (ID # 205373)
    Lawrence Bluestone, Esq.  (ID # 322261)
    1600 Market Street, Suite 1650
    Philadelphia, PA 19103
    (973) 533-0777
    agenova@genovaburns.com
    lbluestone@genovaburns.com

    *Attorneys for Defendant,*
    *Jeffrey Gural*

17422997(2883.073)