**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HOWARD TAYLOR and JUDITH TAYLOR, <br><br> Plaintiffs, <br><br> v. <br><br> JEFFREY GURAL, <br><br> Defendant. | CIVIL ACTION <br><br> No.: 2:23-cv-04882-JHS |

**MEMORANDUM OF LAW OF DEFENDANT JEFFREY GURAL
IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Angelo J. Genova (PA  205373)
Lawrence Bluestone, Esq.  (PA 322261)
**GENOVA BURNS LLC**
19 West 3rd Street
Media, PA 19063
Phone: (973) 533-0777
agenova@genovaburns.com
lbluestone@genovaburns.com

Sean P. McConnell (PA  307740)
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103
Phone: (215) 979-1947
spmcconnell@duanemorris.com

Brian H. Pandya (pro hac vice)
**DUANE MORRIS LLP**
901 New York Avenue N.W., Suite 700 East
Washington, DC 20001
Phone: (202) 776-7807
BHPandya@duanemorris.com

*Attorneys for Defendant,
Jeffrey Gural*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ i

I.      INTRODUCTION ............................................................................... 1

II.    THE AMENDED COMPLAINT'S ALLEGATIONS .................................. 4

    A.    The Parties ................................................................................ 5

    B.    Events Preceding the Alleged Tortious Conduct ................................ 6

        1.    Howard's Lawsuit Against Gural ................................ 6

        2.    The Fishman Trial and Evidence that Howard Purchased Illegal PEDs .......................................... 7

    C.    The Alleged Defamatory Statements ............................................ 11

        1.    The Meadowlands Press Release ................................ 11

        2.    The *Thoroughbred Daily News* Article ........................ 12

        3.    Additional Alleged Defamatory Statements to Individuals in the Horse Racing Industry ................................ 13

    D.    Howard's Alleged Damages ...................................................... 14

    E.    Howard Sells Interest in Certain Horses to His Mother, Judith.................. 15

    F.    Judith's Alleged Damages ........................................................ 15

    G.    Plaintiffs' Antitrust Allegations .................................................. 16

        1.    The Harness Racing Industry .................................... 16

        2.    Plaintiffs' Conclusory Allegations of Anticompetitive Conduct.............. 17

III.    STANDARD OF REVIEW ...................................................................... 18

IV.    ARGUMENT ...................................................................................... 19

    A.  HOWARD'S DEFAMATION AND TRADE LIBEL CLAIMS FAIL BECAUSE THE STATEMENTS COMPLAINED OF ARE NOT FALSE OR DEFAMATORY AS A MATTER OF LAW .................................. 19

1. The Statements In The Press Release Are Not Defamatory Because They Are True and Not Capable of a Defamatory Meaning ...................................................................................21

2. The Statements in the Article and Repeated to Industry Professionals Are Not Defamatory Because they Constitute Opinion ...................................................................................24

3. The Alleged Additional Statements to Industry Professionals Concerning Howard's Ownership of Numerous Horses and Howard's Assurance He Would Provide Legal Representation to Trainers If They Got Caught Using PEDs Are Not Defamatory in Nature or by Implication ...........................................................28

B. HOWARD'S DEFAMATION AND TRADE LIBEL CLAIMS FAIL AS A MATTER OF LAW BECAUSE HE DOES NOT ADEQUATELY PLEAD ACTUAL MALICE ...................................................................30

    1. Howard's Allegations, Assumed True, Demonstrate He Is A Limited  Purpose Public Figure, Requiring Actual Malice......................32

    2. Howard Fails to Sufficiently Plead Actual Malice ...................................35

C. HOWARD FAILS TO STATE A VALID CLAIM OF FALSE LIGHT INVASION OF PRIVACY...................................................................38

D. PLAINTIFFS FAILS TO STATE COGNIZABLE CLAIMS OF TORTIOUS INTERFERENCE WITH CONTRACT OR PROSPECTIVE BUSINESS RELATIONSHIPS................................................................... 39

    1. Plaintiffs Fail to Plausibly Plead the Absence of Privilege or Justification on the Part of Defendant .......................................................41

    2. Howard Has Failed to Plausibly Plead that He Has Sustained Actual Harm as a Result of Defendant's Conduct ....................................44

    3. Judith's Fails to Adequately Plead Prospective Contracts with Third Parties or Non-Speculative Damages................................................45

E. PLAINTIFFS FAILS TO STATE AN UNFAIR COMPETITION CLAIM........48

F. PLAINTIFFS' PROMISSORY ESTOPPEL CLAIM FAILS ..............................50

G. PLAINTIFFS FAIL TO PLEAD PLAUSIBLE ANTITRUST CLAIMS .............53

1.  Plaintiffs Fail to Plausibly Allege a "Conspiracy" Under Sections 1 or 2 of the Sherman Act ..........................................................54

2.  Plaintiffs' Fails to Adequately Plead the Remaining Elements of their Federal Antitrust Claims .............................................................58

    i.    Plaintiffs' Claim Must Be Analyzed Under the Rule of Reason ...............................................................................58

    ii.   Plaintiffs Fail to Adequately Allege a Relevant Product Market ....................................................................................60

    iii.   Plaintiffs Fail to Adequately Allege a Relevant Geographic Market ....................................................................................61

    iv.   Plaintiffs Fail to Allege Monopoly or Market Power ..................62

3.  Plaintiffs Lack Antitrust Standing ............................................................62

4.  Plaintiffs' State Antitrust Law Claims Fail for Same Reasons ..................64

V.    CONCLUSION ..............................................................................................65

## **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Accurso v. Infra-Red Services, Inc.*,
23 F. Supp. 3d 494 (E.D. Pa. 2014) ....................................................................51

*Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*,
801 F. Supp. 1450 (E.D. Pa. 1992) ....................................................................47

*Air Prods. and Chems., Inc. v. Inter–Chem., LTD*, et al.,
No. Civ.A.03–6140, 2003 WL 22917491 (E.D. Pa. Dec. 2, 2003) ........................48

*Alpart v. Gen. Land Partners, Inc.*,
574 F. Supp. 2d 491 (E.D. Pa. 2008) ..................................................................45

*Alvin v. Suzuki*,
227 F.3d 107 (3d Cir. 2000)................................................................................37

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
37 F.3d 996 (3d Cir. 1994)..................................................................................46

*Applied Tech. Int'l, Ltd. v. Goldstein*,
No. CIV.A. 03-848, 2004 WL 2360388 (E.D. Pa. Oct. 20, 2004).........................46

*Arone v. Sullivan Cnty. Harness Racing Ass'n, Inc.*,
457 N.Y.S.2d 958 (App. Div. 3d Dep't 1982).......................................................43

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................18, 37

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)...........................................................................................54

*Assoc. Gen. Contractors, Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)...........................................................................................63

*Beckley Newspapers Corp. v. Hanks*,
389 U.S. 81 (1967) (per curiam).........................................................................35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................. *passim*

*Bennett v. Itochu Int'l, Inc.*,
No. 09-CV-1819, 2012 WL 3627404 (E.D. Pa. Aug. 23, 2012), *aff'd*, 572 F.
App'x 80 (3d Cir. 2014)......................................................................................52

*Beverly Enters., Inc. v. Trump*,
  182 F.3d 183 (3d Cir. 1999) ................................................................29

*Biro v. Conde Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013),
  *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 78 (2d Cir. 2015) .....................31

*Bldg. Materials Corp. of Am. v. Rotter*,
  535 F. Supp. 2d 518 (E.D. Pa. 2008) ................................................62

*Bobb v. Kraybill*,
  511 A.2d 1379 (Pa. Super. Ct. 1986), *app. denied*, 513 Pa. 633 (1987) ................................21

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ................................................................60

*Brunson Cmmcn's, Inc. v. Arbitron, Inc.*,
  239 F. Supp. 2d 550 (E.D. Pa. 2002) ................................................46

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ................................................................63

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ................................................19, 27

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ................................................55, 57, 58

*Burton Imaging Grp. v. Toys "R" Us, Inc.*,
  502 F. Supp. 2d 434 (E.D. Pa. 2007) ................................................52

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
  485 U.S. 717 (1988) ................................................................58

*C & K Petroleum Prod., Inc. v. Equibank*,
  839 F.2d 188 (3d Cir. 1988) ................................................52

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ................................................................63

*Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*,
  415 Pa. 276 (1964) ................................................................49

*Casselli v. City of Philadelphia*,
  54 F. Supp. 3d 368 (E.D. Pa. 2014) ................................................38

*Castleberry v. STI Grp.*,
  863 F.3d 259 (3d Cir. 2017) ................................................18, 36

*City of Pittsburgh v. West Penn Power Co.*,
 147 F.3d 256 (3d Cir. 1998)............................................................................62

*Cornerstone Sys. v. Knichel Logistics, L.P.*,
 255 F. App'x 660 (3d Cir. 2007) .....................................................................24

*Crouse v. Cyclops Indus.*,
 560 Pa. 394 (2000).........................................................................................50

*Dianoia's Eatery, LLC v. Motorists Mut. Ins. Co.*,
 10 F.4th 192 (3d Cir. 2021) ...........................................................................32

*Doe v. Hesketh*,
 77 F. Supp. 3d 440 (E.D. Pa. 2015), *rev'd on other grounds*, 828 F.3d 159 (3d
 Cir. 2016) .........................................................................................8, 19, 28

*Dura Pharm., Inc. v. Broudo*,
 544 U.S. 336 (2005).......................................................................................53

*Earley v. Gatehouse Media Pennsylvania Holdings, Inc.*,
 No. No. 12-1886, 2015 WL 1163787 (M.D. Pa. Mar. 13, 2015) ...........................37

*Egiazaryan v. Zalmayev*,
 No. 11 CIV. 2670 PKC, 2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011)....................37

*Elsai, Inc. v. Sanofi Aventis U.S.*,
 LLC, 821 F.3d 394 (3d Cir. 2016) ...................................................................64

*Empire Trucking Co. v. Reading Anthracite Coal Co.*,
 71 A.3d 923 (Pa. Super. Ct. 2013)...................................................................40

*In re Flat Glass Antitrust Litig.*,
 385 F.3d 350 (3d Cir. 2004).............................................................................56

*Fresh Made, Inc. v. Life Way Foods*,
 No. Civ.A.01–4254, 2002 WL31246922 (E.D. Pa. Aug. 9, 2002)..................48, 60

*Garrison v. Louisiana*,
 379 U.S. 64 (1964)...........................................................................................31

*Gelman v. State Farm Mut. Auto. Ins. Co.*,
 583 F.3d 187 (3d Cir. 2009)..............................................................................18

*Gilmour v. N.Y. State Racing & Wagering Bd.*,
 405 F. Supp. 458 (S.D.N.Y. 1975) ..............................................................42-43

*Glenn v. Point Park College*,
 441 Pa. 474 (1971)......................................................................................45-46

*Gordon v. Lewistown Hosp.*,
  423 F.3d 184 (3d Cir. 2005)............................................................................58

*Graboff v. Colleran Firm*,
  744 F.3d 128 (3d Cir. 2014)......................................................................28, 38

*Granite State Ins. Co. v. Aamco Transmissions, Inc.*,
  57 F.3d 316 (3d Cir. 1995)............................................................................48

*Hadges v. Yonkers Racing Corp.*,
  733 F. Supp. 686 (S.D.N.Y. 1990), *aff'd*, 918 F.2d 1079 (2d Cir. 1990) ........................42, 43

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989)........................................................................................31

*Heyl & Patterson Int'l, Inc. v. F.D. Rich Hous. of the V.I., Inc.*,
  663 F.2d 419 (3d Cir. 1981), *cert. denied*, 455 U.S. 1018 (1982)............................37

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
  32 F.4th 242 (3d Cir. 2022) ...........................................................................63

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010)......................................................................55, 57

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)..........................................................53, 56, 57, 59, 62

*Joseph v. Scranton Times, L.P.*,
  634 Pa. 35 (2015)............................................................................................20

*Kendall v. Daily News Pub. Co.*,
  716 F.3d 82 (3d Cir. 2013)..............................................................................35

*Kerrigan v. Otsuka Am. Pharm., Inc.*,
  560 F. App'x 162 (3d Cir. 2014) ................................................................24, 25

*Larsen v. Phila. Newspapers, Inc.*,
  543 A.2d 1181 (Pa. Super. Ct.), *app. denied*, 520 Pa. 597 (1988) ........................38

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)........................................................................................58

*Lieberman v. Corporacion Experienca Unica, S.A.*,
  226 F. Supp. 3d 451 (E.D. Pa. 2016) ..............................................................51

*Lifewatch Servs. Inc. v. Highmark, Inc.*,
  902 F.3d 323 (3d Cir. 2018).......................................................................59, 60

*Livingston v. Murray*,
612 A.2d 443 (Pa. Super. Ct. 1992), *app. denied*, 533 Pa. 601 (1992)...................................29

*M3 USA Corp. v. Hart*,
516 F. Supp. 3d 476 (E.D. Pa. 2021) ....................................................................................49

*Mallory v. S & S Publishers*,
168 F. Supp. 3d 760 (E.D. Pa. 2016) .............................................................................20, 38

*Mallory v. S & S Publishers*,
260 F. Supp. 3d 453 (E.D. Pa. 2017), *aff'd sub nom.,*
*Mallory v. Simon & Schuster, Inc.*, 728 F. App'x 132 (3d Cir.),
*cert. denied*, 139 S. Ct. 154 (2018) ...................................................................21, 23, 24, 31

*Manco v. St. Joseph's Univ.*,
No. CV 22-285, 2024 WL 299265 (E.D. Pa. Jan. 25, 2024) ...........................................38, 39

*Marcone v. Penthouse Int'l Magazine for Men*,
754 F.2d 1072 (3d Cir. 1985).........................................................................................33, 35

*Martin v. Monmouth Park Jockey Club*,
145 F. Supp. 439 (D.N.J. 1956), *aff'd*, 242 F.2d 344 (3d Cir. 1957)..............................42, 44

*Masson v. New Yorker Mag.*, Inc.,
501 U.S. 496 (1991)..............................................................................................................35

*Mayer v. Belichick*,
605 F.3d 223 (3d Cir. 2010), *cert. denied*, 562 U.S. 1271 (2011).........................................27

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
674 F.3d 369 (4th Cir. 2012) ...............................................................................................36

*In re Maze*,
No. 98–33715, 1999 WL 554600 (E.D. Pa. July 16, 1999)...................................................27

*McCafferty v. Newsweek Media Grp.*,
955 F.3d 352 (3d Cir. 2020).......................................................................26, 31, 35, 36, 39

*McDowell v. Paiewonsky*,
769 F.2d 942 (3d Cir. 1985)..................................................................................................33

*McLaughlin v. Bayer Corp.*,
172 F. Supp. 3d 804 (E.D. Pa. 2016) ....................................................................................18

*Meyers v. Certified Guar. Co., LLC*,
221 A.3d 662 (Pa. Super. Ct. 2019)......................................................................................25

*Mid Penn Bank v. Farhat*,
    74 A.3d 149 (Pa. Super. Ct. 2013) ........................................................53

*Monge v. Univ. of Penn.*,
    674 F. Supp. 3d 195 (E.D. Pa. 2023) ...............................................28, 29, 32, 39

*Moore v. Cobb-Nettleton*,
    889 A.2d 1262 (Pa. Super. Ct. 2005) ...................................................24

*Morse v. Lower Merion Sch. Dist.*,
    132 F.3d 902 (3d Cir. 1997) .............................................................. 4-5

*Mylan Pharma. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
    838 F.3d 421 (3d Cir. 2016) ...............................................................60

*Mzamane v. Winfrey*,
    693 F. Supp. 2d 442 (E.D. Pa. 2010) ....................................................28

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..................................................................31, 35

*Nirvana, Inc. v. Nestle Waters N. Am., Inc.*,
    123 F. Supp. 3d 357 (N.D.N.Y. 2015) ...................................................64

*Pace v. Baker-White*,
    432 F. Supp. 3d 495 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021),
    *cert. denied*, 142 S. Ct. 433 (2022) ...................................24, 25, 26, 29, 37

*Pacitti v. Durr*,
    310 F. App'x 526 (3d Cir. 2009) .........................................................21

*Pena v. New Meadowlands Racetrack LLC*,
    No. CIV.A. 12-2 SRC, 2012 WL 95344 (D.N.J. Jan. 10, 2012) ....................42, 43

*Penn. State Univ. v. Univ. Orthopedics, Ltd.*,
    706 A.2d 863 (Pa. Super. Ct. 1998) .....................................................49

*People v. Licata*,
    268 N.E.2d 787 (N.Y. 1971) ..............................................................43

