**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HOWARD TAYLOR and JUDITH TAYLOR, | CIVIL ACTION |
| Plaintiffs, | No.: 2:23-cv-04882-JHS |
| v. | |
| JEFFREY GURAL, | |
| Defendant. | |

**SUPPLEMENTAL MEMORANDUM OF LAW OF DEFENDANT JEFFREY GURAL
IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Angelo J. Genova (PA 205373)
Lawrence Bluestone (PA 322261)
**GENOVA BURNS LLC**
19 West 3rd Street
Media, PA 19063
Phone: (973) 533-0777
agenova@genovaburns.com
lbluestone@genovaburns.com

Sean P. McConnell (PA 307740)
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103
Phone: (215) 979-1947
spmcconnell@duanemorris.com

Brian H. Pandya (pro hac vice)
**DUANE MORRIS LLP**
901 New York Avenue N.W., Suite 700 East
Washington, DC 20001
Phone: (202) 776-7807
BHPandya@duanemorris.com

*Attorneys for Defendant,*
*Jeffrey Gural*

## **TABLE OF CONTENTS**

I.    The Court should dismiss Plaintiffs' defamation and related common-law claims because Plaintiffs fail to plausibly plead several material elements ........................... 1

  A.  The four alleged statements are not defamatory as a matter of law. .......................... 1

     1.  Statements 1 and 2 are not defamatory because they are either opinion or substantially true. ................................................................................................. 2

     2.  Statements 3 and 4 are not actionable as defamation by inuendo because they are not capable of defamatory meaning. .............................................................. 7

  B.  Howard pleads only the actual malice standard and should be held to his pleading choices; but, regardless, his Amended Complaint establishes that he is a limited purpose public figure as a matter of law. ................................................................. 10

  C.  Plaintiffs fail to plead actual malice as a matter of law............................................. 12

  D.  Plaintiffs' common law claims should also be dismissed because they fail to adequately allege damages. ....................................................................................... 13

II.   The Court should dismiss Plaintiffs' antitrust claims because Plaintiffs fail to plead plausible claims under Section 1 or 2 of the Sherman Act (or equivalent state law claims). ......................................................................................................................... 15

  A.  Plaintiffs have not pled a plausible Section 2 claim, with or without the essential facilities doctrine. ................................................................................................... 17

  B.  Plaintiffs have not pled a plausible Section 1 conspiracy. ....................................... 23

III.  CONCLUSION............................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 4714 Morann Ave.*,
      303 A.3d 200 (Pa. Commw. Ct. 2023) ...................................................................6

*Abdellatif v. Alza Wrae Indus. Co.*,
      No. 18-2297, 2019 U.S. Dist. LEXIS 45684 (E.D. Pa. Mar. 20, 2019)...................14

*Alberta Gas Chemicals Ltd. v. E.I. DuPont De Nemours & Co.*,
      826 F.2d 1235 (3d Cir. 1987)............................................................................ 21-22

*Am. Osteopathic Ass'n v. Am. Bd. of Internal Med.*,
      555 F. Supp. 3d 142 (E.D. Pa. 2021) .........................................................7, 8, 9, 10

*Ashcroft v. Iqbal*,
      556 U.S. 662 (2009)...................................................................................... *passim*

*Assoc. Gen. Contractors v. Cal. State Council of Carpenters*,
      459 U.S. 519 (1983)...............................................................................................22

*Bay View Packing Co. v. Taff*,
      543 N.W.2d 522 (Wis. Ct. App. 1995) ..................................................................11

*Bell v. Sullivan*,
      No. 17-912, 2017 U.S. Dist. LEXIS 190150 (E.D. Pa. Nov. 16, 2017) ...................3

*Brady v. Media*,
      No. 23-1078, 2024 U.S. Dist. LEXIS 160991 (D. Del. Sep. 6, 2024).......................2

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
      509 U.S. 209 (1993)...............................................................................................18

*Brown Shoe Co. v. United States*,
      370 U.S. 294 (1962)...............................................................................................16

*In re Burlington Coat Factory Sec. Litig.*,
      114 F.3d 1410 (3d Cir. 1997)...................................................................................3

*Burtch v. Milberg Factors, Inc.*,
      662 F.3d 212 (3d Cir. 2011).......................................................................15, 23, 24

*Dameron v. Washington Magazine*,
      779 F.2d 736 (D.C. Cir. 1985) ...............................................................................11

*Di Sante v. Russ Fin. Co.*,
  380 A.2d 439 (Pa. Super. Ct. 1977) ...................................................................15

*DiFraia v. Ransom*,
  No. 23-01187, 2024 U.S. Dist. LEXIS 120645 (M.D. Pa. July 8, 2024) .................................2

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009) ..................................................................................1

*Gainey v. City of Phila.*,
  704 F. Supp. 3d 589 (E.D. Pa. 2023) ...................................................................10

*Gertz v. Robert Welch*,
  418 U.S. 323 (1974) ...............................................................................................11

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
  32 F.4th 242 (3d Cir. 2022) .........................................................................21, 22, 23

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*,
  90 F.3d 737 (3d Cir. 1996) ...................................................................................19

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ............................................................................24, 25

*Jankowicz v. Fox News Network, LLC*,
  No. 23-513, 2024 U.S. Dist. LEXIS 129423 (D. Del. July 22, 2024) .....................................2

*Levy-Tatum v. Navient Sols., Inc.*,
  183 F. Supp. 3d 701 (E.D. Pa. 2016) ...................................................................11

*Liberty Mut. Ins. Co. v. Gemma*,
  301 F. Supp. 3d 523 (W.D. Pa. 2018) ...................................................................14

*Mallory v. S & S Publishers (Mallory II)*,
  260 F. Supp. 3d 453 (E.D. Pa. 2017), *aff'd*, 728 F. App'x 132 (3d Cir. 2018).........................6

*Marcone v. Penthouse Int'l Magazine for Men*,
  754 F.2d 1072 (3d Cir. 1985) .................................................................................12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ...........................................................................................16, 21

*Mayfield v. NASCAR*,
  674 F.3d 369 (4th Cir. 2012) .................................................................................12

*McCafferty v. Newsweek Media Grp., Ltd.*,
  No. 18-1276, 2019 U.S. Dist. LEXIS 36543 (E.D. Pa. Mar. 7, 2019), *aff'd*,
  955 F.3d 352 (3d Cir. 2020)................................................................................3, 6

*Monarch Ent. Bureau, Inc. v. N.J. Highway Auth.*,
　　715 F. Supp. 1290 (D.N.J. 1989) .................................................................17, 18

*Monge v. Univ. of Pa.*,
　　No. 22-2942, 2023 U.S. Dist. LEXIS 55322 (E.D. Pa. Mar. 30, 2023).................................2, 7

*Montefusco v. ESPN, Inc.*,
　　47 F. App'x 124 (3d Cir. 2002) ...................................................................2

*O'Keefe v. WDC Media, LLC*,
　　No. 13-6530 (CCC), 2015 U.S. Dist. LEXIS 41127 (D.N.J. Mar. 30, 2015)...........................3

*Pace v. Baker-White*,
　　432 F. Supp. 3d 495 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021) .......................12

*Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc*.,
　　886 F.3d 332 (3d Cir. 2018)........................................................................19

*Pilchesky v. Gatelli*,
　　12 A.3d 430 (Pa. Super. Ct. 2011) ...............................................................14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
　　124 F.3d 430 (3d Cir. 1997)........................................................................20

