**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HOWARD TAYLOR, JUDITH TAYLOR | : | CIVIL ACTION |
| Plaintiffs, | : | NO. 2:23-cv-04882-JHS |
| vs. | : | |
| JEFFREY GURAL, | : | Hon. Joel H. Slomsky |
| Defendant. | : | |

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

---

Michael B. de Leeuw
Tamar S. Wise
COZEN O'CONNOR
3 WTC, 55th Floor
New York, New York, 10007
(212) 908-1331
mdeleeuw@cozen.com
twise@cozen.com

Thomas Ingalls
COZEN O'CONNOR
2001 M Street, NW, 5th Floor
Washington, D.C. 20036
(202) 471-3411
tingalls@cozen.com

Joan Taylor
Catherine Yun
COZEN O'CONNOR
1650 Market Street, Ste. 2800
Philadelphia, PA 19103
joantaylor@cozen.com
cyun@cozen.com

*Attorneys for Plaintiffs Howard Taylor and Judith Taylor*

# TABLE OF CONTENTS

**Page**


I. ARGUMENT .......... 1

A. Plaintiffs Have Adequately Alleged Antitrust Claims .......... 1

1. Plaintiffs Pled an Antitrust Injury .......... 1

2. Plaintiffs Pled Section 1 and Section 2 Claims in the Alternative Because Only Discovery Will Reveal if Copperweld Immunity Applies .......... 4

3. Plaintiffs Alleged a Violation of Section 1 of the Sherman Act. .......... 5

a. Plaintiffs' Stated a Claim Under a Per Se Analysis. .......... 6

b. Plaintiffs Have also Stated a Claim Under the Rule of Reason. .......... 10

4. Plaintiffs Alleged a Violation of Section 2 of the Sherman Act. .......... 13

a. Plaintiffs Plausibly Alleged that Defendant is a Monopolist in Control of the Essential Facility. .......... 13

b. The Essential Facilities Doctrine Applies Here. .......... 16

B. Howard Taylor Has More Than Plausibly Alleged Defamation-Based Claims .......... 17

II. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10x Genomics, Inc. v. Vizgen, Inc.*,
681 F. Supp. 3d 252 (D. Del. 2023)....5

*Abdellatif v. Alza Wrae Indus. Co.*,
2019 WL 1284689 (E.D. Pa. Mar. 20, 2019)....21

*AC2T, Inc. v. Purrington*,
2020 WL 6203573 (E.D. Pa. Oct. 22, 2020)....22

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016)....16

*Associated Gen. Contractors, Inc. of Cal. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)....2

*Banonis v. Roney*,
2023 WL 3167459 (Pa. Super. Ct. May 1, 2023)....25

*Bistrian v. Levi*,
696 F.3d 352 (3d Cir. 2012)....3

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
239 F. Supp. 2d 550 (E.D. Pa. 2002)....10

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)....6, 10, 13

*Byars v. Sch. Dist.*,
942 F. Supp. 2d 552 (E.D. Pa. 2013)....25

*Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*,
696 F. Supp. 97 (D. Del. 1988)....13

*Colonial Penn Grp., Inc. v. Am. Ass'n of Retired Persons*,
698 F. Supp. 69 (E.D. Pa. 1988)....7

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)....4, 5, 14

*Daisy Mountain Fire Dist. v. Microsoft Corp.*,
547 F. Supp. 2d 475 (D. Md. 2008)....16

*Dianoia's Eatery, LLC v. Motorists Mutual Ins. Co.*,
10 F.4th 192 (3d Cir. 2021) ....................18

*Doe v. Hesketh*,
77 F. Supp. 3d 440 (E.D. Pa. 2015) ....................21

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
360 F. Supp. 2d 465 (E.D.N.Y. 2005) ....................15

*Fishman v. Est. of Wirtz*,
807 F.2d 520 (7th Cir. 1986) ....................17

*Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*,
2017 WL 548944 (D.N.J. Feb. 10, 2017) ....................7

*Goldfarb v. Kalodimos*,
539 F. Supp. 3d 435 (E.D. Pa. 2021) ....................18, 23, 24, 25

*Hayes v. Houser*,
2024 WL 3290718 (3d Cir. 2024)....................21

*Hecht v. Pro-Football, Inc.*,
570 F.2d 982 (D.C. Cir. 1977) ....................16

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
32 F.4th 242 (3d Cir. 2022) ....................1, 2, 3

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004)....................8

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)....................7

*In re Mushroom Direct Purchaser Antitrust Litig.*,
621 F. Supp. 2d 274 (E.D. Pa. 2009) ....................4, 5

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
2023 WL 5617784 (E.D. Pa. Aug. 30, 2023) ....................11

*Int'l Constr. Prods., LLC v. Caterpillar Inc.*,
2022 WL 4465376 (D. Del. Sept. 26, 2022)....................8

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
419 F. Supp. 3d 791 (D. Del. 2019)....................6

*Irish v. Ferguson*,
970 F. Supp. 2d 317 (M.D. Pa. 2013)....................2, 7, 9, 10

*Lifewatch Servs. Inc. v. Highmark Inc.*,
902 F.3d 323 (3d Cir. 2018)....................6, 12

*Mallory v. S&S Publishers*,
168 F. Supp. 3d 760 (E.D. Pa. 2016)....................20

*Marcone v. Penthouse Int'l Mag. for Men*,
754 F.2d 1072 (3d Cir. 1985)....................18, 19

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
674 F.3d 369 (4th Cir. 2012)....................20

*McDowell v. Paiewonsky*,
769 F.2d 942 (3d Cir. 1985)....................19

*McMorris v. Williamsport Hosp.*,
597 F. Supp. 899 (M.D. Pa. 1984)....................10

*Meyers v. Certified Guar. Co.*,
221 A.3d 662 (Pa. Super. 2019)....................22

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990)....................22, 23

*Monarch Ent. Bureau, Inc. v. New Jersey Highway Auth.*,
715 F. Supp. 1290 (D.N.J. 1989)....................17

*Monge v. Univ. of Pa.*,
2024 WL 2188473 (E.D. Pa. May 14, 2024)....................19

*Monge v. Univ. of Pa.*,
2024 WL 4595577 (E.D. Pa. Oct. 28, 2024)....................18, 23

*Mzamane v. Winfrey*,
693 F. Supp. 2d 442 (E.D. Pa. 2010)....................24

*NRT Tech. Corp. v. Everi Holdings Inc.*,
2020 WL 3403091 (D. Del. June 19, 2020)....................12

*Pace Elecs., Inc. v. Canon Comput. Sys., Inc.*,
213 F.3d 118 (3d Cir. 2000)....................6, 7

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
998 F.2d 1224 (3d Cir. 1993)....................8

*Premier Comp Sols. LLC v. UPMC*,
377 F. Supp. 3d 506 (W.D. Pa. 2019)....................6

*Queen City Pizza v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)....................11

*Rapid Circuits, Inc. v. Sun Nat'l Bank*,
2011 WL 1666919 (E.D. Pa. May 3, 2011)....................25

*Robertson v. Sea Pines Real Est. Cos., Inc.*,
679 F.3d 278 (4th Cir. 2012)....................5

*Roffman v. Trump*,
754 F. Supp. 411 (E.D. Pa. 1990)....................19

*Sandoz, Inc. v. United Therapeutics, Corp.*,
2020 WL 697137 (D.N.J. Feb. 4, 2020)....................14

*Schoenkopf v. Brown & Williamson Tobacco Corp.*,
637 F.2d 205 (3d Cir. 1980)....................5

