IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HOWARD TAYLOR and JUDITH TAYLOR,<br><br>        Plaintiffs,<br><br>   v.<br><br>JEFFREY GURAL,<br><br>        Defendant. | CIVIL ACTION<br>NO. 23-4882 |

## OPINION

**Slomsky, J.**                                                **February 27, 2025**

## TABLE OF CONTENTS

I.   **INTRODUCTION** ................................................................................................ 4

II.  **BACKGROUND** ................................................................................................. 6

   A.  **Factual Background** ................................................................................. 6

      1.  Harness Racing ...................................................................................... 6

      2.  Parties .................................................................................................... 6

      3.  Fishman Trial ......................................................................................... 8

      4.  Events Post-Fishman Trial ..................................................................... 8

         a.   Meadowlands Press Release ............................................................ 8

         b.   Thoroughbred Daily News Article ................................................... 9

         c.   Defendant's Further Remarks Following the Press Release ................... 9

         d.   Ban of Plaintiff Howard Taylor ..................................................... 10

         e.   Ban of Plaintiff Judith Taylor ....................................................... 11

   B.  **Procedural Background** ......................................................................... 11

**III.    STANDARD OF REVIEW** ........................................................................ 12

**IV.    ANALYSIS** ........................................................................................... 13

   **A.    Defendant's Motion to Dismiss the Defamation <u>Per Se</u>, Defamation, and Trade Libel Claims Will Be Denied** ........................................ 13

     1.    Howard Taylor Sufficiently Alleges Defendant's Statements Are Defamatory ........... 15

       a.    Statement 1 ...................................................................... 16

       b.    Statement 2 ...................................................................... 20

       c.    Statements 3 and 4 ......................................................... 23

     2.    The Court Need Not Address Whether Defendant Acted with Actual Malice at This Stage ............................................................. 27

   **B.    Defendant's Motion to Dismiss the False Light Invasion of Privacy Claim Will Be Denied** .......................................................... 28

   **C.    Defendant's Motion to Dismiss Howard Taylor's Tortious Interference with Contractual Relationships Claim Will Be Denied** ........................ 32

     1.    Howard Taylor Plausibly Pleads an Absence of Privilege or Justification ............. 33

     2.    Howard Taylor Sufficiently Alleges He Sustained Actual Harm ................... 36

   **D.    Defendant's Motion to Dismiss the Antitrust Claims Will Be Granted In Part and Denied In Part** ...................................................... 37

     1.    Plaintiffs Sufficiently Allege an Antitrust Injury ............................. 39

     2.    Plaintiffs Fail to Sufficiently Allege a Violation of Section 2 .................. 41

     3.    Plaintiffs Sufficiently Allege, In Part, a Violation of Section 1 .................. 44

       a.    Plaintiffs Allege Defendant Was a Party to a Conspiracy to Exclude Judith Taylor .................................................. 45

       b.    Plaintiffs Fail to Allege Defendant Was a Party to a Conspiracy to Exclude Howard Taylor .................................................. 48

       c.    Plaintiffs Allege the Conspiracy to Exclude Judith Taylor Was a <u>Per Se</u> Violation of Section 1 .................................... 53

**E.    Defendant's Motion to Dismiss the Unfair Competition Claim
Will Be Denied** ...................................................................................... 56

**F.    Defendant's Motion to Dismiss Judith Taylor's Tortious Interference
with Prospective Economic Advantage Claim Will Be Denied** ................... 57

1.    Judith Taylor Plausibly Pleads that Defendant Acted Without Privilege
or Justification ......................................................................................... 58

2.    Judith Taylor Plausibly Pleads Prospective Contracts with Third Parties .................... 60

3.    Judith Taylor Plausibly Pleads Non-Speculative Damages ........................................... 61

**G.    Defendant's Motion to Dismiss the Promissory Estoppel Claim
Will Be Granted** ...................................................................................... 62

**H.    Plaintiffs' Request for Leave to Amend Their Amended Complaint
Will Be Denied** ....................................................................................... 64

1.    Amendment of Plaintiffs' Sherman Act Section 2 Claims (Count VI and
Count VIII) Would Be Futile ...................................................................... 64

2.    Amendment of Plaintiffs' Sherman Act Section 1 Claims (Count VII,
Count IX, and Count X) Alleging a Conspiracy to Exclude Howard Taylor
Would Be Futile ...................................................................................... 65

3.    Amendment of Plaintiffs' Promissory Estoppel Claim (Count XIII)
Would Be Futile ...................................................................................... 66

**V.   CONCLUSION** .................................................................................... 67

# I.    INTRODUCTION

This case arises out of an alleged smear campaign initiated by Defendant Jeffrey Gural ("Defendant" or "Gural") against his rival, Plaintiff Howard Taylor.  (See Doc. No. 17 at ¶ 6.) Howard Taylor, his mother Plaintiff Judith Taylor, and Defendant are prominent figures in the world of harness racing.[1]  (See id.)  Howard Taylor and Judith Taylor (collectively, "Plaintiffs") are long-time owners of harness-racing horses who have experienced considerable competitive success.  (Id. at ¶¶ 2-3.)  Defendant is also a long-time owner of harness-racing horses and one of Plaintiffs' biggest competitors.  (Id. at ¶ 4.)  In addition to owning horses, Defendant "has an ownership interest in various racetracks where harness racing occurs, including the Meadowlands Racetrack . . ., Vernon Downs, and Tioga Downs."  (Id. at ¶ 5.)

In the Amended Complaint, Plaintiffs allege that "[b]eginning in 2023, Gural spearheaded a smear campaign intended to undermine, defame, and destroy Howard Taylor's reputation in both the harness racing and equine law industries.[2]  [According to Plaintiffs,] Gural has falsely claimed that Howard Taylor purchased and forced his trainers to supply his racehorses with [Erythropoietin ("EPO")], a performance-enhancing drug. There is no more damaging accusation to the reputation of a racehorse owner."  (Id. at ¶ 6.)  As such, Plaintiffs brought the following claims against Defendant:  (1) defamation per se (Count I); (2) defamation (Count II); (3) trade libel (Count III); (4) false light invasion of privacy (Count IV); (5) tortious interference with contractual relationships (Count V); (6) violation of the Sherman Act, Section 2 (Count VI); (7) violation of the Sherman Act, Section 1 (Count VII); (8) violation of N.J. Stat. Ann. § 56:9-4 (Count VIII); (9)

---

[1]  As explained in the Amended Complaint, "[h]arness racing is a type of horse racing in which horses race at a specific gait and pull a two-wheeled cart occupied by a driver."  (Doc. No. 17 at ¶ 42.)

[2]  The Amended Complaint is the operative complaint in this matter.  (See Doc. No. 17.)

violation of N.J. Stat. Ann. § 56:9-3 (Count IX); (10) violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340 (Count X); (11) unfair competition (Count XI); (12) tortious interference with prospective economic advantage (Count XII);[3] and (13) promissory estoppel (Count XIII).[4]  (See id.)  Howard Taylor is named as the only Plaintiff in Counts I, II, III, IV, V, and XI.  (See id.)  Judith Taylor is named as the only Plaintiff in Count XII.  (See id.)  Howard Taylor and Judith Taylor together are named as Plaintiffs in Counts VI, VII, VIII, IX, X, and XIII.  (See id.)

In response to Plaintiffs' Amended Complaint, Defendant filed a Motion to Dismiss Plaintiffs' Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[5]  (See Doc. No. 25.)  For reasons that follow, Defendant's Motion to Dismiss Plaintiffs' Amended Complaint (Doc. No. 25) will be granted in part and denied in part.

---

[3]  In Count XII of the Amended Complaint, Plaintiff Judith Taylor alleges a claim for tortious interference with prospective economic advantage.  Under Pennsylvania law, this claim is also known as tortious interference with prospective contractual relationships.  For the purpose of this Opinion, the Court will use Judith Taylor's description of the claim.

[4]  Plaintiffs plead their antitrust claims, Counts VI through X, in the alternative to each other. Specifically, they plead Count VI and Count VIII, their Sherman Act Section 2 claims, in the alternative to Counts VII, IX, and X, their Sherman Act Section 1 claims.  (See Doc. No. 17.) Plaintiffs explained that whether they proceed with the Sherman Act Section 2 claims found in Counts VI and VIII or with the Sherman Act Section 1 claims found in Counts VII, IX, and X depends on the amount of ownership interest Defendant has in the Meadowlands, Vernon Downs, and Tioga Downs.  (See Doc. No. 44 at 10.)  "If Gural's ownership interest and control does not predominate, Section 1 applies. If Gural's ownership and control of these racetracks is such that he and they share a unity of purpose and economic interest, he is legally incapable of conspiring with them under [Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752 (1984)]. In that case, Section 2 applies. Plaintiffs need discovery to make this determination."  (Id.)

[5]  Federal Rule of Civil Procedure 12(b)(6) provides in relevant part as follows:

> Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion . . . (6) failure to state a claim upon which relief can be granted . . . .

Fed. R. Civ. P. 12(b)(6).

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Harness Racing

Harness racing is a type of horse racing in which horses race at a specific gait and pull a two-wheeled cart occupied by a driver.  (Doc. No. 17 at ¶ 42.)  Harness races occur at a limited number of racetracks in North America, including tracks such as the Meadowlands Racetrack ("the Meadowlands"), Vernon Downs, Tioga Downs, Buffalo Raceway, and Batavia Downs.  (Id. at ¶¶ 46, 57, 129.)  The Meadowlands is host to a number of premier harness racing events, including, this year, the end-of-season championship race.[6]  (Id. at ¶ 47.)  Vernon Downs and Tioga Downs also host prominent harness races.  (Id. at ¶ 55.)  Several races hosted at these tracks are sponsored by the Hambletonian Society, a non-profit organization that sponsors harness races at 13 racetracks throughout North America.  (Id. at ¶ 101.)

Owners of harness-racing horses make their money in different ways:  by winning prize money in races, breeding horses, and by selling horses to others.  (Id. at ¶ 44.)  In the breeding and selling markets, the harness-racing horses that have performed best in the harness races are considered the most valuable.  (See id. at ¶ 45.)  As Plaintiffs phrase it, "[t]he better a horse performs in races, the greater its value to a buyer."  (Id.)

#### 2.    Parties

As mentioned above, Plaintiffs and Defendant are prominent figures in the world of harness racing.  (See id. at ¶¶ 2-4.)  Plaintiff Howard Taylor has been involved in the harness racing industry his whole life:  he "began harness racing when he was 12 years old and experienced

---

[6]  The Amended Complaint, filed in May 2024, alleges that the end-of-season championship race is taking place at the Meadowlands "this year."  (See Doc. No. 17.)  Since it is now 2025, it is unknown whether the championship race will again be taking place at the Meadowlands or if the race will be held at a different racetrack.

success as a driver and trainer before making a name for himself as an owner." (Id. at ¶ 2.)  As an owner, Howard Taylor has owned more than 1,000 horses throughout his career, often partnering as co-owner with others wishing to enter the harness racing industry.  (Id. at ¶ 15.)  In fact, approximately 80% of the over 200 horses he currently owns are owned jointly.  (Id. at ¶¶ 119, 128.)  Throughout the course of Howard Taylor's career, he has "earned millions of dollars each year from racing, selling, and breeding harness-racing horses." (Id. at ¶ 17.)  In addition to owning horses, he is also an established equine lawyer.  (Id. at ¶¶ 2, 38.)

Plaintiff Judith Taylor is Howard Taylor's mother and a long-time owner of harness-racing horses.  (Id. at ¶ 3.)  She has been a staple of the harness racing industry for more than 50 years, owning "hundreds of horses and earning millions of dollars in race winnings during her long tenure in the sport." (Id.)

Defendant Jeffrey Gural also owns, races, breeds, and sells harness-racing horses and is one of Plaintiffs' biggest competitors.  (Id. at ¶ 4.)  But in addition to owning harness-racing horses, Defendant also has an ownership interest in racetracks where harness racing occurs.  (Id. at ¶ 5.)  More specifically, he at least partially owns the Meadowlands, Vernon Downs, and Tioga Downs.[7]  (Id.)  Defendant serves as the Chief Executive Officer ("CEO") of the Meadowlands Racetrack LLC, which operates the Meadowlands.  (Id. at ¶ 32.)

Prior to 2017, Plaintiff Howard Taylor and Defendant shared a cordial relationship and even co-owned horses together.  (Id. at ¶ 66.)  But in 2017, Howard Taylor sued Defendant for canceling an important Meadowlands race for which Howard Taylor had purchased a specific horse with the expectation that the horse would participate in this race.  (Id. at ¶ 67.)  As a result

---

[7]  The exact percentage of Defendant's ownership interest in each racetrack is unknown by Plaintiffs.

of this lawsuit, Howard Taylor and Defendant's relationship is no longer cordial but now fraught with animosity.  (See id. at ¶ 68.)

### 3.     Fishman Trial

Over the last several years, Defendant has been assisting prosecutors in policing the use of performance-enhancing drugs in the horse racing industry.  (Id. at ¶¶ 69-70.)  Plaintiffs allege that one prosecution in which Defendant provided assistance was the prosecution and conviction of Dr. Seth Fishman.  (Id. at ¶¶ 70-71.)  Dr. Fishman is a veterinarian who was convicted in 2022 of federal offenses for providing performance-enhancing drugs to persons in the horse racing industry.  (Id. at ¶ 71.)  During Dr. Fishman's trial, the Government put forth as evidence Exhibit 16000, an 83-page document containing purported receipts from sales of performance-enhancing drugs made by Dr. Fishman.  (See id. at ¶ 73.)  Included in this exhibit were a few receipts for the sale of a product called "BB3" to Howard Taylor.  (Id. at ¶¶ 73-74.)  While BB3 is not characterized as a performance-enhancing drug by Plaintiffs, the Government's sentencing memorandum for Dr. Fishman describe it as a "custom-made blood builder," thus likening it to a performance-enhancing drug.  (See id. at ¶ 76; Doc. No. 25-6 at 4.)

### 4.     Events Post-Fishman Trial

#### a.     Meadowlands Press Release

On November 3, 2023, following Dr. Fishman's trial, the Meadowlands issued a Press Release in which it banned 33 individuals from racing at the Meadowlands effective December 1, 2023.  (Doc. No. 17 at ¶ 77.)  Included on this list of banned individuals was Plaintiff Howard Taylor.  (Id.)  In explaining its decision to ban these individuals, the Press Release cited the now-public Fishman trial exhibits "which reveal the identity of numerous persons who have purchased prohibited substances – BB3 (EPO) or TB-7 Thymosyn (sp)."  (Id. at ¶ 78 (quoting the Meadowlands Press Release, Doc. No. 25-7).)  The Press Release went on to state that, in light of

these revelations, it would conduct its own internal investigation.  (<u>Id.</u> at ¶ 79.)  The Press Release further stated that, should the banned individuals choose "to change trainers and/or horses in partnership with excluded owners," this change will require "proof to the satisfaction of The Meadowlands" before the banned horses are permitted to compete again at the Meadowlands.  (<u>See</u> <u>id.</u> at ¶ 80.)