*People v. Rattenni*,
    613 N.E. 2d 155 (N.Y. 1993) ..............................................................64

*In re Pharmacy Benefit Managers Antitrust Litig.*,
    582 F.3d 432 (3d Cir. 2009) ...............................................................58

*Phillips v. Selig*,
    959 A.2d 420 (Pa. Super. Ct. 2008), *app. denied*, 600 Pa. 764 (2009) ...................40

*Potter v. Cozen & O'Connor*,
   46 F.4th 148 (3d Cir. 2022) ...................................................................62

*Purcell v. Ewing*,
   560 F. Supp. 2d 337 (M.D. Pa. 2008) ...............................................26, 38

*Queen City Pizza v. Domino's Pizza*,
   124 F.3d 430 (3d Cir. 1997)...............................................54, 58, 59, 60, 61

*Reardon v. Allegheny College*,
   926 A.2d 477 (Pa. Super. Ct. 2007), *app. denied*, 596 Pa. 755 (2008)...................................27

*Remick v. Manfredy*,
   238 F.3d 248 (3d Cir. 2001)...............................................21, 24, 30

*Sarkees v. Warner-West Corp.*,
   349 Pa. 365, 37 A.2d 544 (1994) ...............................................29, 30

*Satnum Distrib. LLC v. Commonwealth-Atladis, Inc.*,
   140 F. Supp. 3d 405 (E.D. Pa. 2015) ...........................................55

*Schmidt v. Skolas*,
   770 F.3d 241 (3d Cir. 2014).....................................................19

*Scott-Taylor, Inc. v. Stokes*,
   425 Pa. 426 (1967).................................................................20

*Seguro Medico, LLC v. Suffolk Admin. Servs., LLC*,
   No. 5:23-CV-2495, 2023 WL 7324081 (E.D. Pa. Nov. 7, 2023) ....................20, 31

*SEI Glob. Servs., Inc. v. SS&C Advent*,
   No. 20-3386, 2022 U.S. App. LEXIS 18121, 2022 WL 2356730 (3d Cir. June
   30, 2022) ..............................................................................63

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993).................................................................55

*Spring Steels, Inc. v. Molloy*,
   400 Pa. 354, 162 A.2d 370 (1960) ...........................................49

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)................................................................31

*State v. N.J. Trade Waste Ass'n*,
   472 A.2d 1050 (N.J. 1984)........................................................64

*Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*,
   171 F.3d 912 (3d Cir. 1999).....................................................51

*Synygy, Inc. v. Scott-Levin, Inc.*,
51 F. Supp. 2d 570 (E.D. Pa. 1999), *aff'd*, 229 F.3d 1139 (2000)..........................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................................................................19

*UniStrip Techs., LLC v. LifeScan, Inc*,
153 F. Supp. 3d 728 (E.D. Pa. 2015)........................................................................................46

*United States v. E.I. DuPont de Nemours & Co.*,
351 U.S. 377 (1956)..................................................................................................................62

*United States v. Hodge*,
321 F.3d 429 (3d Cir. 2003).......................................................................................................7

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963)..................................................................................................................61

*Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*,
982 A.2d 94 (Pa. Super. Ct. 2009), *aff'd*, 610 Pa. 371 (2011) .....................................40, 41, 45

*Walter v. Herbert*,
No. 3:23-cv-2166, 2024 U.S. Dist. LEXIS 86459 (M.D. Pa. May 14, 2024)..........................37

*Ware v. Rodale Press, Inc.*,
322 F.3d 218 (3d Cir. 2003).....................................................................................................45

*Weavertown Transp. Leasing, Inc. v. Moran*,
834 A.2d 1169 (Pa. Super. Ct. 2003), *appeal denied*, 578 Pa. 685 (2004).............................50

*Whitaker v. Herr Foods, Inc.*,
198 F. Supp. 3d 476 (E.D. Pa. 2016) .......................................................................................51

*Worldhomecenter.com, Inc. v. KWC Am., Inc.*,
No. 10-7781, 2011 U.S. Dist. LEXIS 104496 (S.D.N.Y. Sep. 15, 2011)..................................64

*Zuber v. Boscov's*,
871 F.3d 255 (3d Cir. 2017).....................................................................................................18

## Statutes

42 Pa. Cons. Stat. § 8343(a)(1–7) .....................................................................................20, 24

N.J.S.A. 56:9-3...........................................................................................................................64

N.J.S.A. 56:9-4...........................................................................................................................64

N.J.S.A. 56:9-18.........................................................................................................................64

Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. C.S. § 5104(b)(1).....................................53

## Rules

Fed. R. Civ. P. 12(b)(6)............................................................................................ *passim*

Fed. R. Civ. P. 8(a)(2)..............................................................................................18

Fed. R. Civ. P. 15(a)(2)............................................................................................37

## Regulations

N.Y. Comp. Codes R. & Regs. tit. 9, § 4119.8.........................................................43

## Treatises

Restatement (Third) Unfair Competition § 1(a) (1995)...........................................48

## Other Authorities

Jordan S. Hollander, *And They're Off! Would Instant Horse Wagering in New Jersey Require Voter Approval?*, 6 UNLV Gaming L.J. 239, 239 (2016). ...........................16

Gus Garcia-Roberts, *With private eyes and political muscle, horse racing's elite pushed to punish dopers*, Washington Post (Apr. 29, 2021), *available at* https://www.washingtonpost.com/sports/2021/04/29/horse-racing-doping-jockey-cub/..........................................................................................................7

Standardbred Canada, Links – Racetracks, https://standardbredcanada.ca/content/links-racetracks.html (last visited July 11, 2024)...........................................................................................................16

U.S. Attorney's Office, Southern District of New York, Press Release, Horse Doping Drug Supplier Sentenced to 11 Years In Prison, https://www.justice.gov/usao-sdny/pr/horse-doping-drug-supplier-sentenced-11-years-prison# (July 11, 2022). .........................................................................1

U.S. Trotting Association, Track Information, https://www.ustrotting.com/trackside/trackfacts/trackfacts.cfm (last visited, July 10, 2024).........................................................................................................16

## I.    __INTRODUCTION__

On July 11, 2022, the U.S. Attorney's Office for the Southern District of New York announced that a federal judge had sentenced Seth Fishman, a veterinarian, to 11 years in prison "for his role at the helm of an approximately twenty-year scheme to manufacture, market, and sell to racehorse trainers and others in the racehorse industry 'untestable' performance enhancing drugs for use in professional horseracing." U.S. Attorney's Office, Southern District of New York, Press Release, Horse Doping Drug Supplier Sentenced To 11 Years In Prison (July 11, 2022).

The claims asserted by Plaintiffs Howard and Judith Taylor ("Plaintiffs")[1] in their Amended Complaint (Doc. No. 17) stem from evidence admitted in Fishman's trial, an 83-page collection of invoices, represented by the Government to be Howard's business records, showing that Howard purchased BB3, a potent and illegal performance enhancing drug ("PED"), from Fishman's company, Equestology. The indictment in that criminal case contended that the existence of illegal PEDs and "doping" in professional horse racing is a matter of significant public concern.  In an attempt to deflect attention from the evidence of Howard's PED purchases, Plaintiffs filed this suit against Defendant Jeffrey Gural ("Defendant" or "Gural"), member of Meadowlands Racetrack LLC, asserting tort claims against Gural for Gural's non-defamatory statements of fact and expressions of opinion about Howard's PED purchases, as well as antitrust claims based on Defendant's exclusion of horses owned by Howard (and later sold to his mother, Judith) from racing at the Meadowlands Racetrack.

As explained below, none of Plaintiffs' claims are viable under applicable law, and their Amended Complaint should be dismissed in its entirety, with prejudice.

---

[1]  When referring to them individually, we will refer to Plaintiffs by their first names to avoid confusion, with no disrespect intended.

***Howard's Defamation Claims.*** Howard—who touts his renown as an owner of Stakes-winning horses and as a nationally preeminent equine law attorney—is, according to the allegations in his Amended Complaint, at the very least a limited purpose public figure, who must allege facts to plausibly support the basic elements of a defamation claim under Pennsylvania law, as cabined by the First Amendment. He fails to do so because his defamation claims are based upon true statements of fact and expressions of opinion about him, neither of which are actionable as defamation, as well as statements that simply are not defamatory in nature or by implication. Moreover, even if the statements in issue could potentially have defamatory meaning, Howard fails to plead facts that show that the statements were made with actual malice, the constitutionally required level of fault needed for a limited purpose public figure like plaintiff to state a claim of defamation. Statements about public figures and matters of public concern are accorded the highest constitutional protection and, as such, attempts by public figures to recover in defamation for statements made about them on matters of public concern have been rejected time and again by other courts. It should be rejected here as well.

***Howard and Judith's Miscellaneous Tort Claims.*** Howard attempts to repackage his defamation claims into additional claims of false light, tortious interference with contractual relations, and unfair competition, and, along with Judith, a "promissory estoppel" claim. Judith also asserts a claim for tortious interference with prospective economic advantage. Each of these claims fails as a matter of law.

Howard has failed to state a claim of false light because, like his defamation claims, he is required to but cannot plead facts plausibly alleging that Defendant made false statements of fact and acted with actual malice. Howard also cannot show that certain of the statements in issue were widely disseminated as is required to state a valid false light claim.

2

Howard's tortious interference with contract claim fails because he cannot allege that Defendant engaged in improper conduct without right or justification. As a racetrack owner and leader in the effort to remove illegal PEDs and doping from the horseracing industry, Defendant was justified in commenting on Howard's purchase of PEDs from an individual who had been convicted of federal criminal offenses related to PEDs and had an absolute right to exclude him and others tied to PEDs from racing at his racetracks as a result. Howard's allegation of future, speculative damage rather than actual harm caused by Defendant's actions is also fatal to his tortious interference claim. Judith's tortious interference with prospective business relations claim is similarly deficient and also fails because she does not plead a specific, prospective business relationship that Defendant interfered with as required by Pennsylvania law and, like Howard, her damages allegations are based solely on speculation.

Howard's unfair competition claim fails because the conduct of Defendant as alleged in the Amended Complaint is not the type of conduct that is recognized as unfair competition under Pennsylvania's common law.

And Plaintiffs' promissory estoppel claim must be dismissed because (i) Plaintiffs do not allege that Defendant, individually, promised anything; (ii) Pennsylvania law does not permit Plaintiffs to convert their failed tort claims into a quasi-contract claim; (iii) Plaintiffs fail to plead a definite promise sufficient to invoke promissory estoppel; and (iv) it was objectively unreasonable for Plaintiffs to assume that the Meadowlands would lift the ban when Howard sold his interest in horses to his own relative, precluding a finding of "reasonable reliance."

***Plaintiffs' Antitrust Claims.*** In a last-ditch effort to state a viable claim against Defendant, Plaintiffs seek in their Amended Complaint to recast their deficient tort claims as alternative federal and state-law antitrust conspiracy claims. These threadbare antitrust claims are legally

deficient for at least four independent reasons. First, Plaintiffs fail to allege an antitrust conspiracy under Sections 1 and 2 of the Sherman Act. Second, Plaintiffs fail to plausibly allege facts to establish the required elements under Sections 1 and 2 of the Sherman Act, including a relevant product and geographic market, and market or monopoly power in an antitrust market. Third, Plaintiffs lack standing to assert antitrust claims under federal and state antitrust law because they fail to allege any antitrust injury. Fourth, Plaintiffs' state law claims are plagued by these same deficiencies because they are governed by the same standards as federal law.

## II.    <u>THE AMENDED COMPLAINT'S ALLEGATIONS</u>

Like Howard's original complaint (Doc. No. 1), Plaintiffs' Amended Complaint, filed on May 29, 2024 ("AC"; Doc. No. 17), includes several tort claims by Howard against Defendant: (i) Defamation *Per Se* (First Count); (ii) Defamation (Second Count); (iii)  Trade Libel (Third Count); (iv) False Light (Fourth Count); and (v) Tortious Interference with Contractual Relationships (Fifth Count).  Judith also brings a claim for tortious interference with prospective economic advantage (Twelfth Count) and both Howard and Judith assert a claim for "Promissory Estoppel" (Thirteenth Count).

The Amended Complaint also includes several federal and state antitrust claims (brought by both Howard and Judith against Defendant) including claims under (i) § 2 of the Sherman Act (Sixth Count); (ii) § 1 of the Sherman Act (Seventh Count); (iii) equivalent provisions of the New Jersey Antitrust Act (Eighth and Ninth Counts); and (iv) equivalent provisions of the New York Donnelly Act (Tenth and Eleventh Counts).

Defendant disputes many of the facts alleged by Plaintiffs, but recites the allegations in the Amended Complaint, which must be presumed to be true for purposes of considering this Rule 12(b)(6) motion to dismiss for failure to state a claim.  *Morse v. Lower Merion Sch. Dist.*,

132 F.3d 902, 906 (3d Cir. 1997).

**A.    The Parties**

According to the Amended Complaint, Howard is a long-time owner of racehorses who experienced success as a driver and a trainer before making a name for himself as an owner. (AC ¶ 2.)  In the last few decades, Howard has owned more than one thousand horses, many of which were nationally ranked stakes-winners.  (*Id.* ¶ 15.)  Approximately 80% of Howard's horses are owned jointly, and Howard owns horses with over 70 partners.  (*Id.* ¶¶ 119, 178, 191, 225.)

Howard cites numerous accolades in his decades-long participation in harness racing.  In 2010, Howard was named the Pennsylvania Owner of the Year by the Keystone Chapter of the U.S. Harness Writers Association.  (*Id.* ¶ 36.)  On August 6, 2016, Howard enjoyed one of the most prolific days as an owner in harness racing history, when his horses won three major races at the Meadowlands: the U.S. Pacing Championship, the Cane Pace, and the Lady Liberty.  Earlier that year, Howard's horse, Control the Moment, won the $732,050 Meadowlands Pace.  (*Id.*)

In addition to his horse ownership, Howard has built a practice as an equine lawyer.  He is one of the preeminent equine law attorneys in the country and frequently represents horse trainers in court and before racing commissions nationwide. (*Id.* ¶¶ 2, 22.)

Judith is Howard's mother and is also a "long-time owner of harness-racing horses" and a "staple in the harness-racing community." (*Id.* ¶ 3.) Judith originally became involved in harness racing with her late husband and has participated in the industry for more than 50 years, both with her husband and independently as a co-owner since her husband's death. (*Id.*)  Judith has owned hundreds of horses and earned millions of dollars in winnings during her "long tenure in the sport."  (*Id.*)

Defendant Gural is the owner and CEO of Meadowlands Racetrack LLC, the operator of

the harness and thoroughbred racing track in East Rutherford, New Jersey (the "Meadowlands"). (*Id.* ¶¶ 5, 32.) Defendant also has an ownership interest in Tioga Downs and Vernon Downs, racetracks in New York State. (*Id.* ¶ 32.) Defendant also owns racehorses, and he races them at the Meadowlands and other racetracks that he owns. (*Id.* ¶ 5.)

### B.    Events Preceding the Alleged Tortious Conduct

Howard has raced his horses at the Meadowlands thousands of times and has won almost every major race at the Meadowlands, including the Meadowlands Pace, the Hambletonian, and the three major races he won on August 6, 2016. (AC ¶ 60.) Until recently, Howard routinely entered five to six races at the Meadowlands per week. (*Id.* ¶ 61.)

### 1.    Howard's 2017 Lawsuit Against Gural

Before 2017, Howard and Gural enjoyed a cordial relationship and even owned horses together. (*Id.* ¶ 66.) In 2017, however, Howard sued Gural following Defendant's cancellation of a Meadowlands stakes race (the "2017 Lawsuit").[2] (*Id.* ¶ 67.) Howard alleged in the 2017 Lawsuit that he owned a New Jersey-bred horse and had purchased the horse with a partner based on the expectation that the horse could participate in this race, which was restricted to horses bred in New Jersey. (*Id.*)

Howard alleges that Defendant developed animosity towards him as a result of the 2017 Lawsuit, which has only increased over time. (*Id.* ¶ 68.) Howard further alleges that this animosity and "desire for vengeance" ignited a "smear campaign" at issue in this suit. (*Id.*)

---

[2] In actuality, the 2017 Lawsuit was filed by Howard against the Standardbred Breeders Association of New Jersey and New Meadowlands, LLC, not against Gural personally. *Taylor v. Standardbred Breeders & Owners Ass'n et al.*, Docket No. MON-L-333-17 (Super. Ct. N.J. Monmouth County).