*Reginella Constr. Co. v. Travelers Cas. & Sur. Co. of Am.*,
　　971 F. Supp. 2d 470 (W.D. Pa. 2013), *aff'd*, 568 F. App'x 174 (3d Cir. 2014) .......................5

*Satnam Distribs. LLC v. Commonwealth-Altadis, Inc.*,
　　140 F. Supp. 3d 405 (E.D. Pa. 2015) (Restrepo, J.)........................................16, 19, 20, 21, 25

*Satterfield v. Borough of Schuylkill Haven*,
　　12 F. Supp. 2d 423 (E.D. Pa. 1998) (Van Antwerpen, J.) ......................................13

*SEI Global Servs. v. SS&C Advent*,
　　496 F. Supp. 3d 883 (E.D. Pa. 2020) ...........................................................18

*Swift Bros. v. Swift & Sons*,
　　921 F. Supp. 267 (E.D. Pa. 1995) ...............................................................15

*Syncsort Inc. v. Sequential Software, Inc*.,
　　50 F. Supp. 2d 318 (D.N.J. 1999) ...............................................................19

*Tanaka v. University of Southern California*,
　　252 F.3d 1059 (9th Cir. 2001) ....................................................................21

*Walker v. Grand Cent. Sanitation*,
　　634 A.2d 237 (Pa. Super. Ct. 1993) ............................................................15

*Weaver v. Lancaster Newspapers, Inc.*,
  926 A.2d 899 (Pa. 2007) ...................................................................................15

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
  No. 15-6480, 2019 U.S. Dist. LEXIS 3091 (E.D. Pa. Jan. 8, 2019) ..........................................1

**Statutes**

Sherman Act, § 1 & § 2 ........................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(b)(6)..........................................................................2, 5, 8, 25

**Other Authorities**

3d Cir. Model Civil Jury Instruction 1.6 at p. 11 (rev. June 2024),
  https://www.ca3.uscourts.gov/sites/ca3/files/chapters%201_2_3_%20for%20p
  osting%20after%20June%202024%20meeting.pdf.................................................5

Merriam-Webster, Mimetic, https://www.merriam-
  webster.com/dictionary/mimetic..................................................................4

In accordance with the Court's November 21, 2024 Order (Doc. No. 37), Defendant Jeffrey Gural submits this supplemental memorandum of law in further support of his Motion to Dismiss (Doc. No. 25).[1] Gural addresses points highlighted by the Court during the November 13, 2024 oral argument (*see* Oral Argument Transcript ("Tr.") (Doc. No. 39)), without waiving the arguments previously briefed and not specifically addressed herein.

Plaintiffs effectively ask this Court to revert to the "less stringent pre-*Twombly* pleading standard," *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-6480, 2019 U.S. Dist. LEXIS 3091, at *17-18 (E.D. Pa. Jan. 8, 2019), under which "a complaint effectively could survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). *Twombly* and *Iqbal* rejected that standard, requiring District Courts to not only ignore conclusory and "threadbare recitals of a cause of action's elements," *Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009), but to draw upon "judicial experience and common sense" to determine if the plaintiff has pleaded a *plausible* claim for relief. *Id.* at 679. Applying common sense, Plaintiffs' allegations do not plausibly support their asserted defamation/common law and antitrust claims.

## I.    The Court should dismiss plaintiffs' defamation and related common-law claims because plaintiffs fail to plausibly plead several material elements.

### A.    The four alleged statements are not defamatory as a matter of law.

During oral argument, the parties isolated the four statements Plaintiffs allege were defamatory:[2]  Statement 1 is the quotation in the Article that included the phrase: "[Howard] had to be giving EPO to his trainers . . . ." (AC ¶ 89.) The remaining statements were allegedly made during a November 3, 2023 conference call with SBOA members: Statement 2 was where Gural

---

[1] Gural again incorporates the capitalized terms from his moving brief ("Moving Br."; Doc. No. 25-2); and sometimes refers to Plaintiffs by their first names solely to avoid confusion.

[2] Plaintiffs' counsel again confirmed that Plaintiffs are not alleging that the statements in the Press Release were defamatory. (Tr. at 40:8-12; *see also* Pls.' Opp. Br. (Doc. No. 27) at 23-24.)

allegedly "repeated his claim that Taylor provided EPO to his trainers and instructed them to use it on his horses." (*id.* ¶ 98.) Statement 3 was that "Taylor also assured his trainers that he (Taylor) would represent them successfully if they were caught." (*Id.* ¶ 100.) And Statement 4 was that "nobody can own as many horses as Howard does." (*Id.*) None of these statements is actionable as defamation.

### 1. Statements 1 and 2 are not defamatory because they are either opinion or substantially true.

Statements 1 and 2 reflect the only logical conclusion from Government Exhibit 16000 from the Fishman trial: that Howard purchased PEDs for his trainers to use.[3] These statements are either opinion based on disclosed facts—as confirmed by Gural's use of "had to be"—or they were substantially true and therefore not defamatory.

Initially, Plaintiffs contend that the substantial truth inquiry is "impossible for the Court to resolve at this juncture." (Tr. at 40:22-24.) To the contrary, courts in the Third Circuit have not hesitated to dismiss defamation claims as lacking plausibility under the *Iqbal/Twombly* standard when the allegations and other contextual matters the Court can consider on a motion to dismiss show that the alleged statements are substantially true. *See Monge v. Univ. of Pa.*, No. 22-2942, 2023 U.S. Dist. LEXIS 55322, at *9 (E.D. Pa. Mar. 30, 2023).[4]

---

[3] Although Plaintiffs alleged that in making Statement 2, Gural "repeated" his claim that Howard provided EPO to trainers, (AC ¶ 98), during oral argument, counsel contended that the word "repeated" did not mean that Gural re-used the phrase "had to be." (Tr. at 43:23-44:8.) Although the phrase "had to be" makes clear that Gural was stating an opinion, ultimately, both statements are substantially true and, therefore, not actionable.

[4] For just a few additional examples where the court granted a Rule 12(b)(6) motion based on substantial truth, see *Montefusco v. ESPN, Inc.,* 47 F. App'x 124, 125 (3d Cir. 2002); *Brady v. Media*, No. 23-1078, 2024 U.S. Dist. LEXIS 160991, at *8 (D. Del. Sep. 6, 2024); *Jankowicz v. Fox News Network, LLC*, No. 23-513, 2024 U.S. Dist. LEXIS 129423, at *9 (D. Del. July 22, 2024); *DiFraia v. Ransom*, No. 23-01187, 2024 U.S. Dist. LEXIS 120645, at *16 (M.D. Pa. July 8, 2024); *Bell v. Sullivan*, No. 17-912, 2017 U.S. Dist. LEXIS 190150, at *23 (E.D. Pa. Nov. 16,

In making the substantial truth determination, as Plaintiffs' counsel conceded at oral argument (Tr. at 40:25-41:8), context is critical both as part of the general, "context-specific" plausibility inquiry in ruling on a motion to dismiss, *Iqbal*, 556 U.S. at 469; and as a matter of Plaintiffs' specific pleading obligations for defamation. *See, e.g.*, *McCafferty v. Newsweek Media Grp., Ltd.,* No. 18-1276, 2019 U.S. Dist. LEXIS 36543, at *6 (E.D. Pa. Mar. 7, 2019), *aff'd*, 955 F.3d 352 (3d Cir. 2020) (in ascertaining whether a statement is capable of defamatory meaning, "the Court must consider the challenged statement ***in context***") (emphasis added).