*Seguro Medico, LLC v. Suffolk Admin. Servs., LLC*,
2023 WL 7324081 (E.D. Pa. Nov. 7, 2023)....................20

*SEI Glob. Servs., Inc. v. SS&C Advent*,
496 F. Supp. 3d 883 (E.D. Pa. 2020)....................13

*State Oil Co. v. Khan*,
522 U.S. 3 (1997)....................10

*Sumotext Corp. v. Zoove, Inc*,
2017 WL 2774382 (N.D. Cal. June 26, 2017)....................15

*Unigestion Holdings, S.A. v. UPM Tech., Inc.*,
412 F. Supp. 3d 1273 (D. Or. 2019)....................16, 17

**Other Authorities**

Daniel A. Crane, *Antitrust*, 28 (Wolters Kluwer Law & Business, 2014)....................11

Fed. R. Civ. P. 12....................15, 18, 21

Fed. R. Civ. P. 201....................15

William Holmes & Melissa Mangiaracina, *Antitrust Law Handbook* § 2:16 (2012)....................7

As the Court noted at oral argument, at this stage of the proceedings, Plaintiffs are entitled to all reasonable inferences from the well-pled facts in their Amended Complaint. The 61-page Amended Complaint more than adequately survives Defendant Jeffrey Gural's motion to dismiss.

# I. ARGUMENT

## A. Plaintiffs Have Adequately Alleged Antitrust Claims

Plaintiffs have more than sufficiently pled violations of the Sherman Act. Cognizant of the fact that wholly owned firms are treated as single economic entities and therefore incapable of conspiring, Plaintiffs pled their Section 1 and Section 2 claims in the alternative. Plaintiffs have alleged either: (1) an illegal group boycott among Gural, the Gural-affiliated racetracks, and unaffiliated racetracks (Section 1 violation); or (2) that Gural, through his ownership of his three racetracks is a monopolist illegally denying access to an essential facility (Section 2 violation).

In either case, Plaintiffs have alleged an antitrust injury, detailing the way Gural's illegal conduct distorts the market for harness-racing horse ownership and breeding by affecting inputs and outputs from each market, along with prohibiting an entire class of potential owners from participating and impairing the quality of the championship races. Assuming the racetracks are legally capably of conspiring, Plaintiffs have alleged direct and circumstantial evidence of a conspiracy. Plaintiffs have also alleged legally cognizable relevant markets and that Gural or Gural-affiliated racetracks have market power due to the nature of the races they host. Taken together, these allegations more than support either a violation of the Sherman Act.

### 1. Plaintiffs Pled an Antitrust Injury

As an initial matter—and to answer the Court's question from oral argument—Plaintiffs have adequately pled they have suffered an antitrust injury. It is true that antitrust laws "aim[] to protect competition, not competitors." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 249–50 (3d Cir. 2022). An "antitrust injury" is an "injury of the type the antitrust laws were

intended to prevent and that flows from that which makes defendant['s] acts unlawful." *Id.* The challenged conduct must affect "the prices, quantity or quality of goods or services, not just [the plaintiff's] own welfare." *Host Int'l, Inc.*, 32 F. 4th at 250 (3d Cir. 2022). "[T]he class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and *competitors* in the restrained market ... and to those whose *injuries are the means by which the defendants seek to achieve their anticompetitive ends* ...." *Irish v. Ferguson*, 970 F. Supp. 2d 317, 363 (M.D. Pa. 2013) (quotations omitted) (alterations in original) (emphasis added).[1]

Gural argued at oral argument and in his briefs that Plaintiffs have failed to allege an antitrust injury, asserting that "the alleged injury here is to Howard Taylor, not to competition." Tr. 71:20–21. This is incorrect. Plaintiffs alleged in detail how their exclusion hurts competition and other participants in both the breeding market and the racehorse-owning market: the prohibition on Howard Taylor's horses excluded not just Howard Taylor from the racehorse

---

[1] Defendant cited to a five-factor test from *Associated Gen. Contractors, Inc. of Cal. v. Cal. State Council of Carpenters.* As Gural conceded at argument (Tr. 73:1–2), these are nonexclusive factors. 459 U.S. 519, 540–44 (1983). Nevertheless, Plaintiffs satisfy them. The factors include:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm…; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury…; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

Plaintiffs have alleged that Gural intended to eliminate competition from the harness-racing market when he banned them from the tracks in which he has an ownership interest. (AC ¶¶ 136–141.) They also alleged that Gural's ban affected "the prices, quantity or quality of goods or services, not just [their] own welfare" (*Host Int'l, Inc.*, 32 F.4th 242, 250 (3d Cir. 2022)) by alleging detrimental effects on the owners with which Howard Taylor partnered, effects on the prices of yearlings, and a decrease in the quality of the races. (AC ¶¶ 81, 119, 139, 140, 178, 225.) Plaintiffs pled the ban led directly to the preclusion of a class of owners, the exclusion of which reduces inputs into and outputs from the racehorse owning market thereby harming competition. *Id*.

owning market, but also an entire class of owners—at least 70 individuals and organizations—from the market for owning horses. (*See e.g.* AC ¶¶ 81, 119, 178, 225.)

Additionally, Plaintiffs alleged that the illegal agreement between Gural and the other racetracks "substantially suppresses competition in the markets for racing, breeding, and selling harness-racing horses…[by] remov[ing] two major purchasers/owners from the market for buying new yearlings." (*Id.* ¶ 269.) Plaintiffs also alleged that Gural's actions are "depressing the prices in the horse market. Because Howard and Judith Taylor—both prolific buyers in the horse-buying market—cannot race horses for the foreseeable future, they are not buying yearlings for future races." (*Id.* ¶ 140.) These are classic and clear harms to competition because they decrease inputs and outputs in the racehorse owning market, decreasing the prices sellers of yearlings receive (which harms breeders and benefits Gural as a racehorse owner), decreasing the competitiveness of the races (which harms spectators and purchases of racehorses for breeding while benefiting Gural as a racehorse owner), and decreasing the pool of racehorses sold into the breading market (which increases the prices and harms breeders while benefiting Gural as racehorse owner). Gural's anticompetitive ban, whether the result of unilateral action or illegal group boycott, thus distorts the markets for breeding racehorses (inputs and outputs) and for owning racehorses (inputs, breeding outputs, and racing outputs)—exactly the sort of antitrust injury Courts have long recognized. *See Host Int'l, Inc.* 32 F.4th at 250.

Gural argued at oral argument that Plaintiffs "can't deny that there are others who can step up and take the place of Mr. Taylor" in these partnerships. Tr. 71:24–25. At the motion to dismiss stage, however, Plaintiffs are entitled to reasonable inferences from their allegations—that Gural's removal of Mr. Taylor from the market has led to the exclusion of a class of owners. *Bistrian v.*

*Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012) (abrogated on other grounds). Any inference to the contrary would be improperly drawn in Gural's favor.[2]

Taken together, these are classic antitrust injuries.

2. Plaintiffs Pled Section 1 and Section 2 Claims in the Alternative Because Only Discovery Will Reveal if *Copperweld* Immunity Applies.

Plaintiffs pled their antitrust claims in the alternative. As discussed at oral argument, whether Section 1 or Section 2 of the Sherman Act claim applies depends on the amount of ownership interest Gural has in the three racetracks (Meadowlands, Vernon Downs, and Tioga Downs) for which he holds himself out as owner. If Gural's ownership interest and control does not predominate, Section 1 applies. If Gural's ownership interest and control of these racetracks is such that he and they share a unity of purpose and economic interest, he is legally incapable of conspiring with them under *Copperweld*. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). In that case, Section 2 applies. Plaintiffs need discovery to make this determination.