> **b.**      **<u>Thoroughbred Daily News</u> Article**

On the same day the Meadowlands Press Release came out, the <u>Thoroughbred Daily News</u> published an article about the Press Release.  (<u>Id.</u> at ¶¶ 85-86.)  The article repeated the substance of the Press Release, "noting that the excluded individuals included 'trainers and owners who had purchased banned substances from individuals who were charged with manufacturing and selling performance-enhancing drugs.'"  (<u>Id.</u> at ¶ 86 (quoting the <u>Thoroughbred Daily News</u> article, Doc. No. 25-8).)  The article also contained numerous quotes from Defendant, who was interviewed about the Press Release as CEO of the Meadowlands.  (<u>See id.</u> at ¶¶ 88-89.)  Included among these quotes by Defendant was the following statement:

> What's really sad is Howard Taylor. He's not a trainer, he's an owner. He had to be giving EPO to his trainers to use and not a single trainer picked up the phone and said I have an owner who wants me to use EPO on his horses. He has 150 horses and he uses a lot of trainers. You would have thought at least one trainer would have picked up the phone and told us what's going on.

(<u>Id.</u> at ¶ 89.)

> **c.**      **Defendant's Further Remarks Following the Press Release**

Following the Press Release, Defendant repeated his allegations against Plaintiff Howard Taylor on at least two more occasions.  On November 3, 2023, the same day the Press Release and <u>Thoroughbred Daily News</u> article came out, Defendant participated in a conference call with "a few of his associates" as well as three members of the Board of Directors of the Standardbred Owners Association of New Jersey ("SBOA"), a state-funded organization that represents horse

owners in securing contracts with two racetracks in New Jersey.  (Id. at ¶¶ 95-96.)  Plaintiffs allege that, while the stated purpose of the call "was to discuss negotiations for horse owners with the Meadowlands," Defendant instead used the call to "repeat[] his claim that Howard Taylor provided EPO [a performance-enhancing drug] to his trainers and instructed them to use it on his horses." (Id. at ¶ 98.)  In the same call, Defendant "added that Howard Taylor also assured his trainers that he (Howard Taylor) would represent them successfully if they were caught" using the performance-enhancing drugs.  (Id.)  Plaintiffs further allege that, separate from the conference call, Defendant "also told others in the industry that 'nobody can own as many horses as Howard does.'"  (Id. at ¶ 100.)

### d.    Ban of Plaintiff Howard Taylor

Since the November 3, 2023 Meadowlands Press Release, Howard Taylor has been banned from racing his horses at the Meadowlands racetrack.  (See id. at ¶ 8.)  This ban has subsequently been extended to Vernon Downs and Tioga Downs, additional racetracks at least partially owned by Defendant.  (Id. at ¶ 9.)  In addition to being banned from Defendant's racetracks, two other racetracks unaffiliated with Defendant, Buffalo Raceway and Batavia Downs, also have banned Howard Taylor.  (Id. at ¶ 129.)

On February 15, 2024, the Hambletonian Society, the non-profit that sponsors harness racing events at several North American racetracks, announced that it would not disturb the Meadowland's decision to exclude Howard Taylor from competing.  (Id. at ¶ 101-02.)  However, the Hambletonian Society noted that there were exceptions to the ban, including for certain races sponsored by the Society.  (Id. at ¶ 103.)

In light of this ban and the accusations leveled against him, Howard Taylor alleges that his reputation and partnerships are at risk of collapse.  (See id. at ¶¶ 118-19.)  Plaintiffs explain that there is no more damaging accusation that can harm the reputation of a racehorse owner than being

accused of using performance-enhancing drugs.  (Id. at ¶ 6.)  Moreover, because the ban of Howard Taylor also extends to those with whom he co-owns horses, his partners have been reaching out to him inquiring about whether they would need to sell the jointly owned horses or buy out Howard Taylor's shares.  (Id. at ¶ 119.)

### e.    Ban of Plaintiff Judith Taylor

Following the Hambletonian Society's decision to enforce Defendant's ban, Howard Taylor decided to sell 10 of his harness-racing horses to his mother Judith Taylor, hoping that by selling them, the horses would be permitted to compete at Defendant's racetracks.  (Id. at ¶ 107.) However, rather than let these horses compete, Defendant instead extended the ban to Judith Taylor.  (Id. at ¶ 111.)  This ban was communicated on May 1, 2024 in an email from Defendant's counsel to Plaintiffs' counsel.  (Id.)  Notably, the ban did not just exclude the 10 horses Judith Taylor had purchased from Howard Taylor but also excluded from competing other horses that Judith Taylor had previously owned.  (Id.)  As a result, Judith Taylor is now banned from competing any horse that she owns at the Meadowlands, Vernon Downs, and Tioga Downs despite there being "not a shred of evidence" connecting her to the use of illegal performance-enhancing drugs.  (Id. at ¶ 135.)

### B.    Procedural Background

On December 11, 2023, Plaintiffs filed their original Complaint against Defendant.  (Doc. No. 1.)  On February 26, 2024, in lieu of filing an Answer, Defendant filed a Motion to Dismiss Plaintiffs' Complaint for failure to state a claim.  (Doc. No. 7.)  On May 22, 2024, after the parties had filed briefs in support of their respective positions on Defendant's Motion to Dismiss, the parties filed a joint stipulation agreeing that Plaintiffs could file an Amended Complaint.  (Doc. No. 15.)  On May 29, 2024, Plaintiffs filed the Amended Complaint.  (Doc. No. 17.)

On July 18, 2024, Defendant filed a Motion to Dismiss the Amended Complaint for failure to state a claim.  (Doc. No. 25.)  On September 12, 2024, Plaintiffs filed a Response in Opposition to Defendant's Motion.  (Doc. No. 27.)  On September 26, 2024, Defendant filed a Reply.  (Doc. No. 30.)  On November 13, 2024, the Court held a hearing on the Motion.  (See Doc. No. 39.)  On January 9, 2025, both parties filed Supplemental Memoranda in support of their respective positions on the Motion.  (Doc. Nos. 41, 42.)  On January 10, 2025, Plaintiff filed an updated copy of their Supplemental Memorandum, in which they corrected a mistake on the cover page.  (Doc. No. 44.)  Defendant's Motion to Dismiss the Amended Complaint (Doc. No. 25) is now ripe for disposition.

## III.   STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Iqbal, 556 U.S. at 678).  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that

a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV.    ANALYSIS

### A.    Defendant's Motion to Dismiss the Defamation Per Se, Defamation, and Trade Libel Claims Will Be Denied

In Counts I, II, and III, Plaintiff Howard Taylor brings defamation per se (Count I), defamation (Count II), and trade libel (Count III) claims against Defendant. (See Doc. No. 17 at

¶¶ 142-201.)  Because Defendant makes the same arguments for dismissal of these claims, the Court will analyze the viability of these claims together.

To state a claim for defamation under Pennsylvania law, a plaintiff must plead the following elements:

> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff from its publication.
> (7) Abuse of a conditionally privileged occasion.

Joseph v. Scranton Times L.P., 129 A.3d 404, 424 (Pa. 2015) (quoting 42 PA. CONS. STAT. § 8343(a)).  Defamation per se claims apply to "words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct."  Id. at 775.  And to state a claim for trade libel under Pennsylvania law, a plaintiff must allege the following:

> The publication of a disparaging statement concerning the business of another . . . where: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity.

Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809 A.2d 243, 246 (Pa. 2002) (quoting Restatement (Second) of Torts § 623(A)).

Here, Howard Taylor's defamation per se, defamation, and trade libel claims are based on the following four allegedly defamatory statements:   (1) Defendant's statement in the Thoroughbred Daily News article that Howard Taylor "had to be giving EPO to his trainers to use . . ." ("Statement 1"); (2) Defendant's statement on a conference call with a few of his associates and three members of the Board of Directors of the Standardbred Owners Association of New Jersey ("SBOA") that Howard Taylor "provided EPO to his trainers and instructed them to use it

on his horses" ("Statement 2"); (3) Defendant's statement on the same conference call that Howard

Taylor "assured his trainers that he (Howard Taylor) would represent them successfully if they

were caught" ("Statement 3"); and (4) Defendant's statement to others in the harness racing

industry that "nobody can own as many horses as Howard does" ("Statement 4").  (See Doc. No.

17 at ¶¶ 89, 96, 98, 100.)

In his Motion to Dismiss the Amended Complaint, Defendant argues Howard Taylor cannot

state a claim for defamation per se, defamation, or trade libel because his statements were not

defamatory and because he has not sufficiently pled actual malice.[8]  (See Doc. No. 25-2 at 33-34,

43-51.)  Specifically, on the first point, Defendant argues that Statements 1 and 2 are either opinion

or substantially true and thus not defamatory, and that Statements 3 and 4 are not capable of a

defamatory meaning and thus not actionable as defamation.  (Id. at 34-43.)  The Court will address

in turn whether Howard Taylor sufficiently alleged the statements are defamatory and whether he

sufficiently pled actual malice.

### 1.    Howard Taylor Sufficiently Alleges Defendant's Statements Are Defamatory

In Pennsylvania, to state a claim for defamation, a plaintiff "must plead the defamatory

character of the communication being alleged."  Rockwell v. Allegheny Health, Educ. & Rsch.

Found., 19 F. Supp. 2d 401, 406 (E.D. Pa. 1998).  "Whether a statement can reasonably be

construed as defamatory is a question of law for the court to decide."  Lynch v. Borough of Ambler,

No. 94–CV–6401, 1996 WL 283643, at *6 (E.D. Pa. May 29, 1996).  The test for whether a

---

[8]   Defendant only argues that Howard Taylor cannot state claims for defamation per se, defamation, and trade libel because the statements are not defamatory and Howard Taylor does not sufficiently plead actual malice.  (See Doc. No. 25-2 at 33-34, 43.)  He does not argue that Howard Taylor fails to satisfy the other elements necessary to state these claims.  As such, the Court will focus its analysis on whether the statements are defamatory and whether Howard Taylor sufficiently pled actual malice.

statement is defamatory "is the effect the article is 'fairly calculated to produce and the impression it would naturally engender in the minds of the average persons among whom it is intended to circulate.'" Rockwell, 19 F. Supp. 2d at 405. "A communication is also defamatory if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade, or profession." Maier v. Maretti, 671 A.2d 701, 704 (Pa. Super. Ct. 1995). A critical factor in this determination is the context in which the statement was made, including "the nature of the audience hearing the remarks." Baker v. Lafayette Coll., 532 A.2d 399, 402 (Pa. 1987).

Here, because Defendant asserts different arguments for each allegedly defamatory statement, the Court will analyze whether each statement is defamatory separately.

### a.    Statement 1

Viewing the allegations in the Amended Complaint in the light most favorable to Plaintiffs, as a court must do at the Motion to Dismiss stage, Plaintiff Howard Taylor has adequately alleged that Defendant's communication in Statement 1 is defamatory. As mentioned above, in Statement 1, Howard Taylor alleges that Defendant's statement in the Thoroughbred Daily News article saying Howard "had to be giving EPO to his trainers to use . . ." is defamatory. (See Doc. No. 17 at ¶ 89.) In response, Defendant argues this statement is not defamatory because his use of "had to be" signals that the statement was an opinion. (Doc. No. 25-2 at 37-41.)

In Pennsylvania, only statements of fact, not statements of opinion, can be the basis of defamation per se, defamation, and trade libel claims. See Moore v. Cobb-Nettleton, 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005) ("Only statements of fact, not expressions of opinion, can support an action in defamation.") However, this principle only applies to statements of pure opinion, which "occur[] when a person expresses a comment as to another's conduct, qualifications or character after either stating the facts on which he bases his opinion or when both parties to the

communication know the facts or assume their existence." <u>Rockwell</u>, 19 F. Supp. 2d at 406 (citing Restatement (Second) of Torts § 566, comment b). Conversely, an "[o]pinion that is not based on disclosed facts is [a] 'mixed opinion,' comprising factual statements that surpass mere expressions of opinion. 'Mixed opinion' implies the existence of undisclosed facts and is therefore actionable." <u>Id.</u>; <u>see</u> <u>also</u> <u>Remick v. Manfredy</u>, 238 F.3d 248, 261 (3d Cir. 2001) ("In Pennsylvania, an opinion cannot be defamatory unless it may reasonably be understood to imply the existence of <u>undisclosed defamatory facts</u> justifying the opinion.") (internal quotations omitted, emphasis in original).

Here, Statement 1 is a mixed opinion, rather than a statement of pure opinion, and is actionable because it implies the existence of undisclosed defamatory facts. In Statement 1, Defendant said in a <u>Thoroughbred Daily News</u> article that Howard Taylor "had to be giving EPO to his trainers to use . . . ." (<u>See</u> Doc. No. 17 at ¶ 89.) In the Amended Complaint, Howard alleges the context of Statement 1 within the article was as follows:

> 86. The Article repeated the substance of the [Meadowlands] Press Release, noting that the excluded individuals included "trainers and owners who had purchased banned substances from individuals who were charged with manufacturing and selling performance-enhancing drugs."
>
> 87. The Article further highlighted that "[w]hile the evidence against Fishman was enough for him to be sentenced to 11 years in prison, the government's case did not shed much light on who was buying what from Fishman and his company."
>
> 88. The Article then quoted [Defendant] as stating that "[i]t's sad because there are people who had no choice but to cheat."
>
> 89. [Defendant] then specifically and intentionally defamed Howard Taylor:
>
> > What's really sad is Howard Taylor. He's not a trainer, he's an owner. <u>He had to be giving EPO to his trainers to use</u> and not a single trainer picked up the phone and said I have an owner who wants me to use EPO on his horses. He has 150 horses and he uses a lot of trainers. You would have thought at least one trainer would have picked up the phone and told us what's going on.

17

(Id. at ¶¶ 86-89 (emphasis added).)  Critically missing from this context are the facts from which

Defendant drew the conclusion that Howard Taylor "had to be giving EPO to his trainers to use."

And it cannot be assumed that the readers of Thoroughbred Daily News knew of those facts or

assumed their existence.

Instead, Statement 1 implies the existence of undisclosed facts.  As Howard Taylor alleges,

"[n]othing in the Article, or elsewhere, supported [Defendant's] allegation that Howard Taylor

either used or forced his trainers to use EPO on his racehorses.  While the Press Release and the

Article suggest that such evidence emerged from the Fishman trial, neither the Press Release nor

the Article detail any such evidence." (Id. at ¶ 90.) But by stating conclusively that Howard Taylor

"had to be giving EPO to his trainers to use," Defendant implies that he knows something the

Thoroughbred Daily News readers do not.