2.    <u>The Fishman Trial and Evidence that Howard Purchased Illegal PEDs</u>

The use of illegal PEDs has been a longstanding problem in the horse racing industry and Defendant has long been a leader in seeking to clean up the sport.[3]  For the last several years, Defendant facilitated criminal prosecutions relating to the use of PEDs in the horse racing industry, pointing federal prosecutors to potential violators for further investigation. (AC ¶ 69.)  Specifically, Plaintiffs allege that Defendant and his representatives assisted federal prosecutors in the recent prosecution and conviction of Dr. Seth Fishman in New York City.  (*Id.* ¶ 70.)

Dr. Fishman is a veterinarian who, along with his associate, Lisa Gianelli, and others, was charged with federal crimes related to PEDs and horses (conspiracy to distribute adulterated and misbranded PEDs) in connection with the operation of his business called "Equestology." Fishman and Giannelli were convicted of those crimes in 2022.[4]  (*Id.* ¶ 71.)  Among the illegal PEDs Fishman was charged with conspiring to sell are Erythropoietin and analogues.[5] Erythropoietin is commonly referred to by participants in the racing industry by the brand name Epogen or the shorthand "epo," and is used to boost a racehorse's red blood cell count in order to stimulate endurance during a race and improve race recovery. (*See* a true and correct copy of the

---

[3] *See, e.g.*, Gus Garcia-Roberts, *With private eyes and political muscle, horse racing's elite pushed to punish dopers*, Washington Post (Apr. 29, 2021), *available at* https://www.washingtonpost.com/sports/2021/04/29/horse-racing-doping-jockey-cub/ (describing Gural's extensive and expensive efforts to rid the industry of PEDs).

[4] Fishman's trial was one of a series of four cases in March 2020, in which over 30 defendants were charged. Of these defendants, only Giannelli and Fishman were convicted by juries, with 22 others pleading guilty. Like the Amended Complaint, this brief refers to both the Fishman and Giannelli trials together as the "Fishman trial." (AC ¶ 71, n. 1.)

[5] An "analogue" is a pharmaceutical with a similar chemical structure that has a similar effect to a controlled substance. *See, e.g.*, *United States v. Hodge*, 321 F.3d 429, 432-37 (3d Cir. 2003).

Superseding Indictment, attached hereto as **Exhibit 1**, at p. 9, ¶ 13(a)**.**) [6] Fishman and Gianelli were also charged with crimes relating to "similar customized 'blood building' substances referred to by the defendants using various code names, including "BB3" [among others]." *Id.*

The Fishman trial was held over eleven days with dozens of witnesses and hundreds of exhibits. (AC ¶ 76.) The Amended Complaint alleges that "[n]one of these witnesses or documents, nor those used in the Giannelli trial, implicated Howard Taylor in any way in providing PEDs to his horses," (*id.*), and there was only "one extremely limited connection between Howard Taylor and the Fishman trial" consisting of "[o]ne 83-page exhibit that the government entered into evidence in the case against Giannelli [which] purports to be a receipt of products that Howard Taylor's trainers received from Equestology." (*Id.* ¶ 73.) The Amended Complaint further alleges that Howard never ordered or used BB3, nor did he instruct his trainers to order or use BB3. (*Id.* ¶ 75.) However, the 83-page exhibit referred to in the Amended Complaint, which the Government introduced into evidence at the Fishman trial as Government Exhibit 16000, shows a history of purchases by Howard from Equestology. (A true and correct copy of Government Exhibit 16000 is attached hereto as **Exhibit 2**.)

---

[6] As explained further, *infra* at Point III, on a Rule 12(b)(6) motion, the court may consider matters of public record and documents referred to in or integral to the complaint without converting it into a motion for summary judgment. The indictment and transcript from the Fishman trial are "quintessential matters of public record." *Doe v. Hesketh*, 77 F. Supp. 3d 440, 447 (E.D. Pa. 2015), *rev'd on other grounds*, 828 F.3d 159 (3d Cir. 2016).

The first page of Exhibit 16000 identifies Howard as owning percentages of certain horses under "Account B":



(Ex. 2 at p. 1.)  The remaining pages are invoices for two accounts (A and B)  directed to "Howard Taylor," and listing his name and address (the latter of which has been redacted for purposes of this filing).  Additionally, in the Client Account Registers, which list the items purchased, Howard Taylor, identified by name and address, is listed as Equestology's "Client."  (*Id.*)

The Amended Complaint acknowledges that BB3 was listed multiple times in Exhibit 16000 (AC ¶ 74) and Exhibit 16000 indisputably shows that BB3 was ordered by Howard on at least 5 separate occasions.  (See Exhibit 2, at pp. 37, 39, 68 and 77.)    When BB3 was purchased, it was listed along with what appears to be the name of a specific horse under the column "For."   For instance, a September 26, 2018 invoice to Howard Taylor (Account A) indicates BB3 was purchased for four horses, Rocking Rusty, Shane Adam, Tell Me a Joke, and Uncle Coz:



(*Id.* at p. 69.)

Although Howard did not testify at the trial, the Government and Fishman stipulated to the admission of Government Exhibit 16000 into evidence, explaining to the Court and jury that "[i]f called as a witness at trial, **Howard Taylor would testify that Government Exhibit 160000 reflects true and accurate copies of records that Taylor maintained with request to Equestology**." (*See* a true and correct copy of excerpts of the trial transcript in the Fishman Trial from May 2, 2022, attached hereto as **Exhibit 3**, at p. 613, line 24 through p. 614, line 17) (emphasis added).

In the Government's publicly filed sentencing memo for Fishman, BB3 is described as "Fishman's custom-made blood builder" that is among the most "potent" of the PEDs sold by

Fishman.  (*See* a true and correct copy of the Government's sentencing memo (without exhibits) dated July 5, 2022, attached hereto as ***Exhibit 4***, at p. 3.)

C.    **The Alleged Defamatory Statements**

1.    **The Meadowlands Press Release**

On Friday, November 3, 2023, the Meadowlands published a press release (the "Press Release") listing 33 individuals, including Howard, excluded from racing at the Meadowlands effective December 1, 2023.  (AC ¶ 77; *see also* a true and correct copy of the Press Release dated November 3, 2023 attached hereto as ***Exhibit 5***.)  According to the Press Release, this ban was the result of evidence revealed in a criminal trial that tied Howard to the purchase of a certain PEDs for racehorses.  (AC ¶ 8.)

The Press Release noted that, "among the volumes of evidence introduced by the US Attorney in the prosecution of these cases are trial exhibits, offered in open court and now available to the public, which reveal the identity of numerous persons who have purchased prohibited substances – BB3 (EPO) or TB-7 Thymosyn (sp)."  (*Id.* ¶ 78.)  The Press Release contained a list of ten individuals identified as purchasers of BB3, including Howard.  (*Id.*)

The Press Release continued: "This remains a serious matter. Consequently, the Meadowlands is conducting its own internal investigation given these revelations. And until that investigation is completed, the Meadowlands has determined that all individuals listed below will be placed on the Meadowlands exclusion list," effective December 1, 2023.  (*Id.* ¶ 79.)

The Press Release stated further:

> We believe this timeframe will also allow owners, should they choose, an opportunity to change trainers and/or horses in partnership with excluded owners. We anticipate the Meadowlands investigation will be time consuming. We also expect that additional disclosures will be released, and if so, where warranted, the Meadowlands will act on that information. We will

11

> also require that any change of trainers or dissolution of any
> partnerships with excluded owners will require proof to the
> satisfaction of The Meadowlands.

(*Id.* ¶ 80.)   Plaintiffs allege that Howard was the only owner included on the "BB3 list," and,

therefore, this language in the Press Release was directed solely at him.  (*Id.* ¶ 81.)  However, the

Press Release did not identify Howard as an owner. (*See* Exhibit 5.) The Press Release concluded:

"We believe these steps are warranted per the revelations from the above prosecutions and are

necessary in the interest of the industry we all love and wish to preserve."  (*Id.* ¶ 82.)

Although Plaintiffs plead that the Press Release was the beginning of a "smear campaign"

against Howard (AC ¶ 8), in opposing Defendant's motion to dismiss Howard's original

complaint, which contained identical allegations, Howard unequivocally clarified that "the

statements in the Press Release ***are not part of the enumerated challenged defamatory***

***statements***." (Doc. No. 10 at 18 (emphasis added).)

## 2.    The *Thoroughbred Daily News* Article

The same day the Meadowlands issued its Press Release, Defendant was quoted making

statements about Howard in an article in the *Thoroughbred Daily News* (the "Article"). (AC ¶ 85;

*see also* a true and correct copy of the Article published on November 3, 2023 attached hereto as

***Exhibit 6***.) The Article repeated the substance of the Press Release, noting that the excluded

individuals included "trainers and owners who had purchased banned substances from individuals

who were charged with manufacturing and selling performance-enhancing drugs."  (AC ¶ 86.)

The Article further highlighted that "[w]hile the evidence against Fishman was enough for

him to be sentenced to 11 years in prison, the government's case did not shed much light on who

was buying what from Fishman and his company."  (*Id.* ¶ 87.)

The Article then quoted Gural as stating that "[i]t's sad because there are people who had

12

no choice but to cheat." (*Id.* ¶ 88.)  With respect to Howard, Gural stated:

> What's really sad is Howard Taylor. He's not a trainer, he's an
> owner. He had to be giving EPO to his trainers to use and not a
> single trainer picked up the phone and said I have an owner who
> wants me to use EPO on his horses. He has 150 horses and he uses
> a lot of trainers. You would have thought at least one trainer
> would have picked up the phone and told us what's going on.

(*Id.* ¶ 89.)

### 3.    Additional Alleged Defamatory Statements to Individuals in the Horse Racing Industry

The Amended Complaint alleges that, in addition to the statements in the Article, Defendant made several additional defamatory statements about Howard "in conversations with individuals of influence and power in the racehorse industry, including leadership of the Standardbred Owners Association of New Jersey ('SBOA')," a state-funded organization that represents horse owners in securing contracts with the two racetracks in New Jersey, Freehold and Meadowlands.  (AC ¶¶ 94-95.)

Specifically, Howard alleges that, on November 3, 2023, Defendant participated in a conference call with a few of his associates and three members of the SBOA's Board of Directors for the purpose of discussing negotiations for horse owners with the Meadowlands.  (*Id.* ¶ 96.) Howard alleges that, during this call, "Gural repeated his claim that Taylor provided EPO to his trainers and instructed them to use it on his horses" and "added that Taylor also assured his trainers that he (Taylor) would represent them successfully if they were caught." (*Id.* ¶ 98.)

Finally, Howard alleges that Defendant has also told others in the professional horse racing industry that "nobody can own as many horses as Howard does," implying that Howard does not actually own his horses but rather is improperly "fronting" for other people who could not receive a license. (*Id.* ¶ 100.)

D. **Howard's Alleged Damages**

In his Amended Complaint, Howard alleges that, as a result of the defamatory statements and "smear campaign" by Defendant, Howard has suffered damages in the form of reputational harm (both as a horse owner and as a lawyer and expert in equine law), humiliation, embarrassment, mental suffering, shame, and emotional distress. (AC ¶¶ 116-117, 183, 205, 220.) He also alleges financial harm consisting of damage to his partnerships and his relationships with trainers, which are "at risk of collapse" because of the Meadowlands ban, (*id.* ¶¶ 119, 227); damage to his investments in the purchase of his horses, which were made in reliance on them being able to race in lucrative Meadowlands races from which Howard is now banned; and "likely" lost potential winnings from races at the Meadowlands and other racetracks (Buffalo Raceway and Batavia Downs) from which he is now banned. (*Id.* ¶¶ 123, 133, 181.)

Howard further alleges that the Hambletonian Society, a non-profit organization that sponsors harness racing at 13 North American racetracks—including, most prominently, the Hambletonian, the Hambletonian Oaks, and the Breeders Crown races—announced on February 15, 2024, "that it would not disturb the Meadowlands exclusion of Howard Taylor, which affected most Hambletonian Society administered stakes races run at the Meadowlands, Vernon Downs, and Tioga Downs." (AC ¶¶ 101-102.) Howard admits he would be permitted to race horses at certain Hambletonian races, including the Hambletonian, Hambletonian Oaks, and the Hambletonian Maturity, but the decision means he would not be permitted to participate in the Breeders Crown, one of the Hambletonian Society's most prestigious races. (*Id.* ¶ 103.) The Hambletonian Society President was quoted as saying that "[o]utside of the Hambletonian races it has always been up to Jeff [Gural]' which horses were permitted to participate." (*Id.* ¶ 105.) The Hambletonian Society rejected an appeal by Howard in March 2024. (*Id.* ¶ 106.)

### E.    Howard Sells Interest in Certain Horses to His Mother, Judith

After the Hambletonian Society's decision, Howard decided to sell his interest in ten horses to his mother, Judith, five of which were previously already partially owned by Judith. (AC ¶¶ 107-108.)   Howard contends this decision was made because the "parameters of the ban as articulated in the Press Release" did not mention Judith or limit the parties to whom Howard could sell his interest. (*Id.* ¶ 110.) Plaintiffs plead in conclusory fashion that the "horses were appraised and sold for fair-market value in several transactions dated April 2024." (*Id.* ¶ 109.)

On May 1, 2024, Defendant notified Plaintiffs that the horses transferred from Howard to Judith (including those horses previously partially owned by Judith) would not be eligible to race at the Meadowlands.  (*Id.* ¶ 111.)  Plaintiffs accuse Defendant of not providing an "explanation for his arbitrary decision," (*id.* ¶ 113), though it is, perhaps, self-evident that Howard's selling his interest to his own mother would be looked upon with suspicion, despite Howard's self-serving statement that "the transactions at issue were bona fide sales for value." (*Id.* ¶ 112.)

### F.    Judith's Alleged Damages

Plaintiffs contend that Judith has since transferred the interests she purchased from Howard to a "third party" and was "unable to recover any of the value she paid for these horses, let alone their fair market value." (*Id.* ¶ 115.)   According to Plaintiffs, Judith has "suffered financially" in being prohibited from racing the horses at the Meadowlands, including "lost potential winnings."  (*Id.* ¶¶ 132-133.)   Judith alleges she has "historically won millions of dollars" through horse racing, but she does not and cannot allege that these specific horses would have won any money. (*Id.*)   Judith also contends she suffered losses because a horse's value is informed by its performance in competitive races (*id.* ¶ 134), and that she suffered reputational harm because of the "implication" that she is associated with the purchase of PEDs. (*Id.* ¶ 135.)

### G.    Plaintiffs' Antitrust Allegations

#### 1.    The Harness Racing Industry

"Harness racing is a type of horse racing where horses race at a specific gait and pull a two-wheeled cart occupied by a driver." (AC ¶ 42). Harness-racing horses are "Standardbred horses," whereas "Thoroughbred horses [are] associated with flat racing" with a jockey riding the horse. *Id.* There are two types of harness-racing horses: "pacers and trotters."[7] (*Id.* ¶ 42). Harness-racing horses are typically characterized by type of race, sex, and age. (*Id.* ¶ 43). Owners of harness-racing horses earn revenue from winning harness-race prize money, and by breeding and selling harness-racing horses. (*Id.* ¶ 44). For nearly 50 years, the Meadowlands has been the Northeast's premier racetrack for harness racing.  (*Id.* ¶ 10.)  Racehorses owned by Plaintiffs have competed against horses owned by Defendant in various races in numerous racetracks throughout North America. (*Id.* ¶¶ 136-141).

While Plaintiffs allege that harness racing occurs at "limited" racetracks in the United States, they acknowledge that the Hambletonian Society sponsors harness horse races at "13 North American racetracks" and publicly available information indicates that dozens of other harness racetracks exist throughout the United States and Canada. (*Id.* ¶¶ 46, 101; *see, e.g.*, U.S. Trotting Association, Track Information,  https://www.ustrotting.com/trackside/trackfacts/trackfacts.cfm (last visited, July 10, 2024) (listing more than 30 harness racetracks in the U.S.); Standardbred Canada, Links – Racetracks,  https://standardbredcanada.ca/content/links-racetracks.html  (last visited July 11, 2024) (listing more than 20 harness racetracks in Canada).  The Meadowlands,

---

[7] "Pacers" and "trotters" "refer to two distinct types of gaits, or the manner in which [the] horse moves its legs while running, used by harness race horses. A pacer is a horse that has a lateral gait while a trotter has a diagonal gate." Jordan S. Hollander, *And They're Off! Would Instant Horse Wagering in New Jersey Require Voter Approval?*, 6 UNLV Gaming L.J. 239, 239 n.1 (2016).