Exhibit 16000, the "83-page exhibit that the government entered into evidence in the [Fishman trial]" (AC ¶ 73), is the baseline for the Court's determination because Plaintiffs allege it is what Gural reviewed when he made his statements. (*See* AC ¶¶ 73-81.)[5] Plaintiffs refer to Exhibit 16000 more than 10 times in their Amended Complaint (*see* AC ¶¶ 73, 76, 91, 93, 151, 152, 171, 172, 215, 216); and they specifically rely on and characterize it, albeit incorrectly, as evidence of Gural's alleged actual malice. (*See id.* ¶¶ 90-91 (alleging that Gural "knew, or was reckless in not knowing, that his statements about Howard Taylor in the Article were false" because "[m]ore specifically, the only link between Howard Taylor and the Fishman trial is the lone exhibit that reflects a handful of July 2018 orders of a substance called BB3 by one of Howard Taylor's trainers.")). Thus, the Court may consider Exhibit 16000 in deciding this motion even though Plaintiffs do not attach it to their Amended Complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (Plaintiffs "cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.").

---

2017); and *O'Keefe v. WDC Media, LLC*, No. 13-6530 (CCC), 2015 U.S. Dist. LEXIS 41127, at *15 (D.N.J. Mar. 30, 2015).

[5] Plaintiffs have never contested that Exhibit 16000 is the 83-page exhibit referenced in their Amended Complaint.

Exhibit 16000 shows that Howard had multiple accounts registered to his address with Equestology, the company Fishman used to sell misbranded PEDs, resulting in his conviction; (AC ¶ 71); and that, on July 2018, BB3 was purchased on five occasions from Equestology ***on Howard's account***, ***for specific horses Howard owned.***  (Mot. Ex. 2, at 37-39, 68-77.)

Plaintiffs seek to muddy the waters by contending that BB3 is not literally the same thing as EPO, but it is a distinction without a difference: both are PEDs.  In its press release discussing Fishman's sentencing, the U.S. Attorney's Office explained that, among the drugs Fishman was convicted for selling was "'blood building' drugs (for example, ***'BB3' and other Epogen-mimetic substances***), vasodilators (for example, 'VO2Max'), and bags filled with scores of 'bleeder pills,' each designed to covertly increase performance in affected horses." U.S. Attorney's Office, Southern District of New York, Press Release, *Horse Doping Drug Supplier Sentenced To 11 Years In Prison* (July 11, 2022) (emphasis added), https://www.justice.gov/usao-sdny/pr/horse-doping-drug-supplier-sentenced-11-years-prison.[6]  This description is consistent with Plaintiffs' allegations. (*See* AC ¶ 76 (BB3 is a "mimetic peptide that is structurally distinguishable from EPO")). "Mimetic" simply means something that imitates or mimics something else. *See, e.g.*, Merriam-Webster, Mimetic, https://www.merriam-webster.com/dictionary/mimetic.  There is therefore only one plausible understanding of what Exhibit 16000 disclosed: that BB3, a "blood builder" PED that mimics EPO, was purchased on Howard's account for use on his horses listed on the invoice.  Plaintiffs ask this Court to ignore this common sense reading of Exhibit 16000, but in reviewing a motion to dismiss, this Court must use its "judicial experience and common sense" to determine the plausibility of Plaintiffs' claims.  *Iqbal*, 556 U.S. at 679.

---

[6] The U.S. Attorney's press release was explicitly referred to in the Meadowland's Press Release at issue in this case, (Mot. Ex. 5, at 1 (Doc. No. 25-7)), which is referenced and relied upon by Plaintiffs in the Amended Complaint. (*See* AC ¶¶ 77-84, 90.)

Plaintiffs also attempt to avoid the truth reflected in Exhibit 16000 by alleging that the PED purchases were made "by a trainer," not Howard (AC ¶ 73.) Accepting this characterization as true would turn the *Iqbal/Twombly* plausibility inquiry on its head. The Court need not accept Plaintiffs' allegations as true if they are contradicted by the facts contained in the document expressly referenced and relied upon in the Complaint. *See Reginella Constr. Co. v. Travelers Cas. & Sur. Co. of Am.*, 971 F. Supp. 2d 470, 475 (W.D. Pa. 2013), *aff'd*, 568 F. App'x 174 (3d Cir. 2014) ("[T]he Court's obligation to draw inferences in the plaintiff's favor extends only to those inferences that are reasonable. . . . If the Court were required to accept contradictory inferences and conclusory allegations as well-pleaded facts, then Rule 12(b)(6) review would be nothing more than the Court alchemizing legally insufficient statements into a plausible cause of action. Such a standard of review is akin to no review at all, and most importantly, is not the law.").

There is no mention of any trainers in Exhibit 16000, something Plaintiffs concede. (*See* Tr. at 38:20-39:8.) Howard, and only Howard, is listed as the client of Equestology and the recipient of the PEDs that were purchased. Plaintiffs ask that the Court ignore this indisputable fact, and common sense, and conclude that Howard had no knowledge of the drugs he was being invoiced for and which were listed for use on a specific horse that he owned. But as the Court explained during oral argument (Tr. at 42:14-21), circumstantial evidence is valid evidence: if someone entered the courtroom "wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining." 3d Cir. Model Civil Jury Instruction 1.6 at p. 11 (rev. June 2024), https://www.ca3.uscourts.gov/sites/ca3/files/chapters%201_2_3_%20for%20posting%20after%2 0June%202024%20meeting.pdf. Howard was not purchasing BB3 as a souvenir; the only logical conclusion is that he was buying BB3 for use on his horses.

With that critical context in mind, Statements 1 and 2 are either opinion or substantially true. The phrase "had to be" expresses an opinion as a matter of common usage. Gural was not writing a treatise on Aristotelian logic, where "had to be" might suggest a necessary conclusion. Although there does not appear to be case law discussing the use of the phrase "had to be" as it specifically relates to a defamation claim (Tr. at 41:17-42:2), at least one court in Pennsylvania has recognized that the phrase "had to be" suggests a statement of opinion. *See In re 4714 Morann Ave.*, 303 A.3d 200, 215 & n.13 (Pa. Commw. Ct. 2023) (finding that presentment in forfeiture proceeding did not support defendant's knowledge of illegal drug activity because it relied on her son's statement that defendant "*had to be* aware . . . which is opinion, not fact."). In stating Howard "had to be" giving EPO to his trainer, Gural was discussing the public documents from the Fishman trial, as disclosed in the Press Release *on the same day* he made his statements (AC ¶¶ 78, 85-89), and opining as to the only rational conclusion that follows from this document, i.e., that Howard "had to be" giving EPO to his trainer to use on horses. Since an "opinion based on disclosed facts cannot be false," these statements cannot be defamatory as a matter of law. *McCafferty*, 955 F.3d at 360.