Under *Copperweld*, "a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1." *Id.* at 771. While *Copperweld* addressed a wholly owned subsidiary of a parent company, "the Third Circuit extended *Copperweld* to permit a de minimis deviation of 99.92% ownership from 100% ownership and recognized that courts have deviated in situations where parental ownership was in the 80% to 91.9% range." *In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274, 289 (E.D. Pa. 2009). To determine whether there is sufficient unity of ownership, courts must "analyze the substance, not the form, of economic arrangements when determining whether a separately incorporated entity is capable of conspiring."

---

[2] Moreover, Gural's argument is belied by the media coverage of the dispute over the anticompetitive ban. Howard Taylor is a successful owner with a winning track record, exactly the sort of person with whom potential owners who lack the skill and expertise, but have the capital, would choose—and indeed did choose—to partner. His absence therefore makes it less likely for them to enter the market, thereby further distorting the breeding and owning markets.

*Id.* The key question here is the substance of Gural's ownership of the subject racetracks. *If* his ownership is more than a de minimis deviation from 100% ownership, he can conspire and Plaintiffs have direct and circumstantial evidence of such a conspiracy.

Plaintiffs do not know Gural's ownership interest in the three tracks, but he holds himself out as the owner of all three.[3] Despite Defendant's allusions to "Gural's" "ownership" and "unilateral conduct" at oral argument, his brief studiously avoids commenting on Gural's actual ownership interest. Currently, there is not enough publicly available information for Plaintiffs or the Court to know whether *Copperweld* immunity applies. Rather only after discovery will Plaintiffs and the Court have enough information to determine if *Copperweld* immunity applies. *See 10x Genomics, Inc. v. Vizgen, Inc.*, 681 F. Supp. 3d 252, 266 (D. Del. 2023); *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 287 (4th Cir. 2012).

Cognizant of this limitation, Plaintiffs pled their Section 1 and Section 2 claims in the alternative. (AC at pages 42, 45.) Should discovery reveal that Gural owns a substantial enough portion of the three racetracks that *Copperweld* immunity applies and Plaintiffs' Section 1 cannot survive, his actions fall squarely within Section 2 as the unilateral actions of a monopolist.

3. Plaintiffs Alleged a Violation of Section 1 of the Sherman Act.

As discussed at oral argument, Section 1 of the Sherman Act prohibits joint conduct. *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 207 (3d Cir. 1980). To state a

[3] Plaintiffs alleged that trade publications identify Gural as the racetracks' owner who decides which horses are permitted to race (AC ¶¶ 18, 105) and the Article featuring the defamatory statement identified Gural as the Meadowlands owner. *Id.* ¶¶ 85–91. Indeed, in his Motion to Dismiss, Gural says he is "owner" of the subject racetracks and argues that the tortious interference claim should be dismissed as against him because of the "right of racetrack owners to exclude any individual for no reason." (Dkt. #25-2 at 41–42.) At oral argument, defense counsel conceded that Gural takes unilateral action as the owner. *See* Tr. 13:1–13 (Gural's actions are the "classic example of unilateral conduct where Mr. Gural has made a decision."); *see also* Tr. 64:5–6. ("This is among, if not the premier[], venue in the country on harness racing… to the extent my client's actions carried with them any flavor, it's in the context of an owner of three major racetracks. . .).

claim under Section 1 of the Sherman Antitrust Act, Plaintiffs need only "allege (1) an agreement (2) to restrain trade unreasonably." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 331 (3d Cir. 2018). So long as Plaintiffs plead "some form of concerted action ..., in other words, a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme ...." that is sufficient. *Id.* at 333 (citations omitted). Because not all restraints of trade are inherently unreasonable, any concerted action is analyzed for reasonableness "under either the *per se* standard or the rule of reason standard" depending on the type of restraint. *See Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 536–37 (W.D. Pa. 2019) (citing *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011)).

As detailed below, Plaintiffs have more than sufficiently alleged a violation of Section 1 of the Sherman Antitrust Act under both a *per se* analysis and a rule of reason analysis by alleging a group boycott in violation of Section 1. When combined with the allegations that Gural has market power in the market for racetrack services for elite harness-racing horses, Plaintiffs have successfully alleged a *per se* violation of Section 1. Moreover, *even if* group boycotts wherein participants have market power were not a *per se* violation of Section 1, Plaintiffs have adequately pled that the group boycott violates the rule of reason. Importantly, courts routinely wait until summary judgment to decide whether a violation is a *per se* violation or subject to rule of reason. *See, e.g., Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 419 F. Supp. 3d 791, 807 (D. Del. 2019) (declining to choose a standard at on a motion to dismiss because a factual inquiry was required).

*a. Plaintiffs' Stated a Claim Under a* Per Se *Analysis.*

Both due to the obviously anticompetitive nature of some restraints of trade and the complexity of inquiring into pro- and anticompetitive and procompetitive effects any restraint, courts have deemed that certain concerted action warrants *per se* treatment. *Pace Elecs., Inc. v. Canon Comput. Sys., Inc.*, 213 F.3d 118, 123 (3d Cir. 2000). The *per se* standard is applied to

plainly anticompetitive conduct, such as price-fixing and group boycotts. *See Colonial Penn Grp., Inc. v. Am. Ass'n of Retired Persons*, 698 F. Supp. 69, 72 (E.D. Pa. 1988). This is because "[j]udicial experience has shown [these types] of restraints [so rarely] have redeeming competitive benefits . . . that their condemnation does not require application of the full-fledged rule of reason." *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 316 (3d Cir. 2010).

One type of concerted conduct frequently subject to *per se* treatment is that of a group boycott, *i.e.*, "concerted action with a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both." *Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*, 2017 WL 548944, at *3 (D.N.J. Feb. 10, 2017) (citations omitted). "'Group boycotts, or concerted refusals by traders to deal with other traders,' [are] *per se* violation[s] of the antitrust laws" when participants possess market power. *Irish,* 970 F. Supp. 2d at 367 (quoting *Klor's, Inc. v. Broadway–Hale Stores, Inc*., 359 U.S. 207, 212 (1959)). "Application of the *per se* rule to a horizontal boycott 'require[s]. . . [that] the defendants' share[] market power or *control over a key resource or facility ….*'" *Id.* (quoting William Holmes & Melissa Mangiaracina, *Antitrust Law Handbook* § 2:16 (2012) (emphasis added). Importantly, "[u]nder the *per se* standard, plaintiffs are relieved of the obligation to define a market…." *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 316 (3d Cir. 2010).[4]

[4] Gural wrongly argued that Plaintiffs' Section 1 claim must be analyzed under the rule of reason analysis, and that their claims failed for failure to identify a relevant market under that analysis. Tr. 68:1–7. Plaintiffs have alleged a group boycott with market power, which should be analyzed under the *per se* standard. Under this standard, the plaintiff need not define a market or allege market power in her complaint, as she would under the rule of reason. *Pace Elecs., Inc. v. Canon Comput. Sys., Inc.*, 213 F.3d 118, 123 (3d Cir. 2000) ( "requiring a plaintiff to demonstrate that an injury stemming from a per se violation of the antitrust laws caused an actual, adverse effect on a relevant market in order to satisfy the antitrust injury requirement comes dangerously close to transforming a per se violation into a case to be judged under the rule of reason.").