This conclusion is underscored by the fact that Statement 1 was communicated by

Defendant.  See Monge v. Univ. of Pa., No. 22-2942, 2023 WL 3594471, at *4 (finding statement

made by the defendants, who were the President and Provost of the University of Pennsylvania,

capable of defamatory meaning because the statement "appears to be an official declaration issued

on behalf of the University of Pennsylvania by its President and its Provost, rather than a statement

expressing the subjective opinions of" the defendants).  As explained in the article, Defendant is

the owner of the Meadowlands and spent $2.5 million on the investigation into the individuals

whose names appeared in the evidence from the Fishman trial.[9] (See Doc. No. 25-8 at 2-3.)  With

---

[9]    It is appropriate for the Court to consider the Thoroughbred Daily News article at the motion to
dismiss stage.  As explained by the Third Circuit Court of Appeals, in addition to examining the
complaint, exhibits attached to the complaint, and matters of public record, a court "can also
consider documents that a defendant attaches as an exhibit to a motion to dismiss, if they are
undisputedly authentic and the plaintiff's claims are based on them."  Estate of Roman v. City
of Newark, 914 F.3d 789, 796 (3d Cir. 2019) (internal citations and quotation marks omitted).
Indeed, "the Supreme Court has been clear about the scope of [the court's] review, stating we

this context, Defendant's statement in the article that Howard Taylor "had to be giving EPO to his trainers to use" could reasonably be understood by readers to imply that Defendant had discovered undisclosed facts during the course of the multi-million-dollar investigation and had drawn this conclusion based on those facts.

Moreover, the undisclosed facts on which Statement 1 is seemingly based are defamatory because the effect they would "naturally engender in the minds of the average persons" in the harness racing community would be devastating to Howard Taylor's reputation as a racehorse owner. Rockwell, 19 F. Supp. 2d at 405. The effect of the undisclosed facts on the minds of the average Thoroughbred Daily News reader is that Howard Taylor, a renowned harness-racing horse owner, has cheated his way to success by giving his horses performance-enhancing drugs. Because these undisclosed facts ascribe to Howard Taylor conduct that adversely affects his fitness for the proper conduct of his business as a racehorse owner, they are defamatory. As Howard Taylor explains in the Amended Complaint, "[t]here is no more damaging accusation to the reputation of a racehorse owner" than accusing him of supplying his horses with EPO. (Doc. No. 17 at ¶ 6.) Accordingly, because Statement 1 is a mixed opinion that implies the existence of undisclosed defamatory facts, Howard Taylor has sufficiently alleged in the Amended Complaint when viewing

---

'must consider the complaint in its entirety, as well as other sources [we] ordinarily examine when ruling on . . . motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

Here, the Thoroughbred Daily News article is attached to Defendant's Motion to Dismiss the Amended Complaint as Exhibit 9. (See Doc. No. 25-8.) Additionally, neither party disputes the authenticity of the article and the article serves as part of the basis for Howard Taylor's defamation, defamation per se, and trade libel claims. (See Doc. No. 17 at ¶¶ 142-201 (listing Defendant's statement in the article that Howard Taylor "had to be giving EPO to his trainers to use" as basis for their defamation, defamation per se, and trade libel claims).)

the allegations in his favor that Statement 1 is defamatory.[10]  See Green v. Mizner, 692 A.2d 169, 175 (Pa. 1997) ("Because the statements imply the existence of undisclosed facts, they are actionable.")

### b.    Statement 2

Next, Plaintiff Howard Taylor also has sufficiently alleged in the Amended Complaint that Statement 2 is defamatory.  In Statement 2, Howard Taylor alleges that Defendant stated on a conference call with a few of his associates as well as three members of the Board of Directors of the Standardbred Owners Association of New Jersey ("SBOA") that Howard Taylor "provided EPO to his trainers and instructed them to use it on his horses."  (Doc. No. 17 at ¶¶ 96, 98.) Defendant argues that Statement 2 is not defamatory because it was substantially true.  (Doc. No. 41 at 8.)

Truth is an absolute defense in Pennsylvania to claims of defamation per se, defamation, and trade libel.  See Pacitti v. Durr, 310 F. App'x 526, 528 (3d Cir. 2009) (citing Bobb v. Kraybill, 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986)).  In asserting the defense of truth, a defendant need only show the substantial truth of the statement rather than the complete truth.  Id.  "[P]roof of substantial truth must go to the 'gist' or 'sting' of the alleged defamatory matter; the test is whether the alleged libel as published would have a different effect on the mind of the reader from which the pleaded truth would have produced."  Emekekwue v. Offor, 26 F. Supp. 3d 348, 362 (M.D. Pa. 2014).

---

[10]  In his Supplemental Memorandum, Defendant also argues that Statement 1 is not defamatory because it is substantially true.  (Doc. No. 41 at 8.)  But for the same reasons the Court concludes, infra, that Statement 2 is not substantially true, it also concludes Statement 1 is not substantially true.

Here, accepting Howard Taylor's allegations in the Amended Complaint as true, the Court cannot construe Statement 2 as substantially true at this stage in the litigation. Defendant's argument that Statement 2 is substantially true is premised on Exhibit 16000 from the Fishman trial.[11] (Doc. No. 25-2 at 35; Doc. No. 30 at 10.) Defendant characterizes Exhibit 16000 as an 83-page exhibit that contains invoices from people who purchased performance-enhancing products from Dr. Fishman, including invoices addressed to Howard Taylor for the purchase of BB3.[12] (See Doc. No. 25-2 at 21-22.) Defendant argues that "[b]ased on the context of [Statement 2] and the information disclosed to the public by the U.S. Attorney's Office [in Exhibit 16000], any person hearing or reading Gural's statement would necessarily think the same thing: Gural concluded that Howard Taylor provided [performance-enhancing drugs] to his trainers to use based on the Exhibit 16000, which is substantially true." (Doc. No. 41 at 13.) Defendant asserts that his conclusion in

---

[11] It is also appropriate for the Court to consider Exhibit 16000 at the motion to dismiss stage because it repeatedly is referred to in Plaintiffs' Amended Complaint. (See Doc. No. 17 at ¶¶ 73, 76, 91, 93, 151, 152, 171, 172, 215, 216); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (finding that, at the motion to dismiss stage, the plaintiff "cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them" in the complaint). Moreover, Exhibit 16000 is attached as an exhibit to Defendant's Motion to Dismiss the Amended Complaint and serves in part as the basis for Howard Taylor's defamation per se, defamation, and trade libel claims. (See Doc. No. 25-4; Doc. No. 17 at ¶¶ 90-91 (alleging that Defendant "knew, or was reckless in not knowing, that his statements about Howard Taylor . . . were false")); see also Estate of Roman, 914 F.3d at 796 (holding that, at the motion to dismiss stage, a court "can also consider documents that a defendant attaches as an exhibit to a motion to dismiss, if they are undisputedly authentic and the plaintiff's claims are based on them").

[12] Whether BB3 is the same thing as EPO is disputed by the parties. (See Doc. No. 17 at ¶ 76 ("In any event, BB3 is not EPO."); but see Doc. No. 41 at 10 ("Plaintiffs seek to muddy the waters by contending that BB3 is not literally the same thing as EPO, but it is a distinction without a difference: both are [performance-enhancing drugs].")) Because the Court's conclusion, infra, that Statement 2 is not the substantial truth does not turn on whether BB3 is the same thing as EPO, the Court need not address this argument at this time.

Statement 2 is substantially true because it "is the <u>only conclusion</u> that one could reach after viewing Exhibit 16000." (<u>Id.</u> at 12-13 (emphasis in original).)

Howard Taylor, however, argues a different interpretation of Exhibit 16000. While he does not dispute that his name appeared among the list of people that purchased products from Dr. Fishman, he alleges that he "never ordered or used BB3." (<u>See</u> Doc. No. 17 at ¶¶ 73-75.) Instead, Howard Taylor claims the invoices in Exhibit 16000 are for purchases made by his trainers. (<u>Id.</u> at ¶ 73.) And the idea that it was Howard Taylor's trainers that purchased BB3 from Dr. Fishman is one possible interpretation of the invoices addressed to Howard Taylor in Exhibit 16000. For example, the trainers could have charged their purchases of BB3 to Howard Taylor's account without him having any knowledge of such purchase. If this were the case, it could explain why the invoices were addressed to Howard Taylor and why Howard Taylor himself claims to never have ordered or used BB3.

In response, Defendant argues this interpretation of Exhibit 16000 is "contradicted by the facts contained in the document." (Doc. No. 41 at 11.) But, as Defendant admits, all Exhibit 16000 reflects is that someone purchased BB3 from Dr. Fishman and requested that the invoices be addressed to Howard Taylor. (<u>See id.</u> at 10.) Based on this information, it is plausible that the purchases could have been made by Howard Taylor's trainers rather than by Howard Taylor himself.

Because the Court is required to accept Plaintiffs' allegations as true at the motion to dismiss stage, it will accept Howard Taylor's interpretation of Exhibit 16000 as another possible conclusion one could reach after viewing the exhibit. As such, the different interpretations of Exhibit 16000 demonstrate that the exhibit might have had a "different effect on the mind of a reader" than the way Defendant interpreted it in Statement 2 when he conclusively stated that

Howard Taylor "provided EPO to his trainers and instructed them to use it on his horses." See Emekekwue, 26 F. Supp. 3d at 362. In this regard, Statement 2 cannot be construed as the substantial truth at the current stage of the litigation.

Moreover, because Defendant said essentially the same thing in Statement 2 as he did in Statement 1, just using different words, Statement 2 is also defamatory. In Statement 1, Defendant stated in an article in the Thoroughbred Daily News that Howard "had to be giving EPO to his trainers to use." (Doc. No. 17 at ¶ 89.) And in Statement 2, Defendant said on a conference call that Howard Taylor "provided EPO to his trainers and instructed them to use it on his horses." (Id. at ¶ 98.) Therefore, like Statement 1, the effect of Statement 2 in the minds of the others on the conference call is that Howard Taylor, a renowned harness-racing horse owner, has cheated his way to success by giving his horses performance-enhancing drugs. As such, Statement 2 is defamatory and, as discussed above, cannot be construed as the substantial truth at this stage in the litigation. Accordingly, Plaintiff Howard Taylor has adequately alleged that Statement 2 is defamatory.

### c.    Statements 3 and 4

Finally, Plaintiff Howard Taylor has adequately alleged that Defendant's statements in Statement 3 and Statement 4 are defamatory. In Statement 3, Howard Taylor alleges that, on the aforementioned conference call, Defendant said that Howard Taylor had "assured his trainers that he (Howard Taylor) would represent them successfully if they were caught." (Doc. No. 17 at ¶ 98.) In Statement 4, Howard Taylor claims that Defendant said to others in the harness racing industry that "nobody can own as many horses as Howard does." (Id. at ¶ 100.) Howard Taylor alleges that these statements are defamatory by implication or innuendo. (See id. at ¶¶ 100, 147, 166, 193.)

Specifically, he alleges Statement 3 is defamatory by implication or innuendo because it implies that he is "unfit in his profession, acting illegally and/or coercing trainers to act illegally, and improperly trading on his credentials as an attorney in order to use banned [performance-enhancing drugs] on his racehorses for personal gain." (Id. at ¶¶ 147, 166.) He further alleges that this statement implies "that Howard Taylor trades on his professional license, experience, and status to sanitize illegal conduct." (Id. at ¶ 193.) Howard Taylor also alleges Statement 4 is defamatory by implication or innuendo because, "[t]hrough this statement, [Defendant] implied that Howard Taylor does not actually own his horses, but rather is improperly 'fronting' for other people who could not receive a license." (Id. at ¶ 100.) Defendant, in contrast, argues that these statements are not defamatory because "they are not capable of a defamatory meaning as a matter of law." (Doc. No. 25-2 at 41.)

A statement is defamatory by implication when "innocent words, i.e., words not defamatory on their face . . . create a defamatory innuendo due to the context in which the statements are issued." Menkowitz v. Peerless Publ'ns, Inc., 176 A.3d 968, 982 (Pa. Super. Ct. 2017). "Innuendo is the insinuation or implication that arises from the literal language used in a statement or set of comments." Id. The words creating such innuendo "are actionable as defamation where the innuendo is both defamatory and false." Id.

The test for whether a statement is defamatory by implication "is whether the challenged language can 'fairly and reasonably be construed' to imply the defamatory meaning alleged by a plaintiff." Id. (quoting Sarkees v. Warner-West Corp., 37 A.2d 544, 546 (Pa. 1944)). A statement is not defamatory by implication, however, if the plaintiff "puts an unfair and forced construction on the interpretation of the publication." Bogash v. Elkins, 176 A.2d 677, 679 (Pa. 1962). But "even where a plausible innocent interpretation of the communication exists, if there is an

alternative defamatory interpretation, it is for the jury to determine if the defamatory meaning was understood by the recipient." Pelagatti v. Cohen, 536 A.2d 1337, 1345 (Pa. Super. Ct. 1987).

Here, viewing Statements 3 and 4 in the light most favorable to Plaintiff Howard Taylor, they can fairly and reasonably be construed to imply the defamatory meanings he alleges. First, in Statement 3, Howard Taylor alleges that when Defendant told those on the conference call that Howard Taylor had "assured his trainers that he (Howard Taylor) would represent them successfully if they were caught," Defendant implied that: "(1) [Howard Taylor] knew his trainers were using EPO on his horses; (2) encouraged them to use EPO on his horses; and (3) offered to help them get away with using EPO on his horses." (Doc. No. 17 at ¶ 98; Doc. No. 27 at 40.) Because these statements "impugn the integrity of Howard Taylor's business and trade," Howard Taylor argues they are "per se defamatory." (Doc. No. 27 at 40.) In response, Defendant asserts that "[t]here is nothing inherently defamatory in a statement by an attorney who has characterized himself as a nationally preeminent equine law attorney offering to provide legal representation to trainers if they were to be accused of being involved with the use of [performance-enhancing drugs]." (Doc. No. 25-2 at 43.)

But the interpretation offered by Howard Taylor is a reasonable, fair, and unforced interpretation of Statement 3. In the Amended Complaint, Howard Taylor explains that Statement 3 was made in the context of Statement 2. Specifically, while on the conference call with a few of his associates and three members of the SBOA Board, Defendant said that "Howard Taylor provided EPO to his trainers and instructed them to use it on his horses" (Statement 2), and then went on to add "that Howard Taylor also assured his trainers that he (Howard Taylor) would represent them successfully if they were caught" (Statement 3). (Doc. No. 17 ¶ 98.) Phrased differently, Howard Taylor alleges that, in one breath, Defendant told those on the conference call

that Howard Taylor gave his trainers EPO to use on his horses and, in the next breath, that he had promised his trainers he would successfully represent them if they were caught. Given this context, the interpretation of Statement 3 proffered by Howard Taylor, namely that Howard Taylor knew his trainers were giving his horses EPO and offered to help them get away with it, is not an unfair or forced construction of the statement. As such, while Defendant offers an innocent interpretation of Statement 3, the defamatory interpretation put forth by Howard Taylor is enough at this stage of the litigation for Howard Taylor's defamation claim concerning Statement 3 to survive.

Second, in Statement 4, Howard Taylor claims that, by stating to others in the harness racing industry that "nobody can own as many horses as Howard does," Defendant implied that Howard Taylor "does not actually own his horses, but rather is improperly 'fronting' for other people who could not receive a license." (Doc. No. 17 at ¶ 100.) In other words, Howard Taylor alleges that, through Statement 4, Defendant implied that Howard Taylor is lying and engaging in fraud. (Doc. No. 27 at 41.)