Vernon Downs, and Tioga, along with two racetracks not-affiliated with Defendant, Buffalo Raceway and Batavia Downs (collectively, the "Racetracks") have prohibited scores of harness-racing horses owned by dozens of harness-racing horse owners, including the Plaintiffs, from racing at their respective Racetracks due to suspicion of "doping" and providing PEDs to harness-racing horses. (*Id.* ¶¶ 6, 77-84, 129). None of the Racetracks are defendants in this case. As noted above, shortly after Howard's prohibition by the Racetracks, the Hambletonian Society, "a non-profit organization that sponsors harness racing horse races at 13 North American racetracks," "announced that it would not disturb the Meadowland's exclusion of Howard Taylor." (*Id.* ¶¶ 101-102).

## 2.     Plaintiffs' Conclusory Allegations of Anticompetitive Conduct

Plaintiffs allege that harness-racing owners "compete in the markets for racing, breeding, and selling harness-racing horses." (*Id.* ¶ 52). The Amended Complaint alleges that Meadowlands, Vernon Downs, and Tioga Downs are "leading harness racing tracks in the Northeast" and that Defendant owns "countless" horses that race at those racetracks. (*Id.* ¶¶ 136-137). Plaintiffs allege that the PED ban has eliminated competition between Defendant and Plaintiffs. (*Id.* ¶ 138). According to the Amended Complaint, the ban "has significantly improved the chances of [Defendant's] horses winning in numerous races." (*Id.* ¶ 139). Plaintiffs add, that "[u]pon information and belief, Gural's actions are also depressing the prices in the horse market," and "Gural benefits from the lack of their competition in the horse-buying market." (*Id.* ¶ 140).

According to Plaintiffs, "Gural also benefits because his anticompetitive actions increase the value of his own horses by increasing the likelihood that they win and by making it more likely that his horses will be among the very few with breeding value." (*Id.* ¶ 141). Defendant's actions are "depressing the prices in the horse market" because Plaintiffs are not buying yearlings for

future races," and Defendant "benefits from the lack of competition in the horse-buying market." (*Id.* ¶ 140).

## III.    <u>STANDARD OF REVIEW</u>

In reviewing a motion to dismiss under Rule 12(b)(6), the court must accept as true the factual allegations in the complaint, viewing all reasonable inferences in the light most favorable to the plaintiff.  *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quotation marks omitted). For a claim to be viable, the plaintiff must plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), sufficient to give the defendant "'fair notice of what the . . .  claim is and the grounds upon which it rests.'" *McLaughlin v. Bayer Corp.,* 172 F. Supp. 3d 804, 812 (E.D. Pa. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court is *not* required to accept as true "unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gelman v. State Farm Mut. Auto. Ins. Co.,* 583 F.3d 187, 190 (3d Cir. 2009) (quoting *Iqbal,* 556 U.S. at 678). "A complaint that pleads facts merely consistent with a defendant's liability stops short of the line between possibility and plausibility of entitlement to relief." *McLaughlin*, 172 F. Supp. 3d at 812. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* The court should dismiss the

complaint under Rule 12(b)(6) if the factual allegations in the complaint fail "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Finally, when analyzing a Rule (12)(b)(6) motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). If a document is integral to the complaint, the Court may consider it in ruling on a motion to dismiss, even if the plaintiff does not expressly cite to it or attach it as an exhibit; "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). In addition, the Court may consider matters of public records on a motion to dismiss, *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014), and "[i]ndictments, change of plea hearings, and sentencing memoranda are quintessential matters of public record." *Doe*, 77 F. Supp. 3d at 447.

## IV.   ARGUMENT

### A.   HOWARD'S DEFAMATION AND TRADE LIBEL CLAIMS FAIL BECAUSE THE STATEMENTS COMPLAINED OF ARE NOT FALSE OR DEFAMATORY AS A MATTER OF LAW.

To state a claim for defamation under Pennsylvania law, Howard has the burden of pleading (and then proving):

> (l) the defamatory character of the communication;
> (2) publication by the defendant;
> (3) its application to the plaintiff;
> (4) understanding by the recipient of its defamatory meaning;
> (5) understanding by the recipient of it as intended to be applied to plaintiff;
> (6) special harm to the plaintiff;
> (7) abuse of a conditionally privileged occasion.

19

*Joseph v. Scranton Times, L.P.*, 634 Pa. 35, 70 (2015) (quoting 42 Pa. Cons. Stat. § 8343(a)(1)–(7)).  A communication is defamatory if it tends to harm the reputation of another so as to lower that person in the estimation of the community or to deter third persons from dealing with that person. *Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 767 (E.D. Pa. 2016) ("*Mallory I*"). However, the statement must do more than embarrass or annoy the plaintiff to be deemed defamatory; "it must provoke 'the kind of harm which has grievously fractured his standing in the community of respectable society.'" *Id.* (quoting *Scott-Taylor, Inc. v. Stokes*, 425 Pa. 426, 428 (1967)).[8]

Similarly, to state a claim for trade libel, or commercial disparagement, a plaintiff must allege that there has been the publication of a disparaging statement concerning the plaintiff's business where: "(1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the publication is false or acts in reckless disregard of its truth or falsity." *Seguro Medico, LLC v. Suffolk Admin. Servs., LLC*, No. 5:23-CV-2495, 2023 WL 7324081, at *3 (E.D. Pa. Nov. 7, 2023) (citation and quotation omitted).

In the Amended Complaint, Howard failed to and cannot plausibly plead all of the elements of his defamation, defamation per se, and trade libel claims because (1) certain of the alleged defamatory statements are true, or substantially true; (2) certain of the statements in issue are expressions of opinion which are not actionable as defamation; and (3) certain of the statements

---

[8]  Defamation per se can be either words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct. *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999), *aff'd*, 229 F.3d 1139 (2000) (internal quotations omitted).  For purposes of this motion, the distinction between defamation and defamation per se is not relevant.

are not capable of a defamatory meaning.

### 1. The Statements In The Press Release Are Not Defamatory Because They Are True and Not Capable of a Defamatory Meaning.

As explained above, in connection with the original Complaint, Howard conceded that the statements in the Press Release "are not part of the enumerated challenged defamatory statements" (Doc. No. 10, at 18), and that admission should apply equally to the identical allegations in the Amended Complaint. Nonetheless, if Howard were to now claim that the Press Release *is* part of the statements alleged to be defamatory in Plaintiffs' *Amended* Complaint, they are not actionable defamation as a matter of law because none of the statements in the Press Release are false. Truth is an absolute defense to a defamation claim. *Pacitti v. Durr*, 310 F. App'x 526, 528 (3d Cir. 2009) (citing *Bobb v. Kraybill,* 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986), *app. denied*, 513 Pa. 633 (1987)). As such, a showing by the defendant that the statements in issue are true precludes liability for defamation as a matter of law. Moreover, a defendant need only show substantial, rather than complete, truth. *Id.*

Although "substantial truth" is a defense to a defamation claim, in reviewing the legal sufficiency the claim, the Court is required to make "a threshold determination of whether a challenged statement is capable of a defamatory meaning." *Mallory v. S & S Publishers*, 260 F. Supp. 3d 453, 458 (E.D. Pa. 2017) ("*Mallory II*"), *aff'd sub nom., Mallory v. Simon & Schuster, Inc.*, 728 F. App'x 132 (3d Cir.), *cert. denied*, 139 S. Ct. 154 (2018) (internal citation omitted). If the statement is not capable of a defamatory meaning, "the claim must be dismissed." *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001).

The statements in the Press Release are true. The first three paragraphs of the Press Release do not apply to Howard; and, in any event, they are straightforward truthful statements of fact about the trial and conviction of Fishman and Gianelli in the Southern District of New York.

The fourth paragraph, which is at the heart of Howard's claim and refers to the evidence of persons who purchased PEDs, states:

> Among the volumes of evidence introduced by the US Attorney in the prosecution of these cases are trial exhibits, offered in open court and now available to the public, which reveal the identity of numerous persons who have purchased prohibited substances – BB3 (EPO) or TB-7 Thymosyn (sp). Persons identified in the lists below and categorized under those substances, are referenced in those trial exhibits released by the US Attorney SDNY office to the Meadowlands at its request.

Howard's name is included at the bottom of the Press Release as the last name on a list of excluded people under the heading "BB3 (EPO)."

The statements contained in this fourth paragraph are unquestionably true. As set forth above, the evidence introduced by the U.S. Attorney in open court in the Fishman trial—specifically, Government Exhibit 16000—did, in fact, reveal that Howard's name was among the names of numerous people who had purchased the prohibited substances of BB3 (EPO) or TB-7 Thymosyn, just as the Press Release stated. (*See* Exs. 2 & 3.) Because the trial evidence disclosed Howard's purchase of BB3, Howard's name was included on the list in the Press Release entitled "BB3 (EPO)."  There is nothing false, and thus can be nothing defamatory, about these statements.

Howard attempts to thread a needle and discredit the veracity of the Press Release by alleging that "BB3 is not EPO. It is a mimetic peptide that is structurally distinguishable from EPO."  (AC ¶ 76.)  Even accepting this allegation as true for the purposes of this motion, it does not render the statements in the Press Release false.  The reference to EPO in the Press Release, simply as a parenthetical next to the term BB3, is an accurate reflection of how BB3 was characterized in the charges filed by the Government against Fishman, and for which he was convicted:  that it was a customized "blood building" substance like EPO that was referred to by the "code name" BB3.  (*See* Ex. 2 at p. 9, ¶ 13(a).)  The use of EPO in parentheses after BB3 in

the Press Release thus accurately reflects the similarity and functional interchangeability of the drugs as presented at the Fishman trial, which was the source of the information in the Press Release related to Howard's PED purchases.

At the very least, the statements linking EPO parenthetically with BB3 are substantially true. "Under Pennsylvania law, proof of substantial truth must go to the 'gist' or 'sting' of the alleged defamatory matter; the test is whether the alleged libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Mallory II*, 260 F. Supp. 3d at 461. The gravamen of Howard's defamation claims is that he was falsely accused of purchasing and instructing trainers to use PEDs, an accusation Howard characterizes as the most damaging accusation that can be made to the reputation of a racehorse owner. (AC ¶ 6.) The evidence at the Fishman trial showed that Howard purchased BB3, described by the Government as among the most "potent" of the PEDs sold by Fishman. (*See* Ex. 4, at p. 3.) Regardless of whether BB3 and EPO are technically structurally distinguishable or not, the gist of the communication is the same: both are PEDs and, thus, the alleged libel that Howard purchased EPO would *not* have a different effect on the mind of the reader than the truth— that he purchased BB3—would produce. Even if were not 100% accurate to characterize BB3 as equivalent to EPO through use of a parenthetical reference, the statements are substantially true within the meaning of Pennsylvania's defamation jurisprudence. As such, they cannot be actionable as defamation as a matter of law.

The remainder of the Press Release sets forth truthful information about how the Meadowlands intended to follow up on the information disclosed at the trial (by investigating), the effective date of the exclusion, and how the effective date of the exclusion will give owners in partnership with excluded owners time to change trainers or horses if they so choose. Howard

alleges that the language in the release addressing excluded owners is directed towards him and his partners because he is the only owner on the excluded list, but neither the excluded list nor any other part of the Press Release identifies him as an owner. (*See* Ex. 4.) Even if it did, there is nothing inherent in the nature of the communication itself that can reasonably be regarded as tending to lower Howard's estimation in the community or to deter third persons from dealing with him. While that might occur as a result of what was stated in the Press Release, any such effect would be the byproduct, not of a false communication by Defendant, but of Howard's own conduct in purchasing the banned PEDs which caused him to be added to the Meadowlands excluded list.

### 2. The Statements in the Article and Repeated to Industry Professionals Are Not Defamatory Because they Constitute Opinion.

Under Pennsylvania law, "[o]nly statements of fact, not expressions of opinion, can support an action for defamation." *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005); 42 Pa. Cons. Stat. § 8343(a)(1–7). Similarly, rhetorical hyperbole and epithets are not actionable as defamation. *See, e.g., Remick,* 238 F.3d at 262. The trial court decides whether the allegedly defamatory statements constitute fact or opinion as a threshold matter of law on a motion to dismiss. *Kerrigan v. Otsuka Am. Pharm., Inc*., 560 F. App'x 162, 168 (3d Cir. 2014); *Mallory II*, 260 F. Supp. 3d at 459-60 (internal citations omitted).

Under Pennsylvania law, an opinion can only be actionable as defamation if it could reasonably be understood to imply undisclosed defamatory facts. *See Remick*, 238 F.3d at 261. The corollary to this rule is that an opinion that could not reasonably be construed as implying undisclosed defamatory facts cannot support a defamation claim. *See Cornerstone Sys. v. Knichel Logistics, L.P.*, 255 F. App'x 660, 665 (3d Cir. 2007); *Pace v. Baker-White*, 432 F. Supp. 3d 495 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 433 (2022).

The statements in the Article that Howard "had to be giving EPO to his trainers to use and

not a single trainer picked up the phone and said I have an owner who wants me to use EPO on his horses"—and the same or similar statements allegedly repeated to horse racing industry leaders—cannot support a claim for defamation under this analysis. These statements reflect the speaker's opinion about what Howard must have done with the PEDs he purchased rather than an unequivocal assertion of fact. A statement by any speaker that something "has to be" or "had to be" true is, by its nature and choice of words, an acknowledgment of a lack of certainty about the underlying matter and also an expression of skepticism about a contrary fact or factual denial, thus negating any reasonable inference that the speaker is making the assertion as a provable statement of fact. Saying that something "has to be" or "had to be" true—words that, by their very nature, are speculative—conveys an ***inference*** from a ***subjective belief*** that it may be true without stating it to be so with certainty. *Meyers v. Certified Guar. Co., LLC*, 221 A.3d 662, 670 (Pa. Super. Ct. 2019) ("[A]n expression of opinion only conveys a subjective belief of the speaker.").

As this court has held, "[i]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable defamation under Pennsylvania law." *Pace*, 432 F. Supp. 3d at 495. No additional factual context is needed for this court to rule, as a matter of law, that this statement constitutes an expression of opinion and not fact. *Kerrigan*, 560 F. App'x at 168 ("Whether a statement constitutes a fact or opinion is a legal question resolved by the court."). The statements allegedly made by Defendant in the Article and repeated to horse racing industry insiders that Howard "had to be" giving PEDs to his trainers and instructing them to use them on his horses fall squarely within that description and constitute non-actionable opinion.

Furthermore, nothing in the "had to be" statements could reasonably be understood to

imply undisclosed defamatory facts that might render the statements actionable even as an opinion. In fact, the opposite is true. The opinion that Howard "had to be" giving PEDs to his trainer and telling them to use them on his horses is based on, and a direct logical inference drawn from the *disclosed*, *non-defamatory* and *true* fact that Howard was identified in Exhibit 16000 as having purchased PEDs from a veterinarian convicted of federal crimes related to the manufacture and sale of those PEDs to individuals in the horseracing industry for use on horses. Exhibit 16000 itself identifies BB3 purchases on Howard's account *for specific horses*, such as, for example, the BB3 purchased for "Tell Me a Joke" on July 31, 2018. (Ex. 2, at p. 69.) Indeed, in his Amended Complaint, Howard characterizes Government Exhibit 16000 as reflecting a handful of orders of BB3 *by one of his trainers*, thereby confirming that the purchases were made for use by a trainer. (AC ¶ 91.) It is hardly a stretch or unfounded for Defendant to deduce that Howard purchased the PEDs for the purpose of having them administered to his horses—or was aware of the purchases on his account—since that is the very purpose of the PEDs being sold by Fishman. Given that Exhibit 16000 was stipulated to be part of Howard's business records, Defendant plausibly deduced that Howard was aware of the purchases, and what other possible use could be made of BB3 except for use on the horses he owned?

As the Third Circuit Court of Appeals has held, "[e]veryone is free to speculate about someone's motivations based on disclosed facts about that person's behavior . . . Those statements are just . . . opinions based on disclosed facts, so they too are not actionable." *McCafferty v. Newsweek Media Grp*., 955 F.3d 352, 359 (3d Cir. 2020). Cases in which alleged defamatory statements feature equivocal language are routinely dismissed because the statements are non-actionable opinion. *Pace*, 432 F. Supp. 3d at 512 (citing *Purcell v. Ewing*, 560 F. Supp. 2d 337, 340 (M.D. Pa. 2008) (finding statements that alumnus looked like "someone accused of child

molestation" was non-actionable opinion); *In re Maze*, No. 98–33715, 1999 WL 554600, at *2 (E.D. Pa. July 16, 1999) (finding statement in letter that plaintiff failed to pay taxes, "which money he seemingly misappropriated from his employees[,]" was non-actionable opinion)); *see also Reardon v. Allegheny College*, 926 A.2d 477, 484 (Pa. Super. Ct. 2007), *app. denied*, 596 Pa. 755 (2008) (finding use of the phrase "might have" rendered statement non-actionable because it was "a strong indication that this statement [was] merely one outlining possibilities"). That same result should obtain here with respect to Howard's claims that are based on Defendant's opinion as to what Howard "had to be" doing with the PEDs he unquestionably purchased.