Even if they cannot be viewed as statements of opinion, however, both Statements 1 and 2 are not actionable because they are at the very least "substantially true." Under Pennsylvania law, statements that are "substantially" true cannot be defamatory; substantial truth goes to "the 'gist' or 'sting' of the alleged defamatory matter; the test is whether the alleged libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Mallory v. S & S Publishers*, 260 F. Supp. 3d 453, 458 (E.D. Pa. 2017) ("*Mallory II*"), *aff'd*, 728 F. App'x 132 (3d Cir. 2018). Gural's reasonable and rational deduction that Howard was providing PEDs to his trainers for use on horses is the *only conclusion* that one could reach after

viewing Exhibit 16000. Based on the context of the statements and the information disclosed to the public by the U.S. Attorney's Office, any person hearing or reading Gural's statement would necessarily think the same thing: Gural concluded that Howard provided PEDs to his trainers to use based on the Exhibit 16000, which is substantially true. No other factual discovery could change this conclusion. Plaintiffs' claims as to Statements 1 or 2 should, therefore, be dismissed.

>    **2.    Statements 3 and 4 are not actionable as defamation by inuendo because they are not capable of defamatory meaning.**

With respect to Statements 3 and 4, Plaintiffs contend that to succeed on a claim for defamation by inuendo, all they must do is advance "a potentially defamatory meaning." (*See* Tr. at 44:12-22.) Plaintiffs again want the Court to ignore the *Iqbal/Twombly* plausibility standard. *Iqbal,* 556 U.S. at 678.  To plausibly allege defamation by inuendo, Plaintiffs cannot propose *any* defamatory meaning, but only one that is "warranted, justified and supported by the publication." *Am. Osteopathic Ass'n v. Am. Bd. of Internal Med.*, 555 F. Supp. 3d 142, 153 (E.D. Pa. 2021) (citation omitted).

Plaintiffs take two facially neutral statements—that "Howard would successfully represent trainers if they were caught" and that "no one can own more horses than Howard"—and ask the Court not only to assume that Gural intended to imply something negative about Howard, but also to ascribe meaning to the words that is not there: that Howard encouraged PED use and that he was acting as a front for unauthorized owners. Requiring the listener/reader to guess the speaker's intention in order to give the language a meaning it will not bear is the type of "unfair and forced construction" not considered defamatory under Pennsylvania law.  *Monge*, 2023 U.S. Dist. LEXIS 55322, at *14.

Nor may Howard rely on his allegations of prior animosity between him and Gural to

support his defamation by innuendo claims. *American Osteopathic Association* presented a similar situation. 555 F. Supp. 3d at 146. That case involved a dispute between the accreditation boards for two rival types of medical training (osteopathic and allopathic medicine). "Historically, the [American Osteopathic Association or] AOA accredited osteopathic residency programs[,] [w]hile the Accreditation Council for Graduate Medical Education (ACGME) accredited corresponding allopathic residency programs." *Id.* After completing an accredited residency program, residents could seek certification in internal medicine from either the American Osteopathic Board of Internal Medicine (AOBIM) or its allopathic equivalent, the American Board of Internal Medicine (ABIM). In 2014, the AOA and ACGME created a single accreditation program, which required residents to take either the osteopathic or allopathic certification exam and provide an attestation from their residency program director. *Id.* at 146-147. In 2017, however, ABIM announced it would no longer accept "attestations of qualification" from AOA-accredited residency programs, stating in a press release that "[b]eginning in 2022, all attestations to ABIM initial certification eligibility criteria will need to come from program directors who are ABIM certified." *Id.* at 147. The AOA and several osteopathic physicians (the "Plaintiff Physicians") brought several claims including for defamation by innuendo, contending that ABIM's statement implied that AOA-accredited programs were inferior and its directors were unqualified to serve as residency program directors. *Id.* at 153. AOA alleged this conclusion was obvious to individuals in the medical field who are aware of the historical rivalry between osteopathic and allopathic medicine. *Id.*

Dismissing this claim under Rule 12(b)(6), Judge Sanchez held that the plaintiffs could not limit the alleged audience of the asserted defamatory statement to those who understood the historical enmity between osteopathic and allopathic medicine: "[T]o be actionable as defamatory, the statement must be reasonably viewed by the appropriate audience as attacking the Plaintiff

Physicians' fitness. Plaintiff Physicians cannot limit the intended audience of the announcement to those who *already* ascribe it a defamatory meaning." *Id.* at 153 n.8.  Read in its proper context:

> ***The statement can only be reasonably and fairly construed as nondefamatory***. The announcement communicates an internal decision; after a transition period, ABIM would implement a new attestation requirement. ***Although the decision is averse to Plaintiffs, the Court cannot speculate as to ABIM's reasons for adopting the policy. And the announcement does not state Plaintiff Physicians are unfit for their jobs, trades, or professions***. It simply states ABIM will not accept statements of student qualification from program directors lacking ABIM certification. ***Even given the history between osteopathic and allopathic medicine, this statement cannot be read to imply undisclosed defamatory facts.***

*Id.* at 153-54 (emphasis added).

A similar common sense conclusion applies to Statements 3 and 4.  For Statement 3, Plaintiffs ask the Court to speculate that Gural intended to imply that Howard offered to represent accused trainers to condone and participate in their wrongdoing, even though the most natural reading is that Howard, who alleges he is "one of the preeminent equine law attorneys in the country and frequently represents horse trainers in court and before racing commissions nationwide" (AC ¶ 38), was simply doing his job as a lawyer.  And for Statement 4, Plaintiffs want the Court to assume that by saying "nobody can own as many horses as Howard does," Gural silently meant to add "because Howard is 'fronting' for others who could not be licensed." (AC ¶ 100.)  These proffered interpretations assume that the party hearing the statement was aware of the alleged hostility between Howard and Gural and already ascribed them defamatory meaning, and presuppose, without any supporting factual allegations, that Gural specifically intended to imply something negative not contained in the statement itself. Like the Physician Plaintiffs in *American Osteopathic Association*, Plaintiffs here can concoct a defamatory meaning to Statements 3 and 4 only by offering bare speculation as to Gural's intention in making the

statements and then taking several more leaps to ascribe a meaning to the statements that is not

contained in the language itself. As a matter of law, those statements are not "warranted, justified

and supported by the publication," *Am. Osteopathic Ass'n*, 555 F. Supp. 3d at 153, and therefore

cannot plausibly support a defamation claim

> **B. Howard pleads only the actual malice standard and should be held to his pleading choices; but, regardless, his Amended Complaint establishes that he is a limited purpose public figure as a matter of law.**

Howard's defamation and related claims also fail as a matter of law because he does not

adequately plead actual malice. Actual malice is required if Howard is a limited purpose public

figure. The Court may make this determination on the pleadings. (*See* Moving Br. at 31-32 (citing

cases).) Here, however, the Court need not engage in that inquiry because Plaintiffs allege only

that Gural acted with actual malice, not negligence, a word which does not appear once in

Plaintiffs' Amended Complaint, despite already having an opportunity to amend. (*See* AC ¶¶ 150,

170.)[7]

Plaintiffs' pleading choices matter. As the master of their complaint, Plaintiffs have the

option to proceed under specific theories, but they must reap both the strategic benefits and

attendant burdens of their choices. *Cf. Gainey v. City of Phila.*, 704 F. Supp. 3d 589, 599 (E.D. Pa.

2023) (plaintiff permitted to plead due process claim instead of *Brady* claim to avoid qualified

immunity defense, but must face higher standard of proving knowing use of false testimony).