As discussed at oral argument, Plaintiffs have more than plausibly alleged a group boycott. First, Plaintiffs have alleged direct evidence of a conspiracy among Gural and the three racetracks in which Gural has an ownership interest: an email—a single communication—from Gural's counsel informing Plaintiffs' counsel that Judith Taylor was banned from the Meadowlands, Vernon Downs, and Tioga Downs.[5] (AC ¶¶ 26, 111–12, 265.) The email was dated May 1, 2024, and the ban began on May 1, 2024, demonstrating that the three racetracks and Gural communicated *before* enacting the ban and that the decision to ban Judith Taylor was not just parallel, independent conduct. (AC ¶¶ 26, 247.) This allegation, standing alone, is sufficient to support a Section 1 claim that Gural was part of a concerted effort to exclude Plaintiffs from the elite harness-racing market as part of a group boycott.

Plaintiffs' allegations of a group boycott among Gural and Gural-affiliated racetracks does not stop at a single email. Plaintiffs have also alleged circumstantial evidence of a group boycott such as parallel conduct and various "plus factors," such as (1) motive to conspire, (2) evidence that the conspirators acted contrary to their interests, and (3) evidence implying a traditional conspiracy. *In re Flat Glass Antitrust Litig*., 385 F.3d 350, 360 (3d Cir. 2004). Evidence implying a traditional conspiracy includes "evidence relating to the defendants' opportunity to conspire and the solicitation of others to partake in common action." *Int'l Constr. Prods., LLC v. Caterpillar Inc*., 2022 WL 4465376, at *14 (D. Del. Sept. 26, 2022) (internal quotations omitted); *see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co*., 998 F.2d 1224, 1244 (3d Cir. 1993). Plaintiffs pled that Gural had a motive to conspire. (AC ¶ 141.) Plaintiffs alleged that Gural acted contrary to his own interests as a racetrack owner (but not as an owner of elite harness-racing

---

[5] As discussed above, there is a possibility that Gural's ownership interest in the three tracks is so large that Gural and those racetracks are legally incapable of conspiring for antitrust purposes. If this proves to be the case, such economic unity only strengthens Plaintiffs Section 2 claims.

horses) because, by eliminating Plaintiffs' horses, he has eliminated some of the strongest competitors in the sport, which risks making the races less interesting to watch. (*Id.* ¶ 271.) Plaintiffs pled that Gural's ownership of interests in all three racetracks provides each an opportunity to conspire. (*Id.* ¶ 257). Finally, Plaintiffs alleged Gural issued a clarion call to other racetracks to conspire to exclude Howard Taylor and that renewed that invitation on the call with the SBOA. (*Id.* ¶¶ 94–98). Indeed, following this invitation, Batavia Downs and Buffalo Raceway joined the boycott. (*Id.* ¶¶ 129, 182, 198, 211.) Plaintiffs have alleged, therefore, both direct and circumstantial evidence of the conspiracy underlying Gural and the racetracks' group boycott.

In addition to these clear ways Plaintiffs have alleged collusion, Plaintiffs have also alleged that Gural and his affiliated racetracks have market power (and in fact, that he has monopoly power) in the racetrack services market (*Id.* ¶¶ 241, 278)—a point which Defendant's counsel conceded during oral argument. *See* Tr. 13:1–19 ("This is among, if not the premier[], venue in the country on harness racing… to the extent my client's actions carried with them any flavor, it's in the context of an owner of three major racetracks. . . he's a leader in the industry . . . ."). Indeed, Plaintiffs have alleged Gural has *veto* power over which owners and horses participate in races at his racetracks. (*See* AC ¶ 105 ("'Outside of the Hambletonian races it has always been up to Jeff [Gural]' which horses were permitted to participate."); ¶¶ 240, 277.)

Gural's veto power is no minor hinderance to participating in the market for owning elite harness-racing horses. As Plaintiffs pled, due to the nature of owning racehorses, access to the Championship races is essential to a racehorse owner's ability to compete in the upper echelon of the sport. (*Id.* ¶¶ 10–14, 47–59.) The very nature of a championship means that the racetrack hosting the Championship races is "a key resource or facility" as necessary to state a *per se* violation. *See Irish*, 970 F. Supp. 2d at 367. Gural's counsel conceded at oral argument that the

Meadowlands is "among, if not the premier[], venue in the country on harness racing." *See* Tr. 13:1–13 ("[T]o the extent my client's actions carried with them any flavor, it's in the context of an owner of three major racetracks. . .). Plaintiffs have alleged, therefore, that Gural has "*control over a key resource or facility*"—the racetracks in which he has an ownership stake—such that the application of the *per se* rule to the group boycott formed by this constellation economic actors is warranted. *Irish*, 970 F. Supp. 2d at 367.

*b. Plaintiffs Have also Stated a Claim Under the Rule of Reason.*

Even if the illegal group boycott is not subject to *per se* treatment, Plaintiffs sufficiently alleged that the illegal conspiracy among Gural, the racetracks in which he has an ownership interest, and the unaffiliated racetracks violates the rule of reason. Generally, "[a]greements that do not fall under *per se* illegality are analyzed under the 'rule of reason' to determine whether they are an unreasonable restraint on trade." *Burtch*, 662 F.3d at 222. When applying the rule of reason standard, courts engage in a complex analysis of the restraint at issue. *McMorris v. Williamsport Hosp*., 597 F. Supp. 899, 909 (M.D. Pa. 1984). To find "whether the questioned practice imposes an unreasonable restraint on competition, [courts take] into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). To plead a violation under the rule of reason, it is sufficient to allege four elements:

> (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Brunson Commc'ns, Inc. v. Arbitron, Inc.,* 239 F. Supp. 2d 550, 564–65 (E.D. Pa. 2002) (citing *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 464–65 (3d Cir.1998)). Of the four elements, the

parties do not dispute the fourth—that Plaintiffs were injured.[6] Gural disputes the remaining elements, but Plaintiffs have already discussed (above) how the Amended Complaint more than adequately alleges multiple conspiracies, through direct and circumstantial evidence, with illegal objectives, satisfying elements one and three.

Plaintiffs' Amended Complaint also more than adequately alleges the final element of a violation under the rule of reason: cognizable markets for racing, owning, and breeding of elite harness-racing horses in the Northeast. At oral argument, Gural's counsel argued that Plaintiffs failed to allege a product and geographic market because Plaintiffs must use (and did not use) certain key terms, such has "interchangeability" or "cross elasticity of demand" to define a product market.[7] Tr. 70:12–14. But interchangeability and cross-elasticity of demand are *not* pleading requirements—they are merely "tools to work with" because there is "no systematic or consistent method of defining markets." Daniel A. Crane, *Antitrust*, 28 (Wolters Kluwer Law & Business, 2014). Similarly, Gural appeared to try to confuse the issue of market definition by suggesting it was unclear whether Plaintiffs were discussing male or female horses, or the specific age of the relevant horses in the relevant market. (Dkt. #25-2 at 61). This pure rhetoric misses the point. It is an accepted principle of antitrust law that simply because one could further whittle down a broader market into legally cognizable submarkets, that does not invalidate a legally cognizable broader market. *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2023 WL 5617784, at *4 (E.D. Pa. Aug. 30, 2023) (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962)).

---

[6] To the extent that this factor contemplates whether an antitrust injury has occurred, Plaintiffs detailed the extent of the antitrust injury, *supra* at 1–4.

[7] As noted during oral argument, Gural relies extensively on *Queen City Pizza v. Domino's Pizza, Inc.* in an attempt to impose heightened pleading requirements. 124 F.3d 430 (3d Cir. 1997). But *Queen City Pizza* is about whether a Domino's franchise contract can define the outer perimeters of the market for tomato sauce used at Domino's franchisees such that store-bought tomato sauce is outside the market. *Id.* at 442. Its applicability here is suspect and very limited at best.