In response, Defendant claims he was merely questioning "whether an individual who claims to have owned over one thousand racehorses over his career does actually own as many horses as he claims." (Doc. No. 25-2 at 42.) But again, the interpretation proffered by Howard Taylor is not an unfair or forced construction of Statement 4. It is plausible that a member of the harness racing industry who heard this statement could have understood Statement 4 as Defendant implying that Howard Taylor is a liar and "fronting" as the owner for racehorses that are actually owned by people who are not licensed to be owners. Therefore, as above, while Defendant has put forth a possible innocent interpretation of Statement 4, because Howard Taylor has offered an alternative defamatory meaning to be accepted at this stage as true, he has also adequately alleged that Statement 4 is defamatory.

Accordingly, because Plaintiff Howard Taylor has adequately alleged that Statements 1, 2, 3, and 4 are defamatory, the Court will proceed to the next matter, actual malice.

### 2.    The Court Need Not Address Whether Defendant Acted with Actual Malice at This Stage

In the Motion to Dismiss the Amended Complaint, Defendant alleges that Plaintiff Howard Taylor is, at a minimum, a limited purpose public figure and that the subject matter of the allegedly defamatory statements, i.e. "the use of illegal and harmful [performance-enhancing drugs] in the horse racing industry," is a matter of public concern. (Doc. No. 25-2 at 43.) As such, Defendant argues that Howard Taylor was required to, but did not, allege that Defendant made the defamatory statements with actual malice. (Id. at 43-44.)

The United States Supreme Court has held that when a public official brings a defamation claim, he is required by the First Amendment to allege that the defamatory statement was made with actual malice. See New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964). Actual malice requires a showing that the purported defamatory statement is made with knowledge that the statement is false or with reckless disregard for whether the statement is false. See id. The Court later extended the actual malice requirement to those considered limited-purpose public figures. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974). An individual is a limited-purpose public figure where he "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Id.

But "[t]he question of whether [a] [p]laintiff is a limited-purpose public figure is a . . . difficult and fact-specific [question] . . . not suitable for resolution under Rule 12(b)(6)." Woods Servs. v. Disability Advocates, Inc., No. 18-296, 2018 WL 2134016, at *6 (E.D. Pa. May 9, 2018) (quotation marks and citation omitted). "As a result, courts regularly find that the determination of a litigant's status as a public or private figure should be deferred until summary judgment when

a full factual record can be developed." Id.; see also Gillon v. Bernstein, No. 12-04891, 2013 WL 5159625, at *5 (D.N.J. Sept. 12, 2013) ("While the Complaint notes that Gillon has appeared on at least two television programs, . . . the [c]ourt finds it appropriate to defer the public figure inquiry until after the record has been more fully developed through discovery."); Trivedi v. Slawecki, No. 4:11-02390, 2012 WL 5987410, at *3 (M.D. Pa. Nov. 28, 2012) (finding that the question of public figure status "is more appropriately resolved at the summary judgment stage on the basis of record evidence").

Here, it would be premature for the Court to determine Howard Taylor's status as a limited-purpose public figure without a more complete record. Like the other District Courts noted above, this Court will reserve the question of whether Howard Taylor is a limited-purpose public figure for a later stage in the litigation. As such, the Court need not address now whether Defendant acted with actual malice. Accordingly, because the Court found, supra, that Plaintiff Howard Taylor adequately alleged Defendant's statements were defamatory and because it need not address whether Howard Taylor sufficiently pled actual malice at the current time, Defendant's Motion to Dismiss the Amended Complaint will be denied as to Howard Taylor's defamation per se (Count I), defamation (Count II), and trade libel (Count III).

### B.    Defendant's Motion to Dismiss the False Light Invasion of Privacy Claim Will Be Denied

In Count IV, Plaintiff Howard Taylor brings a false light invasion of privacy claim against Defendant. (Doc. No. 17 at ¶¶ 202-22.) In the Amended Complaint, Howard Taylor alleges the following false statements by Defendant placed Howard Taylor in false light:

> • [Defendant's] statement in the [Thoroughbred Daily News] Article that Howard Taylor "had to be giving EPO to his trainers to use"; [("Statement 1")]

> • [Defendant's] statement [on a conference call with a few of his associates and three members of the Board of Directors for the Standardbred Owners Association of New Jersey ("SBOA")] that Howard Taylor assured his trainers that if they were

to get caught, Howard Taylor would represent them as their attorney to successfully defend against any actions; [("Statement 3")] and

• [Defendant's] claim [to others in the harness racing industry] that "nobody can own as many horses as Howard does," suggesting that Howard Taylor does not actually own his horses, but rather is fronting for other people who could not receive a license. [("Statement 4")]

(Id. at ¶ 203.)  In response, Defendant argues that Howard Taylor fails to state a false light invasion of privacy claim because (1) the statements by Defendant were not sufficiently publicized, (2) Defendant's statements are true, and (3) Howard Taylor cannot plausibly plead actual malice in connection with his false light claim.  (Doc. No. 25-2 at 51-52.)  Because the Court found, supra, that, at this stage in the litigation, these statements cannot be construed as the substantial truth and, further, that it need not address on a motion to dismiss whether Defendant acted with actual malice, only Defendant's argument that his statements were not sufficiently publicized need be addressed.[13]

Pennsylvania recognizes that publicity which places a person in a false light is a viable cause of action.  See Graboff v. Colleran Firm, No. 10-1710, 2013 WL 1286662, at *16 (E.D. Pa. Mar. 28, 2013).  To plead a claim for false light invasion of privacy under Pennsylvania law, a plaintiff must allege facts showing that the published material "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014).  Notably, the publicity required for a claim of false light invasion of privacy is different from the publication requirement in defamation claims.  Casselli v. City of Phila., 54 F. Supp. 3d 368, 380 (E.D. Pa. 2014).  In a false light invasion of privacy claim, publicity means "widespread dissemination, as opposed to mere 'publication'

---

[13]  Defendant does not challenge Howard Taylor's false light invasion of privacy claim on the ground that his statements were highly offensive to a reasonable person.  (See Doc. No. 25-2.)

under defamation." <u>Fanelle v. Lojack Corp.</u>, No. 99-4292, 2000 WL 1801270, at *9 (E.D. Pa. Dec. 7, 2000). "Publicity . . . requires that the 'matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" <u>Id.</u> (quoting <u>Curran v. Childs. Serv. Ctr. of Wyo. Cnty., Inc.</u>, 578 A.2d 8, 12 (Pa. Super. Ct. 1990)).

But under Pennsylvania law, there is no fixed number of people to whom a statement must be made to satisfy the publicity requirement. <u>Compare Casselli</u>, 54 F. Supp. 3d at 381 (finding the plaintiffs' allegations that "numerous people" within their workplace "were exposed to the[] false light statements" were "sufficient to establish for purposes of surviving a motion to dismiss the publicity element for a false light invasion of privacy claim"), <u>with</u> <u>Manco v. St. Joseph's Univ.</u>, No. 22-285, 2024 WL 299265, at **17-18 (E.D. Pa. Jan. 25, 2024) (finding that a statement made in an email sent only to two people was not publicized but that a comment posted on social media was publicized).

Here, accepting Howard Taylor's allegations as true, he has adequately alleged that Defendant's statements in Statement 1, 3, and 4 were sufficiently publicized to sustain a false light invasion of privacy claim. First, Howard Taylor alleges that Statement 1 was published in a <u>Thoroughbred Daily News</u> article. (<u>See</u> Doc. No. 17 at ¶¶ 85-89.) Defendant does not dispute that this statement was sufficiently publicized. (<u>See</u> Doc. No. 25-2 at 52 (tailoring his publicity argument to "[t]he statements Defendant allegedly made in person or by phone to select industry professionals," which are Statements 2 and 3).) As such, Howard Taylor sufficiently alleged that Statement 1 was adequately publicized.

Next, Howard Taylor alleges that Statement 3 was said by Defendant on a conference call with a few of his associates as well as three members of the SBOA Board of Directors, namely the

SBOA's president, vice-president, and treasurer. (See Doc. No. 17 at ¶ 96.) The Amended Complaint explains that the SBOA is made up of "individuals of influence and power in the [harness] racehorse industry." (Id. at ¶ 94.) It further details how Howard Taylor has been a member of the harness racing industry for almost his entire life and has made his career in the industry. (See Doc. No. 17 at ¶ 2 ("Howard Taylor began harness racing when he was 12 years old and experienced success as a driver and trainer before making a name for himself as an owner. In addition to his horse ownership, Howard Taylor built a practice as an equine lawyer.")) As such, the harness racing industry is analogous to Howard Taylor's workplace. Therefore, just as the court in Casselli, discussed supra, found that statements made to others in the plaintiffs' workplace were "sufficient to establish for purposes of surviving a motion to dismiss the publicity element," Howard Taylor's allegation that Defendant said Statement 3 to prominent members of the industry in which he has made his career is also sufficient to establish publicity at the current stage of litigation. See Casselli, 54 F. Supp. 3d at 381.

Finally, Howard Taylor alleges that Statement 4 was said "to others in the [harness racing] industry."[14] (Id. at ¶ 100.) He further alleges that the contents of this communication were widely disseminated throughout the harness racing industry. (See id. at ¶¶ 208, 211.) For example, Howard Taylor alleges that, following Defendant's statements on the conference call, "the Commissioner of Ohio's State Racing Commission reported a series of complaints made to the Commission by local residents contesting Howard Taylor's ability to race given the allegations

---

[14] Because Howard Taylor alleges that Statement 4 was made "to others in the [harness racing] industry," and the Court found, supra, that the harness racing industry is analogous to his workplace, Howard Taylor also adequately alleges that Statement 4 was sufficiently publicized by alleging that the statement was made to those in his workplace. See Casselli, 54 F. Supp. 3d at 381 (finding the plaintiffs' allegations that "numerous people" within their workplace "were exposed to the[] false light statements" were "sufficient to establish for purposes of surviving a motion to dismiss the publicity element for a false light invasion of privacy claim").

brought against him." (Id. at ¶ 208.)  Furthermore, Howard Taylor alleges that Defendant's statements "also influenced two other [horse racing] tracks, Buffalo Raceway and Batavia Downs, to join the ban on Howard Taylor." (Id. at ¶ 211.)  As such, because this statement was widely disseminated throughout the harness racing industry, Howard Taylor sufficiently alleged that Statement 4 was adequately publicized.

Accordingly, because Plaintiff Howard Taylor has sufficiently alleged that Statements 1, 3, and 4 were publicized and because he has sufficiently pled the other elements required to state a false light invasion of privacy claim, Defendant's Motion to Dismiss the Amended Complaint will be denied as to Howard Taylor's false light invasion of privacy claim (Count IV).

### C.    Defendant's Motion to Dismiss Howard Taylor's Tortious Interference with Contractual Relationships Claim Will Be Denied

In Count V, Plaintiff Howard Taylor brings a claim of tortious interference with contractual relationship against Defendant.  (Doc. No. 17 at ¶¶ 223-37.)  Under Pennsylvania law, to state a claim for tortious interference with a contractual relationship or prospective economic advantage, the plaintiff must allege the following:

> (1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc., 982 A.2d 94, 98 (Pa. Super. Ct. 2009).

Here, Defendant asserts two arguments as to why Howard Taylor has failed to state a tortious interference claim:  (1) he fails to plausibly plead the absence of privilege or justification on the part of Defendant; and (2) he fails to plausibly plead that he has sustained actual harm as a result of Defendant's conduct.  (See Doc. No. 25-2 at 54-60.)  The Court will address each of these arguments in turn.

### 1. Howard Taylor Plausibly Pleads an Absence of Privilege or Justification

To determine whether a plaintiff has established an absence of privilege or justification on the part of the defendant, proof that the defendant's actions were improper under the circumstances is required. Walnut St. Assocs., 982 A.2d at 98. In making this determination, courts should consider the following factors:

> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

RESTATEMENT (SECOND) OF TORTS § 767 (Am. L. Inst. 1979); see also Walnut St. Assocs., 982 A.2d at 97-100 (explaining that Pennsylvania adopted the Restatement (Second) of Torts for intentional interference claims).

Here, considering clause (a) of § 767, Howard Taylor plausibly pleads an absence of privilege or justification on Defendant's part because he has alleged that the nature of Defendant's conduct was improper in that it was defamatory. As the comment to clause (a) recognizes, "[t]he nature of the actor's conduct is a chief factor in determining whether the conduct is improper or not." RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (Am. L. Inst. 1979). The comment lists examples of conduct that qualifies as improper, including physical violence, unlawful conduct, and misrepresentations. Id. Discussing misrepresentations, the comment provides that fraudulent misrepresentations make an interference improper. Id. And it defines a fraudulent misrepresentation as one where "to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient." Id. The comment further provides that a

fraudulent misrepresentation could give rise to separate claims under other rules of the law of torts, like, for example, a claim for defamation.  Id.

As the Court found above, Defendant's statements in which he said that Howard Taylor gave EPO to his trainers to use on his horses give rise to a plausible defamation claim.  And in his tortious interference with contractual relationships claim, Howard Taylor alleges that it was through this improper defamatory conduct that Defendant interfered with Howard Taylor's existing contracts.  Specifically, in the Amended Complaint, Howard alleges the following:

> 227. . . . Howard Taylor's partnerships are now at risk of collapse—all as a result of Gural's wrongful ban and defamatory conduct . . . .
>
> ***
>
> 229. Gural intentionally and maliciously interfered with the [sic] Howard Taylor's contracts with these partners by falsely publicizing that there was evidence from the Fishman criminal prosecution that Howard Taylor directed his trainers to purchase EPO and give it to his horses.
>
> 230. Based on these improper and defamatory statements, Gural intentionally and maliciously interfered with the contracts between Howard Taylor and these partners, inducing Howard Taylor's partners to terminate their co-ownership with Howard Taylor.
>
> ***
>
> 235. By interfering with Howard Taylor's business relations through defamatory means, as detailed herein, Gural did not act with privilege.
>
> 236. Gural's conduct was likewise without justification as his conduct was defamatory . . . .

(Doc. No. 17 at ¶¶ 227, 229-30, 235-36 (emphasis added).)  Through these allegations, Howard Taylor alleges that Defendant knew his statements saying Howard Taylor had told his trainers to purchase and use EPO on his horses were false, i.e., "[Defendant] intentionally . . . interfered with the [sic] Howard Taylor's contracts with these partners by falsely publicizing that there was evidence from the Fishman criminal prosecution that Howard Taylor directed his trainers to

purchase EPO and give it to his horses." (Id. at ¶ 229 (emphasis added).) As such, Howard Taylor has adequately alleged that Defendant's statements were fraudulent misrepresentations and, therefore, improper conduct.

Moreover, courts have held that alleging conduct that gives rise to a claim independent from the tortious interference claim is enough for a plaintiff to establish a lack of privilege or justification to survive a motion to dismiss. See UniStrip Techs., LLC v. LifeScan, Inc., 153 F. Supp. 3d 728, 744 (E.D. Pa. 2015) (concluding that because "UniStrip has alleged wrongful antitrust conduct independent from the claim of tortious interference of actual contractual relations," it has alleged that the defendant's conduct was not privileged); NIBCO Inc. v. Viega LLC, 354 F. Supp. 3d 566, 584 (M.D. Pa. 2018) (rejecting the defendant's argument that its conduct was privileged because "NIBCO sufficiently pleads independently actionable wrongdoing by articulating plausible violations of the antitrust laws"); Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp., No. 22-3287, 2023 WL 8866555, at *6 (3d Cir. Dec. 22, 2023) (vacating the District Court's dismissal of the plaintiff's tortious interference with prospective business relations claim because the plaintiff may have stated an independently actionable defamation claim). Therefore, because Howard Taylor has alleged conduct by Defendant that is independently actionable under defamation per se, defamation, and trade libel claims, these allegations are also enough for him to establish that Defendant lacked privilege or justification.