In opposing Defendant's motion to dismiss the original complaint, Howard, without citation, took issue with Defendant's reliance on information obtained from public record documents during the Fishman trial, including Government Exhibit 16000 and the testimony surrounding it. (ECF No. 10 at 2.) Government Exhibit 16000 is, however, integral and explicitly relied upon in the Amended Complaint. (*See, e.g.*, AC ¶¶ 73-75.) Plaintiffs attempt to minimize Exhibit 16000 and justify what they view as only a "handful" of purchases of BB3 reflected therein, but by specifically relying on that document, the Court is permitted to consider it as part of this Rule 12(b)(6) motion and, as explained above, Howard cannot "prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Burlington*, 114 F.3d at 1426.

Regardless, each of these documents are part of the public record of a criminal trial in a federal court and therefore indisputably authentic matters of public record that may be considered on a Rule 12(b)(6) motion. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010), *cert. denied*, 562 U.S. 1271 (2011). Exhibit 16000 is indisputably authentic because Howard agreed that they were his business records. (*See* Ex. 3.) And documents like indictments, sentencing memos, and

27

trial transcripts are "quintessential" public record documents that this Court routinely considers on a motion to dismiss. *Doe*, 77 F. Supp. 3d at 447. Since Plaintiffs plead that Defendant justified his statements by relying on the records of the Fishman trial, the Court may review those records in considering the legal viability of Plaintiffs' claims.

> **3.    The Alleged Additional Statements to Industry Professionals Concerning Howard's Ownership of Numerous Horses and Howard's Assurance He Would Provide Legal Representation to Trainers If They Got Caught Using PEDs Are Not Defamatory in Nature or by <u>Implication.</u>**

The remaining statements alleged by Plaintiffs cannot support claims of defamation because they are not capable of a defamatory meaning as a matter of law. The first of these statements is that Defendant told racing industry colleagues that "nobody can own as many horses as Howard does." (*See supra*, at 11.) That statement is not defamatory on its face: there is nothing in its nature or words that, standing alone, could be said to "grievously fracture[]" Howard's standing in the community or to deter third persons from dealing with him. *See Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014), *aff'g*, No. CIV. A. 10–1710, 2013 WL 1286662, at *16 (E.D. Pa. Mar. 28, 2013). Recognizing this, Howard writes that the statement was defamatory when viewed in context because it "suggest[ed] that Taylor does not actually own his horses, but rather is fronting for other people who could not receive a license" (AC ¶ 100)—in other words, that the statement is defamatory by implication or innuendo.

"Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the *context in which these statements are issued creates a defamatory implication*, i.e., defamation by innuendo." *Monge v. Univ. of Penn.*, 674 F. Supp. 3d 195, 208 (E.D. Pa. 2023) (quoting *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010)) (emphasis in original). In order to establish a claim of defamation by

innuendo, "the innuendo must be warranted, justified and supported by the publication." *Id.* (quoting *Livingston v. Murray*, 612 A.2d 443, 449 (Pa. Super. Ct. 1992), *app. denied*, 533 Pa. 601 (1992) (internal quotation marks omitted). The Court must determine whether the language used "could fairly and reasonably be construed to have the meaning imputed in the innuendo." *Sarkees v. Warner-West Corp.*, 349 Pa. 365, 37 A.2d 544, 546 (1994). "When the implication alleged by the plaintiff is not 'reasonably susceptible of a defamatory meaning,' the plaintiff has failed to state a claim." *Pace*, 432 F. Supp. 3d at 510 (quoting *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 191 (3d Cir. 1999)).

Furthermore, "[i]f the publication complained of is not in fact libelous, it cannot be made so by an innuendo which puts an unfair and forced construction on the interpretation of the publication." *Sarkees*, 37 A.2d at 546. A claim of defamation by innuendo "cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." *Id.* "It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo." *Id.*

Even when viewed in context, it is not defamatory to question whether an individual who claims to have owned over one thousand racehorses over his career does actually own as many horses as he claims. The statement may imply that Howard is exaggerating, but it would be an unfounded leap of logic for the Court to find that such a statement was actually implying that Howard acts as an illegal "front" for unlicensed owners. This is a textbook example of the kind of "unfair and forced construction" of a statement that the court should reject when making the legal determination of whether a particular statement is defamatory in nature. *Sarkees*, 37 A.2d at 546. The statement concerning horse ownership is simply not capable of a defamatory meaning

and should not be construed as such.

The same is true of Defendant's alleged statement that Howard assured his trainers that he would represent them if they were to get caught using PEDs. There is nothing inherently defamatory in a statement by an attorney who has characterized himself as a nationally preeminent equine law attorney offering to provide legal representation to trainers if they were to be accused of being involved with the use of PEDs. Like the statement about horse ownership, the alleged offer of representation statement can only be viewed as potentially defamatory if the court were to unreasonably view it as implying, as Howard alleges, that Howard himself (as opposed to trainers) is engaged in illegal activity. However, such a construction would be forced and unwarranted under the circumstances. Because these additional statements are not defamatory by nature or by implication, they are not actionable as a matter of law and Howard's defamation claim predicated on them "must be dismissed." *Remick*, 238 F.3d at 261*; see also Sarkees*, 37 A.2d at 546 (affirming dismissal of defamation by innuendo claim for failure to state a claim because, "when taken in their usual and ordinary sense", the alleged defamatory statements "could not be understood by those who read it as disparaging or damaging the plaintiff's reputation" and there is "nothing the [statement] itself or the [Complaint] to justify the meaning ascribed in the innuendo.")

### B.    HOWARD'S DEFAMATION AND TRADE LIBEL CLAIMS FAIL AS A MATTER OF LAW BECAUSE HE DOES NOT ADEQUATELY PLEAD ACTUAL MALICE.

Even if the alleged statements could have a defamatory meaning, Howard's defamation and trade libel claims should nonetheless be dismissed because (1) the allegations in the Amended Complaint demonstrate that Howard is, as a matter of law, at a minimum a limited purpose public figure and the subject matter of the alleged defamatory communications—the use of illegal and harmful PEDs in the horse racing industry—is a matter of public concern; and (2) Howard fails to

adequately allege facts showing the statements were made with "actual malice." *See McCafferty*, 955 F.3d at 356 (quoting *Am. Future Sys., Inc.*, 923 A.2d at 400 ("To show defamation, a public figure (even if just a 'limited purpose public figure'. . .) must show that the publisher acted with 'actual malice.'")); *see also Mallory II*, 260 F. Supp. 3d at 465 (applying and analyzing actual malice standard to a defamation *per se* claim involving a matter of public concern); *Seguro Medico*, 2023 WL 7324081, at *3 (knowledge of falsity or reckless disregard for truth required for trade libel claim).

Actual malice means that the defendant "either knew that the statement was false or published [the statement] with reckless disregard for the truth," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Actual malice is a stringent exacting standard that requires a plaintiff to plead that the speaker made each defamatory statement with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

"The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989) (citation omitted). Thus, applying the ordinary post-*Twombly* Rule 12(b)(6) pleading standard, the Court must determine whether, assuming the truth of a plaintiff's allegations, (1) he is a public figure or limited purpose public figure or the matter is a matter of public concern, and (2) if so, whether he sufficiently pleaded facts that could support a finding of actual malice. *McCafferty*, 955 F.3d at 360 (affirming dismissal of defamation claim for failure to "plead facts that suggest actual malice"); *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013) ("Where the question whether a plaintiff is a public figure can be determined

based upon the pleadings alone, the Court may deem a plaintiff a public figure at the motion to dismiss stage."), *aff'd*, 807 F.3d 541 (2d Cir. 2015) (affirming Rule 12(b)(6) dismissal for failure to allege sufficient facts to demonstrate actual malice), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015) (affirming determination based on plaintiff's pleading that he was a limited purpose public figure); *Monge.*, 674 F. Supp. 3d at 211-12 (granting Rule 12(b)(6) motion and finding plaintiff is limited purpose public figure and that she failed to plead sufficient facts to support an inference of actual malice).

### 1.    Howard's Allegations, Assumed True, Demonstrate He Is A Limited Purpose Public Figure, Requiring Actual Malice.

Howard's allegations, assumed to be true for purposes of this motion, demonstrate he is, at a minimum, a limited purpose public figure and, therefore, the actual malice standard applies to his defamation claims.   Howard pleads the actual malice standard, and only that standard, throughout the Amended Complaint. (*See, e.g.*, AC ¶ 23 (characterizing Defendant's statements as "intentionally false or were made with reckless disregard for the truth"); ¶ 90 ("Gural knew, or was reckless in not knowing, that his statements about Howard Taylor in the Article were false.")). Howard's choice of claim is further bolstered by his failure to change these allegations from his original complaint in his Amended Complaint. (*See* Doc. No. 1 ¶¶ 1, 47 (identical to AC ¶¶ 23, 90).) Howard is "the master of [his] complaint and certainly could have, but chose not to, pursue theories for legal relief . . . ." *Dianoia's Eatery, LLC v. Motorists Mut. Ins. Co.*, 10 F.4th 192, 199 (3d Cir. 2021) (quotation and citation omitted).   Here, Howard elected to plead the public figure standard—failing to mention a negligence standard (or to include it in his Amended Complaint)—and should be held to his choice.

In addition, the court can find that Howard is a limited purpose public figure as a matter of law based on Howard's factual allegations in the four corners of the Amended Complaint.  As the

Third Circuit has explained:

> A limited purpose public figure is an individual who voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. . . . [F]rom the voluntary act is derived the notion of assumption of the risk and the consequent fairness in labelling the person a public figure. In the typical limited purpose public figure case, the plaintiff actively participates in the public issue in a manner intended to obtain attention.

*Marcone v. Penthouse Int'l Magazine for Men,* 754 F.2d 1072, 1081 (3d Cir. 1985). To determine whether Howard is a limited purpose public figure, the Court must first determine (1) whether there is a "public controversy" and (2) "the nature and extent of [the plaintiff's] participation in this controversy." *Id.* at 1084-85; *McDowell v. Paiewonsky*, 769 F.2d 942, 948 (3d Cir. 1985).

Plaintiffs' allegations demonstrate that Howard is, at the very least, a limited purpose public figure in the context of the widely publicized horse doping scandal, ultimately resulting in multiple federal prosecutions, including the Fishman trial. The Fishman trial was not a run-of-the-mill prosecution. As Plaintiffs explain, over the "last several years" federal prosecutors brought a "series of four cases . . . in which over 30 defendants were charged" in connection with "federal crimes related to PEDs and horses." (AC ¶¶ 69-71 & n.1.) As Plaintiffs also plead, Howard's name came up in the high-profile Fishman trial – Exhibit 16000 was a business record of Howard's that was introduced to show purchases of PEDs from Fishman's business, Equestology. (AC ¶¶ 73-74; Exs. 2, 3.)

Whether or not Howard intended to or desired to be in the public eye is "of no moment" because "[t]he purpose of the [F]irst [A]mendment would be frustrated if those persons and activities that most require public scrutiny could wrap themselves in a veil of secrecy and thus remain beyond the reach of public knowledge." *Marcone*, 754 F.2d at 1072; *see also McDowell*, 769 F.2d at 949 ("When an individual undertakes a course of conduct that invites attention, even

though such attention is neither sought nor desired, he may be deemed a public figure.").  Of course, even Plaintiffs' own allegations show that Howard intended to and voluntarily put himself in the public eye in the context of the harness racing industry. Plaintiffs tout Howard's public reputation in the harness racing community, noting his numerous "accolades in his decades-long participation in harness racing," including his being named Pennsylvania Owner of the Year by the Keystone Chapter of the U.S. Harness Writer's Association in 2010 and his enjoying of "one of the most successful days as an owner in harness racing history when his horses won three major races at the Meadowlands" on August 6, 2016. (AC ¶ 36.)  Howard earns millions of dollars each year from "racing, breeding, and selling of harness-racing horses" and, in addition, "is also one of the preeminent equine law attorneys in the country and frequently represents horse trainers in court and before racing commissions nationwide." (AC ¶¶ 37, 38.)

The Press Release that Plaintiffs contend started Defendant's "smear campaign" against Howard was announced in the wake of the sentencing of Fishman and Giannelli and specifically cites to the U.S. Attorney's Office's own press release announcing those sentences.  (*See* Ex. 5.) It was published in Harness Link, an industry wide web publication "dedicated to covering news and events in the Standardbred Industry world-wide"[9] and, as pleaded by Plaintiffs, was covered in another industry publication, the Thoroughbred Daily News.[10] (*See* Ex. 6.) As explained above, Defendant reported and quoted on the evidence introduced at that trial, which included Howard Taylor's name.  In this context, based on his allegations, Howard is, at a minimum, a limited purpose public figure in the context of the publicized horse racing PED prosecutions.  *See*

_____

[9] *See* Harnesslink.com (last visited June 28, 2024) (description from bottom ribbon of home page).

[10] Thoroughbred Daily News is "the world's largest and most widely read Thoroughbred eNewspaper, reaching 3.5 million unique users per year."  The TDN, Thoroughbred Daily News, https://www.thoroughbreddailynews.com/about-the-company/ (last visited June 28, 2024).

*Marcone*, 754 F.2d at 1086 (attorney representing and indicted alongside motorcycle gang members prosecuted by U.S. Attorney in Detroit was a limited purpose public figure because prosecution involved 30 defendants and his involvement was widely reported).

### 2.    **Howard Fails to Sufficiently Plead Actual Malice.**

As a limited purpose public figure, Howard must plead facts that support "actual malice." *McCafferty*, 955 F.3d at 360.  Actual malice under the *New York Times v. Sullivan* standard should not be confused with the common-law concept of malice (i.e., evil intent or a motive arising from spite or ill will). *Masson v. New Yorker Mag*., Inc., 501 U.S. 496, 510 (1991).  "Actual malice is a term of art that does not connote ill will or improper motivation.  Rather, it requires that the publisher either know that its [statement] was false or publish[ed] it with reckless disregard for its truth." *McCafferty*, 955 F.3d at 359 (citation and internal quotation marks omitted); *see also Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82-83 (1967) (per curiam).

Moreover, the Third Circuit has held that the plaintiff's already exacting actual malice burden is higher in defamation-by-implication cases, requiring a showing beyond even knowledge of or recklessness regarding the falsity of the statement's defamatory meaning:  it requires a showing of an intent by the speaker to communicate a defamatory meaning.  The rationale for the higher standard in these cases is that, because the statements in defamation by implication cases can have both a defamatory and non-defamatory meaning, the court cannot presume with certainty that a defendant knows it is making a defamatory statement as it does in more traditional defamation cases. *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 90 (3d Cir. 2013).

When these principles are applied in this case, they compel a finding that the Plaintiffs have failed to plead and cannot establish actual malice by Defendant as a matter of law.  Plaintiffs' actual malice allegations consist solely of "threadbare recitals" of the legal element, and therefore

35

should not be accepted as true. *Castleberry*, 863 F.3d at 263; (*see, e.g.*, AC ¶¶ 154, 174 ("Gural knew his defamatory statements to be false when he made them, had a high degree of awareness of their probable falsity, or otherwise had a reckless disregard of whether or not they were false, such that they were made with actual malice."); ¶ 340 ("Gural has performed, and continues to perform, these acts with malice.")).

Plaintiffs include no specific factual allegations from which the Court could plausibly conclude that Defendant acted with actual malice. All of the alleged defamatory statements relating to Howard's purchase of PEDs are based upon the evidence presented at the Fishman trial showing that Plaintiff made multiple purchases of BB3, a potent PED, from a veterinarian who was convicted and sentenced to 11 years in prison for his adulteration, misbranding and sale of those drugs to horse owners and trainers. Even if there were a question as to whether some or all of the statements in issue were true, misleading, or even wholly inaccurate, because they were based on the court records showing PEDs purchased under Howard's account for his horses, the allegations cannot, as a matter of law, sustain a finding of actual malice because they do not suggest that Defendant had a "high degree of awareness of [the statements'] probable falsity" or "'serious doubts' as to the truth of the publication" – or, with respect to the statements alleged to be defamatory by implication, that he made them with an intent to communicate a defamatory meaning.