Further, Plaintiffs have never attempted to argue a negligence standard or that their Amended

Complaint meets that standard. Their failure to advance that argument constitutes abandonment of

---

[7] Plaintiffs try to explain away their pleading choice by arguing that some of "Plaintiffs' other claims require pleading actual malice." (Pls.' Opp. Br. (Doc. No. 27) at 31.) This argument must be rejected, however, because even in their defamation and defamation *per se* counts, Plaintiffs only plead that Gural made the alleged statements "with actual knowledge that such statements were false or, at least, in reckless disregard of their falsity." (AC ¶¶ 150, 170.)

that theory. *See, e.g.*, *Levy-Tatum v. Navient Sols., Inc.*, 183 F. Supp. 3d 701, 712 (E.D. Pa. 2016) (plaintiff's failure to address argument in opposing a motion to dismiss constitutes abandonment of claims) (citing cases).

Regardless, based on Plaintiffs' own allegations, this Court can determine that Howard is a limited purpose public figure as a matter of law.  Plaintiffs do not contest that the Fishman trial was an important and public doping scandal, but rather contend that Howard's involvement was not substantial enough to qualify him as a limited purpose public figure.  (Tr. at 47:11-23.) Contrary to Plaintiffs' suggestion, however, a person need not voluntarily or "actively" participate in a controversy to be a limited purpose public figure. The Supreme Court has explained that, although rare, it is "possible for someone to become a public figure through no purposeful action of his own." *Gertz v. Robert Welch*, 418 U.S. 323, 345 (1974); *see also Dameron v. Washington Magazine*, 779 F.2d 736, 741-42 (D.C. Cir. 1985) (air traffic controller mentioned once in report about crash at Mt. Weather, Virginia was limited purpose public figure when magazine published story about air traffic safety and mentioned his involvement with incident); *Bay View Packing Co. v. Taff*, 543 N.W.2d 522, 532 (Wis. Ct. App. 1995) (company mentioned in news report accused of ignoring advisory about Milwaukee water contamination is a limited purpose public figure).

Here, as explained in Gural's prior briefs, although, assuming the truth of his allegations, he may not have chosen to be involved in the admittedly public controversy surrounding the high-profile prosecution of 30 individuals for doping in the horseracing industry, his name ended up becoming central as part of the evidence presented in the trial in that case. The case centered around Equestology and its sale of mislabeled PEDs and, whether he intended to or not, Howard was specifically mentioned at the trial where the Government represented that Howard would testify that Exhibit 16000 were his business records relating to purchases from Equestology, which

specifically showed that purchases of the potent PEDs at issue were made on Howard's account. (*See* Mot. Ex. 3 (Doc. No. 25-5).)

Like the *New York Times* standard overall, the limited purpose public figure doctrine strikes a "balance between the First Amendment concerns for open debate on public issues and the need of an individual to protect his reputation." *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1081 (3d Cir. 1985).  Here, the pleadings alone allow the Court to determine that Gural was commenting on a matter of public concern with respect to Howard's specific, albeit involuntary, involvement in that controversy, based on his voluntary purchases. In those circumstances, the actual malice standard applies.

### C.  Plaintiffs fail to plead actual malice as a matter of law.

Plaintiffs' Amended Complaint fails to sufficiently allege facts supporting actual malice. Plaintiffs' counsel contends that the actual malice standard "is not so high as Defendant would have it be," (Tr. at 49:3-5), but courts in this Circuit have highlighted the "onerous" burden faced by plaintiffs in pleading actual malice "in the wake of *Iqbal* and *Twombly*." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 513-14 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021).[8]

To get over their "onerous" pleading hurdle, Plaintiffs ask the Court to make unwarranted inferences and leaps of logic.  *First*, Plaintiffs contend, without any factual support, that Gural had superior knowledge than the general public of what evidence the Government had in the Fishman trial.  (Tr. at 49:6-12.)  This argument flies in the face of reality. The Court, based on its years of judicial experience, knows that the U.S. Attorneys' Office does not share secret investigation files

---

[8] Contrary to Plaintiffs' argument, *Mayfield v. NASCAR*, 674 F.3d 369, 378 (4th Cir. 2012), supports Gural's argument.  As the Fourth Circuit observed in that case, the Court "must not forget the context in which the allegedly slanderous statements were made." *Id.* And as explained in Point I.A.1, the context in which Gural made the alleged statements—after review of Exhibit 16000—show that the statements could not have been made with actual malice because there was no other conclusion he could have reached from the information set forth in that Exhibit.

or evidence not released to the general public to a single private party. Gural had access to the same public records as everyone else, including, most critically, Exhibit 16000, and Plaintiffs can only speculate that Gural somehow had access to secret information.

*Second*, Plaintiffs contend that Exhibit 16000 does not support the inescapable conclusion that Howard purchased PEDs for use on his horses.  (Tr. at 49:13-20.)  As detailed above, Exhibit 16000 makes no mention at all of any trainer, as Plaintiffs concede (Tr. at 38:20-39:8), and there is only one logical reason why Howard would have purchased BB3 on his account with Equestology – to use on his horses.  As many judges have noted in various contexts: "If it looks like a duck, feels like a duck, and quacks like a duck, it must be a duck." *Satterfield v. Borough of Schuylkill Haven*, 12 F. Supp. 2d 423, 444 (E.D. Pa. 1998) (Van Antwerpen, J.).

*Finally*, Plaintiffs argue that the statement in the Press Release that the Meadowlands intended to further investigate suggests that there were only "preliminary findings" that could not be made definitively.  (Tr. at 50:7-13.)  But the Press Release nowhere refers to the Government's evidence, admitted in a trial that resulted in a conviction, as "preliminary."  The Meadowlands investigation was intended to uncover additional information about others that may have been implicated and to determine if there were any mitigating factors beyond the evidence the Government relied on that could result in a lifting of the bans. (Mot. Ex. 5 (Doc. No. 25-7).)  That the Meadowlands wished to do a further investigation does not suggest that it could not (or should not) rely on the already existing evidence from a reliable source.  In sum, Plaintiffs' allegations amount to a conclusory assertion that Gural acted with actual malice.

> **D. Plaintiffs' common law claims should also be dismissed because they fail to adequately allege damages.**

In connection with their tortious interference claims, Plaintiffs contended at oral argument that all they need to plead is that actual or prospective contract partners "have changed the way

13

that they behave with you in a commercial context." (Tr. at 50:23-24.)  Not so.  Plaintiffs rely on *Liberty Mut. Ins. Co. v. Gemma*, 301 F. Supp. 3d 523, 544 (W.D. Pa. 2018), for that proposition, but in that case, the plaintiff, Liberty Mutual, alleged the specific ways "in which Defendants' alleged conduct harmed Liberty Mutual by causing it to lose customers and referrals from Northwood [the third party], as well as facts that demonstrate a reasonable likelihood that Liberty Mutual would have had certain prospective contractual relationships with policyholders, were it not for the Defendants' actions." *Id.* at 544. In a footnote, the Court noted that the Complaint had also alleged it would have received certain prospective referrals from Northwood because its representatives' "personnel changed the way they interacted" with Liberty Mutual, but the Court did not hold (and it would be incorrect to state) that an allegation of changed behavior is sufficient. *Id.* at 544 n.17. In actuality, Plaintiffs must allege facts (not legal conclusions) that they suffered "actual damage resulting from the defendant's conduct." *Abdellatif v. Alza Wrae Indus. Co.*, No. 18-2297, 2019 U.S. Dist. LEXIS 45684, at *19 (E.D. Pa. Mar. 20, 2019) (quotation omitted)

But even if "changed behavior" from a third-party were sufficient—and it is not—Plaintiffs do not even meet their own standard. Howard alleged only that some unidentified "partners inquired whether they would need to sell the horses or buy out [his] share." (AC ¶¶ 119, 127.) Judith alleges even less: she claims to have "suffered financially" (AC ¶ 132), but she fails to allege the existence of any specific prospective business relationship that was impacted in any way. (*Id.* ¶¶ 132, 343.)  *See Abdellatif*, 2019 U.S. Dist. LEXIS 45684, at *20 (tortious interference claim fails where plaintiff fails to identify a "specific prospective contract") (quotation omitted).