Ultimately, when evaluating a relevant market, courts must consider "the commercial realities of the industry" of the proposed market. *Lifewatch Servs. Inc.*, 902 F.3d 323 at 337. Because of this requirement, courts in this Circuit have held that "the determination of a relevant market is a complex and fact-intensive inquiry[; a]ccordingly, courts *should deny* motions to dismiss unless the alleged market makes no economic sense *under any set of facts*. [T]he question must be resolved on the facts and economic realities of the case." *NRT Tech. Corp. v. Everi Holdings Inc.*, 2020 WL 3403091, at *7, n. 30 (D. Del. June 19, 2020) (citing *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc*., 886 F.3d 332, 341 (3d Cir. 2018) (emphasis added).

Plaintiffs have alleged several relevant interrelated product markets: (1) racetrack services; (2) market for owning racehorses; and (3) market for breeding racehorses. (*See* AC ¶¶ 9–28, 42–59, 111–141, 223–352.) The allegations, especially those addressing the interrelated nature of the markets, reflect the "economic realities" of the market for elite harness-racing horses. *NRT Tech. Corp.*, 2020 WL 3403091, at *7. This is a unique industry with nuance and complexities and the antitrust inquiry must start from that recognition. Gural's arguments do not address the unique nature of this industry, but rather focus rigidly on applying inapposite tools developed in the *retail* context to the horse-racing industry. *See* Tr. 70:13–14.

Plaintiffs have also alleged anticompetitive effects in these markets. As explained above regarding antitrust injury (*see supra* pp. 1–4), the exclusion of Mr. Taylor led to the exclusion of a class of owners—at least 70 individuals and organizations—from the market for owning horses. (AC ¶¶ 81, 119, 178, 225.) Plaintiffs further alleged anticompetitive effects in the form of decreased demand for purchasing of yearlings (AC ¶ 140) and a decrease in the number of racehorses competing, which thereby increases the prices in the breeding market (AC ¶ 141).

Plaintiffs, therefore, have plausibly alleged markets and anticompetitive effects felt in those markets as the result of Gural's actions.

Finally, as to the first and third elements of a Section 1 claim under the rule of reason—and as explained in the preceding section—Plaintiffs more than plausibly alleged that Gural conspired to produce anticompetitive effects. To adequately plead an agreement to conspire, "a plaintiff must plead either direct evidence of an agreement or circumstantial evidence." *Burtch*, 662 F.3d 212 at 225. "Alleging parallel conduct…gets the complaint close to stating a claim." *Id.* at 227. Plaintiffs who allege parallel conduct along with additional facts— "plus factors"—plausibly allege an agreement. *Id.* Plaintiffs pled parallel conduct of the racetracks. (AC ¶¶ 9, 26, 27). And, as discussed, Plaintiffs alleged direct and circumstantial evidence—the "plus factors"—of an agreement to conspire. Plaintiffs have thus pled all four elements under the rule of reason.

4. <u>Plaintiffs Alleged a Violation of Section 2 of the Sherman Act</u>.

Plaintiffs have also more than adequately alleged an essential facilities claim under Section 2 of the Sherman Antitrust Act.[8] The core purpose of Section 2 is to address unilateral, anticompetitive conduct. *Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 696 F. Supp. 97, 130 (D. Del. 1988). In cases "where a monopolist controls a facility that its competitors need access to if they are to compete effectively" and denies use thereof, the monopolist has violated Section 2. *SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 899 (E.D. Pa. 2020), *aff'd*, 2022 WL 2356730 (3d Cir. June 30, 2022). Plaintiffs have alleged exactly that.

*a. Plaintiffs Plausibly Alleged that Defendant is a Monopolist in Control of the Essential Facility.*

To survive a motion to dismiss, Plaintiffs need only plead "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the

[8] As discussed, the Section 1 and Section 2 claims are plead in the alternative.

essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Id*. at 898–99.

Gural does not meaningfully dispute the second, third, or fourth elements of this claim.[9] Plaintiffs met the first element by alleging that (1) Gural is a monopolist in the market for racetrack services and (2) that his racetracks are essential facilities for racing elite harness-racing horses.

As explained above (*see supra* pp. 9–10), Plaintiffs alleged that Gural—by virtue of his purported ownership of the Meadowlands, Vernon Downs, and Tioga Down—has monopoly power in the racetrack services market for elite harness-racing horses in the Northeast because he can veto participation in many of the elite races, including the Championship races. Gural's counsel trumpeted that Gural is the owner of these racetracks, which are "among, if not the premier[], venue[s] in the country on harness racing." *See* Tr. 13:1–13.[10] As the owner of these premier tracks, Gural has monopoly power in the market for elite harness-racing. *See Sandoz, Inc. v. United Therapeutics, Corp*., 2020 WL 697137, at *17 (D.N.J. Feb. 4, 2020) ("Monopoly power is the power to … exclude competition."). Importantly, assuming *Copperweld* applies, *no one* disputes that Gural *literally* excluded competition; he wielded this monopoly power when he excluded Plaintiffs from his facilities and the Championship races they hold. Gural thus has veto power over which owners and horses participate in races at his racetracks and, therefore, in the Championships they host. (*See* AC ¶ 105, 240, 277.) Plaintiffs, therefore, have plausibly alleged that Gural is a monopolist.

---

[9] Nevertheless, Plaintiffs have sufficiently alleged these three elements. Plaintiffs alleged that they cannot practically or reasonably to duplicate the racetracks. (AC ¶¶ 244, 281.) Plaintiffs have alleged in extensive detail that Gural has denied the use of his racetracks to the Taylor Plaintiffs. (*See, e.g.*, *id*. ¶¶ 247, 284.) Finally, Plaintiffs have alleged that it is feasible for Gural to provide access to the racetracks, as the he did for many years. (*Id*. ¶¶ 248, 282, 285.)

[10] Further leaning into Gural's ownership, his counsel explicitly argued that Gural's actions are the "classic example of unilateral conduct where Mr. Gural has made a decision." Tr. 64:5–6.

Plaintiffs also pled how Gural's racetracks are essential facilities. The Amended Complaint repeatedly details the ways in which Gural's racetracks are the premier racetracks for elite harness-racing horses and alleges these tracks host the all-important Championship races. (*Id.*. ¶¶ 10–14, 47–58, 59.) And, as pointed out previously, Defense conceded as much at argument. *See* Tr. 13:1–19. ("This is among, if not the premier[], venue in the country on harness racing….").

Gural's counsel contended at oral argument that the racetracks at issue were not essential because there are other racetracks at which Plaintiffs can compete. Tr. 59:9–25. This argument ignores the unique nuances of harness racing, including the need for access to championship races. Elite racehorse owners cannot compete in the upper echelon of the sport unless their horses can race at the premier venues and in the championship races these venues host. (AC ¶¶ 10–11, 14, 47, 52, 57.) There simply is no substitute for competing against the best-of-the-best in championship races. Suggesting so would be akin to suggesting that, if Scottie Scheffler were banned from the PGA Tour and the four "major" championships, that he would be unharmed because he could still compete on the Korn Ferry Tour or at his club championship.[11]