Despite the sufficiency of these allegations, Defendant still argues that Plaintiffs failed to plausibly plead the absence of privilege or justification on the part of Defendant because Defendant, as owner of the Meadowlands, had "an absolute right under the law of both New Jersey and New York (the locations of his racetracks) to exclude anyone from racing at those racetracks." (Doc. No. 25-2 at 54-55.) But Defendant overlooks that the Meadowlands ban is only part of the

improper conduct Howard alleges in his tortious interference claim.  While Defendant may have had the property right to exclude Howard from the Meadowlands, his defamatory statements also interfered with Howard Taylor's contracts.   (See Doc. No. 17 at ¶ 227 ("Howard Taylor's partnerships are now at risk of collapse—all as a result of [Defendant's] wrongful ban and defamatory conduct.") (emphasis added).)  Accordingly, because Howard Taylor plausibly alleges Defendant engaged in improper defamatory conduct, he has established the absence of a privilege or justification on the part of Defendant in interfering with his contracts.

### 2.    Howard Taylor Sufficiently Alleges He Sustained Actual Harm

As mentioned above, one of the elements a plaintiff must prove to succeed on a tortious interference with contractual relationship claim is "the occasioning of actual damage as a result of defendant's conduct."  Walnut St. Assocs., 982 A.2d at 98.  The Restatement (Second) of Torts defines "actual damages" as follows:  (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.  RESTATEMENT (SECOND) OF TORTS § 774A (Am. L. Inst. 1979).

Moreover, to prove actual damages, a plaintiff need not allege that a breach of contract actually occurred.  M3 USA Corp. v. Hart, 516 F. Supp. 3d 476, 504 (E.D. Pa. 2021).  Instead, alleging damages such as a decrease in business or a change in the way the plaintiff's business partners interact with him is enough to withstand a motion to dismiss.  See id. (finding the plaintiff's allegations that the defendant's conduct led to a decrease in business adequate to survive a motion to dismiss); see also Liberty Mutual Ins. Co. v. Gemma, 301 F. Supp. 3d 523, 544 n.17 (W.D. Pa. 2018) (concluding the plaintiff's allegations that their business partners had changed the way they interact with the plaintiff following the defendant's actions sufficient to survive a motion to dismiss).

36

Here, because Howard Taylor alleges actual harm to his reputation and that his business partners have changed the way they interact with him, he sufficiently alleges he sustained actual harm as a result of Defendant's conduct.  In the Amended Complaint, Howard alleges the following actual damage:

> 232. Gural's malicious interference with Howard Taylor's business relationships is causing and will continue to cause Howard Taylor to suffer significant financial harm. The risk of Howard Taylor's partnerships collapsing has already begun materializing. Howard Taylor has received phone calls from his partners inquiring whether they would need to sell the horses or buy out Howard Taylor's shares in order to race these horses.

> 233. Gural's intentional and unlawful acts have caused Howard Taylor harm by damaging his reputation and inducing his partners to disassociate from horse ownership with Howard Taylor.

(Doc. No. 17 at ¶¶ 232-33.)  As demonstrated through these allegations, Howard Taylor claims that Defendant's conduct has damaged his reputation.  (See id. at ¶ 233.)  And further, Howard Taylor alleges that Defendant's conduct has changed the way his business partners treat him, claiming they now wish to dissociate from horse ownership with him and have been calling him asking if they should sell their shares in the horses or buy out his shares.  (See id. at ¶¶ 232-33.)  Therefore, Howard Taylor has alleged actual harm through reputational damage and a change to how his business partners interact with him.  Accordingly, because Howard Taylor has sufficiently pled all the required elements for a tortious interference with contractual relationship claim when viewing the allegations in the Amended Complaint in the light most favorable to him, Defendant's Motion to Dismiss the Amended Complaint will be denied on this claim (Count V).

### D. Defendant's Motion to Dismiss the Antitrust Claims Will Be Granted In Part and Denied In Part

In Count VI through Count X (collectively, the "Antitrust Claims"), Plaintiffs assert various antitrust claims against Defendant.  (See Doc. No. 17 at ¶¶ 238-332.)  Specifically, in Count VI, Plaintiffs bring a claim for a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  (Id. at ¶¶

238-54.)  In Count VII, Plaintiffs bring a claim for a violation of Section 1 of the Sherman Act, 15

U.S.C. § 1.  (<u>Id.</u> at ¶¶ 255-74.)  In Counts VIII and IX, Plaintiffs bring two claims under the New

Jersey Antitrust Act, specifically N.J. Stat. Ann. §§ 56:9-4 and 56:9-3.  (<u>Id.</u> at ¶¶ 275-312.)  Finally,

in Count X, Plaintiffs bring a claim under the New York Antitrust Act, named the Donnelly Act,

found in N.Y. Gen. Bus. Law § 340.  (<u>Id.</u> at ¶¶ 313-32.)

The claim alleged in Count VIII under N.J. Stat. Ann. § 56:9-4 is the state law equivalent

of the claim alleged in Count VI under Section 2 of the Sherman Act.  <u>See</u> <u>Eisai, Inc. v. Sanofi</u>

<u>Aventis U.S., LLC</u>, 821 F.3d 394, 402 (3d Cir. 2016) (applying the same analysis to claims under

N.J. Stat. Ann. § 56:9-4 and Section 2 of the Sherman Act, 15 U.S.C. § 2).  Similarly, the claims

alleged in Counts IX and X under N.J. Stat. Ann. § 56:9-3 and the Donnelly Act, respectively, are

the state law equivalents of the claim alleged in Count VII under Section 1 of the Sherman Act.

<u>See</u> <u>id.</u> (applying the same analysis to claims under N.J. Stat. Ann. § 56:9-3 and Section 1 of the

Sherman Act, 15 U.S.C. § 1); <u>see also</u> <u>Nirvana, Inc. v. Nestle Waters N. Am. Inc.</u>, 123 F. Supp. 3d

357, 378 (N.D.N.Y. 2015) ("[T]he Donnelly Act is governed by the Sherman Act standards.")  As

such, the Court will analyze Counts VI and VIII (the "Section 2 claims") together, as well as Counts

VII, IX, and X (the "Section 1 claims") together.[15]

In the Motion to Dismiss the Amended Complaint, Defendant asserts numerous arguments

in support of dismissing Plaintiffs' Antitrust Claims, including the following:  (1) Plaintiffs lack

antitrust standing because they fail to allege an antitrust injury; (2) Plaintiffs fail to state valid

Section 2 claims under the essential facility doctrine; and (3) Plaintiffs fail to state valid Section 1

---

[15] The parties agree that the state law claims should be analyzed together with the respective federal claims.  (<u>See</u> Doc. No. 25-2 at 77; Doc. No. 27 at 58 n.18, 63 n.22.)  Given this agreement, the Section 1 and 2 claims and their state law counterparts will be referred throughout this Opinion as either the "Section 1 claims" and "Section 2 claims."

claims because they fail to allege that Defendant engaged in a conspiracy to exclude Plaintiffs. (Doc. No. 25-2 at 67.)  As explained further below, while Plaintiffs have adequately alleged an antitrust injury, because Plaintiffs have failed to state valid Section 2 claims under the essential facility doctrine, the Court will dismiss Plaintiffs' Section 2 claims.[16]  Moreover, because Plaintiffs fail to sufficiently allege that Defendant engaged in an antitrust conspiracy to exclude Plaintiff Howard Taylor from competing at Defendant's racetracks, the Court will dismiss Plaintiffs' Section 1 claims as to the conspiracy to exclude Howard Taylor.  However, since the Court finds that Plaintiffs have stated viable Section 1 claims concerning Defendant's alleged conspiracy to exclude Plaintiff Judith Taylor from competing at Defendant's racetracks, the Court will decline to dismiss Plaintiffs' Section 1 claims as to the conspiracy to exclude Judith Taylor.

### 1.    Plaintiffs Sufficiently Allege an Antitrust Injury

In addition to Article III standing, courts have determined that antitrust plaintiffs must also have antitrust standing.[17]  See Host Int'l, Inc. v. MarketPlace, PHL, LLC, 32 F.4th 242, 248 (3d Cir. 2022) (noting that antitrust cases are "subject to an additional, a-textual requirement known as 'antitrust standing'").  When deciding whether a plaintiff has antitrust standing, courts must "consider whether the plaintiff is a proper party to bring a private antitrust action."  Id. at 249 (internal quotations omitted).  To determine if the plaintiff is the "proper party," courts apply the following factors:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for

---

[16]  In the Amended Complaint, Plaintiffs first allege a violation of Sherman Act Section 2 in Counts VI and VIII followed by a violation of Sherman Act Section 1 in Counts VII, IX, and X.  (See Doc. No. 17.)  Because Plaintiffs assert the Section 2 claims first, these claims will be discussed before the Section 1 claims.

[17]  Defendant does not challenge Plaintiffs' Article III standing.

which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

Id.  Here, Defendant argues that Plaintiffs do not have antitrust standing because they have not alleged an antitrust injury, as required by the second factor.[18]

Whether the plaintiff has alleged an antitrust injury is "a threshold requirement in any antitrust case."  Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc., 886 F.3d 332, 343 (3d Cir. 2018).  An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendant['s] acts unlawful."  Host Int'l, 32 F.4th at 249 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).  This means that the plaintiff must plausibly allege that "the challenged conduct affect[s] the prices, quantity or quality of goods or services, not just [the plaintiff's] own welfare."  Id. at 250-51 (alterations in original).  Importantly, antitrust laws were intended to protect "competition, not competitors."  See id. ("[I]t is now 'axiomatic that the antitrust laws were passed for the protection of competition, not competitors.'") (emphasis in original).  Moreover, "a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent, not potential injury."  Id. at 251-52 (emphasis in original, internal quotations omitted).

Here, because the Court must accept Plaintiffs' allegations as true at this stage of the litigation, they have plausibly alleged the existence of an antitrust injury through allegations of Defendant's exclusion of an entire class of owners from participating in harness horse races at Defendant's racetracks.  In the Amended Complaint, Plaintiffs detail how Howard Taylor owns 80% of his horses in partnership with other owners and that Defendant's ban of Howard Taylor

---

[18]  Defendant does not challenge Plaintiffs' antitrust standing under any of the other factors.

extends to these other owners.  (Doc. No. 17 at ¶ 207.)  The Amended Complaint names 70 partners with whom Howard Taylor co-owns horses.  (Id. at ¶ 225.)  Because Defendant's ban extends to Howard Taylor's many partners, Defendant's exclusion of Howard Taylor from racing at his racetracks also excludes what is likely a substantial number of the harness-racing horse owners in the industry.

As a result of Defendant banning a large number of harness-racing horse owners from competing at his tracks, Plaintiffs allege that this exclusion "substantially suppresses competition in the markets for racing . . . ."  (Doc. No. 17 at ¶ 269.)  In other words, by excluding at least 70 harness-racing horse owners from participating in races at Defendant's racetracks, Plaintiffs allege that Defendant's anticompetitive conduct injured the harness-racing horse competition by hurting the competitive quality of the races.  (See id. at ¶¶ 207, 225.)  As such, because Plaintiffs have adequately alleged an antitrust injury that affects not only their own welfare but also the welfare of the harness racing competition as a whole, they have established antitrust standing.

### 2. Plaintiffs Fail to Sufficiently Allege a Violation of Section 2

Section 2 of the Sherman Act prohibits a person from monopolizing, attempting to monopolize, or conspiring with any person to monopolize "any part of the trade or commerce among the several States."  15 U.S.C. § 2.  Here, Plaintiffs allege that Defendant violated Section 2 by way of the essential facility doctrine.[19]  (See Doc. No. 44 at 7.)  Specifically, Plaintiffs allege that "through his ownership of his three racetracks [Defendant] is a monopolist illegally denying access to an essential facility."  (Id.)

---

[19]  As Defendant notes, even though Plaintiffs characterize their Section 2 claims as arising under the essential facility doctrine, the words "essential facility" do not appear in the Amended Complaint.  (Doc. No. 41 at 23; see generally Doc. No. 17.)

The essential facility doctrine "is implicated 'where a monopolist controls a facility that its competitors need access to if they are to compete effectively.'" SEI Glob. Servs., Inc. v. SS&C Advent, 496 F. Supp. 3d 883, 898 (E.D. Pa. 2020) (quoting Monarch Ent. Bureau, Inc. v. N.J. Highway Auth., 715 F. Supp. 1290, 1300 (D.N.J. 1989), aff'd, 893 F.2d 1331 (3d Cir. 1989)). To prevail under the essential facility doctrine, a plaintiff must prove the following:

> (1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.

Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 748 (3d Cir. 1996). Importantly, to prove that the facility at issue is an essential facility, the plaintiff must prove that it "is not merely helpful but vital to the claimant's competitive viability." Monarch Ent. Bureau, 715 F. Supp. at 1300. Put differently, "a facility is only 'essential' where it is otherwise unavailable." SEI Glob. Servs., 496 F. Supp. 3d at 899. At most, courts have held that the essential facility doctrine should extend to "facilities that are a natural monopoly, facilities whose duplication is forbidden bylaw [sic], and perhaps those that are publicly subsidized and thus could not practicably be built privately." Monarch Ent. Bureau, 715 F. Supp. at 1300. Furthermore, in order to prove denial of the use of the facility to a competitor as required by the third prong, the plaintiff must prove "an absolute denial" of use. SEI Glob. Servs., 496 F. Supp. 3d at 899.

Here, Plaintiffs' fail to adequately allege a Section 2 violation because they did not, and cannot, plausibly allege that the racetracks from which Defendant denied them access are essential facilities. As Plaintiffs allege, Defendant has banned them from competing at the Meadowlands, Tioga Downs, and Vernon Downs racetracks. (Doc. No. 17 at ¶¶ 283-84.) And while Plaintiffs have explained the prestige associated with racing at these tracks, the Meadowlands, Tioga Downs, and Vernon Downs are not the only harness racing tracks available to Plaintiffs. (See id. at ¶¶ 50,

53-59.)  For example, the Amended Complaint describes how the Hambletonian Society, a non-profit organization that sponsors harness horse races, holds races at 13 racetracks in North America.  (<u>Id.</u> at ¶ 101.)  Plaintiffs are only banned by Defendant from racing at 3 of these racetracks.