At most, Plaintiffs allege that Defendant's motive was his "animosity" towards Howard and "desire for vengeance." (AC ¶ 68.) As explained above, "actual malice" is not the same as common-law malice. *See McCafferty*, 955 F.3d at 359. The precedent makes clear that allegations of common-law malice (such as spite or desire for revenge) do not satisfy the burden to show actual malice. *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th

Cir. 2012) (finding allegations that defendant "intended to harm" plaintiff insufficient); *Walter v. Herbert*, No. 3:23-cv-2166, 2024 U.S. Dist. LEXIS 86459, at *27 (M.D. Pa. May 14, 2024) (allegations that defendant violated journalistic standards and exhibits "ill will towards" plaintiff insufficient to plead actual malice); *Egiazaryan v. Zalmayev,* No. 11 CIV. 2670 PKC, 2011 WL 6097136, at *8 (S.D.N.Y. Dec. 7, 2011) (rejecting allegations regarding defendant's hostility to plaintiff).

As this court observed in *Pace v. Baker-White*, "[i]n the wake of *Iqbal* and *Twombly*, adequately pleading actual malice is an onerous task[.]" 432 F. Supp. 3d at 513–14 (quoting *Earley v. Gatehouse Media Pennsylvania Holdings, Inc*., No. 12-1886, 2015 WL 1163787, at *2 (M.D. Pa. Mar. 13, 2015)). A failure to do so "regularly results in early dismissal of an action." *Id.* at 514 (citing cases). As in those cases, Plaintiffs have failed to and cannot plausibly allege facts to support that the statements in issue were false and defamatory or published with actual malice.

In addition, because Howard cannot plausibly plead his defamation and trade libel claims as a matter of law, his Amended Complaint should be dismissed with prejudice and without further leave to amend. Although the Federal Rules generally provide that a court "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), leave is properly and frequently denied for a number of reasons, including futility of amendment. *Heyl & Patterson Int'l, Inc. v. F.D. Rich Hous. of the V.I., Inc.*, 663 F.2d 419, 425 (3d Cir. 1981), *cert. denied*, 455 U.S. 1018 (1982). An amendment would be futile "if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000). Here, Howard has already had an opportunity to amend his complaint to cure the pleading deficiencies identified in Defendant's prior motion to dismiss. Any proposed amended pleading could not cure the legal deficiencies that permeate the

Amended Complaint and would be subject to dismissal for the same reasons argued in this motion. As a result, the Amended Complaint should be dismissed with prejudice and without leave to amend. *See Purcell*, 560 F. Supp. 2d at 342-43 (granting Rule 12(b)(6) motion to dismiss libel claim on opinion grounds without leave to amend).

### C.    HOWARD FAILS TO STATE A VALID CLAIM OF FALSE LIGHT INVASION OF PRIVACY.

Under Pennsylvania law, to successfully plead his claim of false light invasion of privacy, Howard must allege facts showing that the defendant published material that is "not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." *Graboff*, 744 F.3d at 136 (*quoting Larsen v. Phila. Newspapers, Inc*., 543 A.2d 1181, 1188 (Pa. Super. Ct.), *app. denied*, 520 Pa. 597 (1988).

Unlike defamation, a claim of false light *always* requires proof of "scienter, or at least reckless disregard." *Mallory I*, 168 F. Supp. at 577. Additionally, "false light requires "publicity," meaning widespread dissemination, as opposed to mere "publication" under defamation." *Id.* (internal citations omitted). "The "publicity" requirement for false light in Pennsylvania requires that the "matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Manco v. St. Joseph's Univ*., No. CV 22-285, 2024 WL 299265, at *16 (E.D. Pa. Jan. 25, 2024) (quoting *Casselli v. City of Philadelphia*, 54 F. Supp. 3d 368, 380 (E.D. Pa. 2014)).

When judged by these standards, Howard's false light claims fail as a matter of law. *Manco*, 2024 WL 299265, at *17. The statements Defendant allegedly made in person or by phone to select industry professionals cannot serve as the basis for a false light claim because they do not and cannot allege widespread dissemination of those statements as required to plead a false light claim. Accordingly, the false light claims based on those statements should be dismissed on that

basis alone. *See, e.g., id.* at *16 (dismissing false light claim on 12(b)(6) motion due to failure to allege sufficient facts to establish widespread dissemination of alleged offensive statements). With respect to the alleged offensive statements in the Press Release and Article, both of which were more widely disseminated, Howard's false light claim is legally deficient for the same reasons as his defamation claims.  He cannot prove the falsity of the statements in the Press Release because they are true (*see* Point IV(A)(1), *supra*), and it is well-settled that false light claims cannot be sustained as to any true or substantially true statements. *See Monge*, 674 F. Supp. 3d at 213. Additionally, "in Pennsylvania, falsity means the same thing for false light as it does for defamation" and "[i]n both contexts, an opinion based on disclosed facts cannot be false." *Id.* at 212-213 (quoting *McCafferty*, 955 F.3d at 360).

As with a public figure defamation claim, under Pennsylvania law the required standard of fault in a false-light claim is actual malice.  *Monge*, 674 F. Supp. 3d at 212.   Howard's inability to plausibly plead actual malice in connection with his defamation claims also fatally undermines his claim alleging that Defendant's published statements placed him in a false light.  Accordingly, for the same reasons argued in Points A and B, the Fourth Count of the Amended Complaint should be dismissed for failure to state a claim upon which relief can be granted.

### D.    PLAINTIFFS FAILS TO STATE COGNIZABLE CLAIMS OF TORTIOUS INTERFERENCE WITH CONTRACT OR PROSPECTIVE BUSINESS RELATIONSHIPS.

Pennsylvania common law recognizes an action in tort for an intentional, unprivileged interference with existing contractual relationships or prospective business relations, but Plaintiffs have failed to and cannot plausibly allege facts necessary to establish key elements of those claims.

To state a claim for tortious interference with contract (Howard's claim) or prospective business relationships (Judith's claim), Plaintiffs must plausibly allege: (1) the existence of a

contractual relationship or a prospective business relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual or business relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct. *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc*., 982 A.2d 94, 98 (Pa. Super. Ct. 2009), *aff'd*, 610 Pa. 371 (2011).

The fundamental premise underlying these causes of action is the general recognition that "one has the right to pursue his business relations or employment free from interference on the part of other persons *except where such interference is justified or constitutes an exercise of an absolute right*." *Walnut St. Assocs., Inc.*, 610 Pa. at 383 (internal citations and quotations omitted) (emphasis added.). In other words, a tortious interference claim cannot lie without a showing of improper conduct by the defendant along with defendant's intention to harm the plaintiff. *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 934 (Pa. Super. Ct. 2013). Courts require a showing of both harm and improper conduct because they have recognized that some intentionally harmful conduct is done "at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff." *Id.* (quoting *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008), *app. denied*, 600 Pa. 764 (2009)).

In the Fifth Count of the Amended Complaint, Howard alleges that Defendant's alleged defamatory statements concerning him and his exclusion of horses owned solely or jointly by him from racing at the Meadowlands are the acts that constituted intentional interference in his contractual relationships with his business partners. (AC. ¶¶ 223-237.) And in the Twelfth Count, Judith alleges tortious interference with prospective economic advantage, contending that Defendant's "extension" of the ban to her interfered with her prospective economic advantage,

causing her to lose expected winnings from the horses and the loss of the cost of the horses that can no longer race at the Meadowlands and other tracks. (AC ¶¶ 341-352.) Plaintiffs have failed to plausibly plead several elements of their tortious interference claims.

### 1.    Plaintiffs Fail to Plausibly Plead the Absence of Privilege or Justification on the Part of Defendant.

First, Plaintiffs cannot state a cognizable claim of tortious interference because they cannot show that Defendant's statements about Howard and his exclusion of Plaintiffs from the Meadowlands were improper and without privilege or justification.

Defendant's statements about Howard were not improper because, as a matter of Pennsylvania law, because they were truthful. *See Walnut St. Assocs.,* 982 A.2d at 100. As shown more fully in Point IV.A, above, the statements that Howard alleges were defamatory were true, substantially true, or constituted an opinion based on a true statement.  As such, they cannot serve as the basis for a tortious interference with contract claim against Defendant.

Furthermore, as an owner of racetracks and a leader in the fight to prevent and eliminate the use of PEDs in the horse racing industry, Defendant was justified in speaking out about Plaintiff's purchase of PEDs from a convicted criminal, especially since, as Plaintiffs allege, the Meadowlands has been the Northeast's premier racetrack for harness racing for 50 years; Howard has raced his horses at the Meadowlands thousands of times, and has won almost every major race at the Meadowlands, including the three major races he won in 2016; and, prior to his exclusion, Howard routinely participated in five to six races at the Meadowlands each week.  (*See supra*, at 3-4.)  Accordingly, Defendant's statements about Howard and his connection to the PEDs cannot serve as the basis for a tortious interference with contract claim in this case.

With respect to the racetrack ban, Defendant had and has an absolute right under the law of both New Jersey and New York (the locations of his racetracks (AC ¶ 40)) to exclude anyone

from racing at those racetracks under the facts alleged in the Amended Complaint.

New Jersey recognizes the right of racetrack owners to exclude any individual for no reason or any reason other than a discriminatory reason. *Pena v. New Meadowlands Racetrack LLC*, No. CIV.A. 12-2 SRC, 2012 WL 95344, at *6 (D.N.J. Jan. 10, 2012); *Martin v. Monmouth Park Jockey Club*, 145 F. Supp. 439, 440 (D.N.J. 1956), *aff'd*, 242 F.2d 344 (3d Cir. 1957). In *Pena*, the Court rejected the plaintiff's assertion that the Meadowland Racetrack's decision to exclude him from the racetrack for no clear reason was conduct fairly attributable to the State (the ground lessor of the property) and, in the absence of that State nexus, recognized the racetrack's "common law right, as a private operator of a horse-racing facility, to exclude Mr. Pena from the racetrack." *Pena*, 2012 WL 95344, at *6 (citing *Martin,* 145 F. Supp. at 439). In *Martin*, a case involving a jockey who was excluded from a racetrack for betting on a horse that was running against his horse (as well as other offenses), the Court held that the racetrack had the right to exclude the jockey, explaining: "Although it is intensely regulated, the defendant Club is a private organization. Nothing is more elementary than its right as a private corporation to admit or exclude any persons it pleases from its private property, absent some definite legal compulsion to the contrary" (for example, the jockey's race). *Martin*, 145 F. Supp. at 440. The Third Circuit affirmed, fully adopting the reasoning of the District Court. *Martin,* 242 F.2d at 344.

New York similarly recognizes a racetrack owner's right to exclude individuals from racetracks, especially when the reason for doing so is to protect the sport against those who might harm it. "The owners of the raceways . . . have a great stake in maintaining and protecting the sport's integrity against those who would despoil it." *Hadges v. Yonkers Racing Corp.* ("*Hadges I*"), 733 F. Supp. 686, 691 (S.D.N.Y. 1990), *aff'd*, 918 F.2d 1079 (2d Cir. 1990) ("*Hadges II*") (quoting *Gilmour v. N.Y. State Racing & Wagering Bd.*, 405 F. Supp. 458, 460

42

(S.D.N.Y. 1975)).  Thus, the private owner of a racetrack has the right to choose with whom it wishes to conduct business, and "*may exclude any person without reason, provided that the exclusion is not based on race, creed, color or national origin.*"  *Hadges II,* 918 F.2d at 1083–84 (emphasis added); *see also People v. Licata*, 268 N.E.2d 787, 788 (N.Y. 1971) ("The rule is well established that the operator of a racetrack can 'exclude a person from attending its races . . . as long as the exclusion is not founded on race, creed, color or national origin."); *Arone v. Sullivan Cnty. Harness Racing Ass'n, Inc.*, 457 N.Y.S.2d 958, 959 (App. Div. 3d Dep't 1982) (noting the "long-recognized prerogative of racetrack operators to exclude anyone from its track, without cause, provided the exclusion is not based on race, creed, color or national origin").  Indeed, New York's Racing Commission has codified this common-law rule.  *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 4119.8 (affirming right of race track to "expel[] from the track" "any person whether a licensee, participant or patron whose conduct is deemed detrimental to the best interest of harness racing or who is deemed an undesirable person," listing examples of such conduct, and noting that "[n]othing contained in this section shall diminish the right of any track to exclude any person as a patron or otherwise without reason, provided such exclusion is not based upon race, creed, color or national origin.").

Here, Plaintiffs do not allege that they were excluded by Defendant from participating in races at the racetracks for a discriminatory reason such as race, creed, color or national origin.  As such, Defendant was and is permitted to exclude Plaintiffs from racing at the Meadowlands *without reason*.  *Pena*, 2012 WL 95344, at *4-6; *Hadges II*, 918 F.2d at 1083–84.  If Plaintiffs could be lawfully excluded from the racetracks for no reason or any non-discriminatory reason, then, *a fortiori*, Defendant had an absolute right to exclude them for the very laudable reason (expressly recognized in both *Martin* and *Hodges*) of trying to maintain the integrity of harness and

43

thoroughbred racing by eliminating the use of harmful PEDs in the sport.  Defendant's act of excluding Plaintiffs from the Meadowlands was justified and an exercise of his absolute legal right and, for this reason alone, Plaintiffs' claims for tortious interference fail as a matter of law.

### 2.    Howard Has Failed to Plausibly Plead that He Has Sustained Actual Harm as a Result of Defendant's Conduct.

Howard's tortious interference claim also fails because he has not adequately pleaded that he suffered actual harm as a result of the Defendant's conduct: instead, his claim is based upon the specter of some future harm or damages.  Plaintiffs' attempt to ground Howard's tortious interference claim on speculative harm that may or may not occur is improper and at odds with Pennsylvania law.

As a preliminary matter, it is noteworthy that, although the Amended Complaint contains a list of various business partners with whom Howard allegedly has contracts (AC ¶ 225), the Amended Complaint fails to allege any specific facts concerning any of those contracts, such as the dates, parties, type of agreement, duration, or any other terms.  Most significantly, completely missing from Plaintiffs' Amended Complaint is any factual allegation that there was an ***actual breach*** of any contracts forming the basis for the tortious interference claim.  Instead, Plaintiffs allege generally and vaguely that Howard co-owns horses with over 70 partners; that Defendant was aware of these contractual relationships; that Defendant made the alleged defamatory statements and placed Howard on the excluded list to target Howard and encourage his partners to divest from co-ownership with Howard; and that Defendant's actions put Howard's partnerships "at risk of collapse."  Howard also alleges that Defendant's actions have damaged his investments in the purchase of his horses, which were made in reliance on them being able to race in lucrative Meadowlands races, and caused "likely" lost potential winnings from races at the Meadowlands and other racetracks from which he is now banned.

44

Howard's allegations of harm are too speculative to support a tortious interference claim. The Amended Complaint alleges only the potential for harm from Defendant's conduct but does not allege any facts showing **actual** harm or damages to Howard, the fourth element required to state a valid tortious interference with contract claim. *Walnut St. Assocs.*, 982 A.2d at 98. Howard's alleged damages hinge entirely on the contention that Howard's horses would have necessarily performed at a level to produce profits for Howard in the future, and not losses.  In other words, Howard's claimed damages are dependent on the wholly uncertain outcomes of future races. (AC ¶¶ 125, 128.)  Howard adds speculation that *if* his horses had won races, their breeding value would have been increased and, *if* he then chose to sell those horses, he may have been able to sell them for more money  (AC ¶¶ 124-128.)  However, a party seeking damages such as lost profits in relation to a claim of breach of a contract must be able to prove damages with "reasonable certainty, which at a minimum embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." *Alpart v. Gen. Land Partners, Inc*., 574 F. Supp. 2d 491, 504 (E.D. Pa. 2008) (citing *Ware v. Rodale Press, Inc*., 322 F.3d 218, 226 (3d Cir. 2003)).   Even accepting Plaintiffs' allegations as true, they are insufficient to plead the requisite element of actual damages to succeed on his tortious interference claims and, for this additional reason, Howard's tortious interference with contract claim should be dismissed.

### 3.    Judith's Fails to Adequately Plead Prospective Contracts with Third Parties or Non-Speculative Damages.

Judith's tortious interference with prospective economic advantage claim also should be dismissed because she fails to adequately plead the existence of a prospective business or contractual relationship between herself and a third party or cognizable damages.   Under Pennsylvania law, a plaintiff must point to a "reasonable likelihood" or probability of future business relations with a third party, not just a "mere hope."  *Glenn v. Point Park College*, 441 Pa.