Plaintiffs' failure to sufficiently allege damages is also fatal to their other common law claims. Plaintiffs' defamation and trade libel claims both require allegations of "actual economic harm" or "pecuniary loss." *Pilchesky v. Gatelli*, 12 A.3d 430, 444 (Pa. Super. Ct. 2011)

(defamation); *see also Weaver v. Lancaster Newspapers, Inc.,* 926 A.2d 899, 903 (Pa. 2007) (trade

libel). Plaintiffs' defamation *per se* claim also requires allegations of actual, "general damages."

*Walker v. Grand Cent. Sanitation,* 634 A.2d 237, 244 (Pa. Super. Ct. 1993). And Plaintiffs'

remaining common-law claims also require some factual allegations—sufficient to meet the

plausibility standard under *Twombly/Iqbal*—of some actual damages. *Swift Bros. v. Swift & Sons*,

921 F. Supp. 267, 276 (E.D. Pa. 1995) (unfair competition requires allegation of pecuniary loss);

*Di Sante v. Russ Fin. Co.*, 380 A.2d 439, 441 (Pa. Super. Ct. 1977) (promissory estoppel claim

requires plaintiff to plead the detriment they have suffered).

Plaintiffs' allegations of damages amount to a claim that they may have won an

unidentified number of races if they had been permitted to race their horses, and that their horses

could have, as a result, been more valuable at some time in the future. (AC ¶¶ 63-65, 121-127,

132-135.)  Plaintiffs also allege vaguely that their reputations have been harmed, but fail to plead

facts as to how this reputational harm has resulted in pecuniary losses.  (AC ¶¶ 118-119, 135.)

Plaintiffs' general, speculative allegations of damages are insufficient to survive a motion to

dismiss.

## II.    The Court should dismiss Plaintiffs' antitrust claims because plaintiffs fail to plead plausible claims under Section 1 or 2 of the Sherman Act (or equivalent state law claims).

Plaintiffs' antitrust claims illustrate why *Twombly* and *Iqbal* require rigorous scrutiny of

the plausibility of antitrust claims at the pleadings stage. This plausibility "standard requires

showing more than a sheer possibility that a defendant has acted unlawfully. A complaint which

pleads facts merely consistent with a defendant's liability stops short of the line between possibility

and plausibility of entitlement of relief."  *Burtch v. Milberg Factors, Inc*., 662 F.3d 212, 221 (3d

Cir. 2011). Crossing the line of possibility to plausibility includes pleading facts supporting both

a defined relevant market and a cognizable antitrust injury. *See, e.g., Satnam Distribs. LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405, 417-418 (E.D. Pa. 2015) (Restrepo, J.) (collecting cases). Plaintiffs have done neither. Their undefined markets and interrelated theories of harm, steps removed from the actual conduct at issue, thus fails to state a claim.

Plaintiffs' primary antitrust claim is that Gural violated Section 2 of the Sherman Act by allegedly controlling the Meadowlands, Tioga Downs, and Vernon Downs and excluding Plaintiffs from those essential facilities. (*See* Pls.' Opp. Br. 46.) They allege "in the alternative" that if Gural does not own or control those racetracks, he conspired with them (and potentially two other racetracks) "to enact an illegal group boycott" in violation of Section 1 of the Sherman Act. (*See id*. at 46-47.) To a layperson, both theories may appear interesting "in insolation," but when viewed in context, as courts must do when evaluating antitrust claims, Plaintiffs' case "is one that simply makes no economic sense." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Plaintiffs fail to present "persuasive evidence" of economic harms in an actual relevant market or that Gural's actions were not "consistent with [his] independent interest" from which the Court can infer the types of violations the antitrust laws were intended to protect. *Id*.

As explained at oral argument, Gural has provided the Court with multiple independent avenues to dismiss to dismiss each Sherman Act claim (and the identical counterpart state law claims). Put simply, this case is the posterchild for the maxim that antitrust laws exist for "the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). Plaintiffs complain that Gural's efforts to promote the integrity of harness racing have "deprived them of the opportunity to compete for the sport's biggest winnings." (AC ¶ 63.) As a result, they contend, they have "each lost the opportunity to prove the value of their horses for breeding and will therefore lose income from sales." (AC ¶ 65.) While perhaps unfortunate for

Plaintiffs personally—though still far from specific enough damages to state common law claims for relief—none of their allegations amount to harm to competition. At most, Plaintiffs complain about injuries to their own economic interests through their own inability to race and resell horses and then recite speculative harms based on the assumption that their horses would have entered and won races. They only allege they cannot participate in "*many* of harness racing's major races held at the Meadowlands," conceding that there are still races at the Meadowlands and elsewhere available for their participation. (AC ¶ 63).[9] Plaintiffs' claims fail on the pleadings as a result of these and other deficiencies.

### A. Plaintiffs have not pled a plausible Section 2 claim, with or without the essential facilities doctrine.

Faced with Gural's motion to dismiss, Plaintiffs recast their Section 2 claim as arising under the "essential facilities" doctrine, even though those words do not appear once in their Amended Complaint. (*See* Pls.' Opp. Br. 47, 51.) As explained in Defendants' reply brief and at oral argument, this recasting fails for at least four separate reasons – any one of which is sufficient to dismiss the Section 2 claims with prejudice.

*First*, as explained in Gural's reply brief, the essential facilities doctrine is one the narrowest in antitrust law. (Reply Br. (Doc. No. 30) at 12.) "An essential facility is one which is not merely helpful but vital to the claimant's competitive viability." *Monarch Ent. Bureau, Inc. v. N.J. Highway Auth.*, 715 F. Supp. 1290, 1300 (D.N.J. 1989). Plaintiffs' pleading does not come close to meeting this demanding standard. As discussed at oral argument, there are many racetracks nationally, including many between "Buffalo and the Meadowlands," where Plaintiffs can race their horses. (Tr. at 108:14-109:8.) Indeed, Plaintiffs concede as much in their Amended

---

[9] Further underscoring that this case is about alleged personal harms, not harm to competition, is Plaintiffs' framing of Gural's actions as an "improper ban," thus tacitly conceding some ability to ban racers from racetracks. (AC ¶ 61.)

Complaint, acknowledging that "[t]he Hambletonian Society . . . sponsors harness racing at 13 North American racetracks." (AC ¶ 101.) Allegations about the prestige of the Meadowlands (or Tioga Downs or Vernon Downs), even if true, do not make a facility essential for antitrust purposes. *Monarch*, 715 F. Supp. at 1300-01 ("[T]he doctrine should at most extend to facilities that are a natural monopoly, facilities whose duplication is forbidden by law, and perhaps those that are publicly subsidized and thus could not practicably be built privately," because "[e]very facility is unique in some way.").