[11] At oral argument, Gural's counsel asserted there were 30 harness racetracks in the United States and directed the Court to its brief stating the same. This fact does not come from the Amended Complaint and therefore should not be considered on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). A Court may take judicial notice of a fact only when "is generally known within the trial court's territorial jurisdiction" or when it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Civ. P. 201(b). Gural provided no support to show that it is a generally known fact that there are 30 harness racetracks in the United States, nor does he argue that ustrotting.com is a "source[] whose accuracy cannot be reasonably questioned." *Id.* And without discovery, this Court cannot determine whether these other facilities—which Gural suggests are interchangeable with Gural's racetracks—are in fact viable substitutes. *See, e.g., Sumotext Corp. v. Zoove, Inc*, 2017 WL 2774382, at *10 (N.D. Cal. June 26, 2017) (rejecting arguments that facilities at issue were interchangeable with other facilities defendant identified; "The Court cannot determine based on the record before it that StarStar numbers in fact are interchangeable with the products identified by counsel. Sumotext has alleged facts supporting its position that the Registry is an essential facility, and thus adequately has defined the relevant market for pleading purposes.") In any case, Plaintiffs did not allege the entire United States as its geographic market—just the Northeastern United States. *See E&L Consulting,*

b. *The Essential Facilities Doctrine Applies Here.*

Although the Essential Facilities Doctrine is not often invoked, courts continue to recognize it is a valid claim and it has been applied in cases that are factually analogous to this one. *See, e.g., Daisy Mountain Fire Dist. v. Microsoft Corp*., 547 F. Supp. 2d 475, 489 (D. Md. 2008) (recognizing that courts have "applied the essential facilities doctrine to numerous types of tangible assets (e.g. electric transmission lines, football and basketball stadiums, downhill ski hills, natural gas pipelines, and local telephone facilities.)"); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc*., 836 F.3d 1171, 1184–85 (9th Cir. 2016) ("The essential facilities doctrine is one of the circumstances in which plain English and antitrust lingo converge . . . we have continued to treat it as having a basis in § 2 of the Sherman Act."); *Unigestion Holdings, S.A. v. UPM Tech., Inc*., 412 F. Supp. 3d 1273, 1289 (D. Or. 2019).

Section 2 essential facilities claims dealing with stadiums are particularly analogous. In *Hecht v. Pro-Football, Inc*., plaintiff contended that defendants violated Section 2 because they entered into a restrictive covenant that prevented competitors from using the only viable stadium for a professional football team in the Washington, D.C. metropolitan area. 570 F.2d 982, 985–87 (D.C. Cir. 1977). The Court of Appeals for the District of Columbia held that the trial court had erred when it failed to give a requested jury instruction on the essential facility doctrine:

> In this case Hecht presented evidence that RFK stadium is the only stadium in the D.C. metropolitan area that is suitable for the exhibition of professional football games. He also presented evidence that proper agreements regarding locker facilities, practice sessions, choice of playing dates, and so forth would have made sharing of the stadium practical and convenient. Accordingly, Hecht requested an instruction that if the jury found (1) that use of RFK stadium was essential to the operation of a professional football team in Washington; (2) that such stadium facilities could not practicably be duplicated by potential competitors; (3) that another team could use RFK stadium in the Redskins' absence without interfering with the Redskins' use; and (4) that the restrictive covenant in the lease prevented

*Ltd. v. Doman Indus. Ltd*., 360 F. Supp. 2d 465, 471 (E.D.N.Y. 2005) ("The 'geographic market' is simply the geographic area where the competition occurs.").

> equitable sharing of the stadium by potential competitors, then the jury must find the restrictive covenant to constitute a contract in unreasonable restraint of trade, in violation of [the] Sherman Act . . . This instruction was substantially correct and failure to give it was prejudicial error.

*Id.* at 993.

Like the stadiums, Gural's racetracks are essential facilities. Because of their monopoly on championship races, they are the only arenas for competing in elite harness racing. Allowing Gural to exclude Plaintiffs would allow him, as the "owner of an essential facility to monopolize the market as to which his facility is the bottleneck." *Fishman v. Est. of Wirtz*, 807 F.2d 520, 540 (7th Cir. 1986) (abrogated on other grounds).[12]

Gural's reliance on *Monarch Ent. Bureau, Inc. v. New Jersey Highway Auth.* is misplaced. 715 F. Supp. 1290 (D.N.J. 1989). In *Monarch*, the plaintiff alleged that a particular outdoor concert venue was an essential facility. *Id.* at 1300. In rejecting this argument, the court pointed to the plaintiff's anemic and "conclusory allegations" that the venue was "essential." *Id.* Moreover, in *Monarch* there were other concert venues the promoter could book. *Id.* at 1301. In contrast to this case, where denial of access to the racetrack is equivalent to denial of access to the Superbowl, *Monarch* was about the ability of a promoter to compete for bookings while being unable to access a particular venue to host concerts. *Id.* at 1292. Here, Plaintiffs have alleged in detail how and why the championship races that Gural's tracks host make his tracks essential facilities. In relying on this case, Gural continues to ignore the nature of horseracing and the importance of championships.

### B. Howard Taylor Has More Than Plausibly Alleged Defamation-Based Claims

**Actual Malice.** At oral argument, the Court asked whether it was premature at this juncture of the case to determine whether Howard Taylor was a limited purpose public figure ("LPPF")—and, if so, whether actual malice needed to be pled for the defamation claims. The answer is that

[12] Essential facility claims in this area likely do not come up more often because of internal due process mechanisms within such facilities.

it is indeed premature to make this determination. As this Court held only three years ago, "[t]he question of whether [a] [p]laintiff is a limited-purpose public figure is a ... difficult and fact-specific [question] ... not suitable for resolution under Rule 12(b)(6)." *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 455 (E.D. Pa. 2021) (Slomsky, J.). In its *Goldfarb* opinion, this Court pointed out that many other courts in this Circuit "regularly" defer the LPPF inquiry until after discovery, and decided it would join those other courts in "reserving the question until a full factual record." *Id.* at 455–56 (citing cases); *see also Monge v. Univ. of Pa.*, 2024 WL 4595577, at *3–4 (E.D. Pa. Oct. 28, 2024) (revisiting prior ruling making LPPF inquiry on pleadings and deciding that "at the Rule 12 stage, without the benefit of discovery, the Court declines to reach that conclusion [that plaintiff is a LPPF and] defers deciding whether Dr. Monge is a limited purpose public figure until after a factual record has been fully developed.").[13] That analysis applies with equal force here.

In any event, the Court could not—by reading the Complaint—make the determination that Mr. Taylor is a LPPF. That analysis requires a "public controversy" and sufficient allegations that the plaintiff "actively participated in" that public controversy. *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1087 (3d Cir. 1985). Gural himself defined the "public controversy" here as the "widely publicized horse doping scandal, ultimately resulting in multiple federal

[13] Both in his reply brief and at oral argument, Gural argued that actual malice allegations in the Amended Complaint somehow amount to a binding concession by Mr. Taylor that the actual malice standard applies, apparently obviating the need for the LPPF inquiry. Gural does not cite a single case that equates allegations to survive a higher standard with a judicially-binding admission. There is no such case. Gural cites only to *Dianoia's Eatery, LLC v. Motorists Mutual Ins. Co.*, 10 F.4th 192 (3d Cir. 2021), which did not involve pleading actual malice or a plaintiff conceding a standard applies based on its choice of allegations. Instead, *Dianoia's Eatery* stands for the unremarkable proposition—unrelated to this case—that a plaintiff who brings a declaratory judgment claim without alleging a claim for breach of contract cannot oppose a remand to state court by arguing that it intended to state a claim for breach of contract. That case has no bearing on whether a plaintiff who includes allegations to satisfy a higher standard for a cause of action is somehow estopped from arguing that it only needs to meet a lower pleading standard.