Plaintiffs argue that competing at the Meadowlands, Tioga Downs, and Vernon Downs is vital to their competitive viability as harness-racing horse owners because these tracks "are the premier racetracks for elite harness racing horses," in that they "host the all-important Championship races."  (Doc. No. 44 at 21.)  While Plaintiffs acknowledge that there are other racetracks at which they can compete, they assert that this fact "ignores the unique nuances of harness racing, including the need for access to championship races."  (<u>Id.</u>)  But, unfortunately for Plaintiffs, the essential facility doctrine requires the facility to be <u>vital</u>, not merely unique, to their competitive viability.  "Every facility is unique in some way," but for Plaintiffs to succeed under the essential facility doctrine, they "must show that it is vital."  <u>See</u> <u>Monarch Ent. Bureau</u>, 715 F. Supp. at 1301.  Instead, Plaintiffs have only alleged that competing at the Meadowlands, Tioga Downs, and Vernon Downs would be helpful, rather than vital, to their competitive viability as harness-racing horse owners and in this regard, they have failed to establish that these racetracks are essential facilities.

Moreover, Plaintiffs also fail to allege an absolute denial of their use of the Meadowlands, Tioga Downs, and Vernon Downs.  As the Amended Complaint explains, there are "a few exceptions" to Defendant's ban of Plaintiffs from competing in harness racing events at these racetracks.  (<u>See</u> Doc. No. 17 at ¶¶ 27, 103.) While Plaintiffs are banned from "most Hambletonian Society administered stake races run at the Meadowlands, Vernon Downs, and Tioga Downs . . . there would be exceptions for the Hambletonian, Hambletonian Oaks, and the Hambletonian

Maturity." (Id. at ¶¶ 102-03.)  Therefore, because Defendant's ban of Plaintiffs from competing at the Meadowlands, Tioga Downs, and Vernon Downs is not an "absolute denial" of their use of these tracks, Plaintiffs are unable to establish the third prong required under the essential facility doctrine.  Accordingly, because Plaintiffs fail to establish that the Meadowlands, Tioga Downs, and Vernon Downs are essential facilities and that their ban from these tracks is an "absolute denial," their Section 2 claims under the essential facility doctrine fail and Defendant's Motion to Dismiss the Amended Complaint will be granted as to Plaintiffs' Section 2 claims (Counts VI and VIII).

### 3.    Plaintiffs Sufficiently Allege, In Part, a Violation of Section 1

Section 1 of the Sherman Act prohibits "[e]very . . . conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  To state a claim under Section 1, a plaintiff must show (1) that the defendant was a party to a conspiracy and (2) "that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade."  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 315 (3d Cir. 2010).

Here, Plaintiffs allege Defendant unreasonably restrained trade by becoming party to a conspiracy "to enact an illegal group boycott of Howard Taylor and Judith Taylor."[20]  (Doc. No. 17 at ¶ 256; Doc. No. 27 at 58.)  But Plaintiffs allege the existence of two different conspiracies: one conspiracy to exclude Judith Taylor, and the other conspiracy to exclude Howard Taylor.  (See Doc. No. 17 at ¶¶ 260, 266.)  Specifically, Plaintiffs allege that "[Defendant], the Meadowlands, Vernon Downs, and Tioga Downs have conspired to enact an improper ban of Judith Taylor," while "[Defendant], Buffalo Raceway, Batavia Downs, the Meadowlands, Vernon Downs, and Tioga

---

[20]  As mentioned above, Plaintiffs' Sherman Act Section 1 claims are pled in the alternative to their Section 2 claims in case "discovery reveal[s] that Gural's ownership interest is sufficiently small that he does not effectively control Meadowlands, Vernon Downs, and Tioga Downs" as necessary for the viability of Plaintiffs' Section 2 claims.  (Doc. No. 27 at 57-58.)

Downs have conspired to enact an improper ban of Howard Taylor." (Id. at ¶ 260.)  For reasons explained below, Defendant's Motion to Dismiss Plaintiffs' Section 1 claims (Counts VII, IX, and X) will be denied as to the Section 1 claims brought by Plaintiff Judith Taylor, but granted as to the Section 1 claims brought by Plaintiff Howard Taylor.  In other words, Plaintiff Judith Taylor's Section 1 claims against Defendant will survive Defendant's Motion to Dismiss the Amended Complaint while Plaintiff Howard Taylor's Section 1 claims will be dismissed.

### a.    Plaintiffs Allege Defendant Was a Party to a Conspiracy to Exclude Judith Taylor

To establish the defendant was a party to a conspiracy, the Third Circuit Court of Appeals has held that the plaintiff must show "some form of concerted action," meaning "a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme."  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 315 (3d Cir. 2010) (quotations omitted).  In other words, the plaintiff must plead the existence of an agreement.  See id. ("Put more succinctly, '[t]he existence of an agreement is the hallmark of a Section 1 claim.'")  One way a plaintiff can establish the existence of an agreement is through evidence of a group boycott.  A group boycott is "a concerted refusal[] to deal."  Comar, Inc. v. Nissan Motor Corp. in U.S.A., 678 F. Supp. 1091, 1095 (D. Del. 1988).  A plaintiff can show the defendant acted as part of a group boycott through either direct or circumstantial evidence.  See In re Chocolate Confectionary Antitrust Litig., 999 F. Supp. 2d 777, 786 (M.D. Pa. 2014) ("[C]ourts allow antitrust plaintiffs to prove their case in one of two ways: by presenting direct evidence of an agreement, or by relying on circumstantial evidence and reasonable inferences that may be drawn therefrom.")

Here, Plaintiffs offer direct evidence that is enough to establish at this point in the litigation that Defendant was part of a group boycott or conspiracy to exclude Judith Taylor.  The evidence of the conspiracy is an email sent by Defendant's counsel to Plaintiffs' counsel on May 1, 2024.

(See Doc. No. 44 at 14.)  The Amended Complaint details the contents of this email as follows:
"[B]y email dated May 1, 2024, Gural (through his counsel) relayed that the horses now owned by
Judith Taylor would not be eligible to race at the Meadowlands. This includes the horses that Judith
Taylor previously owned."  (Doc. No. 17 at ¶ 111.)  Plaintiffs submit that this email is direct
evidence of a conspiracy to exclude Judith Taylor because it is a single communication from
Defendant's counsel "informing Plaintiffs' counsel that Judith Taylor was banned from the
Meadowlands, Vernon Downs, and Tioga Downs."  (Doc. No. 44 at 14.)  Plaintiffs claim this single
communication thus "demonstrat[es] that the three racetracks and Gural communicated before
enacting the ban and that the decision to ban Judith Taylor was not parallel, independent conduct."
(Id.)

While the Amended Complaint does not directly aver that the email excluded Judith from
Vernon Downs and Tioga Downs as well as the Meadowlands, it does at least allude to the email's
exclusion of her from these additional racetracks in certain paragraphs.  As stated above, Plaintiffs
allege that the email they are offering as direct evidence of conspiracy was sent from Defendant's
counsel to Plaintiffs' counsel on May 1, 2024.  (Doc. No. 17 at ¶ 111.)  Paragraph 111 is the only
paragraph in the Amended Complaint that directly references the May 1, 2024 email, stating that
"by email dated May 1, 2024, Gural (through his counsel) relayed that the horses now owned by
Judith Taylor would not be eligible to race at the Meadowlands."  (Id. (emphasis added).)
Noticeably missing from this paragraph restating the email's contents is any mention of Judith
Taylor being banned from competing at Vernon Downs and Tioga Downs.[21]  (See generally id.)

---

[21]  The May 1, 2024 email has not been submitted as part of the record.  As such, the Court only
has the Plaintiffs' allegations in the Amended Complaint to rely on regarding the email's
contents.

However, several other paragraphs in the Amended Complaint allege that Defendant banned Judith Taylor from racing at Vernon Downs and Tioga Downs on May 1, 2024, the same day Defendant's counsel emailed Plaintiffs' counsel about Judith Taylor's ban from competing at the Meadowlands.  (See id. at ¶¶ 26, 111, 265.)  For example, the Amended Complaint alleges that "on May 1, 2024, Gural (through his counsel) arbitrarily determined that Judith Taylor would be excluded from racing the horses she purchased for fair market value at the Meadowlands, Vernon Downs, and Tioga Downs."  (Id. at ¶ 26 (emphasis removed).)  Similarly, the Amended Complaint alleges in another paragraph that "[b]eginning May 1, 2024 and continuing to today, Judith Taylor has been prohibited from racing any harness-racing horses she owns at the Meadowlands, Vernon Downs, and Tioga Downs."  (Id. at ¶ 265.)

As such, viewing Plaintiffs' well-pleaded allegations in the light most favorable to them, the Court will construe Plaintiffs' allegations regarding the contents of the email to mean the email banned Judith Taylor from competing at the Meadowlands, Vernon Downs, and Tioga Downs rather than just the Meadowlands.  Accordingly, through Plaintiffs' allegations in the Amended Complaint, they have alleged direct evidence to establish at this point in the litigation that Defendant was a party to a group boycott or conspiracy to exclude Judith Taylor.[22]

---

[22] Whether Defendant is capable of conspiring with the Meadowlands, Vernon Downs, and Tioga Downs, racetracks which he at least partially owns, is an issue best left for after discovery.  The United States Supreme Court has held that "a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1."  Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771 (1984).  Put differently, a wholly owned subsidiary of a parent company is not capable of conspiring with the parent company for purposes of § 1 of the Sherman Act.  And while Copperweld only extends to wholly owned subsidiaries, the Third Circuit has "extended Copperweld to permit a de minimis deviation of 99.92% ownership from 100% ownership and recognized that courts have deviated in situations where parental ownership was in the 80% to 91.9% range."  In re Mushroom Direct Purchaser Antitrust Litig., 621 F. Supp. 2d 274, 289 (E.D. Pa. 2009) (citing Siegel Transfer, Inc. v. Carrier Exp., Inc., 54 F.3d 1125, 1133, 1133 n.7 (3d Cir. 1995)).

>    **b.**    **Plaintiffs Fail to Allege Defendant Was a Party to a Conspiracy to Exclude Howard Taylor**

As mentioned above, a plaintiff may also show the defendant acted as part of a group boycott through circumstantial evidence.  See In re Chocolate Confectionary Antitrust Litig., 999 F. Supp. 2d at 786.  If the plaintiff is relying on circumstantial evidence, he must establish "both 'conscious parallelism' and certain 'plus' factors."  Id.  Members of a conspiracy engage in consciously parallel behavior when "each [is] aware of the others' conduct and this awareness [is] an element in their decision-making process."  Id.  "To establish a conspiracy based on consciously parallel behavior, a plaintiff must show: (1) that the defendants' behavior was parallel; (2) that the defendants were conscious of each other's conduct and that this awareness was an element in their decision-making processes; and (3) certain 'plus' factors."  Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1242-43 (3d Cir. 1993).  Courts have identified "at least three such plus factors: (1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.'"  In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 (3d Cir. 2004).

Here, because Plaintiffs present no direct evidence that Defendant was a party to a conspiracy to exclude Howard Taylor and also offer no circumstantial evidence of such an agreement, they fail to establish that Defendant was party to a conspiracy to exclude Howard

---

Thus, whether Defendant is capable of conspiring with the Meadowlands, Vernon Downs, and Tioga Downs depends on whether he owns a substantial-enough portion of these racetracks for Copperweld immunity to apply.  (See Doc. No. 44.) And because "there is not enough publicly available information for Plaintiffs or the Court to know" Defendant's ownership interests in these three racetracks, this is an issue to be determined through discovery.  (Id.)

Taylor. [23]  First, Plaintiffs allege Defendant's conduct was parallel with his alleged co-conspirators in that he, Buffalo Raceway, Batavia Downs, the Meadowlands, Vernon Downs, and Tioga Downs each decided to exclude Howard Taylor from competing at their racetracks.  (See Doc. No. 17 at ¶¶ 8-9, 129.)  Second, Plaintiffs also allege that Defendant and his alleged co-conspirators were conscious of each other's conduct and that this awareness was an element in their decision-making process.  For example, Plaintiffs allege that Defendant, "through an agreement between [himself], the Meadowlands, Vernon Downs, and Tioga Downs," banned Howard Taylor from competing at these tracks.  (Id. at ¶ 9.)  Moreover, Plaintiffs allege that Buffalo Raceway and Batavia Downs became aware of these decisions to exclude Howard Taylor "as a result of Defendant's defamatory statements" and decided to also ban Howard Taylor from racing at their tracks.  (Id. at ¶ 129.)  As such, through these allegations, Plaintiffs have established that Defendant, Buffalo Raceway, Batavia Downs, the Meadowlands, Vernon Downs, and Tioga Downs engaged in consciously parallel conduct in banning Howard Taylor from competing at their racetracks.

However, Plaintiffs fail to establish the extra "plus factors" needed to show through circumstantial evidence that Defendant acted as part of a group boycott.  Concerning the first plus factor, Plaintiffs allege that Defendant had a motive to conspire, claiming he benefits from such a conspiracy "because his anticompetitive actions increase the value of his own horses by increasing the likelihood that they win and by making it more likely that his horses will be among the very few with breeding value."  (Id. at ¶ 141.)  But these assertions are based on pure speculation.

---

[23]  Of note, the May 1, 2024 email put forth by Plaintiffs as direct evidence that Defendant conspired with the Meadowlands, Vernon Downs, and Tioga Downs to exclude Judith Taylor does not also serve as direct evidence of a conspiracy between Defendant and the racetracks to exclude Howard Taylor.  As pled in the Amended Complaint, the email only stated "that the horses now owned by Judith Taylor would not be eligible to race . . . ." (Doc. No. 17 at ¶ 111 (emphasis added).)  Because the email makes no mention of banning Howard Taylor, it cannot serve as direct evidence of a conspiracy to ban Howard Taylor.

Plaintiffs cannot know how Defendant's horses would perform against other harness-racing horses, nor how Howard Taylor's horses, had they been allowed to compete, would have performed. Instead, they may only speculate that without Howard Taylor's horses competing, Defendant's horses will perform better. But to establish that Defendant was a party to a conspiracy, Plaintiffs' claims must rise "above the speculative level." See In re Ins. Brokerage Antitrust Litig., 618 F.3d at 319 ("[C]ourts evaluating the viability of a complaint under Rule 12(b)(6) must look beyond conclusory statements and determine whether the complaint's well-pled factual allegations, taken as true, are 'enough to raise a right to relief above the speculative level.'") (quoting Twombly, 550 U.S. at 555). As such, Plaintiffs' speculative allegations regarding Defendant's motive are insufficient to establish the first plus factor.

Plaintiffs also have not adequately alleged the second plus factor, that Defendant acted contrary to his interests. Plaintiffs argue that they alleged Defendant acted contrary to his interests by submitting that Defendant, as a racetrack owner, has an interest in increasing "the number of owners who enter their horses into races at [his] track." (Doc. No. 17 at ¶ 271.) But "[e]vidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." In re Flat Glass Antitrust Litig., 385 F.3d at 360-61. And, as the Amended Complaint makes clear, Defendant's act of banning Howard Taylor from competing at his racetracks was not contrary to Defendant's interest as a racetrack owner. Plaintiffs explain in their Amended Complaint that the value of a harness-racing horse is directly tied to its performance: "[t]he value of a harness-racing horse is largely determined by its ability to win races and, given the nature of the sport, only racing against the other 'best' harness-racing horses in various races will allow a horse of any given age to 'prove' itself." (Doc. No. 17 at ¶ 46.) Therefore, as Defendant explains, "it would be entirely rational for

racetracks to prevent horses suspected of using performance-enhancing substances from devaluing horses that would otherwise win those races." (Doc. No. 30 at 22.)