474, 480 (1971). "Where a plaintiff claims interference with prospective contractual relations, he must allege facts giving rise to an 'objectively reasonable probability' that such a contract would arise from the parties' current dealings." *Applied Tech. Int'l, Ltd. v. Goldstein*, No. CIV.A. 03-848, 2004 WL 2360388, at *6 (E.D. Pa. Oct. 20, 2004) (quoting *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3d Cir. 1994)).

Judith's allegations fall far short of this mark. In support of her tortious interference claim, Judith alleges in conclusory fashion that "she reasonably expected that the horses she purchased would be able to participate in harness races at these tracks and yield earnings in winnings" (AC ¶ 343); that including her in the ban "destroy[ed] her relationship with the racetracks [Meadowlands, Vernon Downs, and Tioga Downs]" (*id.* ¶ 345); and that "there was a reasonable probability that Judith Taylor would have received the economic benefits of racing the horses she acquired from Howard Taylor at the Meadowlands, Vernon Downs, and Tioga Downs." (*Id.* ¶ 352).

As discussed above, Defendant had and has no legal obligation to allow Judith to race any of her horses at the Meadowlands or any other racetrack that Defendant owns. Judith's speculation that her horses may have participated in races at Defendant's tracks and that she would have earned winnings from those horse races does not allege the likelihood of a potential business or contractual relationship needed to sustain her intentional interference tort claim. Under Pennsylvania law, her allegations are plainly insufficient. *See UniStrip Techs., LLC v. LifeScan, Inc*, 153 F. Supp. 3d 728, 743 (E.D. Pa. 2015) (dismissing tortious interference claim where plaintiff fails to allege "actual relations or potential contracts"); *Brunson Cmmcn's, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 578 (E.D. Pa. 2002) (dismissing tortious interference claim where plaintiff did "not identif[y] a single past, present or prospective customer . . . with whom it had a prospective contract which did

not finalize because of Defendant's actions."); *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.,* 801 F. Supp. 1450, 1459 (E.D. Pa. 1992) (allegation of "loss of competitiveness and unknown customers cannot, standing alone, state a claim for tortious interference with prospective business relations").

Judith's allegations of damages are just as speculative as Howard's.  She guesses that she may have received "winnings" from racing her horses and that she "suffered the loss of the cost of the horses." (AC ¶¶ 343, 351.)  Judith obviously has not (and cannot) plead with any certainty that any specific horse would have won any race, let alone what kind of damages that would entail.  To the extent that race-winning horses are valued more for their "potential for breeding," (AC ¶ 134), Judith's damages are doubly speculative.  Not only can she not plead that her horses would necessarily have won anything, but she does also not and cannot plead to what extent those winnings would increase the horse's value.  What's more, Judith does not plead that the ten horses could not race at other racetracks and "demonstrate [their] value for breeding." *Id.*

As to Judith's suggestion that she "suffered the loss of the cost of the horses" this allegation is contradicted by Plaintiffs' allegation that, after she realized the ban would not be lifted, she "transferred the interest she purchased . . . to a third party."  (AC ¶ 115.)  If Judith's purchases of the horses from Howard were "bona fide" as she alleges, why would a third party not have valued the horses at the same price and why would Judith have re-sold the horses if she could still have raced at other racetracks?  At its core, Judith's claim alleges that Defendant's ban caused her to possibly lose winnings in races in the future that her horses may or may not have run in and which she does not and cannot as a matter of logic identify.  These broad, conclusory and wholly speculative allegations are insufficient to state a tortious interference with prospective economic advantage claim under Pennsylvania law.

### E.    PLAINTIFFS FAILS TO STATE AN UNFAIR COMPETITION CLAIM.

In the Eleventh Count of the Amended Complaint, Plaintiffs allege that Defendant's alleged defamatory statements and his ban on Howard's horses and trainers from racing at the Meadowlands constitutes Unfair Competition because they were done with malice and "have caused Howard Taylor's business to suffer while benefitting Gural's business, which is a competitor in the same market." (AC ¶ 335)   These allegations in this Count fall far short of what is required to plausibly plead a common law claim of unfair competition under Pennsylvania law.

Pennsylvania recognizes "a common law claim of unfair competition under the Restatement (Third) of Unfair Competition." *Air Prods. and Chems., Inc. v. Inter–Chem., LTD*, et al., No. Civ.A.03–6140, 2003 WL 22917491, at *12 (E.D. Pa. Dec. 2, 2003) (*quoting Fresh Made, Inc. v. Life Way Foods*, No. Civ.A.01–4254, 2002 WL31246922, at *9 (E.D. Pa. Aug. 9, 2002). The Restatement provides, in relevant part:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless . . . the harm results from . . . acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public.

Restatement (Third) Unfair Competition § 1(a)  (1995).

As the Third Circuit has observed, "[i]t is not so easy to conclude that there is one narrow and clear category of the common law tort" of unfair competition. *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995).  However, that does not mean that the type of conduct actionable as unfair competition is limitless. To the contrary, relying on the Restatement, Pennsylvania courts have recognized a cause of action for unfair competition only in limited circumstances: if a defendant "(1) engages in deceptive marketing, infringement of trademark or other protectable intellectual property, misappropriation of trade secrets, or acts or

48

practices that are actionable under federal or state statutes; and (2) his conduct causes harm to the plaintiff's commercial relations." *M3 USA Corp. v. Hart*, 516 F. Supp. 3d 476, 504–05 (E.D. Pa. 2021); *see also Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 415 Pa. 276, 284 (1964) (holding that "false and misleading representations" in outreach to customers is unfair competition); *Spring Steels, Inc. v. Molloy*, 400 Pa. 354, 364, 162 A.2d 370 (1960) (describing unfair competition where "the defendants' action consist[ed] of ... fraud or deception in its dealings with third parties or consumers"); *Penn. State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 867 (Pa. Super. Ct. 1998) ("A claim of unfair competition encompasses trademark infringement and unfair practices involving a misappropriation of the skill, expenditures and labor of another") (citation omitted)).  A cause of action for unfair competition has been recognized "where there is evidence of, among other things ... tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." *M3 USA Corp.,*516 F. Supp. 3d at 505.

Plaintiffs have not alleged, nor can they, that Defendant engaged in any kind of conduct that could be considered deceptive marketing, infringement of trademark or other protectable intellectual property, misappropriation of trade secrets, usurpation of product rights, siphoning of employees, or any acts or practices that are actionable under federal or state statutes.  As detailed above in connection with Plaintiffs' tortious interference claims, they also have not alleged facts showing *actual* harm to Plaintiffs' commercial relationships but have only speculated that Howard and Judith could be harmed in the future.

Even if Pennsylvania's common law of unfair competition is broad enough to encompass conduct by a defendant that does not fit precisely within any of  the categories of claims described above, Plaintiffs' claim still fails as a matter of law because Plaintiffs do not and cannot plausibly

allege facts to support a finding that Defendant misappropriated the skill, expenditures and labor of Howard, or engaged in any deceptive unfair, and wrongful towards the Howard that was intended to harm the Howard's business and was not justified by non-competitive reasons (in this case, the desire to rid the racing industry of harmful PEDs). The conduct of Defendant as alleged in the Amended Complaint is not the type of conduct that is recognized as unfair competition under Pennsylvania's common law and, accordingly, the claim should be dismissed.

## F.  **PLAINTIFFS' PROMISSORY ESTOPPEL CLAIM FAILS.**

In support of their newly pleaded promissory estoppel count, Plaintiffs contend that the Defendant "made a promise to those named in the ban and to the harness racing community that the Meadowlands would 'allow owners, should they choose, an opportunity to change trainers and/or horses in partnership with excluded owners.' The ban did not limit to whom the horses could be sold." (AC ¶ 354.)  Plaintiffs allege they relied on the "parameters of the ban" in selling Howard's horses to Judith. (*Id.* ¶ 356.)

To state a claim for promissory estoppel, Plaintiffs "must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." *Crouse v. Cyclops Indus.*, 560 Pa. 394, 403 (2000).  Pennsylvania courts have cautioned that promissory estoppel cannot be "loosely applied; if it were, any promise, regardless of the complete absence of consideration, would be enforceable." *Weavertown Transp. Leasing, Inc. v. Moran*, 834 A.2d 1169, 1174 (Pa. Super. Ct. 2003), *appeal denied*, 578 Pa. 685 (2004) (quotation omitted).

Before analyzing the specifics of the claim, Plaintiffs' promissory estoppel claim fails for two threshold reasons.  First, the Press Release was not issued by Defendant Gural individually,

but by the Meadowlands Racetrack LLC, and therefore Defendant Gural cannot be considered the "promisor." (*See* Exhibit 5.) Plaintiffs do not plead that Gural made any promises individually and therefore there is no basis to hold him liable on a quasi-contract claim. *Cf. Accurso v. Infra-Red Services, Inc.*, 23 F. Supp. 3d 494, 503 (E.D. Pa. 2014) (where contract was in the name of the company, contract claim cannot be enforced against individual, even if he was acting as an agent for the company). Even if the Court were to find the Press Release to constitute an enforceable promise on a theory of promissory estoppel, "as a general rule, members of a limited liability company or shareholders of corporations are not personally liable to perform corporate obligations." *Lieberman v. Corporacion Experienca Unica, S.A.*, 226 F. Supp. 3d 451, 467 (E.D. Pa. 2016). Plaintiffs plead no facts to suggest any basis to hold Gural personally liable for an alleged promise purportedly made by the Meadowlands Racetrack LLC.

Second, the Third Circuit has repeatedly refused to allow plaintiffs to recast traditional tort claims as unjust enrichment/promissory estoppel claims. *See, e.g.*, *Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999); *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 493 (E.D. Pa. 2016). Since Plaintiffs' tort claims fail as a matter of law (as explained above), their alternative "promissory estoppel" claim predicated on the same conduct must also fail.

But even if Plaintiffs could surmount these threshold obstacles, their promissory estoppel claim fails because the Press Release does not promise Plaintiffs that any transfer of ownership would lift the ban as to a specific horse. Read in full and in context, the Press Release does not suggest that Plaintiffs would automatically be allowed to compete if they sold horses to anyone. Plaintiffs' argument is predicated on one excerpted quote from a line of the Press Release, failing to give full context to what it said. After discussing the Fishman trial and the evidence presented

51

by the Government in support of Fishman's conviction, the Press Release discusses the anticipated, "time consuming" investigation and concludes:

> We also expect that **additional disclosures will be released, and if so, where warranted, the Meadowlands will act on that information**. We will also require that any change of trainers or dissolution of any partnerships with excluded owners **will require proof to the satisfaction of The Meadowlands.** We believe these steps are warranted per the revelations from the above prosecutions and are necessary in the interest of the industry we all love and wish to preserve.

(Exhibit 5 at p. 3 (emphasis added).)  Thus, the Press Release is clear that the initial exclusion list may not be exclusive and that the change of ownership of a horse would require proof to the Meadowlands' satisfaction.  Plaintiffs can point to no specific promise that any sale of Howard's ownership interest would automatically result in the horse being permitted to race.  *See Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F. Supp. 2d 434, 439 (E.D. Pa. 2007) (a "broad or vague implied promise" is not sufficient to sustain claim for promissory estoppel); *see also C & K Petroleum Prod., Inc. v. Equibank,* 839 F.2d 188, 192 (3d Cir. 1988) ("Promissory estoppel would be rendered meaningless if this Court were to allow[plaintiff] to maintain an action for detrimental reliance based on the alleged existence of such a broad and vague implied promise.")

In addition, given these statements and the context within which they were made, Plaintiffs cannot plausibly allege that they relied on the Press Release to suggest that individuals like Howard who were excluded could sell the horses **to their own family** to avoid the exclusion.  "Under Pennsylvania law, the promisor must have an **objectively reasonable belief** that a purported promise will induce action by the promisee." *Burton Imaging Grp.*, 502 F. Supp. 2d at 439; *see also Bennett v. Itochu Int'l, Inc.,* No. 09-CV-1819, 2012 WL 3627404, at *21 (E.D. Pa. Aug. 23, 2012) ("Action induced by the promisee's mistaken judgment will not satisfy this element of detrimental reliance because such reliance is not reasonable."), *aff'd*, 572 F. App'x 80 (3d Cir.

2014) (quotation and citation omitted). An intra-family transfer is generally viewed with suspicion for obvious reasons. Indeed, in the context of Pennsylvania fraudulent transfer law, sale of an asset to one's parent—an obvious insider—is considered one of the "badges of fraud" that by its nature casts suspicion on a sale. *See* Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. C.S. § 5104 (b)(1); *Mid Penn Bank v. Farhat*, 74 A.3d 149, 154 (Pa. Super. Ct. 2013) (transfer to parent meets "badge of fraud" for sale to insider). Thus, it was objectively unreasonable for Plaintiffs to have relied on the Press Release to conclude that Howard could transfer his horses *to his own family member* without the Meadowlands Racetrack, LLC being skeptical of the bona fides of the transaction. For these reasons, the Court should dismiss Plaintiffs' promissory estoppel claim.

## G.    PLAINTIFFS FAIL TO PLEAD PLAUSIBLE ANTITRUST CLAIMS.

As explained above, in one final effort to plead claims against Defendant, Plaintiffs add "alternative" antitrust claims under Sections 1 and 2 of the Sherman Act (Sixth and Seventh Counts), as well as the equivalent claims under New Jersey and New York law (Eighth through Eleventh Counts).

The Supreme Court's *Twombly* pleading standard was first decided in the context of antitrust claims, the complexity and cost of which caused the Court to require a level of specificity in pleading "to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence.'" *Twombly*, 550 U.S. at 559 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Following this lead, in "antitrust cases," the Third Circuit "insist[s] upon some specificity in pleading" because "defendant[s] should not be put to the expense of big-case discovery on the basis of a threadbare claim." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010).

To state a viable Section 1 claim, Plaintiffs must plead facts plausibly establishing

"(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 442 (3d Cir. 1997). And to state a viable Section 2 claim, Plaintiffs must plead facts plausibly establishing "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n.1 (1985)).

Here, at least four independent deficiencies, among countless other flaws, require dismissal of Plaintiffs' federal and state antitrust claims. First, Plaintiffs fail as a matter of law to plausibly allege an antitrust conspiracy under sections 1 and 2 of the Sherman Act. Second, Plaintiffs fail to allege a relevant antitrust market, power in a relevant antitrust market, and monopoly power in an antitrust market. Third, Plaintiffs lack standing to assert antitrust claims under federal and state antitrust law because they fail to allege any antitrust injury. Fourth, these same deficiencies require dismissal of Plaintiffs' state law claims.

### 1.    Plaintiffs Fail to Plausibly Allege a "Conspiracy" Under Sections 1 or 2 of the Sherman Act.

Plaintiffs allege alternative conspiracy claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. ¶¶ 1 and 2 (Counts 7 and 6, respectively). For the alleged Section 1 conspiracy, Plaintiffs claim that "Gural, Meadowlands, Vernon Downs, Tioga Downs, Buffalo Raceway, and Batavia Downs engaged in a continuing conspiracy with each other to unreasonably restrain interstate trade and commerce." (AC ¶ 256).

For their alternative Section 2 claim, Plaintiffs allege "Gural and his ownership interest in several race tracks possess market power in the market for harness-racing race tracks and he is

using this power in violation of Section 2." (*Id.* ¶ 239). "Section 2 prohibits three types of conduct: monopolization, attempted monopolization, and conspiracy to monopolize." *Satnum Distrib. LLC v. Commonwealth-Atladis, Inc.*, 140 F. Supp. 3d 405, 417 (E.D. Pa. 2015) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993)). While the Amended Complaint is silent as to the type of Section 2 claim Plaintiffs attempt to raise, by pleading it in the alternative to a Section 1 claim, Plaintiffs seem to be attempting to plead a conspiracy to monopolize claim. (AC ¶¶ 238-254).

To successfully plead the "concerted action" element of a Section 1 claim, Plaintiffs must plead facts plausibly suggesting that "(1) the defendant was part of the contract or conspiracy; and (2) that the conspiracy imposed an unreasonable restraint on trade." *Satnam Distribs.*, 140 F. Supp. 3d at 417 (quotation and citation omitted).  And to plausibly allege a Section 2 conspiracy to monopolize claim, a plaintiff must plead facts supporting (i) an agreement to monopolize, (2) an overt act in furtherance of the conspiracy, (3) a specific intent to monopolize, and (4) a causal connection between the conspiracy and the alleged injury. *Id.* (citing *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010)).