Plaintiffs also allege that participating in certain races at the Meadowlands "is necessary to *meaningfully* participate in the markets for racing, selling, and breeding harness-racing horses," (AC ¶ 243) (emphasis added), but they plead no facts explaining why that is the case. They have, at most, pled that racing at the Meadowlands is helpful, but they have not plausibly pled vitality. Nor could they do so, since the Amended Complaint concedes that "the Meadowlands exclusion of Howard Taylor . . . affected *most* Hambletonian Society administered stakes races at the Meadowlands, Vernon Downs, and Tioga Downs," admitting exceptions "for the Hambletonian, Hambletonian Oaks, and the Hambletonian Maturity." (*Id.* ¶¶ 102, 103 (emphasis added); see also *id.* ¶ 13 (only alleging that Plaintiffs are "effectively precluded").) But the essential facilities doctrine requires an "absolute denial," not just an effective or meaningful denial, so the doctrine is not converted into a duty to deal (especially where, here, Gural had reasons to protect the integrity of the harness racing). *SEI Global Servs. v. SS&C Advent*, 496 F. Supp. 3d 883, 899 (E.D. Pa. 2020); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition").

18

*Second*, even if Plaintiffs had pled facts plausibly alleging that one or more racetracks are an essential facility, they must still plead "control of the essential facility *by a monopolist*" to state a Section 2 claim. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir. 1996) (emphasis added). Plaintiffs make no allegations, or at least none beyond conclusions and labels, that Gural is a monopolist. They concede they did not plead market share, (Pls'. Opp. Br. at 48), let alone the type of "concrete evidence of anticompetitive behavior" required to show that Gural is a monopolist to support a Section 2 claim. *Ideal Dairy Farms*, 90 F.3d at 750.

There are no facts in the Amended Complaint supporting an "allegation of the possession of monopoly power, or even of the dangerous probability of achieving monopoly power," *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 330 (D.N.J. 1999), let alone allegations of "whether valid business reasons, as part of the ordinary competitive process, can explain [the] actions that resulted in [the alleged] dangerous probability of achieving monopoly power." *Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir. 2018). Such well-pled allegations are particularly necessary here, because Gural's actions on their face carry the valid business reason of eliminating PEDs from the sport. Indeed, "[t]o determine whether conduct is anticompetitive, courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *Id.* (internal quotations omitted). Thus, Plaintiffs have failed to cross the *Twombly/Iqbal* line of sheer possibility to actual plausibility that the alleged essential facility was controlled by an alleged monopolist.

*Third*, Plaintiffs have not pled a relevant geographic or product market. "Plaintiff's Sherman Act claims must contain sufficient allegations of a viable relevant product market in order to survive [a]motions to dismiss." *Satnam,* 140 F. Supp. 3d at 417. At oral argument, Plaintiffs suggested that the relevant market was "factual" and thus better addressed "at the summary

judgment stage" after discovery, (Tr. at 85:18-86:14), but failing to plausibly plead relevant product and geographic markets is fatal, because the relevant market provides the lens to address the plausibility of the antitrust claims.  "A defined relevant product market is essential to evaluate whether there is monopoly power or dangerous probability of monopolization in violation of Section 2, or to determine the existence of market power for purposes of Section 1." *Satnam,* 140 F. Supp. at 418.  Even under pre-*Twombly*/*Iqbal* cases, "Plaintiffs have the burden of defining the relevant market. . . .Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

Here, Plaintiffs have not pled facts plausibly defining a relevant market.  As discussed at oral argument, there are many racetracks across the northeast, the United States, and North America.  (Tr. at 66:20-67:8.)  Racehorses can be bred and sold across the world.  Plaintiffs have not pled facts showing cross-elasticity and interchangeability such that any of their proposed interrelated markets actually exist, let alone that they exist within their alleged geography.  These are not "check . . . boxes" (Tr. at 85:23) as Plaintiffs deride, but specific facts that matter to the *Twombly*/*Iqbal* analysis. For example, are racetracks in Pennsylvania part of the alleged "Northeast" geographic market (Tr. at 111:3)?  If Pennsylvania is part of the Northeast and not the Mid-Atlantic, why would racetracks in Ohio or Maryland not suffice?  And if the "product market is the owning of harness racing horses that participate in harness races," why is the market limited to "the Northeast United States"?  (Tr. at 111:6-9).  Plaintiffs have not pled facts that answer these

20

questions or that otherwise show a lack of substitutability or cross-elasticity of demand such that the outer bounds of the relevant market are plausibly defined. Simply, Plaintiffs' supposed market does not "make . . . economic sense" based on the limited facts pled. *Matsushita*, 475 U.S. at 587.

Plaintiffs' attempt to cut from whole cloth markets flowing from "prestigious" races at "premier" racetracks in the "northeast" fails. Courts routinely decline to recognize submarkets (product, geographic, or both) that have been created to fit antitrust theories. In *Satnam*, the court declined to create a market for certain brands and types of cigars. 140 F. Supp. 3d at 419 ("Courts routinely reject Sherman Act claims at the motion to dismiss stage where such claims involve single-brand or single-manufacturer product markets."). Similarly, in *Tanaka v. University of Southern California*, the Ninth Circuit rejected the plaintiff's "attempt[ ] to restrict the relevant market to a single athletic program in Los Angeles based solely on her preferences." 252 F.3d 1059, 1065 (9th Cir. 2001). Plaintiffs may prefer to race their horse at the Meadowlands, Tioga Downs, or Vernon Downs, just as the plaintiff in *Tanaka* wished to only play soccer for UCLA, but preferences do not make a relevant market for antitrust pleading purposes.

*Fourth*, Plaintiffs have not pled an antitrust injury, which "requires a plaintiff to prove that the challenged conduct affected the prices, quantity or quality of goods or services, not just its own welfare." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 251 (3d Cir. 2022). Plaintiffs' alleged injuries is "harm only to [their] own welfare*," id*., i.e., purported economic harms from their alleged inability to compete in races, which is "not our focus," especially where there is the suggestion that the conduct "might just as easily secure lower or discounted . . . prices." *Id*. Plaintiffs even acknowledge that "the price of yearlings" may decrease as a consequence of Gural's actions. (Pls'. Opp. Br. at 50.) And "[c]onduct that harms competitors may benefit consumers – a result the antitrust laws were not intended to penalize." *Alberta Gas Chemicals Ltd. v. E.I. DuPont*

*De Nemours & Co.*, 826 F.2d 1235, 1239 (3d Cir. 1987).

For those fundamental reasons, and as discussed at oral argument (Tr. at 72:19-75:3), none of the five *Associated General Contractors* factors that the Third Circuit recognizes as creating an antitrust injury are present here. *See, e.g., Host*, 32 F.4th at 249 (citing *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 540-44 (1983)):

First, there is no "causal connection between the antitrust violation and the harm to the plaintiff and the intent to the defendant to cause that harm." *Id.* The alleged harm (losing money from not being able to compete in certain races), the effect of that alleged harm (prices of yearlings fallings), and Gural's intent (eliminating PEDs) are disconnected from one another.

Second, Plaintiffs fail to present evidence that the antitrust laws were "intended to provide redress" to horse owners impacted by racetracks taking disciplinary actions. *Host*, 32 F.4th at 249. As explained at oral argument (*see, e.g.,* Tr. at 106:2-21), sports leagues routinely take actions that have consequences for individuals in order to promote the sport's integrity. Plaintiffs plead no facts and cite no cases that such actions create antitrust liability, nor can they do so, as they admit they still have other outlets for racing.