prosecutions, including the Fishman trial." (Dkt. #25-2 at 33.) But there is no suggestion anywhere in the pleadings that Mr. Taylor participated in that scandal, much less that he "actively" participated or that he "actively" participated in it in a "substantial" way. That type of participation would be required for Mr. Taylor to qualify as a LPPF. *Roffman v. Trump*, 754 F. Supp. 411, 418 (E.D. Pa. 1990) ("a finding of a limited purpose public figure also requires that the individual's involvement in the issue be substantial"). Indeed, Mr. Taylor's *only* connection to the "horse doping scandal" and Fishman trial is the lone exhibit at the trial (one of thousands introduced in the trial) in which a single trainer placed five transactions (out of more than 700 transactions) on Mr. Taylor's account for a substance called BB3. Given that it is undisputed that Mr. Taylor was never even mentioned during the trial, and did not appear in any other trial document or exhibit, and that he was not a defendant in the Fishman trial, and that he was not named in any of the other "multiple federal prosecutions," the pleadings do not support a finding that Howard Taylor "actively participated," in a "substantial" way, in a public controversy. The pleadings therefore do not support the LPPF characterization, nor does Gural's case law. *Cf. Marcone*, 754 F.2d 1072 at 1087 (finding, in a "close case," attorney was LPPF with respect to drug trafficking ring because he was indicted as a defendant, interacted socially and professionally with drug gang in public manner, and sought extensive media attention in this regard); *see also McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir. 1985) (finding architect was LPPF with respect to public projects controversy because he directly worked on and sought media attention for these projects).

And finally, even if this Court were to find Mr. Taylor a LPPF at the pleading stage, (which, respectfully, it should not), Gural's motion to dismiss should still be denied because the Amended Complaint more than adequately pleads actual malice. *Monge v. Univ. of Pa.*, 2024 WL 2188473 (E.D. Pa. May 14, 2024). There are three independent ways the pleadings allege actual malice:

- ***First***, the Amended Complaint points to the discrepancy between what Gural said (*i.e.*, that Mr. Taylor was telling his trainers to use EPO on his horses) and the document on which this statement was ostensibly based (which stated, at most, that a trainer purchased for Mr. Taylor's account BB3 on one day). Indeed, the Meadowlands Press Release stated that the documents from Fishman trial only showed "persons who have ***purchased*** prohibited substances." Those documents did not show Mr. Taylor told his trainers to give EPO to his horses. This ground for actual malice is best highlighted in contrast to a case Gural himself cites, *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, which held that the actual malice requirement was *not* satisfied where NASCAR's president repeated only that a racecar driver failed three drug tests, because the statements made "did no more than report what the positive drug tests indicated." 674 F.3d 369, 378 (4th Cir. 2012). Because Gural's statement went (far) beyond what the Fishman trial exhibit showed, a reasonable inference of actual malice is pled.

- ***Second*****,** Gural's intimate knowledge with the industry and the prosecutions of PEDs, including the Fishman trial (and his knowledge that Taylor was never prosecuted or otherwise implicated at the Fishman trial other than the one exhibit), provided him with the type of access and specialized knowledge giving rise to a "reasonable inference" he was in a position to know that his statements about Taylor were unfounded. *See, e.g., Seguro Medico, LLC v. Suffolk Admin. Servs., LLC*, 2023 WL 7324081, at *8 (E.D. Pa. Nov. 7, 2023) (actual malice adequately alleged where third party administrator of healthcare plan was in a position to know if statements about that plan were false given its specialized access and knowledge).

- ***Third***, at the time Gural made his statements about the certainty of Mr. Taylor's liability for giving his horses EPO, he acknowledged the Meadowlands needed to conduct an investigation into the implications from the exhibits at the Fishman trial, but that investigation had not yet even begun (let alone led to any conclusions). (*See* AC ¶¶ 79–80.) A reasonable inference is that it is plausible that Gural had a reckless disregard for the truth of his statements by making accusations of liability for giving horses EPO prior to waiting for an investigation to reveal what actually transpired.

**BB3/EPO**. At argument, the Court asked whether EPO and BB3 are the same. The Amended Complaint pleads that they *are not the same*. (*Id*. ¶ 76.) This allegation must be taken as true at this juncture. To the extent Gural argues that they are "functionally the same" substance, such that Gural equating them in his statement is "substantially true," that argument is inappropriate at this stage, particularly here where the pleadings do not invite that determination.[14]

---

[14] Gural repeatedly referred to this Court's decision in *Mallory v. S&S Publishers*, where the substantial truth defense was considered. 168 F. Supp. 3d 760 (E.D. Pa. 2016). But that was a summary judgment case, not a motion to dismiss case. This Court's invocation of substantial truth

It is particularly inappropriate here, because whether two chemical substances are "functionally equivalent" is a complex determination requiring chemical analyses and expert testimony—it is a determination the Court is ill-equipped to make on its own, and certainly not at this stage.

Gural argues that this Court can make a determination at this juncture that EPO and BB3 are functionally equivalent by consulting two documents that the government filed in the Fishman action—an indictment and a sentencing memorandum. Of course, neither of these documents mention Mr. Taylor but, more importantly, neither document says that EPO and BB3 are "functionally equivalent." In any event, these documents are outside the pleadings, and even though they are publicly filed, their contents cannot be considered for their truth because they are one-sided advocacy pieces drafted by the government—they are not learned treatises. In other words, this Court may take judicial notice of the fact that these documents were filed, but it cannot simply accept that what the government says in a document intended to persuade a court to a certain sentencing decision is an unassailable truth. Indeed, the Third Circuit has made clear that a court may not rely on the content of extraneous documents on a motion to dismiss if the plaintiff's claims are not based on these documents. *Hayes v. Houser*, 2024 WL 3290718, at *2 (3d Cir. 2024) (district court erred in considering, on a Rule 12(b)(6) motion, extraneous documents that did not form the basis of plaintiff's claims). To the extent that Gural continues to cite *Doe v. Hesketh* for the proposition that sentencing memoranda and indictments are subject to judicial notice, the court in that case relied on such documents for a very specific reason—to decide what consequences followed from criminal sentence in a subsequent civil case. 77 F. Supp. 3d 440, 447 (E.D. Pa.

in *Abdellatif v. Alza Wrae Indus. Co.*, was distinguishable—in that case, the exhibit to the complaint plainly stated that the plaintiffs were under federal investigation, making the truth of the defamatory statements (that plaintiffs were under federal investigation) plain. 2019 WL 1284689, at *2 (E.D. Pa. Mar. 20, 2019). No such plain truth is apparent here.

2015). The case does not stand for the proposition that *all* sentencing memoranda and indictments, and all their contents, are *always* appropriate to consider on a motion to dismiss.

Finally, whether BB3 is the same as EPO does not end the defamation inquiry. Indeed, even if the two substances were the same, Gural's further statement that Mr. Taylor told his trainers to give that substance to his horses—a false statement of fact—is still defamatory. Critically, in his Motion to Dismiss, Gural only made the "substantial truth" defense as to the equation of BB3 and EPO in the Press Release. (Dkt. #25-2 at 21 ("The Statements in the Press Release Are Not Defamatory Because They Are True and Not Capable of a Defamatory Meaning"); *id.* at 21-24.) Gural, by his own Motion, limited the "substantial truth" defense to this discrete issue.[15]

**Use of Inferences.** At oral argument, the Court also asked whether Gural was entitled to make an inference based on the facts before him, using the analogy of a person wearing a rain jacket to infer that it is raining. But Gural did not frame his statement to his audience as an opinion based on an inferences. Instead, the statements he made were phrased as statements of fact—they were verifiably true or false. Under controlling case law, this is what distinguishes fact from opinion. *See, e.g., Milkovich v. Lorain J. Co.*, 497 U.S. 1, 22, (1990) (a statement of fact, as opposed to one of opinion, is an "articulation of an objectively verifiable [fact]" and "susceptible of being proved true or false"); *AC2T, Inc. v. Purrington*, 2020 WL 6203573, at *4 (E.D. Pa. Oct. 22, 2020) (statement of fact is one that includes provably false assertions); *see also Meyers v. Certified Guar. Co.,* 221 A.3d 662, 670 (Pa. Super. 2019) ("Pennsylvania has adopted the Second Restatement's approach to defamation, and it distinguishes a statement of fact from a statement of

[15] As to the statements about Taylor giving trainers EPO to use on his horses, Gural only moved to dismiss these on the grounds that "they constitute opinion." (Dkt. #25-2 at 24; *id*. at 24-28.)

opinion by whether it can be 'objectively determined.'"). Because these statements of fact are alleged to be false, they are defamatory.