Said differently, Defendant, as a racetrack owner, had an interest in ensuring the horses competing at his tracks do not defile the competition by cheating through the use of performance-enhancing drugs. And deciding to ban a horse owner accused, falsely or not, of using such performance-enhancing drugs on his horses is a rational way for a racetrack owner wishing to protect against cheating to act. And while Plaintiffs argue that Defendant's ban of Howard Taylor was against his interests as a racetrack owner, the "obvious alternative explanation" for Defendant's ban makes Plaintiffs' argument as to the second plus factor deficient. See In re Ins. Brokerage Antitrust Litig., 618 F.3d at 322-23 ("'[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.' Put differently, allegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged.") (quoting Twombly, 550 U.S. at 557, 567).

Finally, Plaintiffs fail to allege plausible facts implying a traditional conspiracy as required by the third plus factor. Evidence implying a traditional conspiracy "consists of non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." Id. at 322 (internal quotations omitted). Plaintiffs argue they put forth evidence implying a traditional conspiracy by showing Defendant, the Meadowlands, Vernon Downs, and Tioga Downs had an opportunity to conspire because Defendant has an ownership interest in each of those tracks which, Plaintiffs assert, "provides each an opportunity to conspire." (Doc. No. 44 at 15.) But Defendant

having an ownership interest in each of the Meadowlands, Vernon Downs, and Tioga Downs is not evidence of an actual agreement not to compete. And "[p]roof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." <u>Petruzzi's IGA Supermarkets</u>, 998 F.2d at 1235.

Moreover, Plaintiffs submit that Defendant's statements in the Meadowlands Press Release, the <u>Thoroughbred Daily News</u> article, and on the conference call with a few of his associates and three members of the SBOA Board were an invitation to Buffalo Raceway and Batavia Downs to join in the conspiracy to exclude Howard Taylor. (<u>Id.</u>) But, at most, these allegations merely demonstrate that Defendant and the racetracks engaged in consciously parallel behavior. As Defendant points out, "neither the Press Release, the Article, nor the SBOA conference call invited or encouraged any racetrack or other entity to exclude any individuals. It merely made facts known, which other tracks were free to follow, ignore, or reject." (Doc. No. 30 at 21.) Put differently, that both Buffalo Raceway and Batavia Downs decided to exclude Howard Taylor from competing at their tracks after reading that he was accused of giving performance-enhancing drugs to his horses is not evidence of a conspiracy. Instead, it is evidence of Buffalo Raceway's and Batavia Downs' consciously parallel decision-making once they were made aware of the same facts Defendant, the Meadowlands, Vernon Downs, and Tioga Downs knew of when they decided to exclude Howard Taylor. Because Plaintiffs fail to offer evidence implying a traditional conspiracy between Defendant, the Meadowlands, Vernon Downs, Tioga Downs, Buffalo Raceway, and Batavia Downs, they have not established the third plus factor.

Without establishing any of the three plus factors, Plaintiffs have only alleged that Defendant, Buffalo Raceway, Batavia Downs, the Meadowlands, Vernon Downs, and Tioga Downs engaged in consciously parallel conduct. And engaging in consciously parallel decision-

making is not enough, without more, to establish circumstantial evidence of a conspiracy.  See

Lifewatch Servs. Inc. v. Highmark Inc., 902 F.3d 323, 332-33 (3d Cir. 2018) ("[A] claim based on

parallel—even consciously parallel—conduct alone would be sufficient to survive dismissal . . .

.")  Accordingly, because Plaintiffs have failed to allege that Defendant was a party to a conspiracy

to exclude Plaintiff Howard Taylor, Plaintiffs' Section 1 claims brought by Howard Taylor fail and

Defendant's Motion to Dismiss Plaintiffs' Section 1 claims (Counts VII, IX, and X) as to Howard

Taylor will be granted.

### c.    Plaintiffs Allege the Conspiracy to Exclude Judith Taylor Was a Per Se Violation of Section 1

When determining whether the defendant imposed an unreasonable restraint on trade, the

court should analyze the defendant's action "under either the per se standard or the rule of reason

standard," depending on the type of restraint alleged.  Premier Comp Solutions LLC v. UPMC,

377 F. Supp. 3d 506, 536-37 (W.D. Pa. 2019).  Here, Plaintiffs allege that Defendant's action

constituted a per se violation but, in the alternative, also allege that Defendant's actions violate the

rule of reason standard.  (See Doc. No. 17 at ¶¶ 273-74.)  Because the Court finds that Plaintiffs

have plausibly alleged a claim under the per se analysis, it will not assess whether Plaintiffs have

also adequately alleged that Defendant's actions violate the rule of reason standard.

"Per se illegality 'is reserved for only those agreements that are so plainly anticompetitive

that no elaborate study of the industry is needed to establish their illegality.'"  Burtch v. Milberg

Factors, Inc., 662 F.2d 212, 222 (3d Cir. 2011).  A plaintiff states a per se violation of Section 1

"solely by alleging the conduct."  Cemar, Inc. v. Nissan Motor Corp. in U.S.A., 678 F. Supp. 1091,

1095 (D. Del. 1988).  As such, "[u]nder the per se standard, plaintiffs are relieved of the obligation

to define a market and prove market power."  In re Ins. Brokerage Antitrust Litig., 618 F.3d at 316.

Courts have developed a list of activities that qualify as per se violations, including certain types

of group boycotts.  See Cemar, 678 F. Supp. at 1095 ("The Supreme Court has held that certain group boycotts are per se violations of the Sherman Act.")  Specifically, "a concerted activity is a per se group boycott if the 'purpose is to' exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both."  Id. at 1096.

However, the Supreme Court has held that a group boycott is not per se illegal unless it involves horizontal agreements among direct competitors.  NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998) ("[P]recedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors.")  A horizontal agreement is "an agreement between competitors at the same market level."  In re Ins. Brokerage Antitrust Litig., 618 F.3d at 318.  In contrast, a vertical agreement is a restraint on trade "imposed by agreement between firms at different levels of distribution."  Irish v. Ferguson, 970 F. Supp. 2d 317, 367 (M.D. Pa. 2013).

Here, accepting Plaintiffs' allegations as true, Plaintiffs adequately allege that Defendant committed a per se violation of Section 1.  First, Plaintiffs allege that the group boycott consisting of Defendant, the Meadowlands, Vernon Downs, and Tioga Downs is a horizontal agreement.  As discussed above, Plaintiffs claim that Defendant, "the Meadowlands, Vernon Downs, and Tioga Downs have conspired to enact an improper ban of Judith Taylor."  (Doc. No. 17 at ¶ 260.)  Moreover, Plaintiffs explain that Defendant "has an ownership interest in . . . the Meadowlands, Vernon Downs, and Tioga Downs."  (Id. at ¶ 257.)  As such, Plaintiffs have alleged that the group boycott consisting of Defendant, as a partial owner of the racetracks, and the Meadowlands, Vernon Downs, and Tioga Downs, as racetracks, is a horizontal agreement because each of the boycott members is a competitor at the same market level:  they each provide harness racing track venues.  (See id. at ¶ 259.)

Moreover, Plaintiffs have also alleged that the purpose of the group boycott was to exclude Judith Taylor from the market of harness racing tracks.  For example, the Amended Complaint makes the following allegations when discussing Defendant expanding the Meadowlands ban to include Judith Taylor:

> 111. <u>Belying Gural's purported motives in enacting the ban</u>, by email dated May 1, 2024, Gural (through his counsel) relayed that the horses now owned by Judith Taylor would not be eligible to race at the Meadowlands. This includes the horses that Judith Taylor previously owned.
>
>         \*\*\*
>
> 114. <u>Gural's purpose is clear</u>: the elimination of fierce competitors.

(<u>Id.</u> at ¶¶ 111, 114 (emphasis added).)  Through these allegations, Plaintiffs establish that the purported purpose of the group boycott between Defendant, the Meadowlands, Vernon Downs, and Tioga Downs was to exclude Judith Taylor from competing to the benefit of Defendant.  Through these allegations, Plaintiffs have adequately pled at this stage of the litigation that Defendant's participation in a group boycott was a <u>per se</u> violation of Section 1 of the Sherman Act.

Accordingly, Defendant's Motion to Dismiss the Section 1 claims (Counts VII, IX, and X) will be denied on the Section 1 claims brought by Judith Taylor.[24]  But, as stated above,

---

[24] Had the Court proceeded to a rule of reason analysis, it would still have declined to dismiss Plaintiff Judith Taylor's Section 1 claims at the current stage of the litigation.  Stating a Section 1 claim under the rule of reason requires the plaintiff to show "that the alleged . . . agreement produced adverse, anticompetitive effects within the relevant product and geographic markets." <u>United States v. Brown Univ.</u>, 5 F.3d 658, 668 (3d Cir. 1993).  Here, Defendant argues Plaintiffs' Section 1 claims fail under the rule of reason because they did not define a relevant market.

But courts are hesitant on a motion to dismiss to dismiss an antitrust claim for failure to define a relevant market.  <u>See</u> <u>Lifewatch Servs. Inc. v. Highmark Inc.</u>, 902 F.3d 323, 337 (3d Cir. 2018) ("[C]ourts are cautious before dismissing for failure to define a relevant market."); <u>Queen City Pizza, Inc. v. Domino's Pizza, Inc.</u>, 124 F.3d 430, 436 (3d Cir. 1997) ("[I]n most cases, proper

Defendant's Motion to Dismiss the Section 1 claims will be granted on the Section 1 claims brought by Howard Taylor.

### E.    Defendant's Motion to Dismiss the Unfair Competition Claim Will Be Denied

In Count XI, Plaintiff Howard Taylor asserts an unfair competition claim against Defendant. (Doc. No. 17 at ¶¶ 333-40.) Pennsylvania recognizes "a common law claim of unfair competition under the Restatement (Third) of Unfair Competition." Air Prods. & Chems., Inc. v. Inter-Chemical Ltd., No. 03–CV–6140, 2003 WL 22917491, at *12 (E.D. Pa. Dec. 2, 2003). "Under the Restatement, a defendant is liable for unfair competition if: (1) he engages in deceptive marketing, infringement of trademark or other protectable intellectual property, misappropriation of trade secrets, or acts or practices that are actionable under federal or state statutes; and (2) his conduct causes harm to the plaintiff's commercial relations." M3 USA Corp., 516 F. Supp. 3d at 504. In Pennsylvania, courts have recognized claims for unfair competition "where there is evidence of, among other things . . . misrepresentation, [and] tortious interference with contract." Synthes (U.S.A.) v. Globus Medical, Inc., No. 04-CV-1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005).

Here, because the Court found, supra, evidence of misrepresentation and tortious interference with a contract and because Howard Taylor alleges that Defendant's conduct harmed Howard Taylor's commercial relations, Howard Taylor has adequately stated a claim for unfair

---

market definition can be determined only after a factual inquiry into the commercial realities faced by consumers."); Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.")

Because the issue of whether Plaintiffs have defined a relevant market is a question better resolved after the parties have engaged in discovery, the Court would have denied Defendant's Motion to Dismiss the Section 1 claims (Counts VII, IX, and X) regardless of whether it assessed Plaintiffs' claims under the per se rule or the rule of reason.

competition.  In the Amended Complaint, Howard Taylor alleges that Defendant "caused harm to Howard Taylor's commercial relations through his defamatory statements and tortious interference with Howard Taylor's prospective and existing business relationships."  (Doc. No. 17 at ¶ 334.) He elaborates on the harm caused to his commercial relations, stating that Defendant's conduct "continue[s] to harm Howard Taylor's commercial interests by prohibiting him from continuing his business relationships and partnerships with others in connection with racing at the Meadowlands."  (Id. at ¶ 336.)  Howard Taylor claims Defendant's conduct has also harmed his commercial relations "by devaluing Howard Taylor's investment in horses that can no longer participate in certain races" and "influenc[ing] other racetracks to ban Howard Taylor and eliminate competition for Gural's racehorses."  (Id. at ¶¶ 337-38.)  Through these allegations, and because the Court has already concluded that evidence of misrepresentation and tortious interference with a contract exists, Howard Taylor has adequately stated a claim for unfair competition.  Accordingly, Defendant's Motion to Dismiss the Amended Complaint as to Howard Taylor's unfair competition claim (Count XI) will be denied.

### F.      Defendant's Motion to Dismiss Judith Taylor's Tortious Interference with Prospective Economic Advantage Claim Will Be Denied

In Count XII, Plaintiff Judith Taylor brings a claim of tortious interference with prospective economic advantage against Defendant.  (Doc. No. 17 at ¶¶ 341-52.)  In Pennsylvania, a claim for tortious interference with prospective economic advantage, like that for tortious interference with an existing contract, requires the plaintiff to prove the following:

> (1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct.

Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 184 (3d Cir. 1997).

Here, Defendant asserts three arguments as to why Judith has failed to state a tortious interference claim: (1) she fails to plausibly plead the absence of privilege or justification on the part of Defendant; (2) she fails to adequately plead prospective contracts with third parties; and (3) she fails to sufficiently plead non-speculative damages. (See Doc. No. 25-2 at 54-60.) The Court will address each of Defendant's arguments in turn.

### 1. Judith Taylor Plausibly Pleads that Defendant Acted Without Privilege or Justification

As mentioned above, to determine whether a plaintiff has established an absence of privilege or justification on the part of the defendant, proof that the defendant's actions were improper under the circumstances is required. Walnut St. Assocs., 982 A.2d at 98. But unlike for tortious interference of existing contract claims, "Pennsylvania has adopted section 768 of the Restatement (Second) of Torts, which recognizes that competitors, in certain circumstances, are privileged in the course of competition to interfere with others' prospective contractual relationships." Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 215 (3d Cir. 2009).

Under § 768, a competitor does not improperly interfere with their competition's prospective contractual relationships if:

> (a) the relation concerns a matter involved in the competition between the actor and the other and
> (b) the actor does not employ wrongful means and
> (c) his action does not create or continue an unlawful restraint of trade and
> (d) his purpose is at least in part to advance his interest in competing with the other.

RESTATEMENT (SECOND) OF TORTS § 768 (Am. L. Inst. 1979). Comment (e) elaborates on clause (b)'s use of "wrongful means," stating that "the predatory means discussed in § 767 . . . [such as] physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section." RESTATEMENT (SECOND) OF TORTS § 768 cmt. e (Am. L. Inst. 1979). "Courts relying on comment e have interpreted the wrongful means element to require that a

plaintiff, to be successful in a tortious interference action, demonstrate that a defendant engaged in conduct that was actionable on a basis independent of the interference claim. . . . that is, for conduct to be wrongful, it must be actionable for a reason independent from the claim of tortious interference itself." <u>Acumed</u>, 561 F.3d at 215.

Here, because Judith Taylor alleges wrongful conduct by Defendant that is actionable for a reason independent from her claim of tortious interference, namely that Defendant violated Section 1 of the Sherman Act, she plausibly pleads the absence of privilege or justification on the part of Defendant.  In the Amended Complaint, Judith Taylor makes the following allegations concerning Defendant's absence of privilege to interfere with her prospective economic advantage:

> 346. Gural, motivated in part by his desire to limit the competition to his own horses, specifically intended to exclude Judith Taylor from the racing and therefore destroy her relationship with the racetracks. Gural specifically reached out to Howard Taylor to communicate the ban of Judith Taylor.