Accordingly, to prevail on either Count 6 or Count 7, Plaintiffs must establish the existence of an agreement, sometimes also referred to as a "conspiracy" or "concerted action." *Twombly*, 550 U.S. at 553. Under section 1 of the Sherman Act, "[t]he crucial question" is whether the conduct "stem[s] from independent decision or from an agreement" among defendants. *Id.* Failure to plausibly allege an agreement is fatal, as "[u]nilateral action, regardless of the motivation, is not a violation." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (affirming dismissal of antitrust conspiracy claim).

Because direct evidence of an agreement is rare, conspiracy claims often rely on

circumstantial evidence of an agreement. *See Ins. Brokerage Antitrust Litig.*, 618 F.3d at 323. In these cases, plaintiffs must plead "plus factors" that tend to suggest that the defendants' behavior was not independent. *Id.* Plus factors include: (i) an industry structure that is conducive to conspiracy, such as an oligopolistic market with transparent pricing; (ii) defendants acting contrary to their economic self-interest, such as defendants not reducing prices to try to increase market share when facing supracompetitive pricing by competitors; and (iii) traditional indications of a conspiracy, such as defendants exchanging information. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004). Evidence of only parallel or similar conduct by alleged co-conspirators is not sufficient to show an agreement because "parallel conduct is just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 321.

Plaintiffs' pleadings fail under Sections 1 or 2 of the Sherman Act because they do not identify a single instance of an actual agreement between Defendant, on one hand, and the Racetracks that banned several racehorses, on the other.  Plaintiffs' theory seems to be that Defendant used his ownership interests in Meadowlands, Vernon Downs, and Tioga Downs to ban certain racehorses, including horses owned by Plaintiffs, and that those decisions led to Buffalo Raceway and Batavia Downs following suit. (AC ¶¶ 127-129). Indeed, according to Plaintiffs, Buffalo Raceway and Batavia Downs excluded Plaintiffs due to supposed "defamatory statements" by Defendant and not due to any agreement or conspiracy. (*Id.*)  Moreover, the Racetracks decided to exclude certain horses because the owners of those horses may have been involved in doping or the use of PEDs with horses, and "[t]here is no more damaging accusation to the reputation of a racehorse owner." (AC ¶ 6).  But the decisions by the Racetracks to ban horses accused of using PEDs, is the type of rational business decision that is generally insufficient to plead an antitrust

conspiracy. *See Burtch*, 662 F.3d at 227 ("Parallel conduct in itself is insufficient to state a plausible claim because it is 'consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'" (citing *Twombly*, 550 U.S. at 554)).

In *Burtch* and *Insurance Brokerage Antitrust Litigation* the Third Circuit rejected similarly implausible antitrust conspiracy allegations. In *Burtch*, 662 F.3d at 227-29, the plaintiff alleged that multiple firms acted in concert by declining or limiting plaintiff's credit facility around the same time. Under the *Twombly* pleading standard, the Third Circuit concluded that the plaintiff failed to plausibly allege a conspiracy because plaintiff failed to plead any of the "plus factors" and, instead, the allegations were equally consistent with the defendants making independent and rational business decisions. And in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d at 328, the Third Circuit rejected the plaintiffs' antitrust conspiracy claims because the allegations suggested an "obvious explanation" for defendant insurers' decision to enter into contingent commission agreements: "each insurer found that the benefits justified the costs."

Similarly, the Amended Complaint fails to identify a single instance of an actual agreement, the identity of any person besides Defendant that may have participated in one, where or how the alleged conspiracy formed or operated, or any other "plus factors" establishing that the Racetracks' similar conduct was irrational or anticompetitive. Instead, Plaintiffs try to make ordinary conduct—like banning horses accused of using PEDs—seem ominous, but their conclusory allegations do not make their insinuations plausible. *See Twombly*, 550 U.S. at 555 n. 3; *Ins. Brokerage Antitrust Litig.*, 618 F. 3d at 326; *Howard Hess Dental Labs*, 602 F.3d at 254-55. If anything, Plaintiffs negate any inference of a conspiracy by alleging an obvious reason why the Racetracks might independently exclude certain horses—to protect horses and the industry

from the use of PEDs in harness racing. *See, e.g.*, *Burtch*, 62 F.3d at 227-28.    Thus, Plaintiffs'

Sherman Act claims fail at the starting gate.

### 2.    Plaintiffs' Fails to Adequately Plead the Remaining Elements of their Federal Antitrust Claims.

As noted above, both Section 1 and 2 claims require Plaintiffs to plead anti-competitive

effects within a relevant antitrust market (both a product market and a geographic market).  *Queen*

*City Pizza*, 124 F.3d at 442-43.  Plaintiffs also fail to allege harm to competition in any relevant

antitrust market, and on that basis alone, Counts 6 and 7 should also be dismissed.

### i.    *Plaintiffs' Claim Must Be Analyzed Under the Rule of Reason.*

Plaintiffs' Amended Complaint includes numerous buzz words, alternately suggesting

that defendants' behavior was *per se* unlawful, that it is susceptible to condemnation under a "quick

look" analysis, or that it is unlawful under a full rule of reason test. (AC ¶ 273, 311).  In order to

proceed under either the *per se* or "quick look" approaches, an antitrust plaintiff needs to show the

existence of a horizontal agreement, that is, an agreement between "competitors at the same market

level." *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 436 n. 5 (3d Cir. 2009);

*see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed

by agreement between competitors have traditionally been denominated as horizontal restraints,

and those imposed by agreement between firms at different levels of distribution as vertical

restraints."). Vertical agreements, by contrast, virtually all receive a traditional rule-of-reason

analysis. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007); *see also*

*Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) (rejecting quick look analysis and

applying rule of reason where restraint was vertical).

As alleged by Plaintiffs, however, Gural is the only defendant, and even if Plaintiffs had

sufficiently alleged an agreement between Gural, on one hand, and the Racetracks, on the other

hand—which plaintiffs did not plausibly allege—that arrangement would be vertical in nature because Defendant is not a racetrack or a competitor of the Racetracks, but rather, he is an alleged partial owner of three of the five Racetracks. (AC ¶ 277). Any alleged agreement, therefore, cannot be "horizontal" and there are simply no factual allegations supporting *per se* or "quick look" condemnation of the conduct at issue.

Even if the alleged conduct involving the non-party Racetracks were considered horizontal and an agreement—it is neither—the alleged conduct at issue would be akin to a concerted refusal to deal with Howard (in not allowing him to race his horses at the Racetracks) and it would still be analyzed under the rule of reason. In *Lifewatch Servs. Inc. v. Highmark, Inc.*, 902 F.3d 323, 330 (3d Cir. 2018)*,* for instance, the plaintiff, a seller of telemetry monitors, sued the Blue Cross Blue Shield Association and five of its member insurance plan administrators, alleging that they violated Section 1 of the Sherman Act by agreeing to deny coverage for plaintiff's telemetry monitors.  *Id.* at 330.  Because the allegations constituted a "horizontal, concerted refusal to deal," the Third Circuit held that it was subject to analysis under the rule of reason.  *Id.* at 336 n. 9  (reserving *per se* treatment to group boycotts in which firms with market power boycott suppliers in order to discourage them from doing business with a competitor).  If Howard's allegations can be construed as alleging any horizontal conduct, it would be akin to the concerned refusal to deal in *Lifewatch* and would be subject to the rule of reason.

Because Plaintiffs' claims must be analyzed under the rule of reason, Plaintiffs have the burden of alleging both a relevant product and geographic market and that defendant possessed market power in that market. *Ins. Brokerage Antitrust Ltig.*, 618 F.3d at 315-16; *see also Queen City Pizza*, 124 F.3d at 435. Plaintiffs have done neither in this case.

###### ii.        *Plaintiffs Fail to Adequately Allege a Relevant Product Market.*

To define a relevant product market, the plaintiff must identify both the product at issue and all of the products that substantially compete with it, that is, those products that are reasonably interchangeable with it.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). The plaintiff must plead facts establishing "the extent to which [the] product is interchangeable with alternative products within the field." *Mylan Pharma. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 436 (3d Cir. 2016). "The term interchangeability implies that one product is roughly equivalent to another for the use to which it is put." *Id.* (cleaned up). In addition, courts must consider the "cross-elasticity of demand, which is defined as a relationship between two products, usually substitutes for each other, in which a price change for one product affects the price of the other." *Lifewatch Servs.*, 902 F.3d at 337; *see also Queen City Pizza*, 124 F.3d at 437–38. Ultimately, "[t]he outer boundaries of the market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Queen City Pizza,* 124 F.3d at 436.

"The Third Circuit has instructed that although in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers, there is no prohibition against dismissal of antitrust claims for failure to plead a relevant market." *Fresh Made, Inc.*, 2002 WL 31246922, at *5; *see also Queen City Pizza*, 124 F.3d at 436.  Accordingly, a court should grant a motion to dismiss "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Queen City Pizza*, 124 F.3d at 436–37 (collecting cases).

Here, Plaintiffs claim that they own, breed, race, and sell racehorses and that they compete in each of those markets against Defendant. (AC ¶¶ 52, 243, 269, 280, 307, 327). Racetracks, on the other hand, operate dozens of different horse races each week. (*Id.* ¶ 58). Plaintiffs allege that "Gural and his ownership interest in several race tracks possess market power in the market for harness-racing race tracks." (*Id.* ¶ 239). The Amended Complaint does not allege a single fact establishing a market owning harness-racing horses, breeding harness-racing horses, racing harness-racing horses, or selling harness-racing horses. It does not reference the rule of reasonable interchangeability and cross elasticity of demand. It identifies certain segments of harness races, (*id.* ¶ 43), but does not state a fact plausibly alleging that those segments are distinct markets or whether those segments are distinct from other horse races, generally. Plaintiffs fail entirely to allege whether there are reasonably interchangeable alternatives for owning, breeding, racing, and selling of harness-racing horses. It is unclear from the face of the Amended Complaint what the contours of the proposed relevant product market is.  Is it harness racing generally? Harness racing by type of race (pacing or trotting)? Harness racing by horse sex? Harness racing by horse age? Or something else entirely? The federal antitrust claims should be dismissed on that basis alone. *See Queen City Pizza*, 124 F.3d at 432–33, 437–38.

> ### iii.    *Plaintiffs Fail to Adequately Allege a Relevant Geographic Market.*

In addition to pleading a relevant production market, a plaintiff must establish a relevant geographic market identifying the area in which the defendant operates and where customers can obtain the product at issue, or its substitutes. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963). Plaintiffs identify various geographic areas where harness racing occurs, including "North America," (AC ¶ 101) the "United States," (*id.* ¶ 46) the "Northeast," (*id.* ¶¶ 136, 241, 257-58, 295-96) and "New Jersey" (*id.* ¶ 21, 67, 94-95), but provide no factual support that any of these

areas would constitute a relevant geographic market within which to analyze competition. For this additional reason, Plaintiffs' antitrust claims should be dismissed as a matter of law. *Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008) (granting motion to dismiss antitrust claim for failure to plausibly allege relevant market).

***iv.       Plaintiffs Fail to Allege Monopoly or Market Power.***

In addition to failing to allege the contours of what might be considered a relevant market, Plaintiffs also fail to plead that Defendant has monopoly power, or even market power in any such market. In addition to pleading a relevant market, a plaintiff must plausibly allege that defendant possessed market power to plead a Section 1 claim, *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315-316, and must plausibly allege that defendant possessed monopoly power to plead a Section 2 claim. *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Plaintiffs allege no facts—not even market share—to support either.

**3.       Plaintiffs Lack Antitrust Standing**

In addition to the above failures, Plaintiffs' antitrust claims must also be dismissed because they fail to establish antitrust standing to pursue their claims.  In addition to Constitutional standing requirements, Courts have imposed a more rigorous prudential standing requirement, referred to as "antitrust standing," to determine whether the plaintiff is the proper party to bring a private antitrust action. *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998). Unlike Constitutional standing, which is a jurisdictional issue, prudential standing is cognizable under a Rule 12(b)(6) motion, *Potter v. Cozen & O'Connor*, 46 F.4th 148, 154-55 (3d Cir. 2022), and is a substantive element of Plaintiffs' antitrust claims. *City of Pittsburgh*, 147 F.3d at 264. To bring an antitrust claim, a plaintiff must allege that it has antitrust standing, which requires that the plaintiff suffer an antitrust injury and be an appropriate plaintiff to bring the antitrust case. *Assoc.*

62

*Gen. Contractors, Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 540-44 (1983).

The Third Circuit distills the AGC factors to five:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 249 (3d Cir. 2022).

The antitrust injury requirement is the most important factor, and without establishing an antitrust injury, the plaintiffs fail to establish antitrust standing. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986). With respect to antitrust injury, plaintiffs must allege more than conclusory statements and must provide specific facts to plausibly suggest injury to competition, not just to a particular competitor. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Harm to competition is conduct that limits output or raises prices, and failure to show harm to the competitive process or an impact on output or prices can result in dismissal. *Host Int'l, Inc.,* 32 F.4th at 250-52; *see also*, *SEI Glob. Servs., Inc. v. SS&C Advent*, No. 20-3386, 2022 U.S. App. LEXIS 18121, at *6-7, 2022 WL 2356730 (3d Cir. June 30, 2022). When the only harm alleged is harm to the plaintiffs, and not to competition, the antitrust claims should be dismissed. *Host Int.'l Inc.,* 32 F.4th at 252; *SEI Glob. Servs., Inc.*. 2022 U.S. App. LEXIS 18121, at *8-9.  Here, the only alleged damages are those allegedly suffered by Plaintiffs related to their inability to race horses owned by them in certain races conducted by non-parties to this lawsuit. (AC ¶¶ 250-253, 263, 266-269). There are no factual allegations supporting alleged harm to competition in any relevant market—just the conclusion that the horse racing ban "substantially

lessens competition in the markets for racing, breeding, and selling harness-racing horses." (*Id.* ¶ 269). Therefore, Plaintiffs' antitrust claims should be dismissed.

### 4.    <u>Plaintiffs' State Antitrust Law Claims Fail for Same Reasons.</u>

Plaintiffs' state-law antitrust claims should fail for the same reasons as their federal claims. The New Jersey Antitrust Act is "construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." *State v. N.J. Trade Waste Ass'n*, 472 A.2d 1050, 1056 (N.J. 1984) (citing N.J.S.A. 56:9-18). Thus, the Third Circuit has applied the same analysis to claims under N.J.S.A. 56:9-3 and N.J.S.A. 56:9-4, as under Section 1 and 2 of the Sherman Act respectively. *Elsai, Inc. v. Sanofi Aventis U.S.*, LLC, 821 F.3d 394, 402 (3d Cir. 2016).

Likewise, the New York Donnelly Act, "was modelled on the Federal Sherman Act of 1890, and thus we have observed that State antitrust law 'should generally be construed in light of Federal precedent . . . ." *People v. Rattenni*, 613 N.E. 2d 155, 158 (N.Y. 1993). Thus, courts apply the same standards as under Section 1 and Section 2 of the Sherman Act to claims under the New York Donnelly Act. *See, e.g.*, *Nirvana, Inc. v. Nestle Waters N. Am., Inc.*, 123 F. Supp. 3d 357, 379 (N.D.N.Y. 2015) (dismissing Donnelly Act claim for failure to plead relevant market); *Worldhomecenter.com, Inc. v. KWC Am., Inc.*, No. 10-7781, 2011 U.S. Dist. LEXIS 104496, at *5 (S.D.N.Y. Sep. 15, 2011) (dismissing Donnelly Act claim for failure to plead agreement or conspiracy).

Thus, the same fatal defects in Plaintiffs' federal antitrust claims doom their state-law antitrust claims and those counts (Eighth through Eleventh Counts) should also be dismissed.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Amended Complaint should be dismissed in its entirety under Fed. R. Civ. P. 12(b)(6), with prejudice, for failure to state a claim upon which relief can be granted.

Respectfully submitted,

Dated: July 18, 2024                                **GENOVA BURNS LLC**

_/s/ Angelo J. Genova_

By:    Angelo J. Genova (ID # 205373)
Lawrence Bluestone, Esq.  (ID # 322261)
1600 Market Street, Suite 1650
Philadelphia, PA 19103
(973) 533-0777
agenova@genovaburns.com
lbluestone@genovaburns.com

Sean P. McConnell (PA  307740)
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103
Phone: (215) 979-1947
spmcconnell@duanemorris.com

Brian H. Pandya (pro hac vice)
**DUANE MORRIS LLP**
901 New York Avenue N.W., Suite 700 East
Washington, DC 20001
Phone: (202) 776-7807
BHPandya@duanemorris.com

_Attorneys for Defendant,_
_Jeffrey Gural_

1757529v1/2883-073