Third, Plaintiffs have not pled "directness of the injury," instead offering "speculative" claims based on downstream consequences. *Id*. Accepting Plaintiffs' theories requires assuming that their horses would have been accepted into races, won, and then been profitable on the resale or breeding market. Any injuries are too indirect and require multiple assumptions to materialize.

Fourth, by the nature of their alleged interrelated market, there are necessarily "more direct victims," as by their own characterization, Plaintiffs' injuries to their breeding and resale businesses are downstream from the actual races. *Id*. If such injuries were in fact injuries to competition, Plaintiffs are not well-suited to bring those claims, as their economic interests are not

aligned with purchasers who may benefit from the admittedly lowered prices of yearlings.

Fifth, given the speculative and interrelated nature of the claims, Plaintiffs' claims risk "complex apportionment." *Id.* For all of these reasons, Plaintiffs' pleading does not comport with the *Associated General Contractors* factors and the court should exercise its prudential gatekeeping function and decline to find antitrust standing in this case.

**B. Plaintiffs have not pled a plausible Section 1 conspiracy.**

As explained at oral argument and in his motion to dismiss, Gural has also provided the Court with five independent avenues to dismiss the alternative Sherman Act Section 1 claim.

*First*, as discussed at oral argument (*e.g.,*Tr. at 64:8-65:2), a Section 1 conspiracy, like any conspiracy, requires multiple parties. As the Third Circuit has explained, "[t]he first element [of Section 1]—a contract, combination, or conspiracy—requires some form of concerted action, which we define as unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *Burtch*, 662 F.3d at 221. Here, Plaintiffs have identified one defendant, Gural. No other individuals are identified in the complaint. No racetracks are named as defendants. Most importantly, no agreements are identified.

During oral argument, the Court asked whether the "famous phone conference with the [racing] Association in which Mr. Gural made certain statements" creating a conspiracy between Gural and the racetracks. (Tr. at 65:14-18.) It did not. The antitrust laws do not reach that type of conduct—even "the exchange of price information still requires showing that the defendants had an agreement." *Burtch*, 662 F.3d at 223. There are no factual allegations in the Amended Complaint from which the court can plausibly (not just possibly) infer that Gural entered into an agreement with other individuals or entities to commit an antitrust violation.

At most, Plaintiffs have pled a case of "conscious parallelism," but that is not an antitrust

violation. "Parallel conduct in itself is insufficient to state a plausible claim because it is consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id*. at 226. Here, Gural's actions were facially in line with a wide swath of legitimate purposes and Plaintiffs cannot explain why it would *not* be rational and competitive for racetracks to exclude racers suspected of (or associated with those suspected of) using PEDs. Because Plaintiffs have not pled a plausible conspiracy and have at most alleged parallel conduct, there can be no Section 1 claims.

*Second*, even if Plaintiffs had identified co-conspirators and not just parallel actors, because Plaintiffs did not plead an overt agreement between conspirators, they were required to plead "plus factors" evincing an agreement. *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 321-22 (3d Cir. 2010). Although Plaintiffs hypothesize that Gural would benefit as a purchaser of horses if the price of yearlings falls, or that he would win more races if his horses were not competing against Plaintiffs' horses, those claims are speculative and therefore not plausible "evidence that the defendant had a motive enter into a price fixing conspiracy." *Id*. Plaintiffs do not plead how those interests outweigh or were otherwise "contrary to [his] interests" in eradicating PED use in racing. *Id*. Nor do Plaintiffs plead any facts "implying a traditional conspiracy" between Gural and the racetracks for the purpose of benefitting Gural personally or reducing competition. *Id*. As with Plaintiffs' other antitrust theories, the conduct is disconnected from the alleged harm.

*Third*, even if Plaintiffs had plausibly pled an agreement or a conspiracy and plus factors, they have not pled that Gural's actions do not pass muster under the rule of reason. Plaintiffs cannot argue that Gural's "behavior was per se unlawful, or that, at the very least . . . susceptible to condemnation under a quick look analysis" because they did not "show the existence of a horizontal agreement . . . between competitors at the same market level." *Ins. Brokerage*, 618 F.3d

24

at 318.  Instead, this case relates to multiple levels of the market.  Plaintiffs allege that Gural, as a racetrack operator, entered into an agreement with other racetracks but that Gural also competes with Plaintiffs as a racehorse owner.  Plaintiffs have not pled facts weighing the alleged anti-competitive harms with the pro-competitive benefits of excluding horses accused of using performance enhancing drugs.  For that reason, there are no facts from which the court can plausibly infer "that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade," as is required to state a Section 1 claim. *Ins. Brokerage*, 618 F.3d at 315

Lastly, and as *fourth* and *fifth* bases for dismissal, relevant market and antitrust injury are, respectively, each also part of the Section 1 inquiry.  *Satnam* 140 F. Supp. 3d  at 418.  Therefore, for the same reasons that the Section 2 claim fails on each of those requirements, so does the Section 1 claim.

## III.    CONCLUSION

For the foregoing reasons and as explained in the prior briefing (Doc. Nos. 25, 30), Plaintiffs' Amended Complaint should be dismissed in its entirety under Fed. R. Civ. P. 12(b)(6), with prejudice, for failure to state a claim upon which relief can be granted.

Dated: January 9, 2025                         Respectfully submitted,

Sean P. McConnell (PA 307740)          **GENOVA BURNS LLC**
**DUANE MORRIS LLP**
30 South 17th Street                           */s/ Angelo J. Genova*
Philadelphia, PA 19103                    By:    Angelo J. Genova (PA 205373)
Phone: (215) 979-1947                            Lawrence Bluestone  (PA 322261)
spmcconnell@duanemorris.com                      19 West 3rd Street
                                                 Media, PA 19063
Brian H. Pandya (pro hac vice)                   (973) 533-0777
**DUANE MORRIS LLP**                             agenova@genovaburns.com
901 New York Avenue N.W., Suite. 700 East        lbluestone@genovaburns.com
Washington, DC 20001
Phone: (202) 776-7807
BHPandya@duanemorris.com

*Attorneys for Defendant, Jeffrey Gural*

17680400v1 (2883.073)

25

## CERTIFICATE OF SERVICE

I, hereby certify that a true and correct copy of Defendant's Supplemental Memorandum of Law in Support of His Motion to Dismiss Plaintiffs' Amended Complaint, was electronically filed on the Court's CM/ECF System on January 9, 2025, which caused a copy to be served on counsel of record for Plaintiffs as follows:

> Tamar S. Wise
> Cozen O'Connor
> 3WTC, 175 Greenwich Street
> 55th Floor
> New York, NY 10172
> 212-883-4924
> twise@cozen.com
>
> Thomas J. Ingalls
> Cozen O'Connor
> 1200 - 19th St NW, Suite 300
> Washington, DC 20036
> 202-471-3411
> tingalls@cozen.com
>
> Catherine Yun
> Joan Taylor
> Cozen O'Connor
> 1650 Market Street, Suite 2800
> Philadelphia, PA 19103
> 215-864-8021
> Fax: 215-665-2013
> cyun@cozen.com
> joantaylor@cozen.com

Dated: January 9, 2025                    /s/ Angelo J. Genova
                                             Angelo J. Genova