The prefatory phrase "had to be"—which only preceded Gural's defamatory statement in the Article (not elsewhere)—does not change the above analysis for two reasons. First, "had to be" it is not a phrase courts have recognized to signal opinion (and as this Court properly asked at oral argument, there has been no judicial decision that addresses this phrase). Moreover, even if it were considered a qualifier, courts have made clear that mere prefatory language cannot alone undermine a finding that a statement is defamatory. *See, e.g., Milkovich*, 497 U.S. at 19.

But, even if Gural's statement can be considered an opinion that he reached based on an inference, it would be—at best—"mixed opinion." Mixed opinions, *i.e.* opinions that imply the existence of undisclosed facts, are not protected. *Monge*, 2024 WL 4595577, at *5 ("Because the Hyperallergic article's opinions imply undisclosed facts that are untrue, the article is capable of a defamatory meaning."). Here, Gural did not disclose any facts to support his statement that Taylor told his trainers to buy EPO and give it to his horses. And the leap from the Fishman trial exhibit (which, in the Meadowlands press release's own words showed only "persons who have ***purchased*** prohibited substances") to Gural's statement that Howard Taylor told his trainers to give EPO to his horses—coupled with Gural's highly publicized role as an authority on doping investigations and the Fishman trial (he had just appeared earlier in 2023 on a nationwide 60 Minutes segment on CBS on doping in the horse industry)—reasonably suggest to his audience that he (Gural) was in possession of undisclosed information that supported his statement. Indeed, in *Goldfarb*, this Court denied a motion to dismiss defamation claims regarding a student's tweets about a professor's lecture, even though styled as "opinion." This Court found that, because the student was present at those lectures, the tweets implied to the audience undisclosed facts

supporting his opinion. *See Goldfarb*, 539 F. Supp. 3d at 458–59 ("Given Defendant's claim in the Tweet that he was present at the lecture, a reader of the Tweet could infer that he was in good position to know undisclosed facts concerning the LCME Review and the February 2016 lecture."; "Defendant's assertions that he was a former Penn Medicine student and was present during the February 2016 lecture could impart to a reader of the Tweet that undisclosed facts bolster his claim[s]…"); *see also Mzamane v. Winfrey*, 693 F. Supp. 2d 442 (E.D. Pa. 2010) (Oprah's role as founder of school would lead reader to believe she had undisclosed facts supporting her critical opinion statements of school headmistress). For these reasons, even if Gural made his statements based on an "inference" (a finding incompatible with how the defamatory statements were phrased), it would still be the type of defamatory mixed opinion that survives a motion to dismiss.

**Context.** At oral argument, the Court asked whether context is relevant for adjudicating a defamation claim. The answer is that context is critical. Here, perhaps the most relevant piece of context for the Court's to consider is the identity of the speaker of the defamatory statements. Gural, by his own admission, had a prominent role in and intimate, extensive knowledge about criminal PED prosecutions (particularly the Fishman trial). Gural also has an ownership interest in the preeminent Meadowlands racetrack, and that racetrack requested documents from the government relating to the Fishman trial and subsequently banned trainers, horses, and Mr. Taylor pending a further investigation. (AC ¶¶ 77–84.) These pieces of context are important for purpose of the actual malice inquiry (if the Court were to find the LPPF inquiry appropriate to make at this juncture and on these pleadings) and also to reinforce the conclusion that Gural's statements about PED use would be interpreted by an audience as statements of fact.

**The Non-Article Challenged Statements.** At oral argument, the Court also asked about the truthfulness of the other (non-Article) challenged statements. First, as pled in the Amended

Complaint, Gural twice defamed Mr. Taylor by publicly stating that he told his trainers to give EPO to his horses—once in the Article and once in a phone call with the SBOA board. (AC ¶¶ 85–100.) Only the Article quote contained the "had to be" language (that, in any event, does not insulate Gural from defamation liability)—the statement to the SBOA board did not include any such prefatory language and Gural's counsel's attempt to unilaterally superimpose that language into the Amended Complaint is entirely unsupported.

As to the non-EPO challenged statements (AC ¶¶ 28–29), critically, Gural did not move to dismiss these defamatory statements on the basis of opinion or substantial truth; instead, he moved solely on the ground that they were incapable of defamatory meaning. (Dkt. #25-2 at 28.) But, Pennsylvania law is clear that "a court should dismiss allegations only if it is certain the communications are not susceptible to a defamatory meaning." *Goldfarb*, 539 F. Supp. 3d at 457. Unless the Court is satisfied that it is "clear" the statement is "incapable of a defamatory meaning," it cannot dismiss on that ground. *Rapid Circuits, Inc. v. Sun Nat'l Bank*, 2011 WL 1666919, at *12 (E.D. Pa. May 3, 2011); *Banonis v. Roney*, 2023 WL 3167459, at *4 (Pa. Super. Ct. May 1, 2023) ("A court should not [dismiss] a defamation case unless it is clear that the communication is incapable of defamatory meaning. Where any doubt exists about the defamatory nature of a communication, the issue is for the jury."). To the extent Gural proposes innocent and non-defamatory meanings, that cannot support dismissal as a matter of law. *Byars v. Sch. Dist.*, 942 F. Supp. 2d 552, 564 (E.D. Pa. 2013).

## II. CONCLUSION

For all of the above reasons, Plaintiffs respectfully request that deny Defendant's Motion.[16]

[16] To the extent the Court credits any of Defendant's arguments for dismissal (which, respectfully, it should not), Plaintiffs respectfully request the opportunity to replead. Plaintiffs amended their complaint only to address new tortious conduct by Gural.

Respectfully submitted,

Dated: January 9, 2025

*/s/: Tamar S. Wise, Esq.*

Michael B. de Leeuw
Tamar S. Wise
COZEN O'CONNOR
3 WTC, 55th Floor
New York, New York, 10007
(212) 908-1331
mdeleeuw@cozen.com
twise@cozen.com

Thomas Ingalls
COZEN O'CONNOR
2001 M Street, NW, 5th Floor
Washington, D.C. 20036
(202) 471-3411
tingalls@cozen.com

Joan Taylor
Catherine Yun
COZEN O'CONNOR
1650 Market Street, Ste. 2800
Philadelphia, PA 19103
joantaylor@cozen.com
cyun@cozen.com

*Attorneys for Plaintiffs Howard Taylor and Judith Taylor*

**CERTIFICATE OF SERVICE**

I, Tamar S. Wise, Esq., hereby certify that a true and correct copy of the foregoing Memorandum of Law was served upon all counsel of record via electronic filing and is available for viewing and downloading from the Court's ECF System.

Dated: January 9, 2025

By: *<u>/s/: Tamar S. Wise, Esq.</u>*
Tamar S. Wise, Esq.