> 347. Gural's ban of Judith Taylor was malicious because it was illegal. Gural's conduct violates Sections 1 and 2 of the Sherman Antitrust Act.

(Doc. No. 17 at ¶¶ 346-47.)  As seen in these allegations, Judith Taylor alleges Defendant's conduct was wrongful and improper because it violates antitrust law.  The Amended Complaint avers separate claims against Defendant for his alleged violation of various antitrust laws.  (<u>See</u> <u>id.</u> at ¶¶ 238-332 (alleging Defendant violated Sections 1 and 2 of the Sherman Antitrust Act as well as New York and New Jersey antitrust laws).)  And while the Court has concluded, <u>supra</u>, that Plaintiffs failed to state a valid claim under Section 2 of the Sherman Act, Plaintiff Judith Taylor has sufficiently alleged a claim under Section 1 of the Act.  As such, Judith Taylor has plausibly pled that Defendant engaged in wrongful conduct without privilege or justification.

2.      **Judith Taylor Plausibly Pleads Prospective Contracts with Third Parties**

As noted above, to succeed on a claim for tortious interference with prospective economic advantage, a plaintiff must prove the existence of a prospective contractual relation.   Kachmar, 109 F.3d at 184.  To do so, the plaintiff must establish the "reasonable likelihood or probability" of future business relations with third parties.  Glenn v. Point Park Coll., 272 A.2d 895, 898-99 (Pa. 1971).  "This must be something more than a mere hope or the innate optimism . . . ."  Id. at 899.  Instead, the plaintiff should show that "but for the wrongful acts of the defendant, it is [r]easonably probable that the plaintiff would have" entered into business with the third party.  Id. A plaintiff may allege prospective contracts with third parties through allegations of its past business relationships.  See Berry Metal Co. v. Smith, No. 2:18-CV-01024, 2019 WL 2433913, at *5 (W.D. Pa. May 10, 2019) (finding the prospective contracts with third parties element was met because the plaintiff had alleged "a prospective contractual and/or economic relationship with [a third party] by virtue of its past business relationship" with the third party).

Here, Plaintiff Judith Taylor has adequately alleged prospective contracts with third parties because she alleged that but for Defendant's actions, she would have continued competing in harness racing events at the Meadowlands, Vernon Downs, and Tioga Downs.  The Amended Complaint explains that Judith Taylor "has owned horses and participated in harness racing for more than 50 years," including "routinely participat[ing] in races at the Meadowlands, Vernon Downs, and Tioga Downs.  (Doc. No. 17 at ¶¶ 3, 62.)  Further, the allegations in the Amended Complaint plausibly infer that but for Defendant's ban of Judith Taylor, she would have continued to race her horses at these racetracks.  (See id. at ¶¶ 343, 352.)  Moreover, because Judith Taylor would have continued competing at these racetracks, she alleges that "there is a reasonable probability that [she] would have received the economic benefits of racing the horses she [owns] .

60

. . at the Meadowlands, Vernon Downs, and Tioga Downs." (Id. at ¶ 352.)  This reasonable probability is supported by the allegation that Judith Taylor has "historically won millions of dollars through racing horses at" these racetracks, meaning that "as a result of [Defendant's] conduct, Judith Taylor has likely lost potential winnings from the Meadowlands, Vernon Downs, and Tioga Downs races." (Id. at ¶ 133.)  Through these allegations, Judith Taylor has plausibly pled prospective contracts with third parties.

### 3.    Judith Taylor Plausibly Pleads Non-Speculative Damages

Finally, to state a claim for tortious interference with prospective economic advantage, a plaintiff must allege actual damage resulting from the defendant's conduct.  Kachmar, 109 F.3d at 184.  As described for Howard Taylor's tortious interference claim, the Restatement (Second) of Torts defines "actual damages" as follows:  (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.  RESTATEMENT (SECOND) OF TORTS § 774A (Am. L. Inst. 1979).

Here, Judith Taylor has pled actual, rather than speculative, damages in the form of both financial and reputational damages.  In the Amended Complaint, Judith Taylor alleges that she suffered financially from Defendant's ban because, "[i]n short, [she] purchased horses that she will be unable to race in the precise events for which she purchased and trained them." (Doc. No. 17 at ¶ 132.)  Judith Taylor further submits she "has suffered and will continue to suffer reputational losses for the implication that her [ban from] participation in Meadowlands races is connected to [the] purchase and/or use of illegal performance-enhancing drugs, despite not a shred of evidence connecting Judith Taylor to any such conduct." (Id. at ¶ 135.)  As such, because Judith Taylor alleges both financial and reputational harms stemming from Defendant's conduct, she has adequately alleged actual, non-speculative damages.

In sum, Plaintiff Judith Taylor has plausibly pled the absence of privilege or justification on the part of Defendant, prospective contracts with third parties, and non-speculative damages, in addition to the other requisite elements of her claim for tortious interference with prospective economic advantage.  For these reasons, Defendant's Motion to Dismiss the Amended Complaint will be denied on this claim (Count XII).

### G.    Defendant's Motion to Dismiss the Promissory Estoppel Claim Will Be Granted

Finally, in Count XIII, Plaintiffs assert a claim for promissory estoppel against Defendant. (Id. at ¶¶ 353-60.)  In Pennsylvania, to state a claim for promissory estoppel, a plaintiff must prove the following:  "1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise."  Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000).

Here, Plaintiffs' promissory estoppel claim fails because they have not plausibly alleged that Defendant made a promise.  In the Amended Complaint, Plaintiffs allege that Defendant, through the Meadowlands Press Release, promised those named in the Press Release that if they sold their ownership interests in their horses, the horses would be permitted to resume racing at the Meadowlands.  (See Doc. No. 17 at ¶ 354.)  Specifically, Plaintiffs base their claim on the following language from the Press Release:  "[Meadowlands would] allow owners, should they choose, an opportunity to change trainers and/or horses in partnership with excluded owners."  (Id. at ¶ 354.)

But in making this claim, Plaintiffs ignore the context of the rest of the Press Release from which this statement was pulled:

We believe this timeframe <u>will also allow owners, should they choose, an</u> <u>opportunity to change trainers and/or horses in partnership with excluded owners.</u> We anticipate the Meadowlands investigation will be time consuming.

We also expect that additional disclosures will be released, and if so, where warranted, the Meadowlands will act on that information. <u>We will also require that</u> <u>any change of trainers or dissolution of any partnerships with excluded owners will</u> <u>require proof to the satisfaction of The Meadowlands.</u> We believe these steps are warranted per the revelations from the above prosecutions and are necessary in the interest of the industry we all love and wish to preserve.[25]

(<u>See</u> Doc. No. 25-7, Ex. 5 (emphasis added).)  Read in context, the statement relied on by Plaintiffs cannot be understood as a promise by Defendant that if those banned from racing at the Meadowlands sell their ownership interests in their horses, the horses would then be allowed to resume racing at the Meadowlands.  Instead, the context of the Press Release makes clear that any change in ownership of a horse from a banned owner to a third party would require "proof to the satisfaction of The Meadowlands" before the horse is once again allowed to race at the Meadowlands.

Therefore, when the Press Release banned Howard Taylor from racing the horses he owns at the Meadowlands and he subsequently transferred his ownership interests in ten horses to Judith Taylor, the Press Release left it up to the Meadowlands' discretion as to whether these horses would be permitted to race at the Meadowlands.  In choosing not to permit these horses to race at the Meadowlands, even though Howard Taylor's ownership interest in the horses had been transferred

---

[25] As noted above, it is appropriate for the Court to consider the Meadowlands Press Release at the motion to dismiss stage because it is repeatedly referred to in the Plaintiffs' Amended Complaint, is attached as an exhibit to Defendant's Motion to Dismiss, and serves as the basis for Plaintiffs' promissory estoppel claim.  (<u>See</u> Doc. No. 17 at ¶¶ 8, 19, 24, 77-84, 90, 92, 110, 119, 207, 354-55); <u>see</u> <u>also</u> <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d at 1426 (finding that, at the motion to dismiss stage, the plaintiff "cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them" in the complaint); <u>Estate of Roman</u>, 914 F.3d at 796 (holding that, at the motion to dismiss stage, a court "can also consider documents that a defendant attaches as an exhibit to a motion to dismiss, if they are undisputedly authentic and the plaintiff's claims are based on them").

to Judith Taylor in a bona fide transaction, Defendant broke no promises.  In fact, from the Press Release, one was never made.  Accordingly, even when construing the language of the Press Release in the light most favorable to them, Plaintiffs have failed to allege that Defendant made a promise.  Consequently, Defendant's Motion to Dismiss the Amended Complaint will be granted as to Plaintiffs' promissory estoppel claim (Count XIII).

### H. Plaintiffs' Request for Leave to Amend Their Amended Complaint Will Be Denied

Finally, in their Supplemental Memorandum, Plaintiffs requested leave to amend their Amended Complaint in the event the Court dismisses any of their claims.  (See Doc. No. 44 at 31 n.16.)  Because the Court will dismiss Count VI, Count VIII, and Count XIII, as well as partially dismiss Counts VII, IX, and X, from the Amended Complaint, whether Plaintiffs should be granted leave to amend these claims becomes ripe for analysis.

"After amending once or after an answer has been filed, [a party] may amend only with leave of court or the written consent of the opposing party, but 'leave shall be freely given when justice so requires.'"  Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000) (quoting Fed. R. Civ. P. 15(a)).  Whether to grant or deny leave to amend is within the discretion of the District Court.  Id. "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

### 1. Amendment of Plaintiffs' Sherman Act Section 2 Claims (Count VI and Count VIII) Would Be Futile

Plaintiffs' request for leave to amend their Section 2 claims is futile because they base their Section 2 claims on the essential facility doctrine, but they have not plausibly alleged, nor could they, that the racetracks from which they are excluded are essential facilities nor that their exclusion from these tracks is an absolute denial.  See Monarch Ent. Bureau, 715 F. Supp. at 1300

(explaining that a claim under the essential facility doctrine requires proof that the facility is essential, meaning vital and not merely helpful to the plaintiff's competitive viability in the market); see also SEI Glob. Servs., 496 F. Supp. 3d at 899 (stating that, in order to prove the defendant denied the plaintiff use of the essential facility, the plaintiff must prove "an absolute denial" of use).

As the Court has already noted, Plaintiffs are only excluded from competing at 3 of the 13 harness racing tracks in North America. (See Doc. No. 17 at ¶ 101.) And while these 3 racetracks are unique tracks due to the championship races hosted at these tracks, access to them is merely helpful, rather than vital, to Plaintiffs' competitive viability as harness racing horse owners. Moreover, even if Plaintiffs were permitted to change their Amended Complaint once more to allege the racetracks from which they are banned are essential facilities, Plaintiffs would still fail to state Section 2 claims under the essential facility doctrine because their ban from these tracks is not an absolute denial. As the Court noted, supra, the Amended Complaint explains that there are "a few exceptions" to Defendant's ban of Plaintiffs from competing in harness racing events at these racetracks. (See id. at ¶¶ 27, 103.) Because changing their Amended Complaint will not make the racetracks from which Plaintiffs are banned essential facilities nor the ban of Plaintiffs into an absolute ban, it would be futile to grant Plaintiffs' request for leave to amend their Section 2 claims. Accordingly, Plaintiffs' request for leave to amend their Amended Complaint as to their Section 2 claims (Counts VI and VIII) will be denied.

### 2. Amendment of Plaintiffs' Sherman Act Section 1 Claims (Count VII, Count IX, and Count X) Alleging a Conspiracy to Exclude Howard Taylor Would Be Futile

As part of Plaintiffs' Section 1 claims, they allege that Defendant was party to a conspiracy with the Meadowlands, Vernon Downs, Tioga Downs, Buffalo Raceway, and Batavia Downs to exclude Howard Taylor. But the Court has concluded, supra, that Plaintiff Howard Taylor failed

to put forth either direct or circumstantial evidence of such a conspiracy.  Because nothing in the Amended Complaint nor in the responses in opposition to Defendant's Motion to Dismiss the Amended Complaint indicates that Howard Taylor would be able to come up with such direct or circumstantial evidence of a conspiracy to exclude him, granting leave to amend these Section 1 claims would be futile.  (See Doc. Nos. 17, 27, 44.)

For example, as discussed previously, the allegations as to Howard Taylor of such a conspiracy merely amount to evidence of consciously parallel decision-making, which is part of the legal test when a party relies on circumstantial evidence to prove an antitrust conspiracy.  And he fails to establish the extra "plus factors" needed to make the consciously parallel actions into circumstantial evidence of a group boycott.  Moreover, in requesting leave to amend their Amended Complaint should the Court dismiss their Section 1 claims, Howard Taylor proffers no new facts that would establish that Defendant and his alleged co-conspirators engaged in anything more than consciously parallel actions to exclude Howard Taylor.  Accordingly, Howard Taylor's request for leave to amend the Section 1 claims alleging an antitrust conspiracy to exclude him will be denied.

### 3.    Amendment of Plaintiffs' Promissory Estoppel Claim (Count XIII) Would Be Futile

Plaintiffs base their promissory estoppel claim on the following language from the Meadowlands Press Release:  "[Meadowlands would] allow owners, should they choose, an opportunity to change trainers and/or horses in partnership with excluded owners."  (Doc. No. 17 at ¶ 354.)  Based on this language, Plaintiffs allege that Defendant, through the Meadowlands Press Release, promised those named in the Press Release that if they sold their ownership interests in their horses, the horses would be permitted to resume racing at the Meadowlands.  (See id.)  However, the Court has found, supra, that when the language from the Press Release on which

Plaintiffs rely is fully read in context, it cannot be construed as a promise.  In light of this finding, the Press Release does not reveal the promise as described by Plaintiffs and relied upon in their promissory estoppel claim.  As such, granting Plaintiffs leave to amend their promissory estoppel claim would be futile, and for this reason, Plaintiffs' request for leave to amend their promissory estoppel claim will be denied.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiffs' Amended Complaint (Doc. No. 25) will be granted in part and denied in part.  The claims remaining in the case are as follows:

- Count I:  defamation per se asserted by Plaintiff Howard Taylor
- Count II:  defamation asserted by Plaintiff Howard Taylor
- Count III:  trade libel asserted by Plaintiff Howard Taylor
- Count IV:  false light invasion of privacy asserted by Plaintiff Howard Taylor
- Count V:   tortious interference with contractual relationships asserted by Plaintiff Howard Taylor
- Count VII:   violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, asserted by Plaintiff Judith Taylor
- Count IX:  violation of N.J. State. Ann § 69:9-3 asserted by Plaintiff Judith Taylor
- Count X:  violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340, asserted by Plaintiff Judith Taylor
- Count XI:  unfair competition asserted by Plaintiff Howard Taylor
- Count XII:   tortious interference with prospective economic advantage asserted by Plaintiff Judith Taylor

In addition, Plaintiffs' request for leave to amend their Amended Complaint (see Doc. No. 44 at 31 n.16) will be denied.  An appropriate Order